ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

RICHARD ZEITLIN,

Defendant.

**SEALED INDICTMENT**

23 Cr. _____ (____)

23 CRIM 419

The Grand Jury charges:

## OVERVIEW

1. RICHARD ZEITLIN, the defendant, has controlled and operated telemarketing call centers (the "Zeitlin Call Centers") for decades, including from at least in or about 1994 to in or about 2023. The Zeitlin Call Centers have raised at least approximately hundreds of millions of dollars for charities and political action committees ("PACs") through at least approximately hundreds of thousands of calls to donors and potential donors and various entities that ZEITLIN controlled (the "Zeitlin Entities"). From at least in or about 2017 through at least in or about 2020, ZEITLIN used the Zeitlin Call Centers to defraud numerous donors and potential donors by providing misleading and false information about how the donors' money would be spent and the nature of the organizations to which they were giving. For example, ZEITLIN directed his employees to make calls on behalf of certain PACs that falsely portrayed the PAC as a charity and/or a direct-services organization rather than as a PAC. Even after receiving complaints that the Zeitlin Call Centers were providing false and misleading information to donors and potential donors during fundraising calls, ZEITLIN continued his fraudulent scheme and made efforts to conceal it. The Zeitlin Entities profited from ZEITLIN's fraud, typically keeping a large portion

of each dollar donated—approximately 90 percent—the rest of which was disbursed to the respective PAC.

2.      In or about May 2022, after learning that he and the Zeitlin Entities were under federal investigation, RICHARD ZEITLIN, the defendant, directed at least one of his employees ("CC-1") to instruct other employees of the Zeitlin Entities to delete electronic messages relating to the Zeitlin Call Centers and the operation of the Zeitlin Entities.

## BACKGROUND

3.      PACs are entities registered with the Federal Election Commission ("FEC") that may be tax-exempt, and collect money to advocate on behalf of or against certain causes and political candidates.  By contrast, charities, unlike PACs, typically provide direct services to communities or causes.  Under federal law, independent expenditure-only PACs may raise unlimited contributions provided they do not make expenditures in coordination or in concert with any candidate for federal office or such a candidate's committee. PACs are required to file periodic reports with the FEC providing information about their fundraising and expenditures.  Based on these reports, the FEC provides information about each PAC to the public through a searchable public database that shows, among other things, how much money is raised and spent by each PAC and how that money is spent.

4.      RICHARD ZEITLIN, the defendant, has owned and operated telemarketing call centers (*i.e.*, the Zeitlin Call Centers) for decades, beginning in at least in or about 1994 when he created a particular entity ("Zeitlin Entity-1").  After Zeitlin Entity-1, ZEITLIN opened and operated a number of different entities (*i.e.*, the Zeitlin Entities), in connection with the Zeitlin Call Centers.  In or about 2020, ZEITLIN effectively replaced certain of the Zeitlin Entities with new entities (together, the "New Zeitlin Entities"), also in connection with the Zeitlin Call Centers.

5. Initially, the Zeitlin Call Centers provided telemarketing services principally to charities. In or about 2017, however, RICHARD ZEITLIN, the defendant, decided to shift the business focus of the Zeitlin Call Centers from charity clients to PAC clients. As part of that shift, ZEITLIN encouraged certain prospective clients to operate PACs rather than charities. ZEITLIN transitioned to servicing primarily PACs in part to avoid certain regulations for charities and requirements associated with telemarketing for charities that do not apply to PACs.

6. The Zeitlin Call Centers employed call center employees or telemarketers in the United States and abroad to call potential donors and solicit financial contributions. These phone calls used either a live call center employee following a written script or pre-recorded portions of a script that a call center employee would play in response to statements made by the potential donor (such as playing, "Can I talk to your mom or dad please?" if a child answered the phone) so that the donor would believe they were having a conversation with a live telemarketer. In either case, PAC treasurers, who were responsible for their respective PACs, were led to believe they had ultimate approval over the call scripts used to solicit contributions. The Zeitlin Entities kept a substantial percentage of the funds raised by the Zeitlin Call Centers—typically approximately 90 percent. The remaining funds went to the charity or PAC on whose behalf the donations were made. As a result of this pay structure, the more funds the Zeitlin Call Centers raised for PACs and charities, the more money the Zeitlin Entities, and thus RICHARD ZEITLIN, the defendant, ultimately made.

### ZEITLIN'S SCHEME TO DEFRAUD DONORS

7. From at least in or about 2017 through at least in or about 2020, RICHARD ZEITLIN, the defendant, defrauded donors and potential donors by directing employees of the Zeitlin Call Centers to make fundraising calls containing false and/or misleading statements that

misled donors and potential donors into believing that they were donating money (a) to a charity or direct-services organization rather than to a PAC; (b) that would go to an organization (rather than to the telemarketers); and/or (c) to support a "new" or "special" drive that was underway.

8.      Specifically, from at least in or about 2017 through at least in or about 2020, RICHARD ZEITLIN, the defendant, directed employees of the Zeitlin Entities to alter the call scripts used when calling potential donors on behalf of certain PACs in order to mislead potential donors into believing that they would be giving to a direct-services organization (*i.e.*, a charity), rather than to a political advocacy organization, (*i.e.*, a PAC). ZEITLIN directed that these lies, misleading statements, and misrepresentations be made so that the donors would be more likely to give money as a result of the call, thereby increasing the funds raised and profits for the Zeitlin Entities. For instance, ZEITLIN directed employees to change call scripts to suggest that the organization soliciting donations performed direct services by, for example, telling a potential donor that "your support helps the handicapped and disabled veterans by working on getting them the medical needs the VA doesn't provide" and/or to remove references to "PAC" or "political action committee." Because of these misleading statements that ZEITLIN directed, donors were not aware that they were being solicited by and contributing money towards a PAC that focused on political advocacy rather than a charity that provided direct services.

9.      For example, in or about 2018, RICHARD ZEITLIN, the defendant, and the Zeitlin Call Centers were hired by the treasurer of a certain PAC ("PAC Treasurer-1") to make solicitation calls on behalf of one of the above-referenced PACs ("PAC-1"). Recipients of fundraising calls from the Zeitlin Call Centers (*i.e.*, potential donors) reported that calls were being made on behalf of PAC-1 that portrayed the organization as a charity that provided certain direct services, including assisting veterans with medical services and housing, rather than as a PAC that engaged

4

in political activity. In response to reports from PAC Treasurer-1 about donor complaints, ZEITLIN falsely denied that such calls were being made on behalf of PAC-1. At or around the same time, however, ZEITLIN also acknowledged that calls describing PAC-1 as a charity or direct-services organization would be improper. In response to requests by PAC Treasurer-1 to produce recordings of solicitation calls, ZEITLIN refused to provide any such recordings.

10. Nonetheless, the Zeitlin Call Centers continued to make such misrepresentations at certain times when raising funds for certain PACs from at least in or about 2017 through at least in or about 2020. Based at least in part on the false and misleading representations directed and authorized by ZEITLIN, the Zeitlin Call Centers raised tens of millions of dollars in contributions.

11. Between at least in or about 2017 up to and including in or about 2018, RICHARD ZEITLIN, the defendant, also raised money through the Zeitlin Call Centers for certain PACs knowing that none of the money raised on behalf of those PACs would actually fund the PAC. ZEITLIN agreed with treasurers of certain PACs that one of ZEITLIN's entities ("Zeitlin Entity-2") would pay an advance of approximately $30,000 to certain of their PACs, and in exchange, 100 percent of the money subsequently raised by the Zeitlin Call Centers for those PACs over a specified time period (the "100% Time Periods") would be kept by Zeitlin Entity-2 (the "100% Agreements"). Despite the 100% Agreements, ZEITLIN and the Zeitlin Call Centers continued to make calls during the 100% Time Periods to potential donors on behalf of certain PACs falsely representing that donations would be used by those PACS, when in fact all of the money raised during the 100% Time Periods went to Zeitlin Entity-2 rather than to the organization or drive referenced on the fundraising call.

12. Between at least in or about 2017 up to and including in or about 2020, in order to increase funds raised and profits for the Zeitlin Entities, the Zeitlin Call Centers, with the approval

5

of RICHARD ZEITLIN, the defendant, falsely represented to potential donors that a "new" or "special" drive was "under way" and that their donation would help support the alleged new or special drive.

13. At various times relevant to this Indictment, RICHARD ZEITLIN, the defendant made multiple attempts to conceal his scheme and avoid attracting scrutiny from the public and investigating agencies relating to the Zeitlin Call Centers, the Zeitlin Entities, and ZEITLIN's scheme to defraud. For example:

a. Between at least in or about 2017 up to and including at least in or about 2020, ZEITLIN created various entities that appeared to provide different types of services to PACs from the Zeitlin Call Centers (*i.e.*, the Zeitlin Entities). In or about 2020, ZEITLIN created new entities to effectively replace certain of the existing Zeitlin Entities (*i.e.*, the New Zeitlin Entities). ZEITLIN selected certain of his employees to act as nominal owners of the New Zeitlin Entities even though ZEITLIN managed and controlled them.

b. As a result of ZEITLIN's efforts, invoices for services provided by the Zeitlin Call Centers listed payments owed by PACs to various of the Zeitlin Entities, rather than one entity. Likewise, publicly available FEC reports for PACs that used the Zeitlin Call Centers listed PAC payments made to multiple Zeitlin Entities rather than to one entity, and the PACs therefore appeared to pay different business rather than one business. In addition, ZEITLIN directed an employee to create fraudulent invoices billing certain PACs at an hourly or per-unit rate when, in truth and in fact, each entity was paid not by the hour, but rather, as part of ZEITLIN's overall collection of a large percentage of the money raised (typically approximately 90 percent).

c. On or about December 8, 2020, while testifying under oath during a deposition in connection with a federal civil matter, ZEITLIN falsely stated, in substance and in

part, that neither he nor employees of the Zeitlin Entities provided input as to the call scripts used by the Zeitlin Call Centers when making telemarketing calls on behalf of PACs. In truth and in fact, ZEITLIN and the employees of the Zeitlin Call Centers frequently provided input on and changed call scripts, including by adding false and misleading statements into the call scripts.

        d.      On or about March 31, 2022, in a declaration filed under penalty of perjury to a federal judge, ZEITLIN falsely stated that, among other things, he was not associated with and did not direct, supervise, or control certain of the New Zeitlin Entities. In truth and in fact, ZEITLIN controlled all the New Zeitlin Entities throughout their existence by exercising ultimate authority over managerial, operational, and financial decisions, including at the time he signed this declaration.

## ZEITLIN'S ORDER TO DESTROY RECORDS

14.    Beginning in or about 2018 to the present, RICHARD ZEITLIN, the defendant, has maintained a practice of principally communicating with employees of the Zeitlin Call Centers by phone or by encrypted messaging applications that typically delete data after a specified time period, or communicating with employees indirectly through an intermediary. For example, in or about 2018, ZEITLIN, directed certain employees of the Zeitlin Entities to delete materials and documents bearing ZEITLIN's name. In addition, ZEITLIN regularly received information about the operations of the business from CC-1 and relayed messages to others through CC-1.

15.    On or about May 24, 2022, in connection with a federal investigation, law enforcement officers served federal grand jury subpoenas to certain individuals associated with the Zeitlin Entities and the PACs for which they solicited donations. On or about the same date, RICHARD ZEITLIN, the defendant, learned about the federal subpoenas and instructed CC-1 to delete his communications on a particularly electronic messaging application ("Application-1")

that Zeitlin's employees used internally to communicate with one another. ZEITLIN also instructed CC-1 to direct other of Zeitlin's employees to do the same. CC-1 relayed ZEITLIN's instruction to certain of Zeitlin's employees. The electronic messages that ZEITLIN instructed his employees to destroy contained internal communications among Zeitlin's employees about the Zeitlin Call Centers and the operations of the Zeitlin Entities, among other things.

## STATUTORY ALLEGATIONS

### COUNT ONE
### (Conspiracy to Commit Wire Fraud)

The Grand Jury further charges:

16. The allegations set forth in paragraphs One through Fifteen are incorporated by reference as if set forth fully herein.

17. From at least in or about 2017 through at least in or about 2020, in the Southern District of New York and elsewhere, RICHARD ZEITLIN, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343, and did engage in the foregoing in connection with the conduct of telemarketing.

18. It was a part and an object of the conspiracy that RICHARD ZEITLIN, the defendant, and others known and unknown, in connection with the conduct of telemarketing, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343, to wit, ZEITLIN agreed with one or more others to engage in a scheme

to defraud donors of certain PACs through false and misleading statements, made during telemarketing calls soliciting donations, about what donations to the PACs would be used for and the nature of the PACs, and sent and received, and caused others to send and receive, wire communications to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1349 and 2326.)

## COUNT TWO
### (Wire Fraud)

The Grand Jury further charges:

19.   The allegations set forth in paragraphs One through Fifteen are incorporated by reference as if set forth fully herein.

20.   From at least in or about 2017 through at least in or about 2020, in the Southern District of New York and elsewhere, RICHARD ZEITLIN, the defendant, in connection with the conduct of telemarketing, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, to wit, ZEITLIN engaged in a scheme to defraud donors of certain PACs through false and misleading statements, made during telemarketing calls soliciting donations, about what donations to the PACs would be used for and the nature of the PACs, and sent and received, and caused others to send and receive, wire communications to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343, 2326, and 2.)

## COUNT THREE
### (Conspiracy to Obstruct Justice)

The Grand Jury further charges:

21. The allegations set forth in paragraphs One through Fifteen are incorporated by reference as if set forth fully herein.

22. In or about May 2022, in the Southern District of New York and elsewhere, RICHARD ZEITLIN, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to obstruct justice, in violation of Title 18, United States Code, Section 1512(c).

23. It was a part and object of the conspiracy that RICHARD ZEITLIN, the defendant, and others known and unknown, would and did corruptly alter, destroy, mutilate, and conceal a record, document, and other object, and attempt to do so, with the intent to impair the object's integrity and availability for use in an official proceeding, and otherwise would and did corruptly obstruct, influence, and impede an official proceeding, and attempt to do so, to wit, after learning that federal grand jury subpoenas had been issued by a federal grand jury in the Southern District of New York that requested certain records of ZEITLIN's businesses, among other things, ZEITLIN instructed CC-1 to delete certain electronic messages and to direct employees of the Zeitlin Entities to delete certain electronic messages.

(Title 18, United States Code, Section 1512(c) and (k).)

## COUNT FOUR
### (Obstruction of Justice)

The Grand Jury further charges:

24. The allegations set forth in paragraphs One through Fifteen are incorporated by reference as if set forth fully herein.

25. In or about May 2022, in the Southern District of New York and elsewhere, RICHARD ZEITLIN, the defendant, corruptly altered, destroyed, mutilated, and concealed a record, document, and other object, and attempted to do so, with the intent to impair the object's integrity and availability for use in an official proceeding, and otherwise corruptly obstructed, influenced, and impeded an official proceeding, and attempted to do so, to wit, after learning that federal grand jury subpoenas had been issued by a federal grand jury in the Southern District of New York that requested certain records of ZEITLIN's businesses, among other things, ZEITLIN instructed CC-1 to delete certain electronic messages and to direct employees of the Zeitlin Entities to delete certain electronic messages.

(Title 18, United States Code, Sections 1512(c) and 2.)

## FORFEITURE ALLEGATION

26. As a result of committing the offenses alleged in Counts One and Two of this Indictment, RICHARD ZEITLIN, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 982(a)(8) and 2328, any and all real or personal property used or intended to be used to commit, to facilitate, or to promote the commission of said offenses; and any and all real or personal property constituting, derived from, or traceable to the gross proceeds that the defendant obtained directly or indirectly as a result of said offenses including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses, and any equipment, software, or other technology used or intended to be used to commit or to facilitate the commission of such offenses.

27. As a result of committing the offenses alleged in Counts Three and Four of this Indictment, RICHARD ZEITLIN, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c),

any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

### Substitute Assets Provision

28. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981, 982 and 2328;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

_____                    _____
FOREPERSON                                                DAMIAN WILLIAMS
                                                                         United States Attorney