N9e2ZeiC kjc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

                v.                           23 Cr. 419 (LAK)

RICHARD ZEITLIN,

                Defendant.

------------------------------x              Conference

                                             September 14, 2023
                                             2:40 p.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                             District Judge


                         APPEARANCES

DAMIAN WILLIAMS
      United States Attorney for the
      Southern District of New York
BY:   JANE KIM
      KEDAR S. BHATIA
      STEPHANIE SIMON
      Assistant United States Attorneys


THE BERNHOFT LAW FIRM, S.C.
      Attorneys for Defendant
BY:   ROBERT G. BERNHOFT


LAW OFFICES OF JOSHUA L. DRATEL, P.C.
JOSHUA L. DRATEL
      Attorney for Defendant


Also Present:  Special Agent Jacob Belog, F.B.I.

N9e2ZeiC kjc

1            (Case called)

2            THE DEPUTY CLERK:  Government, are you ready?  Please

3    put your appearances on the record.

4            MS. KIM:  Yes, your Honor.  Jane Kim, Kedar Bhatia,

5    Stephanie Simon for the government.  And with us at counsel

6    table is Jacob Balog, special agent of the F.B.I.

7            THE COURT:  Thank you.

8            THE DEPUTY CLERK:  Defendant, are you ready?

9            MR. BERNHOFT:  Yes, sir.  Attorney Robert Gerald

10   Bernhoft appearing *pro hac vice* for Defendant Zeitlin.

11   Mr. Zeitlin appears to my immediate right.  He is in custody.

12   To my far right is our local attorney Joshua L. Dratel.

13           THE COURT:  Thank you.  Mr. Dratel is well known.

14           MR. DRATEL:  Good afternoon, your Honor.

15           THE DEPUTY CLERK:  Should I arraign the defendant?

16           THE COURT:  Arraign the defendant, please.

17           THE DEPUTY CLERK:  Mr. Bernhoft, have you received a

18   copy of the indictment?

19           MR. BERNHOFT:  Yes, sir.

20           THE DEPUTY CLERK:  Have you reviewed it with your

21   client?

22           MR. BERNHOFT:  I have.

23           THE DEPUTY CLERK:  Do you waive the public reading?

24           MR. BERNHOFT:  Yes, I do.

25           THE DEPUTY CLERK:  How does he plead?

N9e2ZeiC kjc

1          MR. BERNHOFT:  I'm sorry?

2          THE DEPUTY CLERK:  How does he plead?

3          THE DEFENDANT:  Not guilty.

4          THE DEPUTY CLERK:  Thank you.  Please be seated,

5    gentlemen.

6          THE COURT:  Thank you.

7          I direct the prosecution to comply with its

8    obligation. under *Brady v. Maryland* and its progeny, to

9    disclose to the defense all information, whether admissible or

10   not, that is favorable to the defendant, material either to

11   guilt or to punishment, and known to the prosecution.

12         Possible consequences for noncompliance may include

13   dismissal of individual charges or the entire case, exclusion

14   of evidence, and professional discipline or court sanctions on

15   the attorneys responsible.

16         I will be entering a written order more fully

17   describing this obligation and the possible consequences of

18   failing to meet it, and I direct the prosecution to review and

19   comply with that order.

20         Does the prosecution confirm that it understands its

21   obligations and will comply with them?

22         MS. KIM:  Yes, your Honor, we confirm.

23         THE COURT:  Thank you.

24         Okay.  Since this is the first appearance, Ms. Kim,

25   please give me a thumbnail description.

N9e2ZeiC kjc

1        MS. KIM:  Certainly, your Honor.

2        The defendant was arrested in Las Vegas on August 17,

3    2023.  He was presented there before a magistrate judge and

4    detained.  There were two days of bail proceedings on August 17

5    and August 18.  The defendant was then transported to the

6    Southern District of New York.  And so, for purposes of the

7    Speedy Trial Act, there are still 70 days remaining on the

8    clock.

9        The defendant is charged in an indictment with four

10   counts—conspiracy to commit telemarketing wire fraud,

11   telemarketing wire fraud, conspiracy to obstruct justice, and

12   obstruction of justice.

13       These charges are in relation to the defendant's

14   operation of a multimillion-dollar telemarketing call center

15   that made false and misleading statements to donors and

16   potential donors while raising money on behalf of political

17   action committees, or PACs.

18       The defendant also, upon learning of the government's

19   investigation, instructed his employees to delete evidence of

20   his fraud.

21       THE COURT:  Thank you.  Did you want to go on?

22       MS. KIM:  No, your Honor.  I am happy to talk about

23   discovery but will pause here.

24       THE COURT:  That's what I was going to ask about next.

25       MS. KIM:  The parties have handed up a proposed

N9e2ZeiC kjc

1    protective order that has been signed by the government and

2    defense counsel.

3         We understand that a hard drive is en route from the

4    defense, and the government has been working to prepare a

5    substantial initial production of discovery and will continue

6    to make rolling productions.

7         With the exception of electronic devices that were

8    seized on August 17 from the defendant's home and business, the

9    government plans to produce the large bulk of discovery within

10   the next six weeks, if not sooner.

11        THE COURT:  Let's get a little more specific.  Put

12   aside the electronic devices for a minute.  When do you expect

13   to complete discovery?

14        MS. KIM:  We expect to complete discovery within the

15   next six weeks, if not sooner, your Honor.  That discovery

16   consists of stored Communications Act search warrants and

17   returns.  The returns include e-mails, documents, fundraising

18   call recordings, agreements between PAC owners and the

19   defendant, Skype messages, and other data.

20        The discovery also includes various subpoena returns

21   from providers, individuals, entities and financial

22   institutions; FEC records and reports; FTC materials; 2703(d)

23   and pen materials; a variety of publicly available information,

24   including certain FEC materials, PAC websites and business

25   records; the defendant's statements, including from e-mails,

N9e2ZeiC kjc

1    recorded calls, a signed affidavit to a federal judge and sworn

2    testimony in a civil deposition.

3          The discovery also includes warrants to search the

4    defendant's home and one of his business locations.  Both

5    properties were located in Las Vegas, Nevada.  And the

6    materials seized from those searches include more than two

7    dozen electronic devices that have been transported from

8    Las Vegas to New York, and the government is planning to swear

9    out a search warrant to search those devices, and then we will

10   work to extract and review those devices and provide them to

11   the defendant --

12         THE COURT:  When do you anticipate that you will do

13   that?

14         MS. KIM:  The practice in Las Vegas, what we learned

15   was that typically for out-of-district cases the magistrate

16   judge there will approve a search warrant to seize electronic

17   devices but asks that a supplemental warrant --

18         THE COURT:  I was assuming that.  So I'm assuming you

19   will get the warrant.

20         MS. KIM:  Yes.

21         THE COURT:  And assuming you get the warrant, when

22   will you be done?

23         MS. KIM:  We -- because there are approximately two

24   dozen devices, what we plan to do is triage those devices and

25   prioritize the ones that, you know, were found in the

N9e2ZeiC kjc

1    defendant's bedroom or ones that appear to be newer devices.

2    We will start the extractions as soon as we get the search

3    warrant.  We will then produce the copies of those extractions

4    to the defendant.

5            In terms of timing, it is hard to say, because we

6    don't know at this stage the volume of the electronic devices

7    and how long the extractions will take.

8            THE COURT:  What's your best estimate?

9            MS. KIM:  Could I have one minute, your Honor.

10           THE COURT:  Yes.

11           (Government counsel confer)

12           MS. KIM:  Your Honor, this is our very best estimate,

13   not knowing the size of the devices, but we believe that we may

14   be able to extract all of the devices within approximately two

15   months and then the contents of those devices would have to

16   undergo a privilege review.  If there are devices that solely

17   belong to the defendant, we would produce those extractions

18   promptly to the defendant and then proceed with our review of

19   the devices.

20           THE COURT:  Okay.  Mr. Bernhoft, what have you got to

21   enlighten me with about the progress of the case?

22           MR. BERNHOFT:  We have got a discovery order that

23   Mr. Dratel and I have agreed to, so that will facilitate

24   provisioning of Rule 16 --

25           THE COURT:  I'm sorry.  You've got a discovery motion?

N9e2ZeiC kjc

1          MR. BERNHOFT:  A discovery protective order.

2          THE COURT:  Yes.

3          MR. BERNHOFT:  That was handed up.

4          THE COURT:  That's what counsel just said.

5          MR. BERNHOFT:  Ms. Kim has asked us for a two-terabyte

6     hard drive.  We are supplying that.  We are shipping it to her

7     designee.  It will be shipped out this week, and they will be

8     in receipt of that.

9          We produced approximately 300,000 pages of documents

10    in -- Mr. Zeitlin and his companies did during the grand jury

11    investigation, about 13, 14 months.  We understand there are

12    multiple grand jury subpoenas issued.  We have spoken to joint

13    defense counsel, and they also produced hundreds of thousands

14    of pages.  So I don't think it's hyperbolic --

15         THE COURT:  You spoke to whom?

16         MR. BERNHOFT:  Joint defense counsel that were

17    representing some of the witnesses.  There was a joint defense

18    agreement, your Honor.  And so, I mean, the paper document page

19    discovery could approach a million pages, plus the devices that

20    Ms. Kim is referencing, and I can't make an informed estimate

21    about that.

22         THE COURT:  Well, who were the parties to this joint

23    defense agreement?

24         MR. BERNHOFT:  Yes, they are principally current and

25    former employees of Mr. Zeitlin and his companies.

N9e2ZeiC kjc

1          THE COURT:  And was there a single defense counsel or

2     more?

3          MR. BERNHOFT:  No, there was a pool counsel named

4     Attorney Robert Peabody, from Husch Blackwell in Boston,

5     Massachusetts, and he represented most of the current and

6     former employees.  And then Sebaly Shilito & Dyer, a law firm

7     in Dayton, Ohio, lead counsel there was Attorney Brian Penick,

8     and Brian Penick represented two PAC——political action

9     committee——treasurers.

10         THE COURT:  And was your client a party to that

11    defense --

12         MR. BERNHOFT:  Yes, sir.

13         THE COURT:  -- agreement?

14         MR. BERNHOFT:  Yes.

15         THE COURT:  And who represented him?

16         MR. BERNHOFT:  I did.

17         THE COURT:  Okay.  What else should I know from the

18    defense side?

19         MR. BERNHOFT:  Well, there has been a lot of paper

20    filed, a lot of ink spilled respecting Mr. Zeitlin's detention

21    order from Nevada.  Do you wish to address that, your Honor.

22         THE COURT:  No.  I'm not ready for that.  I want to

23    find out the shape of the case.

24         MR. BERNHOFT:  Yes.

25         Well, the electronic devices I can't give an

N9e2ZeiC kjc

1   intelligent surmise about.  The government's got a couple of

2   dozen of them, and we will wait for word for them on that.  We

3   do expect about a million document pages in discovery.  They

4   requested a two-terabyte drive.

5          Once we receive those materials, the defense will need

6   time to review, investigate, integrate those materials into our

7   theory of defense, so that's -- we expect that, what I am

8   hearing from the government——some of this I am hearing for the

9   first time today——that it is going to be a bit before we can

10  set this case for trial so that the defense can be fully

11  prepared, your Honor.

12         THE COURT:  Is there any reason why pretrial motions

13  can't precede the production of the contents of the electronic

14  devices to the extent there is any?

15         MR. BERNHOFT:  Yes, your Honor.  I would respectfully

16  suggest that pretrial motions, at least most of the ones I

17  would contemplate, cannot proceed because they would be

18  predicated on a review of the discovery.

19         THE COURT:  How so?

20         MR. BERNHOFT:  Well, kind of, for example, it depends

21  on what kind of discovery we see regarding the elements of the

22  fraud charge and the obstruction charge.  We think the

23  indictment -- we contemplate a pre-answer -- a motion to

24  dismiss based on failure to state cognizable offenses, not

25  an --

N9e2ZeiC kjc

1            THE COURT:  Let's focus on that.

2            MR. BERNHOFT:  Yes.

3            THE COURT:  How would the discovery have any bearing

4    on that motion?

5            MR. BERNHOFT:  That would be the one motion that the

6    discovery would not have a material bearing, your Honor.

7            THE COURT:  Okay.  What else?

8            MR. BERNHOFT:  Well, we have to evaluate the discovery

9    and see what the government does with its Rule 16 obligations.

10   We have *Brady, Giglio* issues.  We have discussed Jencks with

11   them.  But ultimately we have to assure ourselves that the

12   government has made fulsome disclosures under their

13   obligations.  If they haven't, we would bring on discovery

14   motions.

15           THE COURT:  Any reason why I couldn't set a motion

16   deadline now for everything that you can think of that is not

17   dependent on the content of the electronic devices?

18           MR. BERNHOFT:  We also have the document pages --

19           THE COURT:  The what?

20           MR. BERNHOFT:  -- but we could set a motion

21   deadline --

22           THE COURT:  I'm sorry.  The what?  You said, "We also

23   have the 'bumble bumble.'"

24           MR. BERNHOFT:  We also have --

25           THE COURT:  I didn't get the "bumble bumble" part.

N9e2ZeiC kjc

1          MR. BERNHOFT:  I'm sorry, Judge.

2          We also have the substantial amount of documents that

3    are produced in addition to the devices.

4          THE COURT:  Well, yes, I know you do.  That's the

5    predicate of the question.

6          MR. BERNHOFT:  Yes.  I think the Court could and

7    should set a motions deadline for a challenge to the

8    sufficiency of the indictment itself.  Discovery motions would

9    have to be held in abeyance pending our receipt and review.

10         THE COURT:  Why?

11         MR. BERNHOFT:  Because we have to review the discovery

12   to make sure that we have everything that we believe we are

13   entitled to under the statues.

14         THE COURT:  And how are you going to do that?

15         MR. BERNHOFT:  By reviewing it.

16         THE COURT:  How is reviewing what you've got going to

17   tell you what you don't have and that the government has it?

18         MR. BERNHOFT:  Well, we have a very good idea what

19   the universe of discovery and what -- who the witnesses are,

20   your Honor, and we will play match-up and cross-map those

21   things and make sure the government has discharged its

22   obligations, sir.

23         THE COURT:  Ms. Kim, why isn't what I suggested

24   totally practical?

25         MS. KIM:  Your Honor, the government doesn't object to

N9e2ZeiC kjc

1    setting a motion schedule now for all motions that don't

2    require review of the discovery.

3           THE COURT:  So that would include, among other things,

4    perhaps, any motions to suppress any custodial statements there

5    might be, motions claiming there was a lack of probable cause

6    for search warrants, and I imagine quite a few other things.

7    Yeah?

8           MS. KIM:  Yes, your Honor.

9           THE COURT:  All right.  So I will set a discovery

10   cutoff applicable to everything except the contents of the

11   electronic devices of October 31.

12          Is there any reason why you would need any longer

13   than the end of November to make whatever motions you can think

14   of other than motions that depend upon the contents of the

15   electronic devices that are produced?

16          MR. BERNHOFT:  None that come to my mind right now,

17   your Honor.

18          THE COURT:  Okay, November 30 for all motions except

19   those dependent.

20          Does the government think it needs more than two weeks

21   to respond to any such motions?

22          MS. KIM:  No, your Honor.

23          THE COURT:  Okay, December 14.

24          I'm assuming these are weekdays, Andy.  You will

25   correct me.

N9e2ZeiC kjc

1          THE DEPUTY CLERK:  The 14th is a Thursday, Judge.

2          THE COURT:  Government opposition by December 14.

3     Reply, if any, by December 21.

4          Let's get a date for early January for argument or

5     conference on those motions, and we will review where we are,

6     if we have not completed discovery of the production of the

7     electronic device material previously, and the government will

8     inform me when that happens.  Andy?

9          THE DEPUTY CLERK:  Judge, how about Thursday, December

10    4 --

11         THE COURT:  No, not December.

12         THE DEPUTY CLERK:  Sorry, I mean January 4.

13         (Court and deputy clerk confer)

14         THE COURT:  January 4 at 3:00 for argument or

15    conference.

16         Has any time gone by on the Speedy Trial clock?

17         MS. KIM:  No, your Honor.

18         THE COURT:  All right.  Anything else relating to the

19    scheduling, basic scheduling of the case?

20         MS. KIM:  Not from the government, your Honor.

21         MR. BERNHOFT:  Not from the defense, your Honor.

22         THE COURT:  How long does the government estimate this

23    will take to try?

24         MS. KIM:  Approximately three weeks, your Honor.

25         THE COURT:  Defense, what do you think?

N9e2ZeiC kjc

1          MR. BERNHOFT:  I think that's a fair estimate right

2     now, your Honor.

3          THE COURT:  Soup to nuts, jury selection to verdict.

4          MR. BERNHOFT:  Maximum four weeks, but I think three

5     weeks is a fair surmise.

6          THE COURT:  Okay.

7          I'm going to set it for trial April 2.  Obviously if

8     there are unanticipated problems with the electronic devices,

9     that can move, but I want to be sure we are on everybody's

10    dance card now.

11         I have signed the protective order.

12         Now, we have a motion to vacate the detention order,

13    which I will hear in a minute.

14         I have read the papers.  Mr. Bernhoft, I realize you

15    are from out of town.  I expect considerably lower temperature

16    and higher level of mutual respect between counsel in any

17    submissions to this Court --

18         MR. BERNHOFT:  Yes, your Honor.

19         THE COURT:  -- than your letter reflects, but I will

20    hear you.

21         MR. BERNHOFT:  Yes, your Honor.

22         Respecting tone and tenor --

23         THE COURT:  If you would please go to the lectern.

24         MR. BERNHOFT:  Respecting tone and tenor of the

25    filings, we felt that we matched the tone and tenor of the

N9e2ZeiC kjc

1     government's opposition.  We felt it was highly aggressive, and

2     typically we don't.

3            THE COURT:  For what it's worth, the judge doesn't

4     agree with that.

5            MR. BERNHOFT:  All right.  Thank you, your Honor.

6            I would turn to the -- first, your Honor, if I may, to

7     the addendum that was submitted by SDNY Pretrial Services,

8     which recommends release conditions somewhat similar to the

9     proposal that we made, if I might.

10           In terms of the factors favoring Mr. Zeitlin's release

11    on conditions that would reasonably assure his appearance at

12    future hearings and court dates, I would note very long

13    substantial ties to Wisconsin and Nevada.  He's been a Nevada

14    resident for almost 30 years.

15           He's been gainfully employed his entire life, since he

16    was a teenager.  He has developed a series of very successful

17    telemarketing fundraising companies over the years.  He has

18    employed thousands of people over those decades and provided

19    gainful employment and spun off other companies that service

20    the fundraising industry.  He did fundraising for many

21    excellent charities for decades and then turned towards

22    political action committee fundraising since about 2017 or so.

23           The indictment alleges, and this is based on the

24    indictment itself, conversations we have had with the

25    government, the core theory of criminality appears to be that

N9e2ZeiC kjc

1    at times Mr. Zeitlin and at least one other person who is

2    unidentified would place a script, a sales script, into the

3    technology system that is required to deliver the sales

4    pitches, and that when sales were down, they would utilize this

5    special script, and that that script made material

6    misrepresentations.

7           There is not an allegation in the indictment, and the

8    government does not allege, that somehow Mr. Zeitlin's

9    operations are fraudulent per se.  It is clear that they

10   aren't.  He has fundraised for some excellent charities and

11   PACs throughout the many decades.  So these are unique charges

12   that target the alleged practice of inserting deceptive scripts

13   so that false and fraudulent statements were made to potential

14   donors when sales were down.

15          I have pretty good knowledge.  I have known

16   Mr. Zeitlin for about 35 years personally.  I started

17   representing him professionally in 2016-2017, when the Federal

18   Trade Commission first opened up a civil investigation into

19   Mr. Zeitlin.  I know him to be a man of integrity and

20   conscience.

21          The government's got serious allegations in that

22   indictment, and we intend to defend them.  I believe that many

23   of the things that were said in the government's opposition are

24   not true.  Some of them are demonstrably not true.

25          So turning back to the addendum to Pretrial Services,

N9e2ZeiC kjc

1    they recommend release.  We urge release.

2          Mr. Zeitlin is a seven-year parishioner at the

3    synagogue in Chabad of Summerlin.  Rabbi Schanowitz has

4    testified to that with a penalty-of-perjury letter.  This

5    occurred about seven years ago, and Mr. Zeitlin sought out

6    counsel there and has been a faithful member since.

7          The other issue is that Mr. Zeitlin has been paying a

8    huge amount of back taxes, and this is reflected in Doc 16,

9    particularly Doc 16-1, Attorney Dan Treuden of my firm files a

10   declaration.  Mr. Treuden does a lot of civil tax work for the

11   firm.

12         Mr. Zeitlin who was the victim -- and his wife, the

13   Zeitlins were victims of serious CPA accounting malpractice,

14   and when the accountants and the CPAs started to tear apart all

15   of the returns, there was rank malpractice, and the Zeitlins,

16   unbeknownst to them, ended up owing an additional 4 or $5

17   million in tax, penalty, and interest.

18         As evidence of the really quite amazing nature of the

19   malpractice was that the insurance defense lawyers and CPA

20   Raben settled that suit for policy limits even before discovery

21   commenced.  The trouble with that was the policy limits were

22   fairly low.

23         And the other issue is that, in spite of the

24   malpractice, the Zeitlins still owed the tax that they didn't

25   know that they owed.  And so Mr. Treuden sets out a chart

N9e2ZeiC kjc

1    there.  And so Mr. Zeitlin has paid between 6 and $7 million

2    over the past two or three years to pay those back taxes.  For

3    someone who intended to flee the jurisdiction, I respectfully

4    submit that they wouldn't go paying 6 or $7 million in back

5    taxes to catch up.  I have had conversations with Mr. Zeitlin.

6    It is incredibly important to him that he clear up these old

7    tax debts, and he's been taking great pains to do it.  And

8    actions do speak louder than words.  It's not the actions of a

9    man who is contemplating flight.

10            THE COURT:  How old is he?

11            MR. BERNHOFT:  54, your Honor.

12            THE COURT:  Five four?

13            MR. BERNHOFT:  I'm sorry?

14            THE DEFENDANT:  52.

15            MR. BERNHOFT:  52.  I apologize, your Honor.

16            THE COURT:  Thank you.

17            MR. BERNHOFT:  The other thing Mr. Zeitlin was a

18    victim of, he was a victim of embezzlement.  His chief

19    financial officer -- I can give her name to the record if I

20    need to.  She was ultimately terminated.  Mr. Zeitlin had known

21    her for 15, 20 years and her family, and as a function of

22    CPA Raben's lack of oversight and professional discharge of

23    obligations as a CPA, there was no internal controls, and so

24    Mr. Zeitlin was embezzled from -- we don't know exactly how

25    much the embezzlement was because the books and records were

N9e2ZeiC kjc

1    deliberately kept in a manner that obscured the embezzlement

2    itself.  So the forensic CPAs that tore that apart weren't

3    clear about that.

4           So I relate this to the Court in response to the

5    government's position that he should -- that he's got millions

6    of dollars of liquidity laying around.  It's not the case.

7           The other thing is, I'm familiar with banking

8    procedures.  In order to wire transfer or ACH the types of sums

9    that we are talking about, they require that signature, that

10   account holder, to do that in person.

11          Now, he has a colleague who has electronic access, and

12   so we were able to -- I have a $250,000 cashier's check from my

13   trust account that we have been doing at 50,000 increments at a

14   time to get that, because we can't do the large transactions.

15          There is also another account with funds in it, and

16   the Nevada lawyers drafted a power of attorney, and he gave

17   durable power of attorney to this colleague, a trusted friend,

18   and Wells Fargo legal has been sitting on that for a couple of

19   weeks.

20          So I just -- it's very difficult to get that kind of

21   money in liquidity out and available when Mr. Zeitlin is in

22   detention.

23          So there isn't this -- there aren't millions of

24   dollars laying around that we can access.  We do have cash and

25   funds, and we offered that in our motion for bail.

N9e2ZeiC kjc

1          Two issues, and these issues came up in Nevada, and

2     because of the out-of-district arrest, we were not expecting

3     that.  We were not prepared for that.  We did not have Nevada

4     counsel pre-engaged.  It happened in the early morning hours of

5     Thursday, August 17.  But we immediately set to work.  We

6     engaged attorneys, and they went out there to counsel with

7     Mr. Zeitlin.

8          And the two issues that appeared to cause the

9     government the most concern are this jet plane and these

10    renunciation e-mails.  Now, I received the renunciation e-mails

11    from the government by e-mail I think about an hour or two

12    before the first hearing on Thursday, August 17, and I also

13    received a picture of the jet.  So the issue of the private

14    plane and these renunciation e-mails, the government knew that

15    and I knew that and Mr. Kiebler, AUSA Kiebler, Nevada AUSA,

16    presented to the Court, Magistrate Judge Ferenbach, that there

17    was an agreement in terms of release.

18          The government has pointed out that our proposed

19    release conditions aren't as severe as those we agreed to in

20    Nevada, and that is absolutely correct.  I was very concerned.

21    I have done out-of-district arrests and detention hearings, and

22    the concern is—and it's understandable—the magistrate judges

23    will many times over-condition or even sometimes detain,

24    because it's not their indictment, and they are justifiably

25    concerned about making a mistake in an indictment that is not

N9e2ZeiC kjc

1    issued from their jurisdiction, and many times they will let

2    the indictment-issuing jurisdiction sort that out, and I

3    believe that's what occurred here.  And I'm not here to attack

4    the magistrate judge's order.  It was short notice for

5    everybody.  Some of the things the mag judge said in the

6    transcript that I just reviewed are at odds with the order

7    itself.  But, you know, Mr. Zeitlin is employed.  He has

8    substantial ties to Wisconsin and Nevada.  None of that was

9    reflected in the order.

10           I would like to directly address the --

11           THE COURT:  I understand he has two adult children

12   living in Wisconsin.

13           MR. BERNHOFT:  Yes, Judge.

14           THE COURT:  But what other ties does he have to

15   Wisconsin?

16           MR. BERNHOFT:  Oh, his former wife lives there, and he

17   has friends and family there, and he visits Wisconsin often.

18   His principal ties in Nevada, and that is where his wife and he

19   live on La Madre Way, and that is where he's lived for 30

20   years.

21           THE COURT:  He and the wife are allegedly divorcing.

22           MR. BERNHOFT:  They are divorcing.  That is correct,

23   your Honor.

24           THE COURT:  What other ties does he have to Nevada?

25           MR. BERNHOFT:  Well, his whole life is in Nevada.

1    He's built his companies there.  He's built his personal life

2    there, his social circle.  Everything revolves around Nevada.

3           Many years ago, Liliana Zeitlin, the currently

4    divorcing spouse, she was born in Mexico, so they vacation in

5    Mexico, and she suggested, and he agreed, and they started

6    purchasing some properties there.  And there is a filing in the

7    Clark County Court where, pursuant to the divorce, all of those

8    properties now will be liquidated and the sums will be split

9    50/50 into the divorcing spouses' respective counsel's trust

10   accounts.  And so, if anything, that severs any ties he has to

11   Mexico.  He is divorcing his Mexican-born wife and liquidating

12   those properties.  And that was on the advice of divorce

13   counsel with the agreement of divorcing spouse's attorney.

14          The La Madre Way house is encumbered by IRS tax liens.

15   I spoke to Attorney Jimmerson, who is Mr. Zeitlin's divorce

16   attorney.  He had run a title search preparing the house for

17   sale and the IRS tax lien showed up to the tune of about 3 1/2,

18   $4 million, and that's the residuum of the taxes that they

19   still owe as a result the CPA malpractice.

20          I felt I put a lot of context on these renunciation

21   e-mails, and the fact of the matter is that Mr. Zeitlin has

22   been a law-abiding, tax-paying citizen his entire life.  These

23   are serious charges.  All federal charges are serious.  There

24   is an obstruction count that we believe is predicated solely on

25   the testimony of one former employee, and we think we have a

N9e2ZeiC kjc

1    factual dispute on that charge.  The fraud charges regarding

2    false statements and telemarketing scripts --

3             THE COURT:  How much do you say are IRS tax liens on

4    the house in Nevada?

5             MR. BERNHOFT:  Attorney Jimmerson told me it's between

6    3.5 and $4 million of tax liens remain.  One of the things

7    about that is IRS is a little slow on the draw in reducing --

8    it doesn't change its tax liens because you have made payments.

9    It doesn't work like that.  So it is likely that the

10   outstanding tax liabilities are less than those liens, and

11   there is more equity in the house than would be facially

12   observed.  But the tax liens speak for themselves at

13   approximately 3.5 to $4 million.

14            THE COURT:  How is it the liabilities on the residence

15   that are in the Pretrial Service report prepared in Nevada say

16   2 million?

17            MR. BERNHOFT:  It says -- I'm sorry, Judge?

18            THE COURT:  Liabilities on the residence are listed at

19   2 million in the Nevada Pretrial Service --

20            MR. BERNHOFT:  I believe that is the mortgage balance.

21   So, there is a mortgage on the home.

22            THE COURT:  Okay.  So if there is a mortgage on the

23   home of 2 million and there are tax liens of 3.5 million, there

24   is essentially no equity in the residence.

25            MR. BERNHOFT:  That is correct, your Honor.

N9e2ZeiC kjc

| | |
|---|---|
| 1 | THE COURT:  That's quite a tie to Nevada. |
| 2 | MR. BERNHOFT:  Well, I understand your point, your |
| 3 | Honor.  It's well taken.  But Mr. Zeitlin is not going |
| 4 | anywhere.  He has nowhere to go.  This is his home. |
| 5 | THE COURT:  How about Israel? |
| 6 | MR. BERNHOFT:  I'm sorry? |
| 7 | THE COURT:  How about Israel? |
| 8 | MR. BERNHOFT:  I thought Rabbi Schanowitz's letter |
| 9 | addressed that fully.  I spoke to Rabbi at length on a number |
| 10 | of occasions about that.  He states in his letter that he |
| 11 | believes that that right of return program was an outgrowth of |
| 12 | Mr. Zeitlin's increasing faith.  It was important to him.  Rick |
| 13 | has related to me that he visited Israel and he was impressed |
| 14 | that an entire country -- I'm not Jewish -- |
| 15 | THE COURT:  He is an Israeli citizen. |
| 16 | MR. BERNHOFT:  Yes.  He did apply to the right of |
| 17 | return program.  He's been provisionally accepted.  My |
| 18 | understanding is that he has to go and live there for a very |
| 19 | significant period of time prior to being able to claim |
| 20 | citizenship and a passport.  So if he travels to Israel even |
| 21 | if -- |
| 22 | THE COURT:  Two different items—citizenship and |
| 23 | passport. |
| 24 | MR. BERNHOFT:  Yes.  Well, the flight risk concern was |
| 25 | about the passport, so -- |

N9e2ZeiC kjc

1        THE COURT:  And why is that?

2        MR. BERNHOFT:  Well, because the government seemed

3   concerned that he was a citizen, he could scoop up an Israeli

4   passport and travel that way.

5        THE COURT:  And isn't it a fact that, with a document

6   obtainable from any Israeli diplomatic mission in the world, I

7   believe, but certainly in the U.S. or London, it is possible

8   for an Israeli citizen to obtain a piece of paper called a

9   *laissez-passer* with an Israeli visa and enter Israel without a

10  passport, isn't that true?

11       MR. BERNHOFT:  It very well could be, your Honor.  I

12  can't speak to that.  I'm sorry, sir.

13       THE COURT:  Okay.

14       MR. BERNHOFT:  Yeah.

15       We don't view Mr. Zeitlin -- and Mr. Zeitlin started

16  pursuing the right of return program and Israeli citizenship

17  years ago, prior to the advent of the SDNY grand jury.

18       THE COURT:  When did he get the citizenship or

19  conditional citizenship?

20       MR. BERNHOFT:  Within the last month or two, and

21  Rabbi Schanowitz's support letter certifying his heritage,

22  etc., I believe that was November 2021, and that letter is

23  attached to one of the declarations that is filed.  So he

24  commenced that process well before we even knew there was

25  another grand jury investigating, the SDNY one, that yielded

N9e2ZeiC kjc

1    this indictment.  That didn't happen until June of 2022.

2              And at that point Mr. Zeitlin and I and my legal team

3    felt that once the Florida grand jury terminated, we never got

4    any clear indication, but after two or three years of no

5    activity, it was clear that the Florida grand jury that

6    commenced in 2018 was shut down.  We understand it was through

7    lack of evidence.  Mr. Zeitlin was not indicted, and

8    Mr. Zeitlin justifiably believed that those travails were over.

9    And it was at that point when he was pursuing his Israeli

10   citizenship, without any connection to the current indictment

11   or any intention to flee.  And I think the facts reflect that

12   as supported by Rabbi Schanowitz's letter and my experience and

13   understanding of Mr. Zeitlin's history over the past number of

14   years.

15             The renunciation e-mails, we have addressed that

16   squarely.  We attach them to our bail motion.  I'm not sure how

17   I would have -- if I was in Mr. Zeitlin's position, how I might

18   have reacted.  I have, I suppose, over the past 30 or 40 years,

19   particularly when I was younger, perhaps sent an e-mail

20   communication that I regretted.  I try to avoid that at all

21   costs, petulant communications, things we don't really mean.

22   But as we put context on it in the motion, Mr. Zeitlin has been

23   hounded for years——FTC investigations, attorneys general

24   investigations.  All of them are terminated in his favor.

25             He's committed to compliance, and his business spends

N9e2ZeiC kjc

1    an enormous amount of money on legal compliance, has attorneys

2    that advise on political action committee scripts, what can be

3    said, what can't be said.  I want to be clear, this is not some

4    sort of an allegation of some sort of boiler room operation

5    that generated hundreds of millions of dollars with money for

6    charities and PACs for decades and somehow it's like a boiler

7    room.  This is not the case.  This is a highly sophisticated,

8    professional operation that he has built over many decades.

9            The renunciation e-mails, I have talked to Mr. Zeitlin

10   about it.  We explained it in the paper.  He is prepared to

11   make a statement to the Court today about it.  He never took

12   action on it.  And he felt that his own government had turned

13   its investigative forces and powers on him unjustifiably and

14   then, particularly after the 2022 grand jury reopened in

15   Southern District of Florida, it just never ended.  And he

16   regrets the e-mails.  He never took any action on them.

17           As we point out in the paper, your Honor, renouncing

18   his citizenship would have been detrimental to any intent to

19   flee, and Mr. Zeitlin is not an irrational man.  He is an

20   intelligent man.  That would have put a target on his back.

21   Notification goes to State Department and consular offices, and

22   many times people that renounce their citizenship are

23   investigated collaterally because it could be, you know, could

24   be a terrorism issue or some such thing.  So --

25           THE COURT:  Do you think we have a lot of terrorists

N9e2ZeiC kjc

1     who do that?

2             MR. BERNHOFT:  Some of the home grown ones I heard do,

3     but domestic, U.S.-born ones will renounce their citizenship

4     and attempt to go to Syria.  I've read these articles.  I don't

5     have personal experience with it and I'm not in federal law

6     enforcement.  Special Agent Balog could probably speak to that

7     more directly than I could.

8             THE COURT:  Okay.  Anything else?

9             MR. BERNHOFT:  We proposed conditions of release that

10    we believe are reasonable, will reasonably assure Mr. Zeitlin's

11    appearance.  This is going to be a complex case to prepare, a

12    complex case to try.  It's very important I have constant

13    access to Mr. Zeitlin --

14            THE MARSHAL:  Sit down.

15            MR. BERNHOFT:  Excuse me.  Could I confer with my

16    client, Judge?

17            (Defense counsel and defendant confer)

18            MR. BERNHOFT:  Mr. Zeitlin reminded me on the

19    renunciation e-mails that the Florence, Italy, consular office

20    invited Mr. Zeitlin to come and make an appointment.  Of course

21    he never did that.  So I wanted to make that point clear.

22            We believe the conditions we proposed, again, are

23    reasonable, will reasonably assure his appearance.  He is

24    committed to fight these charges against him and vindicate his

25    reputation.  He has nowhere to go, your Honor.

N9e2ZeiC kjc

1          We respectfully urge that the Court would grant the

2     proposed order that we submitted in our main bail motion.

3          THE COURT:  Thank you.

4          MR. BERNHOFT:  Thank you, Judge.

5          THE COURT:  Ms. Kim.

6          MS. KIM:  Yes, your Honor.  May I use the lectern?

7          THE COURT:  Yes.  I would appreciate it if you would.

8          MS. KIM:  Your Honor, beginning with risk of flight,

9     there are essentially four reasons why the government submits

10    that there are no conditions that will reasonably assure the

11    defendant's appearance in court.  Those are his limited ties to

12    the community; his wealth and access to resources to flee; his

13    history, which has established that he is an experienced and

14    sophisticated individual who repeatedly deceives others,

15    including courts; and, finally, his disregard for the law.

16         Starting with his limited ties, as the Court stated,

17    the defendant has essentially no equity in his Las Vegas home,

18    and that is his principal home in the United States.  We are

19    not aware of any other homes.

20         The defendant is in the process of getting divorced.

21         He has attempted multiple times to renounce his U.S.

22    citizenship.  He has Israeli citizenship and would be able to

23    travel there based on that.

24         He has significant foreign travel, and he owns

25    approximately ten properties in Tulum, including two restaurant

N9e2ZeiC kjc

1    businesses and various shops.

2              The government also notes that his call center

3    business operates --

4              THE COURT:  What's your answer to counsel's argument

5    relating to the liquidation of those properties as part of the

6    divorce?

7              MS. KIM:  Your Honor, in terms of liquidation, my

8    understanding, based on what defense counsel has submitted, is

9    that the money would then go into a trust based on the order.

10   The government would not have immediate visibility into when

11   that money would then be available to Mr. Zeitlin.  We also

12   don't know if there are certain circumstances under which he

13   would be able to access that money.  But in addition to that,

14   your Honor --

15             THE COURT:  Presumably he could do whatever he wanted

16   with it to the extent the divorced spouse went along with it.

17             MS. KIM:  Yes, your Honor, presumably.

18             In addition to that, your Honor, the defendant has

19   immense resources, and this is in part because he was the owner

20   and operator of the call center business for at least 29 years.

21   The business raised hundreds of millions of dollars for various

22   charities and PACs, and the business typically was paid

23   approximately 90 percent of that money.  The defendant has

24   reported to Pretrial Services in New York that his income has

25   been at least approximately $600,000 per year.  His business

N9e2ZeiC kjc

continues to operate and he continues to have access to the

business's funds.

THE COURT:  Is he the sole owner of the business?

What's the ownership structure?

MS. KIM:  Your Honor, as of now -- so the business has

changed in terms of organization over the years.  At one point,

prior to approximately 2016, the call center business went by

the name of Courtesy Call.

In or about 2016, the defendant changed the name of

the call center business to Donor Relations, although the basic

functioning of the business remained the same.

In or about 2018, the defendant replaced the Donor

Relations entity and created additional entities to take its

place.  Those were Unified Data, Compliance Consultants,

American Tech, TPFE, and ATC.

And then in about 2020 forward, the defendant used

various d/b/as, for example, Cloud Data for Unified Data,

American PCI for Compliance Consultants, and Unlimited Tech

Support for American Tech.

These are all ways in which the defendant created

various layers to conceal, and continue to conceal, his fraud

from the public and from the FEC.

In 2021 to present, the defendant selected certain

employees of the call center business, and he made them nominal

owners of certain entities, and so right now the call center

N9e2ZeiC kjc

1    business, as we understand it, consists of LAV Services, EYP

2    Consultants, Wired for Data, and Standard Data Services.  And

3    the defendant also has a bank account that has continued for

4    Unified Data.

5          These entities, your Honor, the defendant continues to

6    have control over.  The employees who are running these

7    entities by name continue to report to and speak with the

8    defendant.

9          Turning back to the defendant's wealth and his access

10   to resources to flee, we note that the defendant was able to

11   secure $250,000 in cash in less than 24 hours after his arrest,

12   and our understanding was that defense counsel anticipated

13   securing an additional $250,000 in cash shortly thereafter.  In

14   the past three years and three months, he has paid, based on

15   defense counsel's submissions, over $6.8 million in taxes.

16   Just in the last year, he's paid --

17         THE COURT:  I'm sorry.  The time period you just

18   stated?

19         MS. KIM:  That is in the last three years and three

20   months, he paid over 6.8 million in -- and I said taxes.  I

21   think these are back taxes, your Honor.

22         In the last year, he's paid over 1.3 million in back

23   taxes owed.

24         The fact that he has been able to make these

25   substantial payments and the fact that he has been able to

N9e2ZeiC kjc

access upwards of $500,000 in cash so quickly shows that the

defendant has access to resources that the Court has not been

made aware of and that that access would allow him to flee.

You know, the plane is something that has come up in

this proceeding and in the prior proceeding.  It is unclear to

the government whether or not the plane is operable.  Based on

what the government has seen from online postings from March of

this year, it appears the defendant at least represented that

the plane was operable and that his ownership interest in the

plane amounted to approximately $600,000.  Regardless, that

plane is another example of an asset, and the defendant's

access to resources to flee and also his familiarity with

flying privately, your Honor.

One thing the government would also note about the

defendant's back taxes --

THE COURT:  Does the government know where the other

50 percent ownership interest is and what the relationship

between the owners is?

MS. KIM:  Your Honor, based on defense counsel's

representations, we understand that there may be one or two

additional owners, and our understanding is that those one or

two owners own 50 percent.  We don't know what the relationship

is between the defendant.

THE COURT:  Do you know who they are?

MS. KIM:  Yes.  That's based, again, on defense

N9e2ZeiC kjc

1   counsel's representations.

2           THE COURT:  Well, based on their representation, who

3   do they say they are?

4           MS. KIM:  Yes, your Honor.  If I could have one

5   minute.

6           (Government counsel confer)

7           MS. KIM:  Your Honor, the other owner is Joseph

8   Mirakhor.

9           THE COURT:  Mirakhor?

10          MS. KIM:  Mirakhor.

11          THE COURT:  Mirakhor.

12          And what's his connection to the defendant, if you

13  know?

14          MS. KIM:  I do not know.

15          THE COURT:  Does he work for any of these entities?

16          MS. KIM:  We do not believe at this time that he works

17  for any of these entities.

18          THE COURT:  Do you believe at this time that he used

19  to work for --

20          MS. KIM:  No, your Honor.

21          THE COURT:  Okay.  Go ahead, please.

22          MS. KIM:  We would also point out, in terms of the

23  back taxes, that even just based on defense counsel's

24  submission, it appears that the defendant learned about the

25  back taxes and the issues with his records in or about

N9e2ZeiC kjc

September 2018, and he then sought out defense counsel's

assistance.  But also based on the defendant's submission, it

appears that the defendant continued to fail to pay taxes after

September 2018, when he was on notice about these issues.  And

for tax years 2020, 2021, and 2022, he continues to owe back

taxes.

 Based on all of this information, the government

submits that the defendant both has access to resources and

additional wealth that would enable him to flee the

jurisdiction.  And based on his limited ties to the community

and his significant foreign ties and foreign travel, the

defendant is a risk of flight.

 In addition, the defendant's history and

characteristics show that he is experienced and sophisticated

at deception and that the Court cannot rely on his word.  He is

charged with fraud offenses relating to misrepresentations and

false statements made to donors through fundraising calls.

Through those fundraising calls, the defendant made a variety

of different types of misrepresentations.  Some of those were

about the nature of the organization that was doing the

fundraising.  Some of them were about how the money would be

spent.  And also some of them relate to an agreement that the

defendant had with certain PAC owners that, during certain time

periods, all of the money that was raised would go to the

defendant's telemarketing company.  And despite that agreement,

N9e2ZeiC kjc

1   he was still soliciting funds and representing to potential

2   donors that those funds would then go to the organization that

3   was making the call.

4          The defendant's scheme was sophisticated and

5   complicated, and he used various tactics to conceal the fraud.

6   As I mentioned earlier, he changed the name of his businesses

7   numerous times.  His mode of communication with his employees

8   including about the fraud were very particular.  He at a

9   certain point decided to limit his e-mail communications with

10   his employees.  He used encrypted applications like Signal that

11   delete messages and data.  He principally communicated with

12   employees through phone calls.  And he also appears to have

13   used various phones, some of which were seized, and that also

14   includes encrypted phones.

15          THE COURT:  Is there any reason to think that this

16   business couldn't be operated from abroad with essentially the

17   same facility as it is operated from the U.S.?

18          MS. KIM:  Your Honor, there is no reason to think that

19   he could not operate the business from abroad.  In fact, as I

20   mentioned earlier, there are call center locations overseas,

21   and the majority of the employees, as we understand it, work

22   remotely.

23          THE COURT:  Thank you.

24          MS. KIM:  The last point, your Honor, is that the

25   defendant has established that he has a complete disregard for

N9e2ZeiC kjc

the law, and this is highlighted by the fact that he made false

or misleading statements in connection with three different

federal proceedings.

          The first was a civil deposition on or about December

8, 2020.  That's in the case *Zeitlin v. Bank of America*,

18 Civ. 1919.  That is in the District of Nevada.  During that

civil deposition, among other false statements, the defendant

stated that he and his call centers did not have any input

into call scripts to determine what was said to potential

donors.  That is false.  E-mails and other evidence show that

the defendant and his employees did in fact edit call scripts.

          Another example of a misrepresentation is a

declaration that the defendant filed in federal court to Judge

Christopher Conner.  This is in the Middle District of

Pennsylvania.  The case is *Shoemaker v. Zeitlin*, 21 Civ. 1669.

The declaration is Docket 40.  It is dated on or about March 1,

2020.

          Some of the misrepresentations are as follows:

          In paragraph 10, the defendant stated "Wired for Data,

LLC, is not associated with, operated by, or controlled by me."

And he goes on to say, "and I do not direct, supervise, or

control this entity."

          He makes essentially similar statements in paragraphs

11 and 12 about the entities LAV Services and Standard Data

Services.

N9e2ZeiC kjc

1          As I mentioned earlier, these are three entities for

2     which the defendant selected an employee to be the nominal head

3     of the entities and he continues to operate them.

4          THE COURT:  What's the evidence to support that last

5     statement?

6          MS. KIM:  The fact that he continues to operate these

7     entity, your Honor?

8          THE COURT:  Yes, and that he selected these straw

9     owners.

10         MS. KIM:  Yes, the evidence there consists of things

11    such as witness statements, and so we are -- our understanding

12    is that despite the fact that these entities were created with

13    these nominal owners (a) the call center business has

14    continued; you know, no substantial differences have been made;

15    the defendant continues to be the boss of the call centers; he

16    continues to oversea the call centers; and he also continues to

17    have ultimate control over, for example, the salaries of the

18    individuals who nominally own these entities.

19         THE COURT:  And so you are telling me that you have

20    live witnesses who substantiate this?

21         MS. KIM:  Yes, your Honor.  We also have documents

22    that show that the defendant is involved in the day-to-day

23    activities of the call center, even up to the present time.

24         THE COURT:  Okay.  Thank you.

25         MS. KIM:  The last point, your Honor, which I won't

N9e2ZeiC kjc

1   belabor, is most recently, after the defendant's arrest, that

2   the defendant did not include the fact that he had partial

3   ownership in a private plane in his interview with Pretrial

4   Services.  Of course the defendant does not have to answer

5   questions in the Pretrial Services interview, but the

6   government submits that providing incomplete information or not

7   describing all of his assets presents a misleading

8   representation of his resources.

9          And so for all of those reasons, the government

10  submits that he poses a risk of flight.

11         Very quickly, in terms of danger to the community, the

12  defendant is charged with obstructing justice by instructing

13  employees to delete evidence of his fraud.  The defendant used,

14  as I mentioned earlier encrypted and other means to communicate

15  with others, and there is a serious risk that the defendant

16  will obstruct justice, particularly in part because of his

17  ongoing disregard for the law.  And based on Second Circuit law

18  and also *Stein*, which is a case before your Honor, obstructing

19  justice does constitute a basis for remand.

20         So for all of those reasons, your Honor, the

21  government submits that the defendant should be remanded.

22         THE COURT:  Thank you.

23         Relatively briefly, Mr. Bernhoft.

24         MR. BERNHOFT:  Yes.  I appreciate the opportunity,

25  your Honor.

N9e2ZeiC kjc

1          We submit that it is categorically

2     false—categorically false—that Mr. Zeitlin has ever deceived

3     any federal, state court or other tribunal or has demonstrated

4     any disregard for the law.

5          The *Shoemaker* case, government counsel is

6     interpreting, applying a sham alter ego nominee theory to

7     testimony that Mr. Zeitlin -- again, and drawing the conclusion

8     that it is false.  In fact, Mr. Zeitlin's statements in the

9     declaration in *Shoemaker* were true.  He is not the owner of

10    Wired for Data.  He is not the owner of LAD Services.  And

11    there are witnesses who will testify that he doesn't own them

12    and doesn't control them.  Those entities file tax returns

13    independent of anything Mr. Zeitlin owns.

14         And I resent the fact that the government comes in

15    here and says he is deceiving courts.  He's been a law-abiding,

16    tax-paying American his entire life.  We stand by that

17    declaration.  I will defend that declaration.

18         The Bank of America case, I have been lead litigator

19    on that case for five or six years.  They cherry-pick a couple

20    of statements along the same lines about control of entities

21    and editing scripts, and the government claims that Mr. Zeitlin

22    made false statements because the statements he makes

23    contradict core elements of their theory of criminality, and

24    that is not a basis for a reasonable person to conclude that he

25    deceives courts and disregards the law.

N9e2ZeiC kjc

1          THE COURT:  Did he ever, even once, have any input

2     with respect to any script?

3          MR. BERNHOFT:  Oh, sure, but -- yeah, I think that's

4     true.  Mr. Zeitlin has been a telemarketer for 30, 35 years.

5     All of the entities that he works with as clients, he doesn't

6     know what they are doing in terms of their mission statements.

7     They have to approve the script, they have to sign approval,

8     and nothing goes live and no telemarketing occurs until the

9     organizations --

10         THE COURT:  That isn't the point.  Did he testify in

11    the deposition that he never had any input into any of the

12    scripts --

13         MR. BERNHOFT:  No.  He did not testify to that.  This

14    is cherry-picked testimony from a seven-and-a-half-hour

15    deposition --

16         THE COURT:  I'm not asking how long the deposition

17    was.  I'm not asking whether it was cherrypicked.  Of course it

18    was.  That's what lawyers get paid to do, to focus on the

19    evidence that supports their case, not the other case.

20         MR. BERNHOFT:  I understand that, your Honor.

21         THE COURT:  Now can I see the deposition transcript,

22    please?

23         MS. KIM:  Yes, your Honor.

24         THE COURT:  Thank you.

25         MS. KIM:  I would direct the Court's attention to page

N9e2ZeiC kjc

57.

          THE COURT:  From the deposition of the defendant on

December 8, 2020, page 57:

"Q  Do they use a script?  How do they know what to say?

"A  Yes, they use a script.

"Q  Okay.  Who writes the script for them?

"A  The organizations that we represent.

"Q  Okay.  They write the script.  Do you have any input into

the script?

"A  No."

          MR. BERNHOFT:  And I think that's a correct statement

in context, your Honor.  And this is a complicated area and

complicated issue.

          THE COURT:  There is nothing complicated about it,

counsel.  I just asked you whether he ever said -- excuse me,

whether he ever edited scripts, and you said yes.

          MR. BERNHOFT:  Whether he had input into scripts, some

people will come to him and say, "What do you think about

this?"  He doesn't write the scripts.  He doesn't edit them.

He doesn't approve them.  It's not that straight forward, your

Honor.

          THE COURT:  Let's move on.

          MR. BERNHOFT:  I will address the issue of spinning

off companies, which is a very common business practice.  The

Court will note, based on AUSA Kim's statements, that these

1   entities that were spun off from the main Zeitlin

2   enterprise——data, compliance, IT.  There are about four or five

3   critical aspects of any successful fundraising enterprise, and

4   the companies were designed -- he had people that were loyal,

5   that worked very hard, and they went out and formed their own

6   companies to handle various aspects while Mr. Zeitlin focuses

7   on data.  These people know each other very well.  They trust

8   each other.  They have been in business together for a long

9   time.  It does not mean that Mr. Zeitlin was trying to be

10  deceptive by spinning off those companies.

11          I mean, Steve Jobs and Jony Ive from Apple, that's

12  what they did.  Some of the core people would develop certain

13  aspects, and Ive would go his own way.

14          Of course they talked.  They did business.  This is

15  ordinary business, your Honor.  It is not a sign of deception.

16          It's never a bad thing to pay your taxes as far as I

17  can tell.  And Mr. Zeitlin's been trying to catch up from the

18  CPA malpractice he was a victim of for many years and doing the

19  best that he can.  The $250,000 we actually did not obtain in

20  Nevada because the bank flagged the wire transfer to

21  Attorney Lance Maningo's trust account as a fraudulent

22  transaction.  The whole thing blew up and the whole thing

23  failed.  That's what happens with some of these large wires,

24  when the principal is not there in person to authorize the

25  wires.

N9e2ZeiC kjc

1          The relationship between Joseph Mirakhor, Bondio LLC,

2     and Mr. Zeitlin is at daggers drawn.  It is controversial.

3     Mr. Zeitlin believes he was taken advantage of.

4          The timeline is clear, though, and Pilot Ross's

5     affidavit speaks to this.  When Mr. Zeitlin put his share of

6     that plane up for sale -- and of course you can't buy a working

7     Gulfstream III jet, even circa 1980, you can't buy a jet for

8     $1.3 million.  So Mr. Zeitlin is selling his share for

9     $650,000, knowing at the time that Gulfstream had to come in

10    and recertify the frame of that jet, and that was understood.

11    But he did not know that Mirakhor and other partners had

12    started to cannibalize that plane for their other jets.  And

13    that's what Pilot Ross testifies to based on firsthand

14    knowledge.

15         The nominal ownership is a theory.  I submit that

16    those witnesses will testify that they run those companies;

17    that they file tax returns on the income those companies

18    generate; that, yes, they continue to have conversations with

19    Mr. Zeitlin.  Many of these entrepreneurs that develop a large

20    enterprise step back and spin off sub-aspects of their company

21    for others to handle.  It's very common.  It's not a sign of

22    deception.

23         I just -- on balance, Mr. Zeitlin has not been

24    deceptive.  He has handled these investigations with dignity

25    and grace that started back in 2016-17.  We cooperated with the

N9e2ZeiC kjc

1    FTC, produced documents to them.  Then the Florida grand jury

2    popped up and Judge Navarro in Nevada stayed it, on her own

3    motion, because of the overlap in subject matter.  We had know

4    control over that.

5          2018, cooperated regarding the subpoenas in that

6    matter.  I have reviewed --

7          THE COURT:  I think you are wandering a little.

8          MR. BERNHOFT:  I have reviewed 4 or 500,000 pages of

9    e-mail communications from the Zeitlin companies, how they do

10   business.  Everything is about compliance.  I haven't seen one

11   inculpatory electronic communication that would suggest that

12   any of the participants were intentionally, knowledgeably

13   engaging in fraud.

14         I would respectfully urge the Court to impose

15   reasonable conditions of release so Mr. Zeitlin can prepare for

16   trial.

17         Thank you, Judge.

18         THE COURT:  Okay.  Thank you.

19         Decision is reserved.

20         Now, we have the issue of the *Curcio* and I'm already

21   late for another matter, so we are going to have to put that

22   over.

23         What would be convenient, bearing in mind I have a

24   trial starting October 3.

25         MS. KIM:  Your Honor, the government is available.

N9e2ZeiC kjc

1    Any time, for example, next week would work.

2              MR. BERNHOFT:  I will make myself available, your

3    Honor.

4              THE COURT:  All right.  I will let you know a date,

5    but it will be between now and October 3.

6              MR. BERNHOFT:  Thank you.

7              MS. KIM:  Thank you, your Honor.

8              MR. DRATEL:  Your Honor?

9              THE COURT:  Yes, Mr. Dratel.

10             MR. DRATEL:  I have a Second Circuit brief due next

11   Friday, so the following week would probably be better.

12             THE COURT:  It won't be next Friday, that I guarantee

13   you.

14             MR. DRATEL:  No, I mean by next Friday, so I will

15   be --

16             THE COURT:  Oh, by next Friday.  So you are talking

17   about the week of what?

18             MR. DRATEL:  The 25th, although Monday is Yom Kippur,

19   so --

20             THE COURT:  I'm not going to do that day either, I

21   promise.

22             MR. DRATEL:  Tuesday to Friday of that week.

23             THE COURT:  We will fit it in somehow.

24             MR. DRATEL:  Thank you, your Honor.

25             MR. BERNHOFT:  Your Honor, may I?

N9e2ZeiC kjc

1        THE COURT:  Yes.

2        MR. BERNHOFT:  I did want to point out to the Court,

3    and I apologize, I was focused on all of this mass material.  I

4    do want to point out that Mr. Zeitlin's mother is here from

5    Wisconsin in support of his release, as is one of his children,

6    daughter Sarah, and also a close friend from a long time from

7    Nevada, Nick Marlow is here to support Mr. Zeitlin.  And

8    particularly Mrs. Zeitlin and daughter Sarah were hoping that

9    they might be able to visit briefly, subject to the USMS

10   discretion, with Mr. Zeitlin after the hearing.  Is that

11   possible, Judge?

12       THE COURT:  Whatever the marshals feel is appropriate

13   they can do.

14       MR. BERNHOFT:  All right.  Thank you.  I appreciate

15   it, Judge.

16       MS. KIM:  Your Honor, very quickly, the government

17   asks the Court to exclude time between now and October 3.  We

18   understand that the Court may set another conference schedule

19   by October 3.

20       The exclusion of time would allow the Court to

21   consider all of the arguments made, it would allow the

22   government to produce discovery, and for the defendants to --

23       THE COURT:  I would have anticipated you would be

24   asking for --

25       MS. KIM:  Oh, yes, your Honor.

N9e2ZeiC kjc

1           THE COURT:  -- a very different date.

2           MS. KIM:  That is very true.

3           We would ask that time be excluded between now and

4    April 2, 2024.

5           THE COURT:  Is there any objection to that?

6           MR. BERNHOFT:  None.

7           THE COURT:  Granted for the reasons articulated.

8           MS. KIM:  Thank you, your Honor.

9           THE COURT:  Ms. Kim.

10          Okay.  Thank you very much.

11          MR. BERNHOFT:  Thank you, your Honor.

12                                oOo

13

14

15

16

17

18

19

20

21

22

23

24

25