**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 23-cr-419 (LAK) |
| v. | |
| RICHARD ZEITLIN, | |
| Defendant. | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF**
**HIS MOTION TO DISMISS COUNTS ONE AND TWO OF THE INDICTMENT**
**AND FOR A BILL OF PARTICULARS**

Through undersigned counsel, Defendant Richard Zeitlin hereby submits the following memorandum in support of his motion. As discussed below, Mr. Zeitlin respectfully requests this Court dismiss Counts One and Two of the Indictment in whole or in part. Furthermore, to the extent Counts One and Two were to survive Mr. Zeitlin's motion to dismiss, Mr. Zeitlin respectfully would request this Court direct the government to file a bill of particulars.

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................... ii

TABLE OF AUTHORITIES.......................................................................................... iii

INTRODUCTION ..........................................................................................................1

I.    The Substantive Law of Wire Fraud. ...............................................................1

    A.    To establish the critical elements of wire fraud, the government must prove a defendant intended to deny a counterparty an essential element of their bargain...................................2

    B.    Additional pertinent elements of wire fraud include materiality and interstate wire communications..........................................................................................................6

    C.    Both wire fraud and conspiracy are subject to a five-year statute of limitations. ...........7

    A.    The Government's True Theory of Criminality is Foreclosed by Supreme Court Precedent. ...................................................................................................................8

    B.    The Government Has Not Articulated Any Fraud Beyond High Overhead Costs........12

    C.    Counts One and Two of the indictment should be dismissed in whole or in part. ........15

    D.    This Court should dismiss the indictment's "new" or "special" drive and "100% Agreements" theories of wire fraud for failure to state an offense. ......................................15

    E.    This Court should dismiss Count Two of the indictment, because it is impermissibly duplicitous and insufficiently specific.................................................................................22

    F.    This Court should dismiss Count One of the indictment, because it is insufficiently specific.........................................................................................................................27

III.    Alternatively, this Court should direct the government to supply a bill of particulars for Counts One and Two of the Indictment. ................................................................................28

CONCLUSION ............................................................................................................30

**TABLE OF AUTHORITIES**

**Cases**

*Callanan v. United States*, 364 U.S. 587, 81 S.Ct. 321 (1961) ....................................22

*Ciminelli v. United States*, 598 U.S. 306, 143 S.Ct. 1121 (2023) ...............................3, 4

*Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600 (2003).....................passim

*Neder v. United States*, 527 U.S. 1, 119 S.Ct. 1827 (1999) .........................................16

*Spiegel v. Reynolds*, No. 15 C 8504, 2017 U.S. Dist. LEXIS 167777 ...................11, 12

*United Cancer Council, Inc. v. Commissioner,* 165 F.3d 1173 (7th Cir. 1999)...........................11

*United States v. Aracri*, 968 F.2d 1512 (2d Cir. 1992) ...........................................22, 27

*United States v. Bankman-Fried*, No. 22-CR-0673 (LAK), 2023 WL 4194773 (S.D.N.Y. June 27, 2023)................................................................................................16

*United States v. Bin Laden*, 92 F.Supp.2d 225 (S.D.N.Y.2000) .................................29

*United States v. Binday*, 804 F.3d 558 (2d Cir. 2015).....................................................4

*United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987)......................................28, 29

*United States v. Bouyea*, 152 F.3d 192 (2d Cir. 1998) .................................................7

*United States v. Burk*, 737 F. App'x 963 (11th Cir. 2018)............................................8

*United States v. Chalmers*, 410 F. Supp. 2d 278 (S.D.N.Y. 2006) ..............................29

*United States v. Connolly*, 24 F.4th 821 (2d Cir. 2022) ................................................2

*United States v. Eisen*, 974 F.2d 246 (2d Cir. 1992) ...................................................7

*United States v. Fell*, No. 5:01-CR-12-01, 2016 WL 1290416 (D. Vt. Mar. 30, 2016)...............16

*United States v. Fermin Castillo*, 829 F.2d 1194 (1st Cir. 1987)................................23

*United States v. Frank*, 156 F.3d 332 (2d Cir. 1998) ...................................................6

*United States v. Halloran*, 821 F.3d 321 (2d Cir. 2016) ...............................................7

*United States v. Jabar*, 19 F.4th 66 (2d Cir. 2021) ..................................................3, 5

*United States v. Kinney*, 211 F.3d 13 (2d Cir. 2000)............................................................6

*United States v. Margiotta*, 646 F.2d 729 (2d Cir. 1981)...........................22, 23, 25, 26

*United States v. Moses*, 512 F.Supp.3d 448 (W.D.N.Y. 2021) ..................................15

*United States v. Murray*, 618 F.2d 892 (2d Cir. 1980)................................................22

*United States v. Novak*, 443 F.3d 150 (2d Cir. 2006)...................................................3

*United States v. Ramirez*, 420 F.3d 134 (2d Cir. 2005)........................................23, 29

*United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970) .......................5, 16, 17

*United States v. Rentz*, 777 F.3d 1105 (10th Cir. 2015) ...............................................22

*United States v. Resendiz-Ponce*, 549 U.S. 102, 127 S.Ct. 782 (2007)........................15

*United States v. Rogers*, 9 F.3d 1025 (2d Cir. 1993) ....................................................7

*United States v. Roy*, 783 F.3d 418 (2d Cir. 2015).......................................................2

*United States v. Rutigliano*, 790 F.3d 389 (2d Cir. 2015) ...........................................7

*United States v. Santeramo*, 45 F.3d 622 (2d Cir. 1995)............................................16

*United States v. Shellef*, 507 F.3d 82 (2d Cir. 2007) ...........................................passim

*United States v. Starr*, 816 F.2d 94 (2d Cir. 1987).................................................6, 16

*United States v. Sturdivant*, 244 F.3d 71 (2d Cir. 2001) ...........................................22

*United States v. Thomas*, 377 F.3d 232 (2d Cir. 2004) ..........................................2, 5

*United States v. Tutino*, 883 F.2d 1125 (2d Cir. 1989) .......................................23, 26

*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013)......................................................27

*United States v. Walker*, 191 F.3d 326 (2d Cir. 1999) ................................................2

*United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991)...............................................3

*United States v. Walsh*, 194 F.3d 37 (2d Cir. 1999)..................................................28

*United States v. Weaver*, 860 F.3d 90 (2d Cir. 2017)..................................................7

*United States v. Zemlyansky*, 908 F.3d 1 (2d Cir. 2018) ..............................................2

*Village of Schamburg v. Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826
(1980) ..............................................................................................................9, 10

**Statutes**

18 U.S.C. § 1343 ..............................................................................................1

18 U.S.C. § 1349 ...........................................................................................2, 7

18 U.S.C. § 2326 ..............................................................................................1

18 U.S.C. § 3282 ..............................................................................................7

18 U.S.C. § 371 ...............................................................................................2

**Other Authorities**

Dan Pallotta, *The way we think about charity is dead wrong Ted* (2013),
https://www.ted.com/talks/dan_pallotta_the_way_we_think_about_charity_is_dead_wrong
(last visited Nov 29, 2023). ................................................................................10

Richard Steinberg & Deborah Morris, *Ratio Discrimination in Charity Fundraising: The
Inappropriate Use of Cost Ratios Has Harmful Side-Effects*, 1 VOLUNTARY SECTOR
REV. 77, 89 (2010). ..........................................................................................12

**Rules**

Fed. R. Crim. P. 12 ..........................................................................................15

Fed. R. Crim. P. 7 ............................................................................................15

**INTRODUCTION**

For over half a decade the Government has relentlessly and aggressively investigated Mr. Zeitlin. In 2018 the Government opened a grand jury investigation into Mr. Zeitlin which was apparently abandoned for lack of evidence. This failed investigation, and its many Constitutional infirmities, were eventually transferred to New York. After years of investigation and millions of dollars of taxpayer money spent the Government has finally charged Mr. Zeitlin with a crime. The Government accuses Mr. Zeitlin of a massive scheme to defraud potential donors through his fundraising enterprise because unknown callers allegedly told unknown donors on unknown dates that they were donating to a "new" or "special" drive – apparently as opposed to an "old" or "not special drive." The Government does not explain how this is fraud, when the alleged fraud was committed, who it was committed by, or who the alleged victims are. Nevertheless, the Government seeks to imprison Mr. Zeitlin over these weak, almost nonsensical, allegations. The Government's indictment fails in nearly every respect and should be dismissed.

**I.     The Substantive Law of Wire Fraud.**

In a four-count indictment filed on August 15, 2023, a federal grand jury in this District charged Richard Zeitlin with conspiracy to commit telemarketing wire fraud (Count One), telemarketing wire fraud (Count Two), conspiracy to obstruct justice (Count Three), and obstruction of justice (Count Four). (Doc. 1). This memorandum focuses on the pertinent substantive elements of wire fraud, in violation of 18 U.S.C. § 1343, which are also pertinent to the charge of wire-fraud conspiracy under § 1349. For the reasons set forth below, the Government has not stated a single cognizable mail or wire fraud count. This memorandum does not discuss the additional element of Counts One and Two under 18 U.S.C. § 2326(1), which authorizes an additional prison sentence for wire fraud or conspiracy "in connection with the conduct of

telemarketing." Nor does this memorandum discuss the obstruction charges in Counts Three and Four.

"The essential elements of a mail or wire fraud violation are: (1) a scheme to defraud; (2) money or property as the object of the scheme; and (3) use of the mails or wires to further the scheme." *United States v. Shellef*, 507 F.3d 82, 107 (2d Cir. 2007) (quotation marks omitted). Furthermore, "[t]o prove a scheme to defraud, the government must prove three [sub-elements]: (1) the existence of the scheme, (2) fraudulent intent (including some contemplated actual harm or injury), and (3) materiality." *United States v. Thomas*, 377 F.3d 232, 242 n.7 (2d Cir. 2004) (citation omitted). The wire and mail fraud statutes are analyzed the same way. *United States v. Connolly*, 24 F.4th 821, 833 (2d Cir. 2022).

The elements of a wire-fraud conspiracy, in violation of 18 U.S.C. § 1349, are "(1) an agreement between at least two people to commit [wire fraud], and (2) the defendant's knowing engagement in the conspiracy with the specific intent that the object of the conspiracy be committed." *United States v. Zemlyansky*, 908 F.3d 1, 10 (2d Cir. 2018). Unlike the general federal conspiracy statute, 18 U.S.C. § 371, the government need not prove an overt act was committed in furtherance of a wire-fraud conspiracy under § 1349. *United States v. Roy*, 783 F.3d 418, 421 (2d Cir. 2015) (per curium).

**A.      To establish the critical elements of wire fraud, the government must prove a defendant intended to deny a counterparty an essential element of their bargain.**

The critical elements in a wire fraud prosecution are fraudulent intent and money or a traditional property interest was the object of the scheme. "The first element focuses on the intent to harm; the second element is concerned with the precise nature of that harm, and requires that the harm be concrete." *United States v. Walker*, 191 F.3d 326, 335 (2d Cir. 1999). The government

need not "prove that the victims of the fraud were *actually* injured," but at minimum, it must prove the "defendant[ ] *contemplated* some actual harm or injury to [the] victims." *United States v. Novak*, 443 F.3d 150, 156 (2d Cir. 2006).

To establish these critical elements, it is not sufficient for the government to prove the defendant intended to cause a counterparty to part with money or property through misrepresentations or deceit. The Second Circuit has articulated:

> a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid-which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes.

*Shellef*, 507 F.3d at 108.

Until 2023, prosecutors in the Second Circuit pursued wire fraud charges on two "closely related" theories. *United States v. Jabar*, 19 F.4th 66, 82 n.60 (2d Cir. 2021). First was the "benefit of the bargain" theory, under which a defendant may be guilty of wire fraud if he contemplated "a discrepancy between benefits [the counterparty] reasonably anticipated because of the misleading representations and the actual benefits the defendant . . . intended to deliver." *Jabar*, 19 F.4th at 77. However, "the misrepresentations must be central, not just collateral, to the bargain between the defendant and the [counterparty]." *Id.*

Second was the "right to control" theory, which rested on the premise that the "right to control" how assets are spent is an intangible property interest. *United States v. Wallach*, 935 F.2d 445, 462 (2d Cir. 1991), *abrogated by Ciminelli v. United States*, 598 U.S. 306, 143 S.Ct. 1121 (2023). Under this theory, a defendant could be found guilty of wire fraud if he intended his misrepresentations to deprive a counterparty of "potentially valuable economic information" that might be relevant to the counterparty's decision-making. *E.g.*, *United States v. Binday*, 804 F.3d

558, 574, 579-80 (2d Cir. 2015), *abrogated by Ciminelli v. United States*, 598 U.S. 306, 143 S.Ct. 1121 (2023).

1.     **A narrow reading of *Ciminelli* conflicts with longstanding Second Circuit precedent.**

In May of 2023, the Supreme Court invalidated the "right to control" theory in *Ciminelli v. United States*, 598 U.S. 306, 143 S.Ct. 1121 (2023). In *Ciminelli*, the defendants rigged a competitive bidding process, and a defendant's construction company accordingly received a $750 million development contract. The government prosecuted the defendants on the "right to control" theory – that is, that the defendants schemed to deprive the counterparty of economic information it would consider valuable in deciding how to award the contract. But the Supreme Court reversed. The Court held defendants do not commit wire fraud unless "money or property was an object of their fraud." *Id*. at 312, 143 S.Ct. 1121 (quotation marks omitted). And the right to control one's assets, *i.e.*, "to make informed decisions about the disposition of one's assets," is not a property right within the meaning of the federal fraud statutes, *id.* at 314.

The government in *Ciminelli* relied exclusively on the theory that the defendants schemed to deprive the counterparty of valuable economic information about the bidding process, not that the defendants schemed to deprive the counterparty of the actual development contracts. *Ciminelli*, 598 U.S. at 310-11 & n.1; *id.* at 318 (Alito, J., concurring). Thus, the Supreme Court did not resolve whether the government might have prosecuted the same case successfully on a "benefit of the bargain" theory by proving the defendants intended to deprive the counterparty of the contracts themselves.

A cramped reading of *Ciminelli* would restrict its holding to the object-of-the-scheme element of wire fraud, not the intent-to-defraud element. Under such a reading, so long as a defendant ultimately intended to obtain money or a traditional property interest from a

counterparty (which would be true in practically every case), the government could prosecute the defendant on a "benefit of the bargain" theory, even if the defendant only intended his deceit to deprive the counterparty of potentially valuable economic information.

This Court should reject such a narrow reading, however, and hold instead that *Ciminelli* governs both the object-of-the-scheme element and the intent-to-defraud element of wire fraud. This is the proper reading of *Ciminelli*, because as the Second Circuit has previously held, fraudulent intent only exists if a defendant contemplated actual harm or injury to his counterparty. *Thomas*, 377 F.3d at 242 n.7. Thus, because intent to defraud means intent to cause actual harm or injury, and the mere deprivation of potentially valuable economic information is not a cognizable harm after *Ciminelli*, it necessarily follows that intent to defraud requires something <u>more</u> than the intent to deprive a counterparty of potentially valuable economic information.

Accordingly, when prosecuting a defendant under a "benefit of the bargain" theory, the government must prove the defendant intended to cause a counterparty to part with money or property through misrepresentations or deceit about an essential element of their bargain, which the defendant did not intend to deliver. *E.g.*, *Jabar*, 19 F.4th at 77. However, if the defendant merely intended his misrepresentations to deprive a counterparty of potentially valuable economic information, but if the defendant otherwise intended to give the counterparty the essential benefit of their bargain, then the defendant lacked intent to defraud, even if the defendant's ultimate object was to obtain money or a traditional property interest from the counterparty.

These principles are consistent with the Second Circuit's holdings in various "benefit of the bargain" cases over the decades. To begin with, mere fraudulent inducement – as when a salesman lies about his reason for offering a particular bargain – does not qualify as intent to defraud. *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1182 (2d Cir. 1970). Similarly,

intent to defraud does not exist where a defendant merely provides the agreed-upon services dishonestly, *e.g.*, bulk-mailing a counterparty's material as agreed but surreptitiously underpaying the Postal Service for postage, *United States v. Starr*, 816 F.2d 94, 99 (2d Cir. 1987), or surreptitiously taking kickbacks, *Novak*, 443 F.3d at 159. However, "[a] defendant . . . may not defeat a mail fraud charge simply by providing alternative services." *United States v. Frank*, 156 F.3d 332, 335 (2d Cir. 1998).

These principles are also consistent with the legal standards that govern fundraising solicitation. The Supreme Court is clear, "High fundraising costs, without more, do not establish fraud," and "mere failure to volunteer the fundraiser's fee when contacting a potential donee, without more, is insufficient to state a claim for fraud." *Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 624 (2003).[1] However, although telemarketers have no duty to disclose the proportion of their gross intake that will be spent on fundraising overhead, intent to defraud may exist where telemarketers misrepresent the nature and quality of an entity's activities, thereby misleading donors as to how their money will be spent. *United States v. Kinney*, 211 F.3d 13, 18-19 (2d Cir. 2000). Ultimately, the question in a fundraising case is the same as any other "benefit of the bargain" case, *i.e.*, whether the defendant intended to cause potential donors to part with money or property through misrepresentations or deceit about an essential element of their bargain, which the defendant did not intend to deliver.

**B.  Additional pertinent elements of wire fraud include materiality and interstate wire communications.**

As part of wire fraud's first element (the existence of a scheme to defraud), the government must prove a defendant's misrepresentations were material. *United States v. Weaver*, 860 F.3d 90,

---

[1] It is unclear why the Court used the term "donee" here, when apparently it meant "donor."

94 (2d Cir. 2017). "A statement is material if the misinformation or omission would naturally tend to lead or is capable of leading a reasonable person to change his conduct. In other words, a lie can support a fraud conviction only . . . if it would affect a reasonable person's evaluation of a proposal." *Id.* (quotation marks, brackets, and citation omitted). The materiality sub-element is interconnected with the fraudulent-intent sub-element, because a material misrepresentation indicates intent to defraud, whereas an immaterial misrepresentation does not indicate intent to defraud. *Id.*

As the third element of wire fraud, the government must prove the defendant "either used interstate wires in furtherance of his scheme, or knew that the use of interstate . . . wire services was a reasonably foreseeable consequence of the scheme." *United States v. Halloran*, 821 F.3d 321, 342 (2d Cir. 2016). Among other things, wire communications may further a scheme if they are designed to conceal the scheme. *See United States v. Rogers*, 9 F.3d 1025, 1030 (2d Cir. 1993).

### C.     Both wire fraud and conspiracy are subject to a five-year statute of limitations.

As pertinent here, the statute of limitations for wire fraud or conspiracy is five years. 18 U.S.C. § 3282; *United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998). For a substantive charge of wire fraud, the statute of limitations period runs from the date of a charged wire. *See United States v. Rutigliano*, 790 F.3d 389, 401 (2d Cir. 2015); *United States v. Eisen*, 974 F.2d 246, 263 (2d Cir. 1992) ("[T]he statute of limitations in a mail fraud case runs from the date of the charged mailing, notwithstanding that the defendant's actions concerning the scheme to defraud occurred before the statutory period."). Presumably, a § 1349 conspiracy charge is timely if the conspiracy was ongoing within a five-year period preceding the indictment, regardless of whether any overt

act – including use of interstate wire facilities – occurred during that five-year period. *United States v. Burk*, 737 F. App'x 963, 968 (11th Cir. 2018).

## II.     The Indictment of Mr. Zeitlin.

In Mr. Zeitlin's case, the conspiracy and wire fraud charges in Counts One and Two of the indictment rely on the same alleged scheme and core facts. (Doc. 1, ¶¶ 1, 3-13, 16-20). As its charged scheme, the indictment alleges Mr. Zeitlin used call centers "to defraud numerous donors and potential donors by providing misleading and false information about how the donors' money would be spent and the nature of the organizations to which they were giving." (Doc. 1, ¶ 1.) According to the indictment, Mr. Zeitlin's entities "profited from [his] fraud, typically keeping a large portion of each dollar donated – approximately 90 percent – the rest of which was disbursed to the respective PAC." *Id.* This is the Government's true theory of criminality – that Mr. Zeitlin allegedly defrauds donors because he "keeps" too much of the donated money. The problem with this theory is that the Supreme Court has unequivocally rejected it. *Illinois ex rel. Madigan v. Telemarketing Assocs.*, 538 U.S. 600, 615, 123 S.Ct. 1829 (2003).

### A.     The Government's True Theory of Criminality is Foreclosed by Supreme Court Precedent.

This isn't the first time the Government has tried to imprison a fundraiser on the theory that a fundraiser defrauds donors by "keeping" what the Government deems is too high a percentage of the raised funds. *Id.* The Government, in pushing this deceptive narrative, either blatantly misrepresents the facts or ignores basic economic realities.

The Government claims Mr. Zeitlin and his businesses have raised, "hundreds of millions of dollars," and "keep[s]" approximately "90 percent" of the raised funds. *Id.* The Government would have the Court, and the public, believe that Mr. Zeitlin has raised millions of dollars only to put 90% of the funds directly into his own pocket – but this is false. Fundraising, like all

economic endeavors, requires significant overhead costs. The Supreme Court has recognized that fundraising is a particularly complex economic model which has exceptionally high overhead costs. Indeed, the High Court held that fundraisers do not commit fraud solely because they retain 85% of the raised funds to pay for the costs of fundraising while donating the remaining 15% to the cause the funds were raised for. *Illinois x rel. Madigan*, 538 U.S. at 611, 123 S.Ct. 1829. The Court repeatedly refused to set an upper limit on the amount of overhead retention which would be "dispositive" for fraud. *Id.* at 617 fn. 8.

"The First Amendment protects the right to engage in charitable solicitation." *Id.* at 611 (citing *Village of Schamburg v. Citizens for a Better Environment,* 444 U.S. 620, 632, 100 S.Ct. 826 (1980). The High Court has repeatedly emphasized "that fraud may not be inferred simply from the percentage of charitable donations absorbed by fundraising costs." *Madigan*, 38 U.S. at 615. "Such [overhead] spending might be altogether appropriate" to pay for the costs of operating a successful fundraising enterprise such as paying for: salaries and benefits for thousands of callers, massive technological infrastructure (along with the experts needed to set up, maintain, and repair the same), regulatory compliance, legal fees, commercial real-estate, taxes, and more. *Id.* at 613.

The Government's "proportionality" theory of criminality is misguided and rests upon ignorance of basic economic realities and puritanical notions of charity. Acclaimed philanthropist Dan Pallotta explains how the Government's proposed theory of criminality is not only "dead wrong" but actually hurts charitable giving and important social causes:

> We have two rulebooks. We have one for the nonprofit sector, and one for the rest of the economic world . . . In the for-profit sector, the more value you produce, the more money you can make. But we don't like nonprofits to use money to incentivize people to produce more in social service. We have a visceral reaction to the idea that anyone would make very much money helping other people. Interestingly, we don't have a visceral reaction to the notion that people would make a lot of money not helping other people. You know, you want to make 50 million dollars selling violent video games to kids, go for it. We'll put you on the

cover of Wired magazine. But you want to make half a million dollars trying to cure kids of malaria, and you're considered a parasite yourself.

Dan Pallotta, *The way we think about charity is dead wrong Ted* (2013), https://www.ted.com/talks/dan_pallotta_the_way_we_think_about_charity_is_dead_wrong (last visited Nov 29, 2023).

Indeed, if an entrepreneur spent $1,000,000 to create and market a nicotine vaporizer only to net $100,000 in profit, that's called a 10% return on investment and is considered good business. But if a fundraiser spends $1,000,000 to raise $100,000 for a PAC or a charity the Government calls it criminal fraud. But there is no difference between these two hypothetical enterprises.

When the indictment is stripped of its prolix, the Government's true position is that "there ought to be a law" against high overhead costs in fundraising. But such laws have been repeatedly struck down as violative of the First Amendment. *See Schamburg,* 444 U.S. 620, 100 S.Ct. 826 (invalidating a law prohibiting fundraisers from spending more than 25% of raised funds on overhead.) The Government's theory of criminality expressly charges Mr. Zeitlin with defrauding donors by "mislead[ing] donors . . . into believing that they were donating money . . . (b) that would go to an organization (rather than to the telemarketers)." (Doc 1, ¶ 7.) But there is no dispute that this theory of criminality is rejected by binding Supreme Court precedent. *See Madigan,* 538 U.S. at 606, 123 S.Ct. 1829. Thus, the Court must at least partially dismiss this part of the indictment for three reasons.

First, fundraisers are not under a duty to disclose their overhead costs to potential donors, and a "bare failure" to disclose what percentage of funds are retained by the fundraiser "does not suffice to establish fraud." *Id*. at 606. Second, the Supreme Court has thoroughly rejected the notion of a percentage-based theory of criminality in fundraising. *Id.* at 618, n.8. Finally, the Supreme Court rejects the notion that a "charity derived no benefit from funds collected but not

turned over to it" because charities still benefit from other things like donor lists, raised awareness, and "the act of solicitation itself." *Id.* at 616.

Many of these same points were amplified in a thoughtful opinion authored by distinguished law-and-economics scholar Richard Posner, then Chief Judge of the Seventh Circuit Court of Appeals in *United Cancer Council, Inc. v. Commissioner,* 165 F.3d 1173 (7th Cir. 1999). Even though the cost ratio exceeded 92 percent ($28.8M in raised donations and $26.5M retained by fundraisers), the court held emphatically that high fundraising costs alone are not related to inurement, self-dealing or fraud and thus cannot be used as a substitute measure for these violations. *Id.* at 1175. In refusing to allow the IRS to revoke the charity's tax-exempt status, the court noted that it was difficult enough for "new, small, weak, or marginal charities to survive, because they are likely to have a high expense ratio," and explained that sustaining the Tax Court decision allowing revocation would make their survival "even more dubious." *Id.* at 1179.

As Judge Posner explained, the reason the government may not use high-cost ratios as evidence of fraud or self-dealing is that it would allow the government unbridled discretion and lead to standardless adjudications:

> We were not reassured when the government's lawyer, in response to a question from the bench as to what standard he was advocating to guide decision in this area, said that it was the 'facts and circumstances' of each case. That is no standard at all, and makes the tax status of charitable organizations and their donors a matter of the whim of the IRS.

*Id.* at 1179.

In *Spiegel v. Reynolds*, No. 15 C 8504, 2017 U.S. Dist. LEXIS 167777, the Court rejected an argument that charitable organization was a "sham charity" because fundraiser "ACS took hoe 85% of the funds it raised for the Society." *Id*., *3 n.4 and *11.

The *Spiegel* Court noted also that "[I]n addition to being a poor legal standard, interpreting the nonprofit exemption to include a percentage-of-funds threshold would likely cause the TCPA to run afoul of the First Amendment." *Id*. at *10 n.7 (collecting Supreme Court cases).

Moreover, as two noted experts on charitable fundraising have explained, "high cost ratios do not indicate fraud or waste." Richard Steinberg & Deborah Morris, *Ratio Discrimination in Charity Fundraising: The Inappropriate Use of Cost Ratios Has Harmful Side-Effects*, 1 VOLUNTARY SECTOR REV. 77, 89 (2010). "Fundraising costs are necessarily high" when a charity "pursues an unpopular mission," is "new," is "prospecting for new donors," or "when the charity competes with larger, more established causes." *Id*. "[S]trict restrictions on fundraising costs would eliminate…competition." *Id.* at 88. "Simply labeling an action one for 'fraud,' of course, will not carry the day." *Madigan*, 538 U.S. at 617, 123 S.Ct. 1829. In order to survive *Madigan,* the Government must demonstrate an intentional misrepresentation. The Government has failed to do so and its indictment must be at least partially dismissed. Indeed, the Government's exceptionally weak indictment reveals that naked proportionality is its true theory of criminality.

**B.** **The Government Has Not Articulated Any Fraud Beyond High Overhead Costs.**

The Indictment alleges that Mr. Zeitlin "defrauded donors" because unidentified statements led unidentified donors into somehow believing unspecified funds "would go to an [unspecified] organization (rather than to the telemarketers.)" (Doc. 1, ¶ 7) (parentheticals in original, brackets added). This theory is expressly unconstitutional and warrants "swift dismissal." *Illinois ex rel. Madigan,* 538 U.S. at 616, 123 S.Ct. 1829. The Government then identifies three categories of allegedly false and misleading information it believes deceived donors. (Doc. 1, ¶¶ 7-12.) Each of these categories is hopelessly vague, fails to inform Mr. Zeitlin what he is being charged with, and fails to state a cognizable offense for fraud or conspiracy.

*First*, the indictment alleges Mr. Zeitlin "directed employees . . . to alter the call scripts used when calling potential donors on behalf of certain PACs in order to mislead potential donors into believing that they would be giving to a direct-services organization (*i.e*, a charity), rather than to a political advocacy organization, (*i.e.*, a PAC)." (Doc. 1, ¶ 8). Which employees did Mr. Zeitlin direct? When did he direct them? How did he direct them? Which scripts were altered? How were the scripts altered? When were the scripts altered? Which donors were called? When were these unspecified donors called? Which statements were made to unspecified potential donors which led them to believe they would be giving to a charity and not a PAC? How did these unspecified statements mislead unspecified donors? Did the unspecified call also expressly state he or she was raising funds for a PAC during the call? The Indictment does not answer a single one of these threshold questions. Under these non-facts, Mr. Zeitlin is not even aware what he is being charged with in violation of his fundamental Constitutional rights.

*Second*, the indictment alleges that on unspecified dates in either 2017 or 2018 or perhaps both, ("the 100% Time Periods"), Mr. Zeitlin, through unspecified agents, falsely represented that donations would be used by "certain PACs," even though all donations during those time periods were going to Zeitlin Entity-2. (Doc. 1, ¶ 11). The Government alleges that these 100% agreements account for a mere $30,000 of the hundreds of millions of dollars it claims Zeitlin raised over several decades. *Id.* Which PACs signed these agreements and when? What did callers represent during calls? Which agents made these representations and when? Who heard these unspecified representations and when? Did the PAC receive a benefit other than donation funds under these unspecified agreements? Once again, the Indictment doesn't answer any of these foundational questions. Moreover, the Government has produced several terabytes of discovery. The Government apparently seeks a trial by ambush, where Mr. Zeitlin is supposed to dig through

terabytes of data, while in custody, to find an alleged $30,000 agreement, which the Government alleges was made in 2017 "or" 2018 – or perhaps wasn't made at all.

*Third*, the indictment alleges Mr. Zeitlin's telemarketers, with his approval, misrepresented that donations would go to support a "new" or "special" drive that was "under way," apparently as opposed to an "old" or "not special" drive. (Doc. 1 ¶ 12). Who made these representations to whom and when? Furthermore, how is this fraud and not pedestrian marketing? Who did this allegedly deceive and how? Once again, the Government's weak and vague Indictment leaves Mr. Zeitlin without knowing why he is actually being charged in violation of his fundamental Constitutional rights.

Following these categories of false and misleading information, the indictment alleges Mr. Zeitlin attempted to conceal his scheme. (Doc. 1, ¶ 13). In this vein, the indictment alleges Mr. Zeitlin created and used various entities and some fraudulent invoices to obscure the amounts PACs were paying for telemarketing. The indictment also alleges Mr. Zeitlin, on respective occasions, lied in a deposition about his involvement with the call scripts and submitted a false declaration denying his association with some new entities.

The indictment does not allege or identify any specific wire communication or communications associated with Counts One and Two. Instead, the indictment vaguely refers to "at least approximately hundreds of thousands of calls" between 1994 and 2023. (Doc. 1, ¶ 1). Presumably, this means some tens or hundreds of thousands of calls allegedly occurred during the charged timeframes, *i.e.*, "[f]rom at least in or about 2017 through at least in or about 2020." (Doc. 1, ¶¶ 17, 20). However, the indictment does not specify how many of these calls allegedly furthered Mr. Zeitlin's scheme. Nor does it identify any other wire communications that allegedly furthered the scheme. Instead, the indictment merely alleges Mr. Zeitlin "sent and received, and caused

others to send and receive, wire communications to and from the Southern District of New York and elsewhere, in furtherance of that scheme." (Doc. 1, ¶¶ 18, 20). It isn't even clear that the Government has met its burden to prove that New York is a proper venue for this case.

**C.    Counts One and Two of the indictment should be dismissed in whole or in part.**

By pretrial motion, a defendant may challenge defects in an indictment, including "joining two or more offenses in the same count (duplicity)," "lack of specificity," and "failure to state an offense." FED. R. CRIM. P. 12(b)(3)(B)(i), (iii), (v). Here, as discussed below, two of the indictment's three theories of wire fraud fail to state offenses and therefore cannot support Count One or Count Two. Furthermore, Count Two is impermissibly duplicitous, and both Counts One and Two are insufficiently specific. Accordingly, this Court should dismiss Counts One and Two in whole or in part.

**D.    This Court should dismiss the indictment's "new" or "special" drive and "100% Agreements" theories of wire fraud for failure to state an offense.**

**1.    General Rules.**

As a general rule, an "indictment . . . must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." FED. R. CRIM. P. 7. More particularly,

> There are two constitutional requirements for an indictment to be sufficient: (1) it must contain "the elements of the offense charged and fairly inform a defendant of the charge against which he must defend," and (2) it must enable the defendant "to plead an acquittal or conviction in bar of future prosecutions for the same offense."

*United States v. Moses*, 512 F.Supp.3d 448, 455-56 (W.D.N.Y. 2021) (quoting *United States v. Resendiz-Ponce*, 549 U.S. 102, 108, 127 S.Ct. 782 (2007) (brackets omitted)).

> At the motion to dismiss stage, the Court accepts as true all of the allegations of the indictment. Moreover, the Court will not look beyond the face of the indictment and draw inferences as to proof to be adduced at trial, for the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss.

*United States v. Bankman-Fried*, No. 22-CR-0673 (LAK), 2023 WL 4194773, at *7 (S.D.N.Y. June 27, 2023) (quotation marks, brackets, and footnote omitted).

"It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly set forth all the elements necessary to constitute the offence intended to be punished." *United States v. Santeramo*, 45 F.3d 622, 624 (2d Cir. 1995) (quotation marks and ellipsis omitted). However, "[e]ssential elements not stated in the statutory text must be explicitly alleged in the indictment." *United States v. Fell*, No. 5:01-CR-12-01, 2016 WL 1290416, at *3 (D. Vt. Mar. 30, 2016). Pertinent here, although it is absent from the statutory language of § 1343, the element of materiality nevertheless must be alleged in an indictment. *See Neder v. United States*, 527 U.S. 1, 25, 119 S.Ct. 1827 (1999) ("[W]e hold that materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes.").

Furthermore, under Second Circuit precedent, the indictment must adequately allege its theory of intent to defraud. In *Shellef*, 507 F.3d at 109, the indictment alleged the defendant falsely represented it would export all the industrial chemical product it purchased from a seller, thereby inducing the sale, whereas the seller would not have sold the product if it had known the defendant intended to sell the product domestically. The Second Circuit held this indictment did not sufficiently allege a "benefit of the bargain" theory of wire fraud. *Id.* Specifically, the indictment did not allege "a 'discrepancy between benefits reasonably anticipated' and actual benefits received." *Id.* (quoting *Starr*, 816 F.2d at 98). Similarly, the indictment did not allege the defendant "misrepresented 'the nature of the bargain,'" *id.* (quoting *Regent Office Supply*, 421 F.2d at 1179), or that the defendant's "misrepresentation had 'relevance to the object of the contract,'" *id.* (quoting *Starr,* 816 F.2d at 100). Accordingly, the indictment was not "legally sufficient." *Id.*

**2.    The indictment's "new" or "special" drive theory does not state an offense, because it does not allege intent to defraud.**

In Mr. Zeitlin's case, the indictment's "new" or "special" drive theory does not state an offense of wire fraud or conspiracy, because it does not allege either fraud or intent to defraud. The Government has investigated Mr. Zeitlin for over half a decade, including a failed grand jury investigation in Florida. After interviewing countless witnesses and reviewing several terabytes of information, this is apparently the best the Government could come up with. The weakness of this theory would be humorous if a man's life wasn't on the line.

To get around *Madigan,* the Government must allege a fraud which deceived a donor. What is a new drive? When does a drive stop being new? After a day, a week, a month? The Government doesn't explain. Could a salesman be criminally prosecuted for calling a sale "new" if the sale had run for month? Moreover, what is a special drive? What is a "not-special" drive and how is it different from a "special" drive? Everyone knows that "Honda-Days" aren't actually a holiday. Does the Government seek to criminally charge Honda car dealerships for deceiving car buyers into thinking they were participating in a holiday sale and not a regular sale? When a retailer sends a 10% off coupon for a "special sale," is this criminal fraud? Under the Government's theory basic pedestrian marketing is apparently criminal, though the Government doesn't actually explain how such milquetoast language is fraudulent.

As a matter of law, intent to defraud does not exist where an offeror merely gives a false reason for offering a particular transaction. *Regent Office Supply*, 421 F.2d at 1182. Such a falsehood may cause a counterparty "to enter into [a transaction it] would otherwise avoid," *Shellef*, 507 F.3d at 108, but it does not misrepresent any essential element of the transaction. It's difficult to imagine a weaker theory of criminality than this.

17

Furthermore, the indictment's "new" or "special" drive theory fails to satisfy *Shellef*'s pleading standard for wire fraud, because it does not allege any discrepancy between what potential donors reasonably would have expected and what Mr. Zeitlin intended to provide, or that the telemarketers misrepresented any essential element of any transaction. *Id*. at 109. Thus, the indictment's "new" or "special" drive theory does not allege intent to defraud and does not state an offense of wire fraud or conspiracy.

### 3. The indictment's "100% Agreements" theory does not state an offense, because it does not allege intent to defraud.

The indictment's "100% Agreements" theory is similarly deficient and barred by Supreme Court precedent. In this vein, the indictment alleges Mr. Zeitlin agreed with unspecified PAC treasurers that Zeitlin Entity-2 would pay an advance of approximately $30,000 to the unspecified PACs, and in exchange, Zeitlin Entity-2 would keep 100% of funds raised for the PAC during the 100% Time Period. (Doc. 1, ¶ 11). The indictment alleges Mr. Zeitlin and his call centers falsely represented to potential donors that donations would be used by the PACs during the 100% Time Periods, when in fact, the money went to Zeitlin Entity-2 per the 100% Agreements. *Id.* Essentially, this theory of wire fraud rests on the premise that Mr. Zeitlin had a duty to disclose his financial arrangements with the PACs during the 100% Time Periods.

The Supreme Court rejects the notion that a "charity [or PAC] derived no benefit from funds collected but not turned over to it" because charities still benefit from other things like donor lists, raised awareness, and "the act of solicitation itself." *Illinois ex rel. Madigan,* 538 U.S. at 616, 123 S.Ct. 1829. Thus, even assuming there were 100% agreements, which allegedly accounted for a mere $30,000 of what the Government claims is a multi-hundred-million-dollar case, it cannot be said that the PAC or charity received no benefit from the fundraising. Once again, the

Government's theory of criminality rests upon a misguided and myopic view of complex economic structures.

Furthermore, the PACs and telemarketers operated no differently during the alleged 100% Time Period than otherwise. The only difference is, whereas Zeitlin Entity-2 apparently would keep fixed percentages of the intake during ordinary time periods, it would keep variable percentages during the 100% Time Period.[2] Meanwhile, the PACs presumably benefited during the 100% Time Periods by receiving certain payments upfront, along with other non-monetary benefits recognized by the Supreme Court. Therefore, when Mr. Zeitlin's telemarketers represented that donations would be used by PACs during the 100% Time Period, as alleged, they were telling the truth. Although the percentages were variable rather than fixed, the PACs were using much of the donated money to pay for fundraising overhead, just as they were doing during ordinary time periods.

Accordingly, the "100% Agreements" theory fails to state an offense of wire fraud or conspiracy, because it does not allege intent to defraud. As the Supreme Court has held, fundraisers have no duty to volunteer their fees when contacting potential donors. *See Madigan*, 538 U.S. at 624, 123 S.Ct. 1829. Moreover, as outlined above, the mere intent to deprive a counterparty of potentially valuable economic information is not criminal intent to defraud after *Ciminelli*. Here,

---

[2] Although the indictment outlines the 100% Agreements, it does not elucidate Zeitlin Entity-2's ordinary billing arrangements with the pertinent PACs. (Doc. 1, ¶ 11). But generally, the indictment alleges Mr. Zeitlin's entities typically kept approximately 90% of each dollar donated. (Doc. 1, ¶ 1). Using this percentage to illustrate, suppose Zeitlin Entity-2 were to raise $200,000 on behalf of a PAC. Under ordinary circumstances, assuming a 90% fixed rate, Zeitlin Entity-2 would keep $180,000 and disburse $20,000 to the PAC. Under the 100% Agreements, having paid $30,000 to the PAC upfront, Zeitlin Entity-2 would have a net intake of $170,000, or only 85% of the total. But of course, the more money Zeitlin Entity-2 raised, the higher its proportional net intake would be. For instance, if Zeitlin Entity-2 were to raise $400,000, its net intake would be $370,000, or 92.5% of the total, less the $30,000 upfront payment to the PAC.

regardless of whether Zeitlin Entity-2 was keeping fixed or variable percentages of the gross intake, Mr. Zeitlin's telemarketers had no duty to volunteer these details to potential donors. At most, by not disclosing the existence of variable-percentage agreements during the 100% Time Periods, the telemarketers concealed potentially valuable economic information from potential donors, *i.e.*, information about the relatively higher percentage of each donation that might go to fundraising. But the indictment does not otherwise allege Mr. Zeitlin intended to deprive potential donors of any essential element of their bargains during the 100% Time Periods. Thus, the indictment's allegations are legally insufficient to constitute intent to defraud.

Furthermore, the indictment's "100% Agreements" theory also fails to satisfy *Shellef*'s pleading standard, because it does not allege any discrepancy between what potential donors reasonably would have expected and what Mr. Zeitlin intended to provide, or that the telemarketers misrepresented any essential element of any transaction. *See Shellef*, 507 F.3d at 109. Thus, the "100% Agreements" theory does not allege intent to defraud and therefore does not state an offense of wire fraud or conspiracy.

### 4. The indictment's "new" or "special" drive and "100% Agreements" theories do not state an offense of wire fraud or conspiracy, because they do not allege materiality.

Apart from failing to allege intent to defraud, the indictment's "new" or "special" drive and "100% Agreements" theories of wire fraud also fail to state offenses because they fail to allege materiality. In this regard, although the indictment alleges misrepresentations associated with each theory, it does not allege such misrepresentations were "material." Nor does the indictment include implicit allegations of materiality for either theory. Thus, both theories fail to state the offenses of conspiracy and wire fraud, because they omit the essential materiality element.

5.   **The indictment's allegations of concealment do not rescue its otherwise-deficient "new" or "special" drive and "100% Agreements" theories.**

Finally, the indictment's allegations of concealment, (Doc. 1, ¶ 13), do not rescue its otherwise deficient "new" or "special" drive and "100% Agreements" theories. The concealment allegations do not relate to the "new" or "special" drive theory at all. As for the "100% Agreements" theory, the concealment allegations similarly accuse Mr. Zeitlin of trying obscure the amounts PACs were paying for telemarketing. But even if true, such conduct is no more fraudulent after *Ciminelli* than failing to disclose the 100% Agreements themselves, because at most, it demonstrates an intent to deprive donors of potentially valuable economic information that might be relevant to their decision-making, *i.e.*, the proportional impacts of their donations. Accordingly, the concealment allegations do not resuscitate the indictment's otherwise deficient "100% Agreements" theory of wire fraud.[3]

6.   **Because they fail to state an offense, the indictment's "new" or "special" drive and "100% Agreements" theories should be dismissed.**

For the reasons outlined above, the indictment's "new" or "special" drive and "100% Agreements" theories do not state an offense, because they do not allege essential elements of wire fraud. Accordingly, this Court should dismiss both theories under Counts One and Two of the indictment.

---

[3] To whatever extent the government might rely on the indictment's concealment allegations as freestanding theories of wire fraud, such theories would not state an offense, because they do not allege a viable theory of intent to defraud as part of the charged scheme.

**E.** **This Court should dismiss Count Two of the indictment, because it is impermissibly duplicitous and insufficiently specific.**

    **1.** **General Rules.**

"An indictment is duplicitous if it joins two or more distinct crimes in a single count."

*United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992).[4]

> Important policy considerations underlie the rule that two or more distinct crimes should not be alleged in a single count of an indictment. If an indictment is duplicitous, a general verdict of guilty will not reveal whether the jury found defendant guilty of only one crime and not the other, or guilty of both. Moreover, a guilty verdict on a duplicitous indictment does not indicate whether the jury found defendant guilty without having reached an unanimous verdict on the commission of a particular offense. Thus, the prohibition of duplicity is said to implicate a defendant's rights to notice of the charge against him, to a unanimous verdict, to appropriate sentencing and to protection against double jeopardy in a subsequent prosecution.

*United States v. Murray*, 618 F.2d 892, 896 (2d Cir. 1980) (citation omitted).

    Duplicitous counts are not *per se* impermissible in the Second Circuit. Rather, considering the policy considerations outlined above, "a single count of an indictment should not be found impermissibly duplicitous whenever it contains several allegations that could have been stated as separate offenses, but only when the failure to do so risks unfairness to the defendant." *United States v. Margiotta*, 646 F.2d 729, 733 (2d Cir. 1981); *see United States v. Sturdivant*, 244 F.3d 71, 75 n.3 (2d Cir. 2001) ("[W]e will . . . refer to duplicity that causes prejudice to the defendant as 'impermissible duplicity.'"). Furthermore, "acts that could be charged as separate counts of an

---

[4] To determine whether a particular count is duplicitous, the first step is to identify the statute's "unit of prosecution." Unlike a *Blockburger* double-jeopardy inquiry, which involves distinct statutory provisions, a "unit of prosecution case[ involves] an inquiry into the minimum amount of activity for which criminal liability attaches for each charge under a single criminal statute." *United States v. Rentz*, 777 F.3d 1105, 1108 (10th Cir. 2015) (quotation marks omitted); *accord Callanan v. United States*, 364 U.S. 587, 597, 81 S.Ct. 321 (1961) ("[T]he problem before us does not involve the appropriate unit of prosecution – whether conduct constitutes one or several violations of a single statutory provision . . . .").

indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme." *United States v. Tutino*, 883 F.2d 1125, 1141 (2d Cir. 1989) (citing *Margiotta*, 646 F.2d at 733).

### 2. Discussion.

Count Two of the indictment (substantive wire fraud) is obviously duplicitous. For purposes of wire fraud under § 1343, "each such use of the wires pursuant to a criminal fraud constitute[s] a separate, independent, freestanding crime." *United States v. Fermin Castillo*, 829 F.2d 1194, 1199 (1st Cir. 1987). *Cf. United States v. Ramirez*, 420 F.3d 134, 145 (2d Cir. 2005) ("It is well-established that each use of the mails constitutes a separate offense of mail fraud."). Here, Count Two of the indictment alleges an unknown number of unspecified wire transactions. Thus, because it combines multiple alleged acts of wire fraud in a single count, Count Two is duplicitous.

Furthermore, as discussed below, Count Two is impermissibly duplicitous, because it implicates Mr. Zeitlin's right to notice of the charges against him, his right to a unanimous verdict, and his ability to raise future double-jeopardy claims. For parallel reasons, Count Two fails to satisfy the minimum pleading standards for criminal indictments under Rule 7.

Because Count Two identifies no individual wire communications and instead implicates thousands of unspecified wire communications over the course of years, it gives inadequate notice of the charge against Mr. Zeitlin. It is unclear whether the grand jury charged Mr. Zeitlin with any individual wire communications on certain dates or merely categories of wire communications occurring over larger time frames, *e.g.*, categories of phone calls utilizing certain scripts. It is unclear whether the grand jury merely charged Mr. Zeitlin with causing phone calls, with causing other unspecified wire communications, or both. And whatever communications the grand jury

charged, it is unclear which of these communications traveled across state lines, which touched this District, which occurred within the five-year statute of limitations, and which were reasonably foreseeable to Mr. Zeitlin. In short, Count Two's lack of specificity prevents Mr. Zeitlin from understanding what criminal acts the grand jury charged him with. The Government's indictment fails in nearly every respect.

Similarly, Count Two's lack of specificity threatens to deny Mr. Zeitlin a unanimous jury verdict and his fundamental right to prepare a competent defense. To illustrate, consider what a jury would need to find before convicting any defendant of wire fraud. Unanimously, the jury would need to find the defendant: (a) caused or reasonably foresaw an interstate wire communication, (b) that occurred within five years before the indictment; and (c) that furthered the defendant's criminal scheme to defraud. In this regard, a well-pled indictment would allege identified wire communications within the statute of limitations, which would support unanimous jury findings on all the elements of wire fraud.

But here, the indictment of Mr. Zeitlin fails in several respects. Count Two is not only duplicitous because it combines multiple wire communications (apparently thousands) in a single count. It is duplicitous and vague because it fails to identify any wire communication at all. This is even true for the indictment's only facially viable theory of wire fraud, *i.e.*, that Mr. Zeitlin allegedly intended to deceive donors into believing they were donating to charities instead of PACs. (Doc. 1 ¶ 8). Under this theory, the indictment gives excerpts of allegedly misleading statements, but it does not specify any actual wire communications. (Doc. 1 ¶¶ 8-10). In this regard, the indictment alleges exemplar complaints by unidentified recipients of unspecified calls on behalf of a particular PAC "in or about 2018," (Doc. 1 ¶ 9), and it more broadly alleges Mr. Zeitlin's telemarketers "continued to make such misrepresentations at certain times . . . from at

least in or about 2017 through at least in or about 2020." (Doc. 1 ¶ 10). But none of these allegations would permit a jury to return a unanimous guilty verdict on Count Two at face value, because no specific wire communication is identified or alleged.

Furthermore, amid its universe of unspecified wire communications, Count Two appears to include many that would not be viable predicates for a wire-fraud conviction. The timeframe of the alleged scheme straddles the five-year statute of limitations, so at least some of the unspecified wire communications would be time-barred as the basis for a conviction. These might include the exemplar calls that allegedly resulted in donor complaints "in or about 2018," (Doc. 1, ¶ 9), and the calls during the 100% Time Periods, which allegedly occurred "[b]etween at least in or about 2017 up to and including in or about 2018," (Doc. 1, ¶ 11). And apart from timing issues, the alleged scheme incorporates two theories of wire fraud that do not actually state a criminal offense, as discussed above. All told, even assuming the jury were able to agree unanimously on a particular wire communication, the duplicity of Count Two raises a serious risk that the jury might agree on an untimely wire communication or a communication that did not further a criminal scheme.

This also raises double jeopardy concerns. Here, the indictment is so vague that the scope of Mr. Zeitlin's charged conduct is palpably unclear. Thus, regardless of a jury verdict or any attachment of jeopardy, the preclusive effect of any such verdict or attachment under Count Two would be similarly unclear. The double-jeopardy concerns occasioned by Count Two's duplicity are too serious to minimize.

Finally, the principle that duplicity may be permissible where the acts involve "a single continuing scheme" does not save Count Two. This principle arose in *Margiotta*, an interlocutory appeal in which the defendant challenged the government's allegation of numerous mailings in a single mail-fraud count. *Margiotta*, 646 F.2d at 730-31. After articulating the rule that duplicity is

only impermissible where it "risks unfairness to the defendant," *id.* at 733, the Second Circuit opined the "risk is slight in a case like [Margiotta's] where the essence of the alleged wrong is the single scheme to defraud and the various mailings, though they are technically the acts that violate the federal statute, are really the jurisdictional bases for federal prosecution," *id.* The Second Circuit subsequently emphasized that "the essence of [Margiotta's] alleged crime is carrying out a single scheme to defraud." *Id.* From this, in later cases, the Second Circuit began holding "acts that could be charged as separate counts of an indictment may instead be charged in a single count if those acts could be characterized as part of a single continuing scheme." *E.g.*, *Tutino*, 883 F.2d at 1141 (citing *Margiotta*, 646 F.2d at 733).

However, Mr. Zeitlin's case is materially distinguishable from *Margiotta*. In *Margiotta*, a "bill of particulars supplied details for hundreds of separately listed mailings, including dates and names of sender and addressee." *Margiotta*, 646 F.2d at 731. Moreover, the government subsequently offered to limit the mail-fraud charge to 50 specific mailings taken from the bill of particulars. *Id.* at 732. Here, by contrast, no specific wire communications have been identified in the indictment or otherwise specified by the government. Furthermore, although the indictment tries to characterize Mr. Zeitlin's scheme as a single continuing fraud that enabled his entities to keep approximately 90 percent of the donated money, (Doc. 1, ¶ 1), a closer look belies this conclusion. Merely retaining 90 percent of the donated money as overhead would not be fraudulent. *See Madigan*, 538 U.S. at 624. And as discussed above, the indictment attempts to incorporate three distinct theories of wire fraud in Count Two. Two of these theories are not criminal, and for its part, the "100% Agreements" theory is limited to a shorter, unknown, timeframe than the others. (Doc. 1, ¶¶ 8-12). Accordingly, *Margiotta* does not save Count Two from impermissible duplicity.

For all these reasons, Count Two of the indictment is impermissibly duplicitous and fails to satisfy Rule 7's minimum pleading standards and fails to give Mr. Zeitlin notice of the charges against him. Accordingly, this Court should dismiss Count Two.

### F.    This Court should dismiss Count One of the indictment, because it is insufficiently specific.

The duplicity analysis is different for Count One than Count Two. "[T]he allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for the conspiracy is the crime, and that is one, however diverse its objects." *United States v. Vilar*, 729 F.3d 62, 79 (2d Cir. 2013) (quotation marks and brackets omitted). *E.g.*, *Aracri*, 968 F.2d at 1518 ("A conspiracy indictment presents unique issues in the duplicity analysis because a single agreement may encompass multiple illegal objects." (quotation marks omitted)). Here, Count One of the indictment is not facially duplicitous, because it alleges a single conspiracy to commit wire fraud via multiple theories.

Nevertheless, the indictment's lack of specificity affecting Count Two similarly affects Count One. To convict Mr. Zeitlin on Count One, the jury would need to find unanimously that Mr. Zeitlin and at least one co-conspirator agreed and specifically intended to commit wire fraud. However, as with Count Two, Count One incorporates a conglomeration of fraud theories, of which only one is viable, and a conglomeration of unspecified wire communications. This lack of specificity raises notice, jury-unanimity, and double-jeopardy concerns. For instance, because Count One incorporates alleged fraud theories that are not actually criminal, there is a risk that the jury might convict Mr. Zeitlin of conspiracy for a non-criminal agreement. Similarly, the jury might convict Mr. Zeitlin of a conspiracy that terminated more than five years before the indictment's return.

**III.** **Alternatively, this Court should direct the government to supply a bill of particulars for Counts One and Two of the Indictment.**

Alternatively, and to whatever extent Counts One and Two of the indictment may survive Mr. Zeitlin's motion to dismiss, this Court should direct the government to supply a bill of particulars. A defendant may "seek a bill of particulars in order to identify with sufficient particularity the nature of the charge pending against him, thereby enabling defendant to prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense." *United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987). "The decision to grant or deny a bill of particulars is within the sound discretion of the district court." *United States v. Davidoff*, 845 F.2d 1151, 1154 (2d Cir. 1988). "A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (quotation marks omitted).

Here, as discussed above, the allegations in Counts One and Two do not advise Mr. Zeitlin of the specific acts of which he is accused. To the contrary, these counts rely on a conglomeration of legal theories, of which two are not viable. They also rely on an unspecified number (perhaps tens of thousands) of unspecified wire communications involving unspecified senders and recipients at unspecified times and places. For the indictment's only viable theory of wire fraud, it is unclear which communications occurred within the statute of limitations. And of course, because the indictment specifies no wire communications, it is unclear which wire communications the government may seek to substantiate at trial or what evidence the government may offer. For instance, it is unclear whether the government will seek to establish the occurrence of particular calls through witness testimony or documentary evidence or whether the government will merely seek to establish the occurrence of categories of calls by offering call scripts or testimony from

telemarketers. And beyond calls, it is unclear whether the government might offer evidence of other unspecified wire communications, unmentioned and unreferenced by the indictment except through its general allegation.

In short, given the indictment's pervasive lack of specificity on Counts One and Two, and the time periods and voluminous potential wire communications involved, a bill of particulars is necessary to advise Mr. Zeitlin of the specific acts of which he is accused and to enable him to prepare effectively for trial. A bill of particulars also would clarify the extent to which jeopardy may attach to Mr. Zeitlin in this prosecution.

Admittedly, "if the information sought by defendant is provided in the indictment or in some acceptable alternate form, no bill of particulars is required." *Bortnovsky*, 820 F.2d at 574. However, in a case involving voluminous discovery, a bill of particulars may be beneficial to apprise the defendant of what the government will seek to prove at trial. *See United States v. Ramirez*, 609 F.3d 495, 503 (2d Cir. 2010). Indeed, "sometimes, the large volume of material disclosed is precisely what necessitates a bill of particulars," *United States v. Bin Laden,* 92 F.Supp.2d 225, 234 (S.D.N.Y.2000), although the government may reduce this need by distilling voluminous discovery productions for a defendant, *United States v. Chalmers*, 410 F. Supp. 2d 278, 285 (S.D.N.Y. 2006). For instance, the government may "provide the defendant[ ] with a subset of documents, culled out from the voluminous records, that it believes support the charges and may be used in its case-in-chief." *Chalmers*, 410 F. Supp. 2d at 285.

Here, the defense does not currently know whether the government's discovery productions may elucidate its potential trial evidence. However, the discovery in this case has been voluminous to date, totaling more than 2.4 Terabytes of data, with more to come. And to date, although the government has provided helpful indices cataloging its discovery productions, the

government has not identified subsets of documents amid its discovery productions that might support the indictment's wire fraud allegations or be used in its case-in-chief against Mr. Zeitlin. Accordingly, apart from the vagueness of the allegations themselves, the government's voluminous discovery supports the issuance of a bill of particulars to aid Mr. Zeitlin's preparation for trial.

For all these reasons, even if this Court were to deny Mr. Zeitlin's motion to dismiss Counts One and Two in whole or in part, this Court should direct the government to supply a bill of particulars for both counts.

## CONCLUSION

For the foregoing reasons, Mr. Zeitlin respectfully prays the Court grant his motion to dismiss Counts One and Two of the indictment in whole and in part and for a bill of particulars on the aforesaid counts to the extent they are not dismissed.

Dated: November 30, 2023.

**THE BERNHOFT LAW FIRM, S.C.**
Attorneys for Defendant Richard Zeitlin


  /s/ Robert G. Bernhoft
Robert G. Bernhoft, Esq.
Appearing *pro hac vice*
1402 E. Cesar Chavez Street
Austin, Texas 78702
Telephone: (512) 582-2100
Facsimile: (512) 373-3159
rgbernhoft@bernhoftlaw.com