Case 1:23-cr-00419-LAK   Document 66   Filed 01/18/24   Page 1 of 5



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 18, 2024

**BY ECF AND HAND DELIVERY**
The Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    <u>United States v. Richard Zeitlin</u>, 23 Cr. 419 (LAK)

Dear Judge Kaplan:

      The Government respectfully submits this letter in opposition to the January 2, 2024, bail application of defendant Richard Zeitlin. (Dkt. 57). The defendant has twice before sought bail, including once upon his presentment in the District of Nevada in August 2023 (Dkts. 17-1 and 17-2), and a second time before this Court in September 2023 (Dkt. 20). On both occasions, his application was denied on the basis that there are no conditions or combination of conditions that could reasonably address the risk of flight that the defendant poses. (Dkt. 20). This third application for bail does not dispute any prior findings that supported pretrial detention and instead argues that pretrial release is necessary to protect the defendant's Sixth Amendment right to counsel and his right to participate in the preparation of his defense. For the reasons that follow, this Court should—once again—deny the defendant's application for bail.[1]

### I.    The Defendant Continues to Pose a Significant Risk of Flight

      Although left unaddressed in the defendant's application, a preponderance of the evidence continues to demonstrate that the defendant poses a significant risk of flight that no condition or combination of conditions of pretrial release can reasonably address. *United States v. Sabhnani*, 493 F.3d 63, n.5 (2d Cir. 2007). There are no changed circumstances that alter the Court's finding that the defendant presents a risk of flight as set forth in its Memorandum and Order of September 21, 2023, denying the defendant's bail application. (Dkt. 20).

      As this Court has already found, the defendant has the means and motive to flee from prosecution, and a demonstrated track record of taking substantial steps to evade prosecution. The defendant has access to millions of dollars, multiple properties in foreign countries, conditional Israeli citizenship, and an ownership interest in a private plane. (*Id.* at 3-4). And in the months prior to his arrest in this case, when the defendant was well-aware of the Government's criminal

---

[1] Pursuant to the Court's January 3, 2024, Order (Dkt. 59), the Government attaches to this letter a declaration from Sophia Papapetru, a lawyer with the Bureau of Prisons ("BOP") assigned to the Metropolitan Detention Center ("MDC"), that addresses the topics contained in the Court's Order.

investigation, he obstructed the Government's investigation by telling subordinates to destroy records and demonstrated his sincere willingness to start life anew in a foreign country by attempting to renounce his U.S. citizenship. (*Id.* at 4; Dkt. 15-3 (emails sent between April 2022 and August 2022 from the defendant to U.S. State Department consulates in eight different locations requesting "an appointment to renounce my citizenship")).

Nothing about the defendant's conduct since his arrest or this Court's prior denial of bail alters the calculus concerning the defendant's risk of flight. The defendant has now been arrested, and he faces decades in jail should he be convicted. This potential sentencing exposure for a 53 year-old who has so far enjoyed a life of vast wealth and freedom presents, by itself, an acute incentive to flee.

Nor can the defendant satisfactorily mitigate that incentive to flee by offering to abide by "whatever strict supervision the Court deems necessary." (Dkt. 57 at 1). That offer is hollow given the extensive assets the defendant evidently possesses coupled with his failure to provide a verified accounting of his net worth and assets. *See United States v. Epstein*, 425 F. Supp. 3d 306, 323 (S.D.N.Y. 2019) (finding a "cursory asset statement" to be "insufficient to support a bail package"). Absent a verifiable picture of the defendant's actual net worth and assets, it is difficult—if not impossible—to assess the extent to which the defendant's blanket offer to abide by "strict supervision" can assure his presence. *See Sabhnani*, 493 F.3d at 77 ("[T]he deterrent effect of a bond is necessarily a function of the totality of a defendant's assets."). The paucity of details surrounding the defendant's net worth and assets is especially jarring in light of his prior non-disclosure of assets. In sum, absent a verified accounting, the defendant's willingness to abide by "whatever strict supervision the Court deems necessary" is toothless.

For all of these reasons, and those set forth in the Court's prior decision rejecting bail, the Court should once again find that the defendant poses a risk of flight that cannot be sufficiently mitigated through any condition or combination of conditions of pretrial release.[2]

## II. The Defendant's Claims about Trial Preparation and Access to Counsel Are Not a Basis for Pretrial Release

The Government agrees that the defendant must have meaningful, in-person access to his counsel and an opportunity to participate in his defense. But the defendant has not established that his conditions of confinement at MDC have constitutionally deprived him of his access to counsel and the opportunity to participate in his defense such that pretrial release is required. Accordingly, as explained below, the conditions at MDC are not a basis for pretrial release.

As an initial matter, the defendant's conclusion that his access to counsel and opportunity to participate in his defense has constitutionally been curtailed is legally unsupported. Binding Supreme Court precedent makes clear that "when an institutional restriction" on pretrial detainees "infringes on a specific constitutional guarantee . . . the practice must be evaluated in the light of the central objective of prison administration, safeguarding institutional security." *Bell v. Wolfish*,

---

[2] For reasons the Government has previously articulated, the defendant should also be subjected to pretrial detention because he poses a risk of danger to the community, as evidenced by his obstruction of justice and history of lying to federal courts. (Dkt. 15 at 8).

2

441 U.S. 520, 547 (1979). Here, the defendant principally alleges that his access to counsel and opportunity to review discovery were curtailed by (a) lockdown conditions imposed on December 15, 2023, due to an inmate assault on a staff-member, and (b) a malfunction rendering the MDC's phone system out of service on December 28, 2023. (Dkt. 57 at 1-3). The defendant, however, has made no showing—and has not even alleged—that these measures did not serve the "central objective of prison administration" and the "safeguarding [of MDC's] institutional security." *Bell*, 441 U.S. at 547.

The lockdown at issue was instituted in response to multiple assaults of staff members by inmates and multiple assaults by inmates of other inmates, and the disorder that could result from such an assault (Papapetru Decl. ¶ 2(a))—an aim that falls squarely within "the central objective of prison administration." *Bell*, 441 U.S. at 547.[3] That lockdown continued on an institution-wide basis until January 3, 2024, after which it was confined to two particular units, until January 18, 2024, due to gang-related disturbances on those units. (*Id.* ¶ 2(b)). The defendant was housed on one of those units. (*Id.* ¶ 2(b)). During this period, inmate phone calls and video conferences with counsel were canceled because of the lockdown on only one day, December 15, 2023. (*Id.* ¶ 5). In addition, although during the same time period MDC was subjected to modified operations for approximately 15 days due to staff shortages, the Government's understanding is that during that time period any effected inmates continued to have at least three hours per day outside their cells with access to discovery computers. (*Id.* ¶ 2(e)).

As to the phone outage, the defendant fails altogether to allege that state action itself *caused* the outage (as necessary to establish a constitutional violation) or how a one-day outage of phone services could have meaningfully deprived him of access to counsel or an opportunity to participate in his defense. The defendant, for example, provides no specific factual allegation that his counsel had plans to visit or call him on December 28, 2023 (the day without phone service). His counsel instead intimates—without any evidentiary proffer—that the phone outage may "reflect[] a more systemic problem at MDC." (Dkt. 57 at 2). But that intimation is hardly sufficient to establish a systemic deprivation of access to counsel, and available evidence—including the fact that phone service resumed the next day (Papapetru Decl. ¶ 6)—strongly suggests the phone outage was *not* a result of any systemic issue.

The defendant's attempt at more individualized allegations is equally unavailing. With respect to access to counsel, the defendant at most offers generalized statements made by other courts in other contexts about the need for MDC to guarantee access to counsel. (Dkt. 57 at 7-8). But the defendant nowhere explains how MDC has deprived him individually of his right to counsel. He does not identify, for example, occasions when his lawyers attempted to visit him and were denied an opportunity to do so. The closest the defendant comes to alleging non-generalized facts is that his counsel "learned from *colleagues* who visited MDC Thursday, December 28, 2023" that those *colleagues* waited "3-1/2 hours for their clients to be produced for visit" on that

---

[3] For similar reasons, the Court should reject any argument by the defendant that he suffered a constitutional infringement from "mace or pepper spray" that MDC personnel used to address the assault and that "wafted into his cell." (Dkt. 57 at 2).

3

day. (*Id.* at 2 (emphasis added)). Plainly, those allegations relate to other inmates—not to the defendant.

The defendant's additional contention that he is unable to participate in his defense principally derives from a claim that he has not been afforded an adequate opportunity to review discovery. This contention is triply flawed. *First*, it is insufficiently specific. The defendant notes that "[t]he computer on his unit is shared with other inmates, reducing the available time for him dramatically," but he does not proffer how much time is actually available to him. (*Id.* at 2). He states that "the age of the equipment and/or software freezes or crashes the operating system before any discovery can be reviewed," but he does not proffer what discovery he has been unable to access. (*Id.* at 2-3). This failure to make "any detailed showing as to specific materials that [the defendant] claims he has been unable to access personally and the reasons why any such personal inability actually would impede his defense" is fatal. *United States v. Bankman-Fried*, No. 22 Cr. 673 (LAK) (S.D.N.Y. Sept. 12, 2023), Dkt. 278.

*Second*, as in all cases, the Government stands ready to coordinate with counsel or MDC to address specific concerns about the defendant's access to computer time and any functionality issues with specific files within discovery, but to date defense counsel has not raised any of his complaints with the Government. The Government stands ready to confer with the defense and legal staff at MDC to assist in ensuring the defendant has adequate time to review discovery and to address any technological issues that may arise with that discovery. Given the availability of these alternatives to pretrial release as a means to addressing any specific concerns, the defendant's generalized complaints about discovery review do not warrant his release.

*Third*, the defendant's contention is based on the incorrect premise that "he personally is entitled to review and consider every single piece of discovery in this case." *Id*. But "no represented defendant . . . has a constitutional or other right to inspect every bit of discovery." *Id*. It bears emphasis that, by his counsels' own admission, the defendant is represented by "[a] team of attorneys, paralegals, and document reviewers [who] have been diligently reviewing and culling" the Government's productions of electronically stored information. (Dkt. 64 (defendant's motion for trial adjournment) ¶ 8). Yet, the defendant tellingly does not assert in his bail application that MDC has stymied the ability of his "team" to review discovery and "cull[]" it for his review. Rather, the diligence of the defendant's privately retained team shows that it is readily capable of involving the defendant in a careful and focused review of the discovery. Indeed, as noted above, the defendant has not alleged that any member of his defense team has been denied access to the defendant when attempting to visit him at MDC—let alone that MDC has restricted any member of his team from reviewing key pieces of discovery with him during legal visits.

The defendant's allegations notwithstanding, there is good reason to believe that the defendant's discovery access is otherwise meaningful. As set forth in Ms. Papapetru's declaration, absent any lockdown or modified operations the defendant (and other inmates) have access to discovery computers on their housing units on a daily basis for as much as 15 hours per day. (Papapetru Decl. ¶ 11). During lockdowns, access to discovery has been limited to between 1.5 and 3 hours per day. (*Id*. at 11). The BOP, moreover, stands ready to implement any court order for a defendant to be furnished with additional computer time or, as necessary, with a specialized laptop for discovery review in cases with a high volume of electronic discovery or electronic discovery that is incompatible with BOP computers. (*Id*. ¶¶ 12, 15, 23).

In the end, the appropriate remedy to address any limitations on the defendant's access to electronic discovery or access to counsel is *not* to release an individual who poses a clear risk of flight. Instead, it is for the defendant to articulate the specific impediments he faces and seek assistance in mitigating those impediments from the Government and BOP or, if necessary, the Court. Since filing his renewed bail application, the defendant has now sought an adjournment of his trial until September 2024. (Dkt. 63). If granted, such an adjournment will give the defendant more time to prepare for trial, further undermining his claim that he lacks adequate opportunity to participate in his defense or confer with counsel. *Cf. Bankman-Fried*, No. 22 Cr. 673 (LAK) (S.D.N.Y. Sept. 12, 2023), Dkt. 278 (observing that adjournment of trial date would address defendant's complaint of inadequate access to discovery at MDC given "time pressure" of impending trial). And although the defendant has not alleged any effort to seek assistance from the Government, BOP, or the Court to implement measures designed to address his complaints, the Government stands ready to confer with the defense and legal staff at MDC regarding any specific issues the defendant encounters.

### III.     Conclusion

For the foregoing reasons, the Government respectfully requests that the Court deny the defendant's most recent bail motion.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:   /s/_____
      Jane Kim / Rebecca Dell / Daniel H. Wolf
      Assistant United States Attorneys
      (212) 637-2038 / 2198 / 2337

cc:   Counsel of Record (by ECF)