LAW OFFICES OF
**DRATEL & LEWIS**
29 BROADWAY
Suite 1412
NEW YORK, NEW YORK 10006

TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: jdratel@dratellewis.com

JOSHUA L. DRATEL
LINDSAY A. LEWIS

AMY E. GREER

ACHARA AMY SCHRODER
*Paralegal*

November 26, 2024

**BY ECF**

The Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re: *United States v. Richard Zeitlin*,
23 Cr. 419 (LAK)

Dear Judge Kaplan:

This letter is respectfully submitted on behalf of Richard Zeitlin, defendant in the above-entitled matter, and whom Robert G. Bernhoft, Esq., and I represent therein, and constitutes the sentencing submission on Mr. Zeitlin's behalf. For the reasons set forth below, it is respectfully submitted that Mr. Zeitlin should be sentenced to a term of imprisonment substantially below the U.S. Guidelines range of 121-151 months set forth in the Plea Agreement between Mr. Zeitlin and the government, as well as in the draft Pre-Sentence Report ("PSR"), at ¶ 97.[1]

As detailed below, the reasons a sentence substantially below the Guidelines range would constitute punishment "sufficient, but not greater than necessary" as prescribed in 18 U.S.C. §3553(a)(2), include the following:

(A) Mr. Zeitlin's letter to the Court reflects his genuine and profound remorse for his criminal conduct, and manifests his authentic deep self-reflection and commitment to lead a laudable, law-abiding life following his release. Moreover, his background and personal history, supported by letters submitted on his behalf, provide important context for the offense conduct and Mr. Zeitlin's personal

[1] References are to the draft PSR because the final PSR is not due until December 2, 2024.

journey to productive self-examination;

(B) the abysmal, intolerable, and well-documented conditions at the Metropolitan Detention Center ("MDC") – recognized by this Court in this case – including persistent lockdowns, woefully inadequate hygiene, contaminated food, and a climate of violence and drug abuse, as well as neglect with respect to medical treatment, which Mr. Zeitlin has endured for 13 grueling months (of the 16 months he has been in custody), is a factor courts have increasingly recognized as a mitigating circumstance justifying sentences considerably below the applicable Guidelines range;

(C) while Mr. Zeitlin accepts full responsibility for his misconduct, and does not minimize it (or its financial magnitude) in any respect, (1) the offense conduct itself occurred in only a small fraction of Mr. Zeitlin's business operations over the course of decades, and (2) the Guidelines enhancement attributable to the loss amount disproportionately increases Mr. Zeitlin's applicable Guidelines range;

(D) the statistics regarding sentencing published by the Judiciary Sentencing Information ("JSIN") database and the U.S. Sentencing Commission with respect to the Southern District of New York ("SDNY") and even nationally demonstrate that a sentence substantially below the applicable advisory Guidelines range would be appropriate and reasonable, and, consistent with 18 U.S.C. §3553(a)(6), avoid unwarranted disparity;

(E) Mr. Zeitlin's letter to the Court, as well as the relevant data from the Sentencing Commission and other sources regarding defendants his age, and who lack any prior criminal record, demonstrate that he poses the lowest conceivable risk – if any – for recidivism, and likewise obviate the need for deterrence; and

(F) the deteriorating and dangerous conditions that currently exist within the U.S. Bureau of Prisons ("BoP") system generally will put Mr. Zeitlin at risk physically and psychologically the longer he is incarcerated.

In addition, it is respectfully requested that the Court recommend that Mr. Zeitlin (1) be designated to the BoP facility at FCI Terminal Island; and (2) participate in BoP's Residential Drug and Alcohol Program ("RDAP"). In the alternative, if FCI Terminal Island is not available, it is respectfully requested that Mr. Zeitlin be designated to a facility that offers RDAP and is commensurate with his security designation.

**I. *Mr. Zeitlin's Plea Agreement and the Pre-Sentence Report***

Pursuant to the Plea Agreement between Mr. Zeitlin and the government, he pleaded guilty to Count One of the Indictment (ECF # 1), a violation of 18 U.S.C. §1343 (conspiracy to commit wire fraud). *See* Plea Agreement, at 1. According to the Plea Agreement and draft PSR, Mr. Zeitlin's Offense Level is 32, and his Criminal History Category ("CHC") is I (with zero criminal history points, and no prior convictions), corresponding to an advisory Sentencing Guidelines range of 121-151 months' imprisonment. *See* Plea Agreement, at 4; Draft PSR, at ¶ 97.

Notably, Mr. Zeitlin's Offense Level skyrockets 18 levels from a base offense level of 7, pursuant to U.S.S.G. §2B1.1, because the alleged loss amount is between $3,500,000 and $9,500,000. *See* Plea Agreement, at 2; draft PSR, at ¶¶ 8 ,36 . Removing that loss amount increase illustrates the dramatic impact of that single factor. Without it, Mr. Zeitlin's Guidelines level would be calculated as follows:

| | | |
|---|---|---|
| Base Offense Level: | | +7 |
| Specific Offense Characteristics [10 or more victims] | | +2 |
| Specific Offense Characteristics [misrepresentation on behalf of charity] | | +2 |
| Role in the Offense | | +4 |
| Obstruction of Justice | | +2 |
| Adjusted Offense Level | | 17 |
| Acceptance of Responsibility | -3 | |
| Total Offense Level | | 14 |

As a result, absent the 18-point enhancement attributable to the loss amount, the applicable advisory Guideline sentencing range at CHC I would be 15-21 months, dramatically below the 121-151 months in both the Plea Agreement and the draft PSR, *See* draft PSR, at ¶¶ 35, 37-47.

## II. *Application of the §3553(a) Factors to Mr. Zeitlin Makes a Sentence Substantially Below the Applicable Guidelines Range Reasonable and Appropriate*

As discussed below, in applying to Mr. Zeitlin both §3553(a)'s directive that a sentence be "sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in" §3553(a)(2), as well as the sentencing factors enumerated in §3553(a)(1)-(7), it is respectfully submitted that given the particular circumstances presented by Mr. Zeitlin, a sentence substantially below the applicable advisory Guidelines range would be reasonable, appropriate, and consistent with the mandate of §3553(a)(2)'s parsimony clause.

### A. *Mr. Zeitlin's Clearly Expressed Remorse, Combined with His Personal Character and History, Establish That a Sentence Substantially Below the Applicable Guidelines Range Would Be Reasonable and Appropriate*

As the letters submitted on Mr. Zeitlin's behalf – and, in particular, his letter to the Court as well – attest, his character and conduct consist of far more than the offense to which he has pleaded guilty. Indeed, the letters portray a kind, compassionate, and generous man whose specific gracious acts were performed laudably – if unusually – without the need for public recognition or gratitude, but who also struggled with an overriding fear of poverty that fueled his approach to financial security.

#### 1. *Mr. Zeitlin's Deep Remorse and Self-Reflection*

The letters also demonstrate that Mr. Zeitlin's arrest has generated within him a profound and productive remorse and self-reflection that provides the foundation for a future in which Mr. Zeitlin contributes positively to his family and society at large. As his letter reveals, at sentencing – in contrast, as he acknowledges, to his perceptions beforehand – he is a man authentically humbled and committed to making amends as he accepts responsibility for his crime and seeks a forward-looking life of honesty and integrity. As he states, he appears with "a contrite spirit and a contrite and broken heart." Letter from Richard L. Zeitlin (a copy of which is attached hereto as Exhibit 1).

For example, in his letter, Mr. Zeitlin, after "apologiz[ing] for the crime that [he] committed" – including "to the people that were misled and the employees that relied upon me" – concedes that "[u]pon my arrest I blamed everyone else for my problems. After several weeks I began to see how everything was my fault and my fault alone." *Id*.

"Strangely enough[,]" Mr. Zeitlin expresses the need to thank the Court "for denying my bail[]" because "[e]ven though MDC is as much of a menacing nightmare as portrayed by

everyone familiar with it, had you granted me bail I probably would not have done the deep soul searching while in MDC." *Id*.

As a result of his detention, Mr. Zeitlin reports that

> [d]uring my incarceration I have spent a tremendous amount of time reflecting on my life. I can tell you I did not like what I saw. I saw a person that could rationalize breaking the law as just "little white lies." Looking back it was far more than just little white lies. I lost track of who I really was and it became easier and easier to cross the line of right and wrong.

*Id*.

Mr. Zeitlin's contrition and acceptance have been recognized by MDC staff. MDC Chaplain Rev. Steve Mun describes how Mr. Zeitlin, upon his arrival at MDC, "immediately established himself as a faithful member of the Jewish community." Letter from Rev. Steve Mun, Chaplain, MDC (a copy of which is attached hereto as Exhibit 2). Rev. Mun adds that Mr. Zeitlin has made "outstanding contributions" as a "Chapel helper," who "is doing a wonderful job in that role." *Id*. Rev. Mun further observes that "the Religious Services Department sees Mr. Zeitlin [as] a positive role model for other inmates[.]" *Id*.

### 2. *The Letters Submitted on Mr. Zeitlin's Behalf Attest to His Generosity and Dedication to Others*

Mr. Zeitlin's self-examination while in custody has helped him rediscover the version of himself that the authors of the letters submitted on his behalf praise without reservation. Rabbi Yisroel Schanowitz notes that he first met Mr. Zeitlin, whose spiritual and religious commitment predates his detention, in approximately 2017 at Chabad of Summerlin (in Las Vegas). *See* Letter from Rabbi Yisroel Schanowitz (a copy of which is attached hereto as Exhibit 3). According to Rabbi Schanowitz, Mr. Zeitlin started meeting regularly with him, and as the Rabbi developed a better sense of Mr. Zeitlin, the Rabbi saw "a man of integrity, with a warm heart and an open hand." *Id*. *See also* Letter from Leon Saja (a copy of which is attached hereto as Exhibit 4).

In fact, Mr. Zeitlin quietly helped the Chabad, including paying for an entire roof repair that was not in the Chabad's budget. *Id*. Mr. Zeitlin also once noticed the Rabbi speaking to a woman who appeared distressed, and asked what he could do to help. As a result, Mr. Zeitlin

began assisting the woman financially, but completely anonymously except for the Rabbi's knowledge. *See* Exhibit 3.

Similarly, long-time younger friend Rom Itskovich's letter focuses on Mr. Zeitlin's care and support for others, describing Mr. Zeitlin as a man of "character, wisdom, and religious dedication." Letter from Rom Itskovich (a copy of which is attached hereto as Exhibit 5). Mr. Itskovich noted that he and Mr. Zeitlin "grew a bond . . . past a mentor and mentee, we became friends." *Id.* Mr. Itskovich credited Mr. Zeitlin with "display[ing] a multitude of facets to what the best parts of a human being can be, and to have that ability to learn and better oneself through mistakes and hardships for the people he loves and respects." *Id*.

Doug Brown, Mr. Zeitlin's friend for nearly ten years, reports that Mr. Zeitlin "has always been an upstanding member of his community[,]" and "is a good father, good neighbor, great friend, and generous member of his synagogue." Letter from Doug Brown (a copy of which is attached hereto as Exhibit 6).

One of Mr. Brown's "avocations has been to assist men just released from prison through the organization 'Hope for Prisoners.'" *Id.* Mr. Brown notes that "[i]t is ironic that Rick that used to help me in this work because of his compassion and his hope that these men become good contributing members of society[,]" and now Mr. Zeitlin is on "the other side" of that divide. *Id.*

Consistent with the experience of others, Mr. Zeitlin's good friend Jessica Segal writes that Mr. Zeitlin is "the first to offer help, often without being asked and without seeking recognition," and how his selfless help for others has inspired her. Letter from Jessica Segal (a copy of which is attached hereto as Exhibit 7). Ms. Segal also considers Mr. Zeitlin "an incredible father, husband, son, and friend who wholeheartedly cares for others . . ." *Id*.

Liliana Zeitlin, Mr. Zeitlin's spouse, echoes that "[w]hen a family member or friend needs help, Richard is the first call anyone makes. He's willing to do anything he can to help anyone." Letter from Liliana Zeitlin (a copy of which is attached hereto as Exhibit 8). *See also id*. ("Richard is generous with his time and energy. He's compassionate and a good neighbor. From day one, my family loved and respected my husband").

Liliana's mother lived with her and Mr. Zeitlin nearly three years, "during her struggle with dementia[.]" *Id*. During that period, Liliana notes that Mr. Zeitlin would "study with my mom daily to help her pass her citizenship exam." *Id*. As a result, Liliana was "so grateful for his welcoming heart[,]" because "[n]ot every man embraces and adores his in-laws the way Richard does."

Leon Saja has been Mr. Zeitlin's friend for more than 25 years, and that "experience has been a friendship of abundant mutual care, trust and respect." Exhibit 4. During that extended period, Mr. Saja has "personally observed the many virtues of my friend[,]" and, "aware of challenges Rick experienced growing up," concurs that "[d]espite [Mr. Zeitlin's] challenges, he went on to be a diligent worker, husband and father." *Id*.

Mr. Saja adds that,

> [l]ike most parents, [Mr. Zeitlin] perseveres. From filling up shopping carts for the less fortunate with his kids, to managing his son's special needs. Fatherhood never ends. Rick is a well-loved, deeply missed, respected father and a rock for his children.

*Id*.

In addition, Mr. Saja and his family "have been the grateful recipients of [Mr. Zeitlin's] generosity, care, and kindness over the years." *Id*. Mr. Saja notes "[t]here have been many," but provides a specific example of Mr. Zeitlin's "pure kindness and loyalty:" "Several years ago, when my children were just 7 and 9 years old, Rick expressed if anything ever happened to both me and my wife, he would care for our Daughter Layla and our Son Leo as his own." *Id*.

Repeating that theme that is constant among the letters, longtime employee Nicole Dillman writes that Mr. Zeitlin is able to views the best in people and their true potential. *See* Letter from Nicole Dillman (a copy of which is attached hereto as Exhibit 9). In her letter, Ms. Dillman recounts that she was at a low point in her life when she applied for employment with Mr. Zeitlin, and how Mr. Zeitlin inspired her with motivational conversations, and invested in her through personal and professional development seminars. *Id*. Ms. Dillman attributes her "second chance at life" – including marriage, building a family, and becoming a "contributing citizen" – to Mr. Zeitlin's encouragement and cultivation. *Id*.

Similarly, Nancy Ridge, the long-distance telecommunications broker for Mr. Zeitlin's companies for more than 20 years, notes that Mr. Zeitlin "was always straight-forward and honest in his dealings with me and my vendors." Letter from Nancy Ridge, a copy of which is attached hereto as Exhibit 10. In fact, many of Ms. Ridge's telecom vendors had worked with Mr. Zeitlin "for over 10 years – an extraordinary amount of time in the long-distance telecom business," and a testament to Mr. Zeitlin's integrity as well as his long-term commitment to his business and business relationships. *Id*.

[redacted] [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**4. *The Results of Mr. Zeitlin's Self-Reflection Since His Arrest***

Mr. Zeitlin's brother Alan recalls how he has "leaned on Rick for support when I have had problems . . . [h]e was always very understanding and supportive of me[,]" and reports how Mr. Zeitlin's pre-trial detention "has been extremely difficult for [him]." Letter from Alan Zeitlin (a copy of which is attached as Exhibit 13). In his letter, Doug Brown points out that as a result of Mr. Zeitlin's offense, prosecution, and detention, Mr. Zeitlin has "lost his business, his home, all his money and his freedom." Exhibit 6.

In his letter, Mr. Zeitlin confides that "[s]pending many nights alone in my cell soul searching gave me the needed time to look at myself and my actions." Exhibit 1. He adds that "I broke my contract with society and I deeply apologize to my victims, society and to you." *Id.* He acknowledges that "[m]y actions alone have landed me in prison and I truly understand the gravity of my conduct." *Id.*

Mr. Zeitlin also recognizes that "[u]nfortunately I cannot go back and change what I have done, however I do look forward to getting back to society and having an opportunity to be an honest neighbor." *Id.* In that spirit of looking ahead, Mr. Zeitlin commits to "look[ing] forward to rebuilding my life with integrity and a commitment to honesty." *Id.*

Moreover, he is also cognizant of his need to reconstruct his familial relationships, and is "looking forward to show my children how much I value them and hopefully they can also learn from my mistakes." *Id.* Also, Mr. Zeitlin's "mother is 78 and not in great health[.]" *Id.* As a result, he "hope[s] to be able to see her outside of prison before she passes. . . . [E]very day I can spend with her would truly be a gift." *Id.*

Mr. Saja verifies Mr. Zeitlin's reformation since his arrest, and "can't help but notice serious positive changes in Rick over the period of his incarceration." Exhibit 4. As a result, Mr. Saja "now respect[s] [Mr. Zeitlin] even more[]" because "[m]ost noticeably, [Mr. Zeitlin] has been humbled. Humility is not necessarily considered a virtue by most, but his humility was the catalyst for change. Changes related to honesty, integrity and self-control." *Id.*

In addition, Mr. Saja observes that Mr. Zeitlin "has come to an understanding that he must be proactive in every step he takes to do better for himself and his family's future." *Id.* Consequently, Mr. Saja "believe[s] that Rick can live a life of true integrity[,]" and is "confident he will regain the full trust and respect of so many that he once enjoyed." *Id.* Ms. Segal concludes her letter with the hope that the sentence imposed will "reflect[] both accountability and the potential for redemption."

In closing his letter, Mr. Zeitlin describes his most recent Yom Kippur experience at MDC as "truly transformative." Exhibit 1. He notes that "[t]he day of atonement in MDC will never be forgotten as I was able to atone for all my sins and behavior[,]" which "goes beyond this case, and includes other lifestyle choices that I have been forced to confront and, fortunately, now have the strength to change." *Id.*

### B. *Mr. Zeitlin Has Endured the Ordeal of Confinement at MDC for 13 Months*

Mr. Zeitlin has suffered the intolerable conditions of confinement at MDC for 13 months, and will likely do so for another 60 days until his designation to another BoP facility.[2] As the Court is aware (and does not require citation to the legion of cases), as a result of those conditions, courts in the Southern District of New York ("SDNY") and the Eastern District of

---

[2] Mr. Zeitlin was confined at the Essex County Correctional Facility for the first three months of his detention.

New York have as a matter of course reduced the length of sentences they would otherwise impose. That standard should apply as well to Mr. Zeitlin, whose tenure at MDC has corresponded to a particularly violent, volatile, and extraordinarily difficult period for the institution.

In February 2024, during oral argument on Mr. Zeitlin's renewed motion for pretrial release, the Court acknowledged the problems plaguing MDC, commenting that "I don't have any illusions about the MDC. . . . The conditions are bad. I know they're bad." Transcript, February 14, 2024, at 7 (ECF # 100). *See also id*., at 12 (noting "the bad conditions during that specific period of time" in which Mr. Zeitlin spent his first few months at MDC); *id*., at 13 ("I'm not blind to the problem over there. I'm absolutely not. Nobody on this court is at this point").

In denying Mr. Zeitlin's application, the Court noted "obviously, there are systemic problems over [at MDC], there, but many of those that you have raised are just not sufficiently germane to bail to warrant any change, in my view, here." *Id*., at 13. *See also id*., at 7 ("I don't consider the arguments as relevant to bail").

Yet while not pertinent to pretrial release, conditions at MDC are unquestionably relevant to sentencing. In that context, Mr. Zeitlin respectfully incorporates by reference the letters he submitted in support of his renewed application for pretrial release to describe the conditions for Mr. Zeitlin through mid-February. *See* January 2, 2024, letter (ECF # 58); February 1, 2024, letter (ECF # 74); February 12, 2024, letter (ECF # 79).

Nor does the summary below provide a detailed litany of the problems at MDC that afflict inmates like Mr. Zeitlin. That accounting – including multiple homicides, multiple assaults, severe staff shortages, inadequate medical care, and a decaying physical plant – would consume dozens of pages.

### 1. *The October 28, 2024, Law Enforcement Operation at MDC*

Indeed, the situation at MDC has deteriorated to the extent that one month ago, October 28, 2024, "[i]nvestigators from various federal agencies launched an 'interagency operation'" at MDC. Michael Balsamo and Michael R. Sisak, "Authorities launch 'interagency operation' at federal jail in New York housing Sean 'Diddy' Combs," *AP News*, October 28, 2024 ("*Authorities Launch 'Interagency Operation'*"), available at https://bit.ly/417l65I. *See also* Chelsia Rose Marcius, "U.S. Officials Sweep Troubled Brooklyn Prison Where 2 Were Killed," *The New York Times*, October 28, 2024, available at https://bit.ly/3APmak9.

The October 28, 2024, law enforcement operation at MDC included "investigators from the Bureau of Prisons, the Justice Department's inspector general's office and other law enforcement agencies . . ." *Authorities Launch "Interagency Operation."* According to a BoP spokesperson, the action was "designed to achieve our shared goal of maintaining a safe environment for both our employees and the incarcerated individuals housed at MDC Brooklyn[.]" *Id.*

Unfortunately, and ironically, the immediate impact on inmates of even that high-profile effort to interdict illegal activity at MDC – and not necessarily to improve conditions otherwise – was negative.[3] The law enforcement activities continued for a week, during which inmates were locked down and deprived of all activities except legal visits, legal calls, and medical appointments. In addition, for two days there was no running water in the facility. Thus, inmates could not flush toilets, shower, or operate the sinks. Each inmate was provided one 16 ounce bottle of water daily.

Thus, for the entire week, as stated in the October 28, 2024, "Memorandum for Inmate Population" from MDC Captain C. Haines (a copy of which is attached as Exhibit 13), even though the law enforcement operation was a "pre-planned event and is based on no active threat[,]" inmates nevertheless were denied "access to institution telephones, computers, and social visits during this operation." Also, inmates were "afforded showers in small, controlled groups[.]" *Id.*

All inmate cells were searched, and during the search of Mr. Zeitlin's cell, agents broke the light bulb therein, and it was not fixed until the following Saturday. As a result, throughout the week-long lockdown, Mr. Zeitlin was in the dark, unable to read or consult his prayer book. Furthermore, the agents who conducted the search rear-handcuffed Mr. Zeitlin and lifted him in a manner that hurt his left shoulder to the extent his range of motion remains impaired weeks later. After a week of ordinary operations, Mr. Zeitlin's unit was again placed on lockdown the week of November 11, 2024.

**2. *BoP's Moratorium on Designation to MDC***

BoP itself has recognized the dire situation at MDC. In response to the opinion in *United States v. Colucci*, 23 Cr. 417 (GRB) 2024 WL 3643857 (E.D.N.Y. August 5, 2024), BoP instituted a moratorium on designating sentenced defendants (who are often designated to serve

[3] Nor, to the extent any positive reforms emerge from that law enforcement action – directed only at security and not a host of other problems at MDC – they will be implemented too late to benefit Mr. Zeitlin.

short – 18 months or fewer – sentences at MDC) to the facility. *See* Michael R. Sisak and Michael Balsamo, "Inside the Brooklyn federal jail where Sean 'Diddy' Combs is locked up: Violence, squalor and death," *Associated Press*, September 19, 2024, available at https://bit.ly/4eQLQLN (referencing the *Colucci* decision in August, "[i]n response [to *Colucci*], the Bureau of Prisons said it had 'temporarily paused' sending any defendants convicted of crimes to the jail to serve their sentences").

Like the January 2024 opinion in *United States v. Chavez*, 710 F. Supp.3d 227 (S.D.N.Y. 2024), the opinion in *Colucci*, issued in August 2024, addressed MDC's problems in detail, and with withering criticism of the conditions at MDC.

In *Colucci* (in sentencing a defendant to nine months in prison, but with the proviso that it *not* be served at MDC), similar to *Chavez*, the Court commenced its discussion by declaring that determining the appropriate sentence was "further complicated by an extrinsic factor that looms large in nearly every bail and sentencing determination made in this judicial district: *the dangerous, barbaric conditions that have existed for some time at*" MDC. 2024 WL 3643857, at *1 (emphasis added).

### 3. *A Sampling of Judicial Opinions and Comments Regarding MDC*

The Court in *Colucci* thus joined other courts, including that in *Chavez*, in concluding that MDC fails to provide adequate conditions of confinement. *See also United States v. Griffin*, 22 Cr. 408 (EK) (E.D.N.Y.) (ECF # 36) 2024 WL 2891686 (E.D.N.Y. June 10, 2024). *See also* January 2, 2024, letter (ECF # 58); February 2, 2024, letter (ECF # 74); February 12, 2024 (ECF # 79).

Other instances of recent judicial condemnation of MDC and its management, motivating judges to impose shorter prison sentences (or even non-custodial sentences) than they would otherwise, abound, and include the following reported cases in addition to the many others that are not memorialized in published opinions or reported to the media at large:

- *United States v. Santana*, No. 22 CR. 368 (VM), 2024 WL 2275037, at *2 (S.D.N.Y. May 20, 2024) ("[g]iven the severe prison conditions that prevail at the MDC (conditions that amount to imposing harsher punishments on prisoners), this Court and others have adjusted sentences of defendants in custody there for lengthy periods"). *See also Colucci*, 2024 WL 3643857, at *2;

- *United States v. Nordlicht*, 16 Cr. 640 (BMC) (E.D.N.Y.). *See Colucci*, 2024 WL 3643857, at *2 ("[i]n yet another case, Judge Cogan indicated that he might have

sentenced an offender to incarceration 'if not for the length of the sentence landing him in'" MDC) (footnote omitted). *See also* Emily Saul, "'Such a Weird Case': US Judge Sentences Platinum Partners Co-Founder to Six Months Home Confinement," *The New York Law Journal*, July 17, 2024, available at https://bit.ly/4dXJYjg ("'[s]entences [at MDC] are much longer,' the judge sighed. 'Things are not right over there right now'"); and

- *United States v. Anatoly Legkodymov*, 23 Cr. 496 (ENV) (E.D.N.Y.). *See* Emily Saul, "'An Entrepreneur and a Visionary': US Judge Sentences Ex-Crypto Exchange Founder to Time Served," *The New York Law Journal*, July 18, 2024, available at https://bit.ly/4dyp2zi ("'[y]ou will get no quibble from me about the MDC,' the jurist sighed [at sentencing]. 'It has been the bane of this court and our sister court across the bridge for years'"). *See also id.* ("'It's a terrible place and the court does consider that,' [the Court] added").

Thus, as the Court in *Colucci* recognized, "[a]llegations of inhumane treatment at MDC continue, however, and judges in this district are subject to a steady drumfire of such charges, often uncontested by prosecutors." 2024 WL 3643857, at *2 (*citing Chavez*, 710 F.Supp.3d, at 230).[4]

Also, while MDC has been the subject of increased attention from BoP since the *Chavez* opinion generated considerable adverse publicity, there has not been material improvement at the facility. Indeed, the homicides and assaults catalogued in *Colucci* (and that in *Griffin*) occurred *after* BoP claims it concentrated its focus on MDC. Also, drug use continues unabated within the facility.

### 4. *The Continuing Serious Staff Shortage at MDC*

Among the principal issues is staffing shortages. While MDC has claimed gains in adding staff, it is often unclear how much of that is *correctional* staff, and not simply clerical or other staff. An August 29, 2024, *New York Law Journal* article describes how serious the situation remains, and how BoP continues its resistance to transparency.

---

[4] Earlier this year the government made the obtuse argument in its sentencing submission that the Court should not consider the conditions at MDC because *all defendants confined there suffered from those same substandard conditions*. *See United States v. Mustapha*, 23 Cr. 440 (PKC), Government's April 29, 2024, Sentencing Letter, at 5 (ECF # 24) ("defendant's criticisms of [MDC], whatever their merits, could be made with respect to any defendant").

For instance, when asked for specifics regarding the number of staff positions added and filled, an MDC spokesperson replied, "We don't have specific numbers to provide at this time[.]" Emily Saul, "The New Federal Sentencing Factor in Downstate New York? Prison Conditions," *The New York Law Journal*, August 29, 2024 ("*New Federal Sentencing Factor*"), available at https://bit.ly/3BTFNYj.

At that time of that article, MDC had "239 correctional staff (in general parlance, prison guards) and 105 unstaffed correctional positions." *Id*. Thus, despite nearly a year of attempts to buttress staff numbers since the *Chavez* opinion in January, MDC *still suffered from a 44% shortfall in correctional officers.*

Moreover, the attrition rates for MDC are alarming: while prior to and including 2020, the attrition rate for correctional staff hovered at just under ten percent, "[t]he years since have seen only increases: 13.85% attrition in 2021, 14.98% in 2022 and 17.67% in 2023." *Id.* In addition, the author of the *Law Journal* article added that BoP "told [her] 143 MCC employees were 'temporarily' assigned to duty at the MDC following the MCC closure, 70 of which were correctional services employees." *Id*. Yet she "was directed [by BoP] to file a records request under FOIA in response to a question as to whether the temporary duty was indefinite or if it had lapsed." *Id*.[5]

### 5. *The Persistent Extreme Violence at MDC*

The instances of violence listed in *Colucci* ultimately resulted in federal criminal charges. The Indictment in *United States v. Andrew Simpson and Devone Thomas*, 24 Cr. 360 (EK), charges the two defendants, detainees at MDC, "for their roles in the June 7, 2024 murder of inmate Uriel Whyte." *Id*.

As the Press Release issued by the United States Attorney for the Eastern District of New York recounts,

> [o]n the morning of June 7, 2024, following a verbal dispute between Simpson and Whyte, cellmates Simpson and Thomas armed themselves with makeshift weapons and proceeded to engage in a series of two-on-one attacks against Whyte. The escalating violent attacks, which took place over a span of

---

[5] The author of the article remarked that "[i]n the nearly 10 years I've covered criminal courts in New York, I've yet to hear a positive statement about the MDC. It's more often likened to hell on earth."

> approximately 15 minutes, were committed against Whyte inside Simpson and Thomas's shared cell, which served to hide their conduct from guards and surveillance cameras.

Press Release, "Federal Charges Announced Against Inmates for Violent Crimes Committed in the Metropolitan Detention Center in Brooklyn," United States Attorney, Eastern District of New York, September 30, 2024 ("*EDNY Press Release*"), available at https://bit.ly/48gJgwc.

Eventually, "[t]he attacks culminated with Whyte suffering a severe stab wound to his neck, which severed his carotid artery." *Id*. Although "Whyte was able to exit the cell and seek medical aid, he succumbed to his wounds shortly thereafter despite the efforts of onsite medical personnel and responding paramedics." *Id*.

The *EDNY Press Release* also confirmed that the Indictment in *United States v. Jamaul Aziz, James Bazemore and Alberto Santiago*, 24 Cr. 380 (NCM), alleges that the three defendants, who had already pleaded guilty to the charges for which they had been detained at MDC, murdered another MDC inmate, Edwin Cordero. *EDNY Press Release*. Regarding that July 17, 2024, homicide, the *EDNY Press Release* states,

> following an earlier altercation between Cordero and Santiago – Santiago, Aziz and Bazemore met with each other intermittently over approximately half an hour. Cordero then reengaged with Santiago – both of them armed with makeshift weapons – when shortly after Aziz and Bazemore, also armed, joined in. Aziz, Bazemore and Santiago cornered Cordero while swinging and stabbing at him.

*Id*.

Despite that commotion, the assault continued without interference from any MDC personnel: "[a]fter Cordero was able to escape, Bazemore continued to attack him, which allowed Santiago to approach Cordero from behind and stab him in the center of his chest, perforating various parts of his heart. Cordero then staggered forward, and Bazemore stabbed him in the back." *Id*. Yet even that did not provoke staff intervention, as "Aziz and Bazemore next cornered the victim again next to a table and repeatedly stabbed, struck and kicked him, including after he fell to the ground and tried to shield himself with the table." *Id*.

While the *EDNY Press Release* adds that "[s]taff members quickly responded to the commotion and delivered emergency medical care but were unable to save the victim[,]" *id*., it is

obvious that an extended assault with three separate phases – preceded as well by "an earlier altercation" between the victim and one of his assailants – could not possibly have resulted in a sufficiently "quick" response from MDC staff.

More likely, as is evident from the video of a separate April 27, 2024, stabbing, due to staff shortages at MDC, staff were not present for the initial stages of the July 17, 2024, homicide, which therefore proceeded unimpeded. That serious stabbing that occurred at MDC April 27, 2024, was not publicly known until the government filed a June 7, 2024, letter in *United States v. Rivas*, 18 Cr. 398 (RPK) (E.D.N.Y.) (ECF # 363) (from Assistant United States Attorney Nadia E. Moore) ("AUSA Moore Letter") detailing the assault.

Six months after the stabbing, and nearly four months after the AUSA Moore Letter – and only after the video of the stabbing was released in conjunction with a media report, *see* John Annese, "See it: Video from inside troubled Brooklyn federal jail shows brutal gang stabbing," *New York Daily News*, July 27, 2024, available at https://bit.ly/4dARkcC – formal charges were filed in connection with the stabbing.

As the *EDNY Press Release* noted, the Indictment in *United States v. Luis Rivas*, 24 Cr. 390 (OEM) charged the defendant with "attempted murder in a federal detention facility[]" and "assault in a federal detention facility and possession of contraband in prison . . ." *EDNY Press Release*. According to the *EDNY Press Release*, the defendant (Mr. Rivas), who was at MDC after pleading guilty to a homicide in which he participated as part of his membership in the La Mara Salvatrucha ("MS-13") gang,

> and two other MS-13 members brutally attacked another inmate in their housing unit. Prior to the attack, the victim was sitting peacefully, relaxing with his feet up. Rivas then approached the victim, took a makeshift weapon from his waistband, and stabbed the victim with it. Two other MS-13 members then came to Rivas' aid and assisted him in punching and stabbing the victim repeatedly.

*Id*.

The gravity of the stabbing was apparent from the fact that "[a]fter the assault, the victim was taken to MDC-Brooklyn's medical unit and then to a hospital to treat the approximately *44 stab wounds to his back, chest, abdomen, right arm and legs*." *Id*. (emphasis added). A copy of the video of the assault, also provided with the AUSA Moore Letter, at 1, and the *Colucci* opinion provides a link to the video. *See* 2024 WL 3643857, at *5 n.9 (https://bit.ly/4ckg9bS).

### 6. *The Continued Lockdowns at MDC*

Existing in an environment in which there is always the potential for the type of violence detailed above is harrowing, and even witnessing it is traumatizing. Also, unsurprisingly, each of the instances of violence chronicled above – as well as others that are not included or are unreported publicly altogether – is followed by a lockdown of indeterminate duration. Sometimes they last only hours, but more often days and even weeks. Their length is aggravated by the shortage of correctional staff: the lack of adequate staff makes lockdowns the preferred (and easier) alternative for MDC's management.

As chronicled in my January 2 ,2024, February 1, 2024, and February 12, 2024, letters (ECF #s 58, 74 & 79, respectively) in support of Mr. Zeitlin's renewed application for pretrial release, within weeks after Mr. Zeitlin's arrival at MDC, the facility instituted lockdowns that lasted longer than one month in the entire MDC and *seven weeks* on Mr. Zeitlin's unit. Mr. Zeitlin estimates that, conservatively, he has been under lockdown 35% of the 13 months he has spent at MDC.

The lockdowns also exert a cumulative effect, as they increase tension among inmates (and between inmates and staff), which of course perpetuates a cycle of lockdown-violence-lockdown that disrupts not only the inmates' routines – programming, work, visits, case preparation – but their emotional stability as well – further contributing to the cycle.

While Mr. Zeitlin's letter to the Court acknowledges the benefits he has realized from his detention, certainly serving it at a facility as dangerous and dysfunctional as MDC was not necessary for that self-examination to occur. Accordingly, it is respectfully submitted that, as many courts have done routinely in the past few years (at least), Mr. Zeitlin's unduly arduous 13 months at MDC should be treated as a mitigating factor of considerable magnitude in determining his sentence.

### C. *The Division of Fundraising Proceeds and the 18-Point Enhancement for the Loss Amount Distort the Precise Nature of Mr. Zeitlin's Offense Conduct*

As his plea of guilty and his letter to the Court manifest, Mr. Zeitlin accepts responsibility for his criminal conduct: for a discrete period (2017-2020), selectively deploying telemarketing scripts that deceived potential donors into thinking they were being solicited for a charity rather than a political action committee ("PAC") – in a percentage approximating 11.5% of gross fundraising revenue. *See* Indictment (ECF # 1), at ¶ 1.

Thus, those numbers themselves demonstrate that Mr. Zeitlin and his companies performed predominantly legitimate work raising funds for worthy organizations for many years. Indeed, as the Court's July 15, 2024, Memorandum Opinion (ECF #83) denying Mr. Zeitlin's motion to suppress, pointed out, "the government concedes that aspects of defendant's business were legitimate and does not prove sufficiently that the business was permeated with fraud." *Id*., at 15.

In that context, it is respectfully submitted that two factors are important in considering what constitutes a reasonable and appropriate sentence that is "sufficient, but not greater than necessary." The first is that Mr. Zeitlin conducted the vast majority of his business legally, and in a manner that requires some explanation (and correction) given the broader allegations against him, namely that his entities would "typically keeping a large portion of each dollar donated – approximately 90 percent – the rest of which was disbursed to the respective PAC." *Id*.

The second is that, as calculated **ante**, at 3, and discussed **post**, at 22-25, the 18-point enhancement based on loss pursuant to Guidelines §2B1.1, creates a Sentencing Guidelines range that is disproportionately high based exclusively on that single element – which, as discussed below, is not the type of Guidelines enhancement that is entitled to judicial deference.

### 1. *Mr. Zeitlin's Companies Did Not "Keep" 90% of the Funds Raised*

Mr. Zeitlin's companies successfully raised funds for charities and PAC's during the past three decades. As noted above, the Indictment claims that Mr. Zeitlin's entities would "typically keeping a large portion of each dollar donated – approximately 90 percent – the rest of which was disbursed to the respective PAC." Indictment, at ¶ 1.

However, that does not accurately portray either the fundraising process, and/or the division of "proceeds." As reflected in the cases discussed below, Mr. Zeitlin's companies were compensated consistent with similar companies in the tele-funding marketplace.

While Mr. Zeitlin's companies received between 85 and 90% of the gross fundraising monies collected for charities and PAC's through their respective campaigns, Mr. Zeitlin's companies did not *retain* that revenue percentage as *profit*. In fact, as recognized in the case law discussed below, tele-fundraising overhead – borne solely by Mr. Zeitlin's companies in this arrangement, with the PAC's and charities absolved of any responsibility in that regard – is by definition very high, with the dominant expenses consisting of telecommunications and data charges, server and other network technology costs, postage, and payroll for the individuals making the calls, as well as the employees performing administrative tasks related to collecting and disbursing the funds raised.

Mr. Zeitlin's companies thereby incurred administrative costs in the 75-80% range (of the gross), which were in accord with industry practice, and reduced significantly the amount those companies retained from the gross revenue. Thus, the portion Mr. Zeitlin's companies realized as profit was roughly equivalent to the 10-15% paid to the charities and/or PAC's. In addition, Mr. Zeitlin and his companies incurred very substantial legal fees through the years in order to comply with the burgeoning federal, state, and local regime of charity and PAC regulations – something fraudulent telemarketing enterprises simply do not do.[6]

Moreover, smaller charities, PAC's, and those engaged in less popular and/or nascent causes necessarily face extremely high fundraising costs of acquiring donors and supporters. Mr. Zeitlin's companies provided "turn-key" services to these smaller organizations, which involved Mr. Zeitlin's companies assisting with registering the organization with the appropriate federal or state agencies, handling the telemarketing calls, and setting up an account with a fulfillment company that sends U.S. Mail donor pledge invoices, and has lockbox services to collect and process donations.

Again, these contribute to overhead expenses paid solely by Mr. Zeitlin's companies, and not by the charities or PAC's. Another important aspect of the contracts that provided 85-90% of the gross go to Mr. Zeitlin's companies is that Mr. Zeitlin's companies also bore the entire risk of each campaign's success or failure: if sufficient funds were not raised to pay for the telemarketing campaign's expenses, Mr. Zeitlin's companies absorbed the entire loss.

In turn, these costs were particularly high in connection with many of Mr. Zeitlin's companies' clients because nascent organizations lack any existing "donor list" to utilize for fundraising. Such donor lists must be created and constantly updated through what is referred to as "cold calling," *i.e.*, contacting potential donors without any prior history of donating to a particular organization. This reality has been discussed and approved in both Supreme Court and Circuit decisions, as discussed **post**, at 21.

Notwithstanding those figures, which provide perspective on the relative shares of the amounts raised, there is nothing illegal or unethical about the division of the funds. In fact, in a series of important cases the Supreme Court rejected the conventional wisdom that high fundraising costs by themselves, or that a larger share to the fundraising mechanism, warranted any presumption of fraud.

---

[6] Typically, in this field of the tele-funding industry, collection rates for donations pledged by telephone are 30% – which of course means that a considerable portion of the expenses, *i.e.*, payroll and telecommunications/data charges, are unproductive in securing revenue even when a phone call yields an oral commitment from a prospective donor.

For instance, in *Illinois ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600 (2003), the Court cautioned that "[h]igh fundraising costs, without more, do not establish fraud." *Id.*, at 624. That principle applied *even when the fundraiser retains* "*85 percent of the proceeds of their fundraising endeavors*." *Id.*, at 605 (emphasis added). *See also Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781, 793 (1988) (reiterating "clear holding in [*Sec'y of Md. v. Joseph H. Munson Co.*, 467 U.S. 947 (1984)] that there is no nexus between the percentage of funds retained by the fundraiser and the likelihood that the solicitation is fraudulent"); *Munson*, *Sec'y of Md. v. Joseph H. Munson Co.*, 467 U.S. at 966 ("[t]he flaw in the statute is not simply that it includes within its sweep some impermissible applications, but that in all its applications it operates on a fundamentally mistaken premise that high solicitation costs are an accurate measure of fraud"); *see also id*. at 966 n.15 ("[t]he Secretary's own records illustrate the tenuous connection between low fundraising costs and a valid charitable endeavor" because the Secretary approved cost ratios as high as 85 percent).

Moreover, as Judge Posner explained in an important Seventh Circuit decision reversing the Tax Court's decision to revoke the tax-exempt status of a non-profit entity because the cost ratio was 85 percent, "the ratio of expenses to net charitable receipts is unrelated to the issue of inurement." *United Cancer Council, Inc. v. Commissioner*, 165 F.3d 1173, 1179 (7th Cir. 1999). Also, *United Cancer Council* recognized that "new, small, weak, or marginal charities" are "likely to have a high expense ratio[;]" consequently, and sustaining the Tax Court's decision would have the effect of making those charities' "survival even more dubious." *Id.* at 1178.

A summary of the annual net income of Mr. Zeitlin's companies for 2019-2023 (gleaned from tax returns) is set forth below, with it ranging between a low of approximately $1.2 million in 2019, to a high of approximately $6.9 million in 2020, with the other years falling somewhere between. For 2019, 2020, and 2021, several companies provided the suite of services required for successful telemarketing fundraising campaigns, but in 2022 and 2023 those services were consolidated into a single company. The specific annual figures were as follows:

**2019 Net income:**

| | |
|---|---|
| Unified Data: | $ 525 |
| Advanced Telephony: | $ 8,569 |
| Advanced Technology Services: | $ 690,037 |
| Compliance Consultants: | $ 501,645 |
| TPFE: | ($1,293) |
| **Total Net Income 2019:** | $1,199,483 |

**2020 Net Income:**

| | |
|---|---|
| Unified Data: | $ 507,328 |
| Advanced Telephony: | ($326,546) |
| Advanced Technology Services: | $3,594,484 |
| Compliance Consultants: | $3,129,471 |
| **Total Net Income 2020**: | $6,904,737 |

**2021 Net Income:**

| | |
|---|---|
| Unified Data: | $5,108,173 |
| Advanced Telephony: | ($7,685) |
| Advanced Technology Services: | $ 139,384 |
| Compliance Consultants: | $ 171,944 |
| **Total Net Income 2021**: | $5,411,816 |

**2022 Net Income:**

| | |
|---|---|
| Unified Data: | $2,671,544 |
| **Total Net Income 2022**: | $2,671,544 |

**2023 Net Income**:

| | |
|---|---|
| Unified Data: | $1,323,790 |
| **Total Net Income 2023**: | $1,323,790 |

Accordingly, the claim that Mr. Zeitlin and his companies "typically keeping a large portion of each dollar donated – approximately 90 percent," is facile, and masks the accurate disposition of the proceeds and profits – and risks – associated with specific charities and PAC's and their fundraising campaigns.

### 2. *The 18-Point Enhancement Pursuant to §2B1.1 Irrationally Influences Mr. Zeitlin's Applicable Guidelines Range*

The extraordinary impact of the 18-point enhancement for loss amount pursuant to §2B1.1 on Mr. Zeitlin's applicable Guidelines range is computed **ante**, at 3. Indeed, the Guidelines levels in financial fraud cases are driven principally by the loss amount adjustments. Courts have criticized the rigid and arbitrary nature of the Guidelines in this context, recognizing the injustice "that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." *See United States v. Adelson*, 441 F.Supp.2d 506, 512 (S.D.N.Y. 2006), *aff'd* 301 Fed. App'x. 93 (2d Cir. 2008). *See also United States v. Parris*, 573 F. Supp. 2d 744, 745, 754

(E.D.N.Y. 2008) (describing "Sentencing Guidelines for white-collar crimes" as "a black stain on common sense" and sentencing defendant "to a term of incarceration of 60 months in the face of an advisory guidelines range of 360 to life"); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.) ("[t]he Guidelines place undue weight on the amount of loss involved in the fraud").

Elaborating, the Court in *Adelson*, a case involving a conviction at trial for accounting fraud at a publicly traded company that resulted in a $260 million loss to shareholders, and in which the Court imposed a 42-month prison sentence despite a Guidelines Total Offense Level of 46 (with a range of 360 months to life imprisonment),

> [a]s many have noted, the Sentencing Guidelines, because of their arithmetic approach and also in an effort to appear "objective", tend to place great weight on putatively measurable quantities, such as weight of drugs in narcotics cases or *the amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors*. *See generally* Kate Stith & Jose Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998).

*Id*., at 509 (emphasis added).[7]

The absence of an empirical rationale for the dominance of the loss table, and/or the lack of an explanation "why it is appropriate to accord such huge weight to" the table, in sentencing in fraud cases has troubled courts. In *United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013), Judge Underhill, concurring, commented that "[t]he loss guideline . . . was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices." *Id*., at 379 (Underhill, J., *concurring*). *See also United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) ("[t]his approach, unknown to other sentencing systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider").

---

[7] In addition, Mr. Zeitlin's Guidelines calculation includes another two-point enhancement – for more than ten victims (pursuant to §2B1.1(b)(2)(A) – that is essentially automatic in modern financial fraud cases. *See United States v. Dorvee*, 604 F.3d 84, 96 (2d Cir. 2010), *amended* 616 F.3d 174, 186 (2d Cir. 2010) (noting that enhancements that apply in all cases can inappropriately and disproportionately increase a Guidelines level beyond the point of reasonableness, and that a sentencing court could correct that imbalance through analysis of other §3553(a) factors).

In fact, the loss Guidelines suffer from an original, fundamental, and material flaw that compromises its capacity to an provide empirical basis: in calculating the "average" pre-Guidelines sentence for fraud cases, the Sentencing Commission included *only* sentences of imprisonment, and *excluded* all sentences of probation, thereby distorting the Guidelines in favor of not only imprisonment, but *longer* terms of imprisonment. *See* U.S. Sent'g Comm'n, *Supplementary Report on the Initial Sentencing Guidelines and Policy Statements*, Table 1(a), p. 22, 34 (1987), at 22, 24 (referring to Table 1(a) at 27), available at https://bit.ly/3AON9fL.

Due to that original bias in favor of imprisonment, "the Sentencing Commission's loss enhancement numbers do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime." *United States v. Johnson*, 2018 WL 1997975, at *3 (E.D.N.Y. April 27, 2018).

Instead, "the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology – thus maximizing the risk of injustice." *United States v. Gupta*, 904 F. Supp.2d 349, 351 (S.D.N.Y. 2012); *see also Johnson*, 2018 WL 1997975, at *4 (describing the loss enhancement as a "grievous wrong" and noting "the rigidity of the loss amount overriding the diverse reality of complex financial crimes [and] the lack of any consideration of danger to society[]").

Commentators, too, have expressed reservations. *See* Mark H. Allenbaugh, *"Drawn from Nowhere:" A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent'g Rep. 19, 22 (2013); *see* Jillian Hewitt, *Fifty Shades of Gray: Sentencing Trends in Major White-Collar Cases*, 125 Yale L. J. 1018, 1025 (2016) (concluding that review of the post-[*United States v. Booker*, 543 U.S. 220 (2005)] sentencing data "empirically corroborate[d] scholarly criticism that the loss table often vastly overstates the seriousness of an offense").

Thus, the amount of loss is often "a kind of accident[,]" and thus a "relatively weak indicator of [] moral seriousness . . . or the need for deterrence." *Emmenegger*, 329 F.Supp.2d at 427. As the Supreme Court instructed in *Kimbrough v. United States*, 552 U.S. 85 (2007) (internal quotations omitted), when the Sentencing Commission has failed to base its formulation of a guideline upon empirical evidence of pre-Guidelines practice and/or review and revision based on judicial decisions and sentencing data, or when a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role" because the Commission "did not take account of empirical data and national experience," the sentencing court is free to conclude that the guideline "yields a sentence greater than necessary to achieve §3553(a)'s purposes, even

in a mine-run case" and "may vary [from Guidelines ranges] based solely on policy considerations." *Id*., at 101, 109-110.[8]

As a result, in *Corsey* Judge Underhill counseled that "the low marginal utility of the guideline in this very high intended loss case should have prompted greater, not lesser, reliance on the section 3553(a) factors other than the Guidelines." 723 F.3d at 380. *See also id*. (loss Guidelines are "fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges").

### D. *The Data from JSIN and the Sentencing Commission Establish That a Sentence for Mr. Zeitlin Substantially Below the Applicable Guidelines Range Would Be Consistent with Current Sentences for His Offense Conduct, and Avoid the Unwarranted Disparities Prohibited by §3553(a)(6)*

The statistics available from both JSIN and the U.S. Sentencing Commission establish that, measured by any objective metric, a sentence substantially below the PSR's recommended sentence of 121 to 151 months would conform with the vast majority of sentences for those defendants similarly situated to Mr. Zeitlin nationwide or in SDNY (even absent the mitigation set forth above that is peculiar to Mr. Zeitlin, *i.e.*, his genuinely articulated remorse; his 13 months at MDC; how certain Guidelines enhancements distort the offense level and Guidelines range).

In *United States v. Singh*, 877 F.3d 107 (2d Cir. 2017) and *United States v. Jenkins*, 854 F.3d 181 (2d Cir. 2017), the Second Circuit employed statistical comparison as a key element in determining whether a sentence would represent an unwarranted disparity. Indeed, in both cases, the Court held that sentences significantly above the national norm for persons in the same CHC who committed the same offense were substantively unreasonable.[9]

---

[8] That judicial deference is not required in this instance has been reinforced by the Supreme Court's decision last term in *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024).

[9] Other courts have also relied upon statistics in reviewing and crafting sentences. *See United States v. Stock*, 685 F.3d 631, 629-30 (6th Cir. 2012) (observing sentence was "by far the longest" imposed for an offense such as the one at bar, and that this might affect the reasonableness of the sentence on remand); *United States v. Musgrave*, 647 Fed. App'x 529, 538 (6th Cir. 2016) (sentence reasonable in part because district court "studied sentencing statistics nationally and in the Southern District of Ohio"); *United States v. Buesing*, 615 F.3d 971, 974 (8th Cir. 2010) (affirming sentence arrived at in part through analysis of Sentencing Commission statistics); *United States v. Kamper*, 860 F. Supp.2d 596, 608 (E. D. Tenn. 2012) ("[t]he

### 1. *JSIN Statistics*

For example, the JSIN results for the criteria in the Plea Agreement – Guidelines level 32 and CHC I – are as follows (*see also* draft PSR, at Appendix A, at pp. 25-26): for the 60 defendants "whose primary guideline was §2B1.1, with a Final Offense Level of 32 and a Criminal History Category of I," and "who received a sentence of imprisonment in whole or in part, the average length of imprisonment imposed was 94 month(s) and the median length of imprisonment imposed was 86 month(s)." *See* JSIN, available at https://jsin.ussc.gov/.

That data – which excludes those defendants who were the subject of Guidelines §5K1.1 motions by the government – does not include the one defendant in that cohort who did not receive a sentence of imprisonment at all (with elimination of the latter skewing the average upward). *Id.*[10] Thus, including that defendant, the average sentence imposed was 92 months and the median sentence was 84 months' imprisonment. In addition, of the 61 defendants with the primary guideline §2B1.1, 40% received a downward departure or variance, and only 22% were sentenced within Guidelines range. *Id.*[11]

### 2. *Sentencing Commission Statistics*

The statistics published by the Sentencing Commission are even more precise and more compelling. Generally, only 19.6% of sentences imposed in SDNY in Fiscal Year ("FY") 2023 were within the applicable Guidelines range, and an overwhelmingly majority 68.4% were subject to a variance (with all but a handful of cases being *downward* variances below the Guidelines range). *See* United States Sentencing Commission, *2023 Sourcebook*, at Table 30, available at https://www.ussc.gov/research/sourcebook-2023.[12]

---

Commission's statistical work is invaluable to district court judges"). *See also* Alan Ellis & Mark Allenbaugh, *Unwarranted Disparity: Effectively Using Statistics in Federal Sentencing*. 101 Crim. L. Rptr. 71 (Apr. 26, 2017), available at https://bit.ly/491SJb6.

[10] Nor do JSIN means and medians distinguish between defendants who pleaded guilty and those who proceeded to trial, thus potentially distorting the means and medians for either category.

[11] The remainder were the beneficiaries of Guidelines §5K1.1 motions by the government (34%), or received an upward departure or variance (4%).

[12] Nationally, 42.4% of sentences imposed in 2022 were within the applicable Guidelines range, and 20.1% of all sentences were subject to a downward variance *not* sponsored by a

In fact, of all SDNY sentences imposed in FY 2023, a decisive majority of 57.1% included a non-government sponsored downward variance. *See* United States Sentencing Commission, *Statistical Information Packet Fiscal Year 2023 Southern District of New York* ("*FY 2023 SDNY Statistical Information Packet*"), at Table 8, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2023/nys23.pdf.

More specifically related to this case, for FY 2023 the mean length of sentences nationally for fraud/theft/ embezzlement offenses was 22 months' imprisonment, while the median length was 12 months' imprisonment. *2023 Sourcebook*, at Table 15. For defendants, like Mr. Zeitlin, in CHC I, the mean sentence was 18 months' imprisonment, with the median at eight months. *Id*., at Table 27.

Relative to the applicable Guidelines range, in SDNY in FY 2023, only 13.9% of sentences for fraud/theft/embezzlement convictions were within the Guidelines range. *Id*., at Table 10. In FY 2023, for all cases in which fraud/theft/embezzlement was the offense of conviction, in SDNY, the mean sentence imposed was 26 months' imprisonment, while the median was 18 months' imprisonment. *See FY 2023 SDNY Statistical Information Packet*, at Table 7.

According to the *2023 Sourcebook*, for FY 2023 nationally, for the 2,081 defendants convicted of fraud/theft/embezzlement offenses, the average *downward* variance from the applicable Guidelines range was 57.8%, and the median decrease was 51.4%. *Id*., at Table 40 ("Extent of Downward Variance By Type of Crime").

The most recent results, encompassing the first three quarters of FY 2024 (October 1, 2023 through June 30, 2024), continue the same trends, even replicating some of the numbers. For instance, nationally for fraud/theft/embezzlement, the mean sentence was 22 months' imprisonment, and the median 12 months. *See* United States Sentencing Commission, *3rd Quarter Release Preliminary Fiscal Year 2024 Data Through June 30, 2024*, at Table 6, available at https://bit.ly/3CiNaZt.

More particularly, within SDNY, 77.6% of all SDNY sentences imposed through the first three quarters of FY 2024 were below the applicable Guidelines range, with 65.6% of sentences including a variance absent any government motion. *Id*., at Table 9. There were not a single upward departure. *Id*.

---

government motion. Only 3.0% of sentences were subject to an upward variance. *See 2023 Sourcebook*, at Table 29.

Regarding fraud/theft/embezzlement offenses, for the first three quarters of FY 2024 the mean *downward* variance from the applicable Guidelines range was 57.5% , with the mean decrease at 50%. *Id*., at Table 18 ("Extent of Downward Variances By Type of Crime"). For those defendants sentenced pursuant to Guidelines §2B1.1, the average sentence was approximately 25% below the applicable Guidelines range. *See id*., at Figure 6.

Consequently, when considering the sentencing data – both general and specific – in SDNY, a Guidelines sentence is certainly not the norm. Instead a sentence significantly below the recommended 121 to 151 months would fulfill §3553(a)(6)'s mandate that a court avoid "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]"

**E. *Mr. Zeitlin Poses the Lowest Risk for Recidivism***

The U.S. Sentencing Commission's research and data analysis also demonstrate that first-time non-violent offenders like Mr. Zeitlin pose the lowest risk of recidivism. *See, e.g.*, U.S. Sentencing Commission, *Recidivism of Federal Offenders Released in 2010* (Sept. 2021, at 14, 26-28, available at https://bit.ly/41KsJgL.

In fact, the data establishes that those defendants without criminal history points are substantially less likely to be re-arrested – even markedly less than those with only one Criminal History point (26.8% compared to 42.3%, "the largest variation of any comparison of offenders within the same Criminal History Category")." *Id*. *See also* U.S.S.G. App. C, Amendment 821, Reason for Amendment. *See also U.S. Sent'g Comm'n, Recidivism of Federal Offenders Released in 2010*, 2021, available at https://bit.ly/41KsJgL.

In his letter, Mr. Zeitlin articulates his commitment to live a law-abiding life upon release:

> I do look forward to getting back to society and having an opportunity to be an honest neighbor. I look forward to rebuilding my life with integrity and a commitment to honesty. I also am looking forward to show my children how much I value them and hopefully they can also learn from my mistakes.

Exhibit 1.

Moreover, Mr. Zeitlin's age – 54 – corresponds with an age range during which recidivism decreases dramatically. *See id*., at 30. *See also* U.S. Sentencing Commission, *The*

*Effects of Aging on Recidivism Among Federal Offenders* (Dec. 2017), available at https://bit.ly/4aVjpus (finding same trend). As a result, it is respectfully submitted that the prospect of recidivism should not be a factor in Mr. Zeitlin's sentencing.

### F. *The BoP System Generally Has Become Increasingly Unsafe, and a Threat to the Physical and Mental Health of Inmates*

#### 1. *BoP's Serious Systemic Problems Are Longstanding and Thus Far Impervious to Meaningful Reform*

The persistent problems at MDC reflect the deficiencies within the BoP system as a whole – in which Mr. Zeitlin will exist for the remainder of whatever sentence is imposed. For example, in his February 28, 2024, prepared statement accompanying his testimony before the Senate Judiciary Committee, Department of Justice Inspector General ("DoJ OIG") Michael E. Horowitz pointed out that, before turning to the principal subject of his testimony (a February 2024 report on deaths in BoP custody, *see* **post**, at 30),

> it is important to put [the report's] findings into a broader context, and to emphasize the recurring, chronic nature of many of the issues we identified. I have been the Inspector General at the Justice Department for almost 12 years, and every year I have included the BOP in my annual report of the top management and performance challenges facing the Department. Yet, with some notable exceptions, *the problems at the BOP have generally increased over the years.*

*Examining and Preventing Deaths of Incarcerated Individuals in Federal Prisons Before the Senate Committee on the Judiciary*, 118th Cong. (2024) (prepared statement of Michael E. Horowitz, Inspector General of the U.S. Department of Justice, at 2) (emphasis added).

Even BoP Director Colette Peters, testifying at the same hearing, acknowledged that BoP is in "crisis" in multiple respects. *See Examining and Preventing Deaths* (testimony of Colette S. Peters, Director of the Federal Bureau of Prisons), available at https://bit.ly/4cowpbV. *See also* Jamiles Lartey and Christie Thompson, "How Federal Prisons Are Getting Worse," *The Marshall Project*, March 2, 2024 ("*Federal Prisons Getting Worse*"), available at https://bit.ly/4cCdRpU

("[o]n Wednesday [February 27. 2024], federal prisons' director Colette Peters once again found herself facing tough questions over an agency in crisis").[13]

The report that was the subject of DoJ OIG Horowitz's February 24, 2024, congressional testimony studied fatalities that had occurred within the BoP system during a nine-year period. *See* Office of the Inspector General, U.S. Department of Justice, No. 24-041, *Evaluation of Issues Surrounding Inmate Deaths in Federal Bureau of Prisons Institutions*, February 2024) ("*DoJ OIG 2024 Inmate Deaths Report*"), available at https://bit.ly/4fHHM1q.

Summarizing the *DoJ OIG 2024 Inmate Deaths Report*, *The New York Times* noted that BoP, "responsible for about 155,000 inmates, routinely subjects prisoners to conditions that put them at heightened risk of self-harm, drug overdoses, accidents and violence, the department's inspector general found after analyzing 344 deaths from 2013 to 2021 that had not been caused by illnesses." Glenn Thrush, "Many Suicides in Prisons Could Have Been Averted, Justice Dept Watchdog Says," *The New York Times*, February 15, 2024, available at nyti.ms/48qsSYv.

**2. *The DoJ OIG's Disturbing Report Regarding FCI Sheridan***

Less than three months later, in May 2024, the DoJ OIG issued another report, based on examination of FCI Sheridan, in Oregon, that was extremely critical of BoP. Concurrent with the release of the report, DoJ OIG Horowitz sat for separate interviews with news media. In one, he told *National Public Radio* ("*NPR* ")

> [i]t's a problem that is at least 20 years in the making. It's not going to get fixed overnight. But what these inspections show us how serious the problem has now become[.] . . . It is deeply concerning when you go to a facility like Sheridan and you hear from the staff, correctional officers, health care workers, educators, that they can't do the jobs that they're there to do and they want to do.

Jaclyn Diaz, "Lack of staffing led to 'deeply concerning' conditions at federal prison in Oregon," *NPR*, May 22, 2024 ("*Deeply Concerning*"), available at https://bit.ly/3ZpUTOL.

The report regarding FCI Sheridan "identified significant issues at FCI Sheridan, *many of which were consistent with BOP-wide issues on which we have made recommendations in prior*

---

[13] The "crisis" admission was made during Director Peters's live testimony under oath to the Senate Judiciary Committee. *See id*, available at https://bit.ly/3YFf7Uo.

*work*." Department of Justice, Office of Inspector General, *Inspection of the Federal Bureau of Prisons' Federal Correctional Institution Sheridan*, Report 24-070, May 2024, at i ("*2024 DoJ OIG FCI Sheridan Report*") (emphasis added), available at https://bit.ly/3WYmUvh.

Moreover, those prior reports "direct[ed] BOP to address these issues at an enterprise level," but without success in achieving correction. *Id*. Yet those issues had not been addressed by BoP, much less rectified.

### 3. *The Ongoing Scandal Involving FCI Dublin and Its Recent Closure*

The persistence and pervasiveness of unattended problems within BoP – which in the case of FCI Dublin BoP attempted to sweep under the rug by closing the facility and dispersing the hundreds of inmates there to facilities across the U.S. – is illustrated by the chronology of events regarding FCI Dublin.

BoP's surprise early April 2024 closure of scandal-ridden FCI Dublin, the only federal prison for women west of the Rocky Mountains, and which in mid-March had been placed under the court-ordered supervision of a Special Master (a first for a BoP facility) who recently filed a report discussed **post**, at 32, demonstrates BoP's institutional resistance to meaningful reform.

In issuing a preliminary injunction – in response to a lawsuit instituted by FCI Dublin inmates (and former inmates) – that included the extraordinary and unprecedented measure of appointing a Special Master to manage the prison, a federal judge in the Northern District of California held that the inmates were likely to prevail on their claims of "the risk of sexual abuse and serious medical neglect, along with their First Amendment claim that they face an ongoing risk of retaliation." *California Coalition for Women Prisoners*, 23 Cr. 4155 (YGR), 2024 WL 1290766, at *24, *25 (N.D. Cal. March 15, 2024) ("*California Coalition*"). *See also* Heather Knight, "Federal Officials to Shut Women's Prison After Years of Sexual Abuse," *The New York Times*, April 15, 2024, available at https://bit.ly/4aGoe9X ("[i]t was the first time in United States history that a federal prison had been placed under that kind of oversight").

The Court's opinion in *California Coalition* also demonstrates that FCI Dublin suffered from a litany of the systemic problems identified by the DoJ OIG (most recently particularized in the *2024 DoJ OIG FCI Sheridan Report*), the opinion in *Chavez*, and other sources cited herein:

(a) **Staff Shortages**. *See California Coalition*, 2024 WL 1290766, at *18; *May 8 Order re Closure*, at 4;

(b) **Inadequate Health Care**. *See California Coalition*, 2024 WL 1290766, at *6, *17, *18 n.108, *19; *May 8 Order re Closure*, at 2-3, 5;

(c) **Inadequate Mental Health Care**. *See California Coalition*, 2024 WL 1290766, at *18;

(d) **BoP's Unaccountable and Non-Transparent Culture**. *See California Coalition*, 2024 WL 1290766, at *5-*6, *8, *22, *25;

(e) **Persistent Failure to Correct Deficiencies**. *See id*., at *3; and

(f) **Deteriorating Physical Conditions**. *See id*., at *6, *8.

In June 2024, the Special Master appointed by the Court to administer FCI Dublin issued a report that was not unsealed for public review until August 5, 2024. *See* First Report of the Special Master Pursuant to the Court's Order of March 26, 2024, U.S Bureau of Prisons, Federal Correctional Institution, Dublin, (June 5, 2024), *California Coalition for Women Prisoners, et al., v. United States of America Bureau of Prisons, et al.*, 23 Civ. 4155 (YGR) (N.D.Cal.) ("*FCI Dublin Special Master's Report*"), available at https://bit.ly/3M2oru4. *See also* Lisa Fernandez, "FCI Dublin: Special master finds 'cascade of failures' at women's prison," FOX-KTVU, August 5, 2024, available at https://bit.ly/3LYEYPT.

The *FCI Dublin Special Master's Report* determined that "[i]n addition to the dysfunction noted by the Court, the [Special Master's Team] found numerous operational, policy and constitutional violations," which "included the failure of [BoP's] Central Office and Regional Office management to correct significant and longstanding deficiencies that had previously been identified in multiple audits and investigations." *Id*., at 13.

In addition, and particularly relevant here, the *FCI Dublin Special Master's Report* pointed out that "[i]t is critical to note that some of the deficiencies and issues exposed within this report are likely an indication of systemwide issues with the BOP rather than simply within FCI Dublin." *Id*., at 6.

## III. *Mr. Zeitlin Respectfully Requests That the Court Recommend He Be Designated to FCI Terminal Island and Participate in RDAP*

Mr. Zeitlin respectfully requests that the Court recommend he be designated to FCI Terminal Island, and that he participate in RDAP. If FCI Terminal Island is not availabe, it is

respectfully requested that Mr. Zeitlin be designated to a facility that offers RDAP and is commensurate with his security designation.

**Conclusion**

Accordingly, for all the reasons set forth above, it is respectfully submitted that Mr. Zeitlin should be sentenced to a term of imprisonment substantially below the applicable Guidelines range.

Respectfully submitted,

Joshua L. Dratel

JLD/
Encl.