UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

RICHARD ZEITLIN,

                Defendant.

23 Cr. 419 (LAK)

**THE GOVERNMENT'S SENTENCING SUBMISSION**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Jane Kim
Rebecca Dell
Emily Deininger
Assistant United States Attorneys
     *Of Counsel*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................ 1

RELEVANT BACKGROUND ........................................................................................... 1

    I. The Defendant's Schemes to Defraud and Obstruct Justice ................................. 1

    A. 1994 to Present: The Zeitlin Call Centers .......................................................... 1

    B. 2017 to 2020: The Defendant's Fraud................................................................. 4

        1. United Americans Veterans PAC ("UNAV" or "PAC-1")............................. 5

        2. US Veterans Assistance Foundation ("VAFUS")........................................... 7

        3. The 100% Agreements..................................................................................... 8

    C. The Defendant's Tactics to Conceal His Fraud ................................................. 9

    D. 2020: The Defendant's Lies Under Oath ......................................................... 14

    E. May 2022: The Defendant's Directive to Employees to Destroy Evidence.................... 18

    II. The Defendant's Guilty Plea and Stipulated Guidelines Range .......................... 19

    III. The Presentence Investigation Report ............................................................... 20

DISCUSSION ................................................................................................................. 21

    I. A Guidelines Sentence Is Warranted.................................................................... 21

        A. The Nature and Circumstances of the Offense ............................................. 22

        B. The History and Characteristics of the Defendant ....................................... 25

        C. Deterrence and Public Safety ....................................................................... 29

    II. Forfeiture, Restitution, a Fine, and Firearms .................................................... 29

CONCLUSION............................................................................................................... 31

**TABLE OF EXHIBITS**

| A | Defendant's Objections to the Presentence Investigation Report (November 25, 2024) |
|---|---|
| B | Government's Response to the Defendant's Objections (December 2, 2024)<br><br>B-A: Exhibit A to the Government's Response (100% Agreement)<br><br>B-B: Exhibit B to the Government's Response (100% Agreement) |
| C | Victim Impact Statement of PAC-1 Treasurer<br>[Sealed and Publicly Filed/Redacted Copies]* |
| D | Email Between the Defendant and PAC-1 Treasurer (May 29, 2018)<br>[Sealed and Publicly Filed/Redacted Copies]* |
| E | Emails Between the Defendant and an Employee (August 21, 2018)<br>[Sealed and Publicly Filed/Redacted Copies]* |
| F | Transcript of Defendant's Sworn Civil Deposition Testimony (December 8, 2020) |
| G | Defendant's Sworn Declaration to a Federal Court (March 31, 2022) |

*  The Government respectfully requests that the unredacted copies of these exhibits remain under seal.  The Government has redacted personal identifying information from these exhibits, the redacted version of which has been publicly filed on the docket.

## PRELIMINARY STATEMENT

As a career telemarketer, Richard Zeitlin, the defendant, orchestrated a years-long scheme to defraud thousands of victims of millions of dollars through false and misleading fundraising calls.  To conceal his massive fraud scheme and obstruct justice, the defendant created various business entities, communicated principally through phone calls and encrypted messaging applications, exploited his employees, directed his staff to destroy evidence, and lied over and over again, including while under oath, to government agencies, and to federal courts.  The defendant's schemes were driven by greed, hubris, and a complete and utter disregard for the law and the public.  Even now, at sentencing, the defendant fails to show respect for the law and acknowledge the full scope of his conduct by disputing certain aspects of his offense conduct.  For these reasons and those discussed below, a Guidelines sentence between 121 and 151 months' imprisonment is warranted in this case in light of the factors set forth in 18 U.S.C. § 3553(a).  A significant sentence is necessary given the nature and circumstances of the defendant's sophisticated and years-long fraud scheme, his history of repeated and unabashed lies and disregard for the law, the need for general and specific deterrence, just punishment, respect for the law, and in order to protect the public from future crimes of the defendant.  In addition, forfeiture, restitution, and a fine should be ordered as set forth below.

## RELEVANT BACKGROUND

### I. The Defendant's Schemes to Defraud and Obstruct Justice

#### A. 1994 to Present: The Zeitlin Call Centers

For approximately 30 years, beginning in or about 1994, the defendant owned and operated a telemarketing call center business that was headquartered in Las Vegas, Nevada, and included

call centers around the United States and overseas (the "Zeitlin Call Centers").  (PSR ¶¶ 12, 16).[1]
From in or about 1994 through 2016, the Zeitlin Call Centers operated under the business entity
"Courtesy Call, Inc." ("Courtesy Call" or "Zeitlin Entity-1").  (*Id.*).  For years, and for a variety of
reasons,[2] the defendant's call centers have been the subject of much scrutiny from the press and
the public, as well as from state and federal investigating agencies and regulators, including the
Federal Trade Commission ("FTC").[3]  And for years, the defendant maintained a website called
"Richard Zeitlin Truth," that defended the Zeitlin Call Centers and alleged that the defendant was
the victim of a "coordinated" government attack.[4]

In or about 2016, as Courtesy Call began to garner a negative reputation in the press, the
defendant created a new entity to replace Courtesy Call, in name only: Donor Relations.  (PSR

---

[1] "PSR" refers to Presentence Investigation Report, dated December 3, 2024 (Dkt. 103); "Def.
Mem." refers to the defendant's sentencing submission, dated November 26, 2024 (Dkt. 102).

[2] The defendant, the Zeitlin Call Centers, and their underlying business entities have been
scrutinized for, among other things, the defendant's use of "soundboard" technology, robocalls,
and/or the use of prerecorded call recordings played by a call center agent who pressed certain
keys for certain segments of the recording to play; the defendant's fundraising for various charities
and political action committees ("PACs") suspected of defrauding donors; the significant portion
of funds raised that were paid to the Zeitlin Call Centers; and potential violations of state and
federal telemarketing laws.

[3] *See, e.g.*, Chad Garland and Andrew Knochel, *Some Charities Claiming to Support Veterans
Spend Heavily on Overhead Instead*, The Center for Public Integrity (Sept. 6, 2013), available at
https://publicintegrity.org/national-security/some-charities-claiming-to-support-veterans-spend-
heavily-on-overhead-instead/ (last visited Dec. 2, 2024) ("From 2008 to 2009, the Federal Trade
Commission and charity enforcement officials from 49 states and Washington, D.C., cracked down
on charities and fundraisers claiming to support veterans, police and firefighters. The sweeps led
to disciplinary actions against 22 nonprofits or organizations claiming to be nonprofits, 31
individuals and 32 fundraising companies, among them [Courtesy Call]."); *see infra* at 10-11 &
nn.13-14.

[4] The defendant's website, www.richardzeitlintruth.com, is no longer available online.  The
Government has saved screenshots of the website and will provide them to the Court upon request.

¶¶ 12(b), 16).  Nothing changed with respect to the day-to-day operations of the Zeitlin Call Centers.  In addition, although the Zeitlin Call Centers had principally made fundraising calls on behalf of charities for at least approximately 23 years, in or about 2017, the defendant decided to shift his business focus from charity clients to PACs, in part to avoid certain state inquiries, regulations, and reporting requirements for charities and telemarketing for charities that do not apply to PACs.  (*Id.* ¶¶ 16-17).  The defendant encouraged some of his contacts, including former and future clients, to also shift from charities to PACs because PACs are comparatively less regulated than charities.  (*Id.* ¶ 17).

Charities, unlike PACs, can provide direct services to communities or causes.  (*Id.* ¶ 15).  PACs are registered with the Federal Election Commission ("FEC") and collect money to advocate for certain causes and political candidates (*e.g.*, to support a candidate for election, to advocate against certain legislation).  (*Id.*).[5]  As a result, there are distinctions between fundraising messaging for charities (*i.e.*, a charity message, which describes the direct services a charity provides), and fundraising for PACs (*i.e.*, a PAC message that describes the advocacy or support the PAC will provide).  (*Id.* ¶¶ 13, 15, 18-21).  As one might expect, charity fundraising messages and human causes typically raise more money than PAC messages and political causes.

As of in or about 2017, the Zeitlin Call Centers typically operated in the following way: employees, at the defendant's direction, would develop call scripts, either by drafting them or by editing call scripts submitted by clients; individuals were paid specifically for the quality of their

---

[5] Under federal law, PACs are required to file periodic reports with the FEC providing information about their fundraising and expenditures.  Based on these reports, the FEC provides information about each PAC to the public through a searchable public database that shows, among other things, how much money is raised and spent by each PAC and how that money is spent.  (PSR ¶ 15).

voices, and their readings of the call scripts were recorded (the "call recordings"), which the defendant often reviewed; call agents placed calls to donors and, depending on the donor's response, the agent would press certain keys to play certain segments of the call recordings as appropriate; the defendant and other employees regularly analyze the amount of donations made to determine whether call scripts and recordings should be edited in order to raise more money. (*See id.* ¶ 18-20).

### B.    2017 to 2020: The Defendant's Fraud

After creating Donor Relations and shifting towards PACs, from in or about 2017 through 2020, the defendant engaged in a scheme to defraud thousands of donors in order to make more money for his business and for himself. (PSR ¶¶ 13, 19-20). The defendant defrauded donors by directing his employees to alter call scripts to include lies, misleading statements, and misrepresentations so that donors would be more likely to give as a result of the call. (*Id.* ¶ 20). The defendant directed his employees to falsely portray PACs as charities or as direct-services organizations, misleading donors into believing that their contributions were going to charities rather than to PACs. (*Id.*). Certain of these fundraising calls falsely stated that the respective PAC would provide a direct service, such as "getting [handicapped and disabled veterans] the medical needs that the VA [Veterans Administration] doesn't provide,"[6] and certain calls removed references to "PAC" or "political action committee." (*Id.*). Because of the misleading statements that the defendant directed, donors were not aware that they were being solicited by and contributing money towards a PAC that focused on political advocacy rather than to a charity that

---

[6] As discussed in the PSR and in the defendant's objections to the PSR, attached hereto as Exhibit A, the defendant disputes this (Ex. A ¶ 4) and other facts, as discussed below, *see infra* at 21, 26-27; (*see also* Ex. B (Government's response to defendant's PSR objections)).

provided direct services.  (*Id.* ¶¶ 13, 19-20).  The defendant also misrepresented to donors that they were fundraising on behalf of a "new" or "special" drive when, in actuality, there was no new or special drive underway. (*Id.* ¶ 20).  The defendant further told donors their money would go to the organization soliciting support when in actuality, for certain time periods, Zeitlin agreed with certain PAC owners that 100 percent of all funds raised would go to the Zeitlin Call Centers—not to the PACs.  (*Id.*).[7]  Examples of elements of the defendant's sweeping fraud scheme are discussed below.

1.    United Americans Veterans PAC ("UNAV" or "PAC-1").

UNAV was created in or about 2017 by a U.S. veteran who was one of the defendant's former charity clients ("PAC-1 Treasurer").[8]  Between approximately 2017 and 2020, UNAV raised approximately $1.5 million, the majority of which was fundraised by the Zeitlin Call Centers in or about 2017 and 2018.  *See* UNAV FEC Filings.  Between 2017 and 2018, UNAV paid the Zeitlin Entities approximately $1.1 million of its approximately $1.2 million in Oes to the Zeitlin Entities.  *See id.*

PAC-1 Treasurer submitted call scripts to the Zeitlin Call Centers.  In or about May 2018, PAC-1 Treasurer learned from concerned donors that the Zeitlin Call Centers were not making calls consistent with the scripts he had approved.  (Ex. D (email between PAC-1 Treasurer and the

---

[7] The defendant disputes this fact (Ex. A ¶ 6), which is discussed in greater detail below, s*ee infra* § I.C (100% Agreements), at 21, 26-27; (*see also* Ex. B ¶ 3, Exs. B-A, B-B).

[8] The victim impact statement of PAC-1 Treasurer is attached hereto as Exhibit C.  The facts set forth in this section include the anticipated testimony of PAC-1 Treasurer if this case had proceeded to trial, as well as FEC filings for UNAV, available at https://www.fec.gov/data/filings/?data_type=processed&q_filer=C00656942 (last visited Dec. 3, 2024) ("UNAV FEC Filings").

defendant)).  Specifically, PAC-1 Treasurer received approximately three to four calls per day reporting that they were being misled by the telemarketers who described UNAV as a 501(c)(3) nonprofit or as a charity rather than as a political effort.  (*Id.*).  Certain donors stated that the Zeitlin Call Center agents were "lying about what we [UNAV] are and what we do."  (*Id.*).  The donors indicated that they were being told by telemarketers that UNAV provided direct services to veterans, including helping wounded veterans returning from Afghanistan that were amputees. UNAV was not providing any direct services to veterans, and PAC-1 Treasurer was concerned that the Zeitlin Call Centers were misleading UNAV donors, in part because such misrepresentations were against telemarketing laws.  (*Id.*).  PAC-1 Treasurer also expressed to the defendant that he had thought the fundraising calls would be made live rather than through audio recordings.  Concerned about the call script for UNAV, PAC-1 Treasurer also asked the defendant for a copy of the call script that was being used.  The defendant declined to provide additional information, stating that "it could only hurt both of us."  The PAC-1 Treasurer also asked for call recordings; the defendant "adamantly refus[ed]" because a "three-letter agency would be coming after him . . . [a]nd it could only hurt everyone involved."[9]

On or about June 13, 2018, PAC-1 Treasurer asked the defendant and one of his employees for confirmation that the Zeitlin Call Centers had ceased fundraising for UNAV until PAC-1 Treasurer could review the call scripts.  Ultimately, PAC-1 Treasurer decided to stop doing

---

[9] It is possible that the defendant refused to send PAC-1 Treasurer audio recordings because he was under scrutiny for using audio recordings (*i.e.*, robocalls).

6

business with the defendant and his call centers.[10]  In doing so, PAC-1 Treasurer withheld a large sum of money from the defendant, and the defendant began calling him, making threats, and demanding payments.  (Ex. C).  Even after receiving complaints from PAC-1 Treasurer and donors about the false and misleading statements the Zeitlin Call Centers were making to donors, the defendant continued his sweeping fraud scheme for years.

2.    US Veterans Assistance Foundation ("VAFUS")

At times, depending on the volume of complaints from donors, the level of public and press scrutiny, and the profit generated, the defendant switched between fraudulent call scripts and recordings, less fraudulent call scripts and recordings, and compliant call scripts and recordings. For example, from 2018 through 2020, the Zeitlin Call Centers made misleading calls on behalf of VAFUS, another PAC, that delivered a fraudulent charity message.  When the defendant learned that the Zeitlin Call Centers were receiving complaints about the VAFUS calls, the defendant directed his employees to change the fraudulent call script for VAFUS to a call script that was less misleading.  After time passed, the defendant returned to the fraudulent call script, which was used at times until in or about 2020.  Specifically:

The <u>fraudulent call script</u> for VAFUS included the following language (or largely similar language):

> Hi this is Paul calling on behalf of the US Veterans Assistance Foundation. Now, The reason for the call is to let you know that the new drive is underway and <u>your support helps the handicapped and disabled veterans by working on getting them the medical needs the VA doesn't provide</u>. You know these men and women were there when we needed them the most and

---

[10] On or about June 20, 2018, the defendant's office administrator finally sent the PAC-1 Treasurer what purported to be the call script for UNAV.  The metadata on the call script reflected that the script had been edited approximately five minutes before it was sent to the PAC-1 Treasurer.

> we just want to let them know they're not forgotten. [sic] If we were to
> send you an envelope could they count on your support?

(Ex. E (emphasis added); *see also* PSR ¶ 20).[11]  The fraudulent script above was used from at least

in or about January 2018 through in or about March 2020, with the exception of a short time period

in or about August and September 2018.

On or about August 20, 2018, when the Zeitlin Call Centers began to receive complaints

about the fraudulent script, the defendant directed his employees to temporarily use a less

misleading script, as follows:

> Hi this is Paul calling on behalf of the US Veterans Assistance Foundation.
> Now, The reason for the call is to let you know that the new drive is
> underway and your support will help us to <u>advocate as a political action
> committee</u> that the VA provides the medical needs of handicapped and
> disabled veterans. You know these men and women were there when we
> needed them the most and we just want to let them know they're not
> forgotten. If we were to send you an envelope could they count on your
> support?

(Ex. E (emphasis added)).  Once the complaints waned, the Zeitlin Call Centers returned to the

fraudulent script, which was used at least in or about 2019 and 2020.

### 3.    The 100% Agreements

The defendant also entered into agreements with certain PAC owners under which 100

percent of *all funds* raised during certain time periods would go to the Zeitlin Call Centers (*i.e.*,

the Zeitlin Entities)—not the PACs (the "100% Agreements").  (PSR ¶ 23).[12]  Two examples of

these agreements are attached hereto.  (Ex. B, Exs. B-A and B-B) (100% Agreements)).

---

[11] The defendant disputes that the above underlined statement was misleading (Ex. A ¶ 4), as
discussed further below, *see infra* at 21, 26-27; (*see also* Ex. B ¶ 4).

[12] The defendant disputes the existence of the 100% Agreements (Ex. A ¶ 6), as discussed further
below, *see infra* at 21, 26-27; (*see also* Ex. B ¶ 6).

Exhibit B-A is a 100% Agreement between the defendant, on behalf of TPFE, Inc. ("TPFE"), one of the Zeitlin Entities, and Robert Piaro, the Treasurer for the Association for Emergency Responders and Firefighters ("AFERF") PAC. Under this 100% Agreement:

> TPFE shall give [AFERF] the sum of (thirty thousand) dollars $30,000 on or before October 1st 2017, in one lump sum. TPFE shall be compensated 100% of the gross proceeds collected as a result of the services of TPFE. TPFE shall be compensated 100% of the gross proceeds collected as a result of the services of TPFE. The term 'gross proceeds collected' shall be defined to mean the amount actually received after credits are given for stop payment orders and refunds.

(Ex. B-A at 6). Exhibit B-B is a 100% Agreement between the defendant and Piaro, on behalf of the Standing by Veterans ("SBV") PAC. (Ex. B-B). It includes a nearly identical provision. (*Id.* at 12). Both 100% Agreements are signed by the defendant and the PAC Treasurer. (Exs. B-A and B-B). In addition, invoices from the Zeitlin Entities show that the Zeitlin Entities, for certain time periods, collected 100 percent of the funds raised by the Zeitlin Call Centers for certain PACs.

During the time periods when *all of the money raised* by a certain PAC was retained by the Zeitlin Entities, virtually all of the fundraising calls for that PAC were false because *none of the money* the Zeitlin Call Centers were asking donors to contribute was going to the PAC.

**C.    The Defendant's Tactics to Conceal His Fraud**

The defendant engaged in numerous tactics to conceal his sprawling fraud scheme from press and public scrutiny and detection by state and federal regulatory agencies and law enforcement. (PSR ¶ 25).

<u>First</u>, the defendant changed the names of the entities underlying the Zeitlin Call Centers, used multiple entities rather than one, and even went so far as to nominally give ownership of certain entities to certain of his loyal employees. (*Id.* ¶¶ 12, 25(a)-(b)). In or about 2018—after

several news reports critical of the Zeitlin Call Centers,[13] and after Bank of America froze Donor Relations' bank account—the defendant created four entities under which the Zeitlin Call Centers operated: Unified Data, Compliance Consultants, American Tech, and TPFE (together, the "Zeitlin Entities") to replace Donor Relations.  (PSR ¶ 12).  The use of multiple entities and entity names made it appear to the public and to regulators as if four entities were providing services to certain PACs and charities rather than one (*i.e.*, the Zeitlin Call Centers).  (*Id.* ¶ 25(b)).

Each of the Zeitlin Entities were billed for certain aspects of the Zeitlin Call Centers' work. In 2020, the defendant testified under oath in a civil deposition in his lawsuit against Bank of America, *Zeitlin v. Bank of America*, 20 Civ. 1919 (RFB) (D. Nev.), which is discussed below, *see infra* § I.D (defendant's lies under oath).  The defendant testified that Compliance Consultants handled billing verification and processed credit card payments for the Zeitlin Call Centers.  (Ex. F (Dep. Tr. at 35, 53-54)).  American Tech handled the "technical side of the calling" for the Zeitlin Call Centers, and included the "actual computers" and the "software on those systems."  (*Id.* at 63).  TPFE handled payroll for the Zeitlin Call Centers (*id.* at 111), and ATC handled payroll for the "technical side" (*id.* at 37-38) and/or "designed and maintained call center software" that the defendant used, at his discretion, with clients of the Zeitlin Call Centers (*id.* at 37, 40-42).

---

[13] *See, e.g.*, Aaron Maybin, *"West Bend police warn about telemarketers seeking donations for 'Police & Troopers,'"* Fox6Now.com (Feb. 2, 2018), available at https://www.fox6now.com/news/west-bend-police-warn-about-telemarketers-seeking-donations-for-police-troopers (last visited Dec. 3, 2024); Maggie Severns and Scott Bland, *"'Scam PACs' rake in millions under guise of charity,"* Politico (May 4, 2018), available at 'Scam PACs' rake in millions under guise of charity - POLITICO (last visited Dec. 3, 2024); Sarah Kleiner and Chris Zubak-Skees, *"They Promise To Help Families of Fallen Officers. But They're Mostly Paying Telemarketers,"* The Center for Public Integrity (Dec. 27, 2019), available at https://publicintegrity.org/politics/iupa-leorf-police-union-charity-telemarketers/ (last visited Dec. 3, 2024).

Even after this creation of four new entities, in or about 2018, the defendant and his call center business and entities continued to garner intense scrutiny in 2019, 2020, and 2021, by the press, the public, and state and federal agencies.[14]  Some of the press scrutiny focused specifically on the defendant.  For example, in September 2019, The Center for Public Integrity reported that the Zeitlin Call Centers (*i.e.*, the Zeitlin Entities) had raised at least "$121.3 million for nonprofits," and, more recently, approximately "153.1 million" for PACs, with approximately "133.1 million" of the 153.1 million paid to the Zeitlin Entities.  *See* 9/12/2019 CPI Report.

In or about late 2020 or early 2021, the defendant directed the creation of four new entities: LAV Services, Inc. ("LAV Services"), EYP Consultants, Wired4Data, and Standard Data Services LLC ("Standard Data") (together, the "New Zeitlin Entities").  (PSR ¶¶ 12, 25(b)).[15]  The

---

[14] *See, e.g.*, Brady Carlson, *"Super PAC's Fundraising in Name of Veterans Draws New Attention: Campaign Finance Law Might Allow Super PACs to Use Money for Any Purpose*, WPR (Jan. 15, 2019), available at https://www.wpr.org/politics/super-pacs-fundraising-name-veterans-draws-new-attention (last visited Dec. 3, 2024); Sarah Kleiner and Chris Zubak-Skees, *"You donated to kids with cancer. This Vegas telemarketer cashed in.,"* The Center for Public Integrity (Sept. 12, 2019), available at https://publicintegrity.org/politics/charitable-contributions/ (last visited Dec. 3, 2024) ("9/12/2019 CPI Report"); Jarrett Renshaw and Joseph Tanfani, *"'Scam PAC' fundraisers reap millions in the name of heart-tugging causes,"* Reuters (Jan. 29, 2020), available at https://www.reuters.com/investigates/special-report/usa-fundraisers-scampacs/ (last visited Dec. 3, 2024); *"'Scam PACs' Are On the Rise: Don't Confuse Them For Legitimate Charities,"* Charity Watch (June 17, 2020), available at https://www.charitywatch.org/charity-donating-articles/scam-pacs-are-on-the-rise-dont-confuse-them-for-legitimate-charities#:~:text=Sadly%2C%20nearly %20all%20of%20the,to%20an%20analysis%20by%20CFPI. (last visited Dec. 3, 2024); Sarah Kleiner and Chris Zubak-Skees, *"Embattled Las Vegas Telemarketer Got COVID-19 Business Loans,"* The Center for Public Integrity, available at https://publicintegrity.org/politics/las-vegas-telemarketer-ppp-loans-richard-zeitlin/ (last visited Dec. 3, 2024); Sarah Kleiner, *"Telemarketer at Center of Public Integrity Investigation Banned from Fundraising,"* The Center for Public Integrity (Sept. 16, 2020), available at https://publicintegrity.org/politics/veterans-charities/telemarketer-banned-from-fundraising/ (last visited Dec. 3, 2024).

[15] The defendant disputes that he "owned" or "controlled" the New Zeitlin Entities (Ex. A ¶¶ 2, 7, 8), and therefore did not submit false statements in his sworn declaration, *see supra* § I.D, as

defendant met with four of his employees, Leslie Vidrine, Isabelle Blouin, Nicholas Marlow, and Andrew Johnson, and announced that he was going to allegedly step back from fundraising and split his existing entities into new ones.  The defendant agreed to gift elements of the Zeitlin Entities to the four employees.  LAV Services was nominally Vidrine's company, and it acquired the payroll functions previously performed by TPFE.  EYP Consultants was nominally Blouin's company, and it provided rousting and verification for telemarketing calls.  Wired4Data was nominally Marlow's company, and assumed American Tech's responsibilities, providing IT services for the Zeitlin Call Centers.  Standard Data Services LLC was nominally Johnson's company.  The defendant kept Unified Data, which was the "leads" portion of the business (*i.e.*, lists of phone numbers).  In or about 2020, the defendant also began using new entities for the Zeitlin Call Centers, including Cloud Services, American PCI, and Unlimited Tech Support, that were "doing business as" ("d/b/a") the Zeitlin Entities.  (*Id.* at 45, 103-04, 109).

Despite the nominal change in ownership of the New Zeitlin Entities, the defendant continued to maintain control over the entities, and supervise and direct their activities.  For example, the nominal owners of the New Zeitlin Entities could not increase their pay from the businesses they purportedly owned without approval from the defendant, nor could they use the entity that they purportedly owned to expand or conduct other types of business without approval for the defendant.  The nominal owners did not have full control and power over the New Zeitlin Entities.  In fact, little, if anything changed: the defendant continued to direct the activities of the Zeitlin Call Centers and their underlying entities.  The New Zeitlin Entities, moreover, could not

---

discussed below, *see infra* at 21, 26-27; (*see also* Ex. B ¶¶ 2, 7, 8).  If this case had proceeded to trial, the facts in this section include anticipated witness testimony.

operate without one another—including without Unified Data, the entity the defendant kept in his own name—because they each captured (or purported to capture) a part of the full business of the Zeitlin Call Centers.

The defendant's ongoing creation and replacement of business entities and entity names concealed potential links and public associations between the defendant and his telemarketing business.  (*Id.* ¶ 25(b)).  For example, PAC reports to the FEC, which are public, listed expenditures from PACs to four entities rather than one, or four entities that were not owned by the defendant on paper, but were under the defendant's control and direction.

<u>Second</u>, the defendant appears to have withheld material information from the FTC.  On or about August 28, 2017, the FTC issued Civil Investigative Demand ("CIDs") to Courtesy Call and Donor Relations (*i.e.*, two of the defendant's entities) for various documents, records, and materials of Courtesy Call (*i.e.*, one of the Zeitlin Entities) to determine whether the Zeitlin Entities had  "engaged in deceptive acts or practices in connection with telemarketing, in violation [of certain telemarketing laws]."  The CIDs specifically requested, among other things, "[a]ll records related to call monitoring (including call recordings, and written evaluations and summaries of the calls)"; "all telemarketing scripts (including opening, rebuttal, FAQ, Soundboard recordings, and verification scripts"; and "all other documents used in connection with communicating with prospective donors about or on behalf of the client (including . . . recordings of telephone messages left for prospective donors, or victim transcripts thereof)".  On or about July 16, 2018, the FTC issued a CID to the defendant for testimony at an investigational hearing.  In response to these CIDs, it does not appear that the Zeitlin Entities or the defendant produced to the FTC call recordings, whether in draft or final form, to be made or that were made to donors by the Zeitlin

Call Centers, despite the fact that these materials were requested by the FTC.[16]  During the FTC's hearing, the defendant frequently stated that he did not know and/or invoked his Fifth Amendment rights in response to questioning.  On or about April 24, 2019, the defendant and certain of the Zeitlin Entities filed suit against the FTC for purportedly violating his First Amendment rights, among other things.  *See Zeitlin et al. v. United States Federal Trade Commission*, 19 Civ. 698 (JCM) (VCF) (D. Nev. Apr. 24, 2019), Dkt. 1 (Complaint).

Third, beginning in or about 2018, the defendant maintained a practice of intense operational security to minimize incriminating electronic evidence of the fraud.  (PSR ¶ 26).  The defendant rarely used Skype, the messaging application that all of his employees used throughout the day to conduct business.  He communicated with his employees by phone, through an intermediary (*i.e.*, a co-conspirator ("CC-1")), and/or by encrypted messaging applications like Signal that can be set to automatically delete data after a specified time period.

Fourth and fifth, as discussed below, the defendant lied under oath about the Zeitlin Call Centers and the Zeitlin Entities, and he directed employees to destroy evidence.

### D.    2020: The Defendant's Lies Under Oath

In 2020 and in 2022, to conceal his fraud, the defendant lied under oath in a civil deposition and in an sworn declaration to a federal judge.

---

[16] The defendant was represented by Robert Bernhoft, Esq., Daniel Treuden, Esq., and others employed by The Bernhoft Law Firm, in connection with the FTC's investigation, among other matters.  On August 15, 2023, the Government served The Bernhoft Law Firm with a grand jury subpoena for certain records relating to the FTC's investigation (Dkt. 15 at 11); the Bernhoft Law Firm informed the Government that it would not respond to the subpoena (Dkt. 16-3).  In light of this and other legal representations of the defendant by The Bernhoft Law Firm (Dkt. 15 at 11-12 & n.10), on December 21, 2023, the Court held a *Curcio* hearing, and the defendant decided to keep his current counsel (12/21/2023 Min. Entry).

The Sworn Deposition.  On or about December 8, 2020, in connection with *Zeitlin v. Bank of America*, 20 Civ. 1919 (RFB) (D. Nev.), the defendant falsely testified under oath and during a deposition that neither he nor his employees provided input as to the call scripts used by the Zeitlin Call Centers when making telemarketing calls on behalf of PACs—when, in actuality, the defendant and his employees frequently provided input and changed call scripts, including by adding false and misleading statements into call scripts.  (PSR ¶).  Specifically, the defendant's false statements are underlined below:

Q. Do [call agents] use a script? How do they know what to say?

A. Yes. They use a script.

**Q. Okay. Who writes the script for them?**

**A. <u>The organizations that we represent.</u>**

**Q. Okay. They write the script. Do you have any input into the script?**

**A. <u>No.</u>**

Q. Okay. Do you verify that the script is accurate?

A. I really wouldn't know how to answer that question. When we work with PACs, it's a First Amendment, freedom of speech, so I'd have to leave it at that.  I'm not there to tell someone how to word things.  I'm not the word police.

Q. Okay. So --

A. I certainly wouldn't allow someone to break the law and, you know, lie, things of that nature, if that's what you're asking.

**Q. Right. So do you -- so to make sure that you're not lying on these calls, do you do anything to verify the scripts to make sure that they're accurate?**

**A. What we would do for a client is look at their mission statement**

15

**to make sure that it equals what they're wanting to have the script say.**

Q. Okay.  So you would review the mission statement.  Would you do anything else?

A. It's about all we can do.

. . .

Q. . . . If you're -- you're employing the agents that are talking with the donors; is that right?

A. Yes.

**Q. Okay.  And they're reading scripts that have been provided by your clients, the PACs or charities; is that right?**

**A. Right.**

Q. And to -- to verify that those representations that they're making are accurate, you would look at their mission statement; is that right?

A. Yes.

**Q. But you wouldn't do any independent research or investigation into -- at the PACs, other than that; is that right?**

MR. BERNHOFT: Objection. Asked and answered.

BY MS. GRIFFITH:
Q. You can answer the question.

A. I'm not a regulate -- I'm not a regulator.

Q. Okay.

**A. As I said -- I guess I can answer it again. An organization gives their mission statement and their script. We follow what they want said, period.**

(Ex. F (Dep. Tr. at 56-61) (emphasis added)).

<u>The Sworn Declaration</u>.  In *Shoemaker et al. v. Zeitlin et al.*, 21 Civ. 1668 (CCC) (M.D. Pa.), the defendant was sued for operating "a profit-making enterprise that uses sham political action committees and their complicit treasurers to raise millions of dollars in political contributions by rampantly violating the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227, for the sole purpose of siphoning those donations out in the form of enormous profits." Amended Complaint, *Shoemaker et al. v. Zeitlin et al.*, 21 Civ. 1668 (CCC) (M.D. Pa. Feb. 18, 2022), Dkt. 33.  In support of his motion to dismiss, Zeitlin filed a declaration under penalty of perjury.  The defendant lied in his declaration by denying association and control over certain of the New Zeitlin Entities.  (Ex. G (defendant's declaration)).  Specifically, the defendant falsely stated:

> 10. Wired 4 Data, LLC is <u>not associated with, operated by, or controlled by me</u> as alleged in paragraph 158 of the First Amended Complaint. I am neither an owner nor an officer of this Limited Liability Company, and <u>I do not direct, supervise, or control this entity</u>.

> 11. LAV Services, LLC is neither owned, <u>operated, or controlled by me</u> as alleged in paragraph 155 of the First Amended Complaint. I am neither an owner nor an officer of this Limited Liability Company, and <u>I do not direct, supervise, or control this entity</u>.

> 12. Standard Data Services, LLC is neither owned, <u>operated, or controlled by me</u> as alleged in paragraph 162 of the First Amended Complaint. I am neither an owner nor an officer of this Limited Liability Company, and <u>I do not direct, supervise, or control this entity</u>.

(Ex. G ¶¶ 10-12 (emphasis added)).

In truth and in fact, however, the defendant controlled all of the New Zeitlin Entities by exercising ultimate authority over managerial, operational, and financial decisions, including at the time he signed and submitted to the Court his declaration under penalty of perjury.

**E.    May 2022: The Defendant's Directive to Employees to Destroy Evidence**

On or about May 24, 2022, in connection with a federal investigation, law enforcement officers served federal grand jury subpoenas issued from the Southern District of New York to certain individuals associated with the Zeitlin Entities and client PACs that used the Zeitlin Call Centers.  (PSR ¶ 27).  On or about that same date, the defendant learned about the federal subpoenas served and instructed CC-1 to delete his communications on a particular electronic messaging application used by Zeitlin employees to communicate internally about the call center business.  (*Id.*).  The defendant also directed CC-1 to relay this instruction to certain other Zeitlin employees.  (*Id.*).  The internal communications that the defendant instructed his employees to destroy contained internal communications about the Zeitlin Call Centers and the operations of the Zeitlin Entities.  (*Id.*).

Indeed, on or about August 17, 2023, the Federal Bureau of Investigation ("FBI") seized certain electronic devices from the defendant's residence and business address, pursuant to judicially authorized search warrants.  (*Id.* ¶ 28).  On or about September 15, 2023, the FBI began searching the seized devices, pursuant to a judicially authorized search warrant.  (*Id.*).  Based on the FBI's search of one of the defendant's Apple laptops seized from his residence, the defendant conducted an Internet search for "how do I export or delete my skype data" on or about May 24, 2022.  (*Id.*).[17]

---

[17] There is a typographical error in the PSR at Paragraph 28; "May 24, 2023" should read "May 24, 2022."  (PSR ¶ 28).

**II.      The Defendant's Guilty Plea and Stipulated Guidelines Range**

On or about August 15, 2023, a grand jury in this District returned Indictment No. 23 Cr. 419 (LAK) (the "Indictment"), charging the defendant in four counts with: (1) conspiracy to commit telemarketing wire fraud, in violation of 18 U.S.C. §§ 1349 and 2326 ("Count One"); (2) telemarketing wire fraud, in violation of 18 U.S.C. §§ 1343, 2326, and 2 ("Count Two"); (3) conspiracy to obstruct justice, in violation of 18 U.S.C. § 1512(c) and (k) ("Count Three"); and (4) obstruction of justice, in violation of 18 U.S.C. §§ 1512(c) and 2 ("Count Four").  (PSR ¶¶ 1-5).

On September 10, 2024, the defendant pleaded guilty to Count One of the Indictment, pursuant to a plea agreement.  (*Id.* ¶ 8).  As set forth in the plea agreement, the parties stipulated to an obstruction of justice enhancement under Section 3C1.1 of the U.S. Sentencing Guidelines ("U.S.S.G." or the "Guidelines"), a loss amount of approximately $8,906,760, an offense level of 32, a Criminal History Category of I, a stipulated guidelines range of 121 to 151 months' imprisonment, and an applicable fine range of $35,000 to $350,000.  (*Id.*).  The defendant agreed to pay forfeiture and restitution, each in the amount of $8,906,760.  (*Id.*).

During the defendant's guilty plea, the defendant admitted that between 2017 and 2020, he agreed with others to:

> alter scripts for telephone fundraising [in] order to conceal from and misrepresent to potential donors that the money was going to a political action committee and not a charity.  As a result[,] we deceived them into donating on that basis.  Regulatory environment created an incentive to do the fundraising through the political action committees rather than simple charities.  And we took advantage of that to continue fundraising without informing the donors of the true character of the organization to which they were donating.

(PSR ¶ 34).

### III.    The Presentence Investigation Report

Consistent with the parties' plea agreement, the Probation Office has calculated a Guidelines offense level of 32, a Criminal History Category of I, and an applicable Guidelines range of 121 to 151 months' imprisonment.  (PSR at 35).  The Probation Office recommends a sentence of 96 months' imprisonment followed by five years of supervised release because: the defendant "engaged in the offense for almost four years," used his "extensive experience and accumulated telemarketing business resources to facilitate the offense," was "the organizer and facilitator of the offense," used his "various business entities and employees who worked for those businesses to engage in the offense," and it is unlikely that he will ultimately "satisfy even a fifth of the expected restitution amount." (*Id.* at 35-36).  The Probation Office recommends a downward variance, however, because of the defendant's lack of criminal history, among other things.  (*Id.* at 36).

The Probation Office also noted its concerns with respect to the defendant's "reported financial situation." (*Id.*).  The defendant reported limited information on his financial affidavit relating to only two bank accounts and has not provided any information concerning the alleged sale of his 20 to 30 firearms, despite repeated requests from the Probation Office.  (*Id.*).  Ultimately, the Probation Office does not appear to have a clear picture of the defendant's finances.[18]

---

[18] On or about November 4, 2024, the Probation Office asked the parties by email for their positions on resetting the 55-day disclosure date for the PSR to November 7, 2024, with a final PSR disclosure date of December 2, 2024, in part because the defendant had not yet submitted his financial affidavit to the Probation Office.  By email, both the Government and the defense stated that they had no objection to the new PSR disclosure date.  The defendant thus agreed that he did not need to review the final PSR prior to the deadline for his sentencing submission.  In addition, the defendant declined to request a sentencing adjournment in light of the new PSR disclosure schedule, presumably because he wanted to be sentenced and potentially transferred to a new Bureau of Prisons ("BOP") facility before the new year.

The PSR reflects certain objections that were submitted by the defense to the Probation Office the day before Thanksgiving, on November 27, 2024.  (*Id.* at 30-33; *see also* Ex. A).  The Government responded to the defendant's first eight objections on Monday, December 2, 2024, and the Probation Office agreed and adopted the Government's position as to these defense objections.  (PSR at 30-33; *see also* Ex. B).  The defendant principally disputes the following facts: (1) that the Zeitlin Entities retained "approximately 90 percent" of the funds raised; (2) that the defendant controlled the New Zeitlin Entities; (2) that his misrepresentation regarding one of the PACs' provision medical services to veterans was not a misrepresentation because the PAC did intend to provide such direct services; and (3) that there were any "flat fee arrangements" (*i.e.*, the 100% Agreements).  (PSR at 30-33; Ex. A).  On December 2, 2024, the Government contacted the defense about its PSR objections and understands that the defense does not intend to proceed to a *Fatico* hearing on the above facts because "none of these issues has an impact on the plea agreement, Mr. Zeitlin's allocution, or the advisory sentencing range."  The Government also understands that the defense is in the process of reviewing the Government's response to its PSR objections and may amend its position as to the above facts at sentencing.

## DISCUSSION

### I.    A Guidelines Sentence Is Warranted

In this case—where the defendant committed a massive, years-long fraud that victimized thousands of individuals and yielded millions of dollars, and tried to conceal his fraud over the course of years, including by repeatedly lying and obstructing justice, and continues to fail to acknowledge the full scope of his conduct—a Guidelines sentence is warranted and necessary. The defendant was a sophisticated career telemarketer who, for too long, believed he was above

the law and too clever to be held accountable.  A significant sentence is necessary given the nature and circumstances of the defendant's sophisticated and years-long scheme to defraud, his history of repeated and unabashed lies and disregard for the law, the need for general and specific deterrence, just punishment, respect for the law, and in order to protect the public from future crimes of the defendant.  The Section 3553(a) factors are discussed in turn below.

### A.    The Nature and Circumstances of the Offense

<u>Scope, Duration, and Sophistication</u>.  The defendant led and executed a sweeping, years-long scheme to defraud thousands of victims of millions of dollars.  The defendant was the leader of the scheme, directing employees to change call scripts and mislead thousands of donors and potential donors.  The scheme was broad in scope and duration, sophisticated, and carefully crafted and executed by the defendant in efforts to avoid law enforcement detection and public scrutiny. The defendant used multiple tactics to evade detection: he changed the entities underlying the call centers; he created many entities rather than one; he nominally gave select employees ownership over entities to create distance between himself and the fraud and to make it more difficult for regulators, investigators, and the press to identify his crimes; he rarely communicated by email or by Skype (which all of his employees used), and instead principally communicated his orders by phone call, encrypted message, or by CC-1.  The defendant lied, repeatedly, including to the public, while under oath, and to a federal judge.  And when he was challenged for his conduct, he went on the offensive.  When Bank of America closed his bank accounts in 2018, the defendant responded by suing the bank.  When the FTC investigated him, he alleged that they were out to get him.  When he learned of this Office's investigation of him, he directed his employees to destroy evidence and tried to get Israeli citizenship, as a first step in an apparent plan to avoid

22

facing potential charges and avoid being held accountable for his criminal conduct. (Dkt. 15 at 9, *id.*, Ex. C).

Harm Caused By the Defendant's Crimes. The harms caused by the defendant are serious and widespread. The defendant defrauded and duped thousands of victims of millions of dollars by lying to them for profit. The Zeitlin Call Centers were not raising large-dollar donations from wealthy investors or companies. The defendant's victims were average Americans who were contacted because their personal information ended up on a call list purchased or otherwise obtained by the defendant. The victims earnestly listened to the defendant's employees (*i.e.*, the call agents), rather than hanging up on them, and they made small-dollar donations. They reached into their pockets for $5, $30, and sometimes $50 or $100, to directly support individuals and communities they wanted to help, even if they were on a fixed income or struggling themselves. From the call recordings, it does not appear that certain victims even knew that they were communicating with an automated system of recorded calls rather than an actual human. The victims believed that what they were hearing from the Zeitlin Call Centers was the truth, and that their money would be spent on veterans, breast cancer patients, firefighters, children with autism, and heart disease, among other worthy causes. But they were lied to at the defendant's direction. The defendant exploited thousands of victims—and attempted to exploit countless more. As one victim stated: "My $100? Big deal. It doesn't change my life. . . . But on a bigger scale, those millions of dollars came from somebody. What kind of a society, what kind of a culture, what kind of a country are we being when we accommodate those kinds of things to go on?" 9/12/2019 CPI Report. PAC Treasurers, including PAC-1 Treasurer, was likewise harmed significantly by the defendant's fraud. (*See* Ex. C).

The defendant also exploited his employees.  As reflected in a letter submitted by one of the defendant's employees (the "Employee") (Def. Mem. at 7 & Ex. 9), the defendant did not have stringent qualification requirements in terms of who could be hired by the Zeitlin Call Centers to be a call agent.  That was in part because call agents were typically transitory, replaceable, and short-term employees.  This meant that the defendant's call centers hired, for example, individuals without very much experience, troubled backgrounds, or struggles with substance abuse.  In the Employee's case, because of her diligence and reliability, she continued her employment with the Zeitlin Call Centers and was able to advance from a call agent to a manager.  But the defendant's hiring practices also meant that he hired individuals who likely would not have been able to find employment elsewhere.  His employees were therefore less likely to question his orders—including when the defendant directed them to alter invoices, make misrepresentations in call scripts and recordings, and destroy evidence.  And they were more likely to be loyal to him in order to keep their jobs.  The defendant thus exploited his employees to further his fraud scheme and/or participate in it unwittingly or with conscious avoidance.

The Defendant's Arguments.  As to the nature and circumstances of the offense, the defendant effectively makes two claims: first, he claims that his fraudulent conduct constituted only a "small fraction" of what was otherwise legitimate business at the Zeitlin Call Centers (Def. Mem. at 2), and second, that the Guidelines range is unfairly driven by the high loss amount (*id.* at 3).  As to the defendant's first claim, the defendant provided telemarketing services to dozens upon dozens of charities and PACs.  Because of the immense scope of the Zeitlin Call Centers' business, which spans approximately 30 years and hundreds of clients, the Government focused

its investigation on a select number of PACs and conduct within the limitations period.[19]  Given the defendant's telemarketing experience, the operational security he employed, and his sophistication, the Government is highly doubtful that only a "small fraction" of his business was fraudulent; rather, only a "small fraction" of his conduct was charged.  For these reasons, the Court should reject the defendant's claim and make no finding as to precisely what portion of the defendant's overall business was criminal.

As to the defendant's second claim, the loss amount and its applicable increase in the defendant's offense level and Guidelines range, is an appropriate measure of the seriousness of the defendant's fraud and the sentence warranted.  The stipulated loss amount is a very conservative estimate of the loss in this case, which can be estimated in several different but reasonable ways.

The nature and circumstances of the defendant's crimes warrant a significant sentence.

## B.    The History and Characteristics of the Defendant

<u>The Defendant's Serial Lies</u>.  The defendant's history and characteristics also warrant a significant sentence.  The defendant's history shows that he is a person who has and will lie to get what he wants, whether that involves creating false and misleading call scripts and call recordings, lying to the public, lying to the FTC, lying under oath, or lying to a federal judge.  Indeed, the defendant admits that he was "a person [who] could rationalize breaking the law as just 'little white

---

[19] The Government principally focused on the defendant's telemarketing work, from 2017 through 2020, to the following PACs, among others: Americans For Police And Trooper Safety; Americans For The Cure Of Breast Cancer; Association For Emergency Responders And Firefighters; Autism Hear Us Now; Children's Leukemia Support Network; Cops And Kids Together; Firefighters Alliance Of America; Heart Disease Network Of America; National Assistance Committee; Police Officers Defense Alliance; Standing By Veterans; Support Our Police; United American Veterans PAC (*i.e.*, UNAV); United Veterans Alliance Of America; and US Veterans Assistance Foundation (*i.e.*, VAFUS).

lies.'" (Def. Mem., Ex. 1 at 1). And even after the defendant was charged in this case, he appears to have provided misleading (or at least, incomplete) information to the District Court in Nevada and to this Court. On August 17, 2023, the day of the defendant's arrest, he failed to disclose certain assets, as well as his ownership of a private plane that he had just tried to sell months earlier. (Dkt. 15 at 8; *id.*, Exs. A, C).[20]

The Defendant's Failure to Admit and Acknowledge the Full Scope of His Conduct. In his letter to the Court, the defendant expresses his remorse for his crimes. (Def. Mem., Ex. 1). The problem with the defendant's letter, however, is twofold. First, the defendant has a track record of lying—repeatedly—and it is extremely difficult to discern the sincerity of the defendant's remorse and the extent to which that remorse, if it exists, will shape his future conduct. Second, and more importantly, the defendant has failed to admit and acknowledge the full scope of his conduct. While expressing his remorse in his letter to the Court, the defendant simultaneously disputes certain aspects of his crimes.

- The defendant disputes that the Zeitlin Entities retained "approximately 90 percent" of the funds raised, and even if they did, the defendant vehemently emphasizes that this percentage is not a crime. (Ex. A ¶ 3; *contra* PSR ¶ 18; Ex. B at ¶ 3). Perhaps this dispute is based in part on the defendant's below-described dispute as to the 100% Agreements. Either way, if this case had proceeded to trial, the anticipated testimony of multiple

---

[20] Both at the time of his bail applications and now at sentencing, the defendant has failed to provide a complete and accurate picture of his finances to the Probation Office and the Court. (PSR at 36). The location of the hundreds of millions of dollars that the Zeitlin Call Centers made over the last 30 years remains unclear. The defendant appears to be liquidating and dispersing his funds, perhaps in order to avoid paying forfeiture, restitution, or a fine. Tellingly, he recently sold his approximately $4.5 million mansion and has already used proceeds from the sale to pay his overdue taxes in the amount of $1,605,144.98. (Ex. A ¶19). And the defendant was reportedly exceedingly generous in his recent divorce settlement. (Def. Mem., Ex. 11 (describing the settlement as the "most generous" offer the divorce attorney had seen)). Moving funds in order to avoid paying forfeiture and restitution is inconsistent with sincere remorse for the crimes the defendant committed.

witnesses would have confirmed that for the PACs, the defendant's entities took approximately 90 percent of the funds raised.

- The defendant disputes that he had control over the New Zeitlin Entities, and argues that his sworn declaration to a federal judge was not false because he was not associated with and did not own LAV Services, EYP Consultants, Wired4Data, and Standard Data Services.  (Ex. A ¶ 2, 7, 8).  This dispute is absurd, in part because the defendant disputes his "ownership" and "control," but does not dispute the fact that his employees nominally owned the New Zeitlin Entities even though he managed and controlled them, as set forth in Paragraph 25(a) of the PSR.  *See also supra* at 11-13 (describing how the New Zeitlin Entities were created and operated).  Even assuming the defendant did not "control" the New Zeitlin Entities—which he did—he was still "associated" with them and did "direct" and "supervise" them—and his declaration remains false.  *See supra* § I.D.

- The defendant contests that he made misrepresentations regarding one of the PACs' provision of medical services to veterans because he thought that the PAC intended to provide these services.  (Ex. A ¶ 4).  This argument is belied by the record, including the defendant's own admission that he altered scripts to communicate a charity or direct-services message rather than a PAC message.  In fact, emails confirm that the defendant made temporary alterations to the script when the misleading script was scrutinized.  *See supra* § I.B.2.[21]

- Finally, the defendant disputes that he entered into 100% Agreements with certain of the PACs, claiming that "there were no flat fee arrangements of the type described in ¶ 23" of the PSR.  (Ex. A ¶ 6).  The defendant claims that "[r]egarding that particular client, no agreement was ever reached or signed with respect to any flat fee." (*Id.*).  As discussed above, however, the 100% Agreements were signed by both the defendant and the PAC Treasurer, and invoices reflected that the Zeitlin Entities at times received 100 percent of the funds raised.  *See supra* § I.B.3 (citing Exs. B-A and B-B).  In addition, if this case had proceeded to trial, at least one witness would have been expected to testify that the 100% Agreements did, in fact, exist, and were executed.

---

[21] The PAC Treasurer for this particular PAC, Robert Piaro, has been charged with wire and mail fraud, in *United States v. Piaro*, 23 Cr. 420 (AS), which is scheduled for trial in 2025.  Piaro was (and may still be) a PAC client of the defendants.  Piaro appears to contend that he intended to fulfill the representations contained in his call scripts, which may be the reason for the defendant's position here.  But to be clear, apart from the 100% Agreements, Piaro's fraud was separate from the defendant's fraud in that Piaro drafted his own call scripts and donor materials that contained misrepresentations, and the defendant conducted his own scheme to defraud donors by editing call scripts.

For the reasons set forth above, the facts disputed by the defendant reflect his clear failure to fully admit and acknowledge the full scope of his criminal conduct.

The Defendant's Arguments.   The defendant has submitted numerous letters of support from friends and family who describe the defendant, in sum and substance, as a man of integrity and honesty.   (Def. Mem. at 5 (citing exhibits)).   These positions are inconsistent with the defendant's own admissions and guilty plea.   The letters also describe the defendant as someone who is generous, compassionate, and "willing to do anything to help anyone." (*Id.* at 6).   These positions, however, appear inconsistent with the way in which the defendant communicated with certain of his employees and clients. *See supra* at 7, 24; *see also* Ex. C.   From these letters, the Court can only conclude that the defendant had multiple facets.   His friends and families saw and benefitted from the defendant's better qualities, and his victims and others were harmed by his worst.

The defendant also argues that his purported childhood trauma weighs in favor of a lenient sentence.   (Def. Mem. at 8-9).   The Government is unclear as to whether there is any lasting impact on the defendant as a result of his allegedly difficult childhood, and notes that numerous defendants who have appeared before this Court have come from significantly more difficult backgrounds than the defendant.   In any event, it is clear that the defendant committed his crimes as an adult— when he was approximately 50—and after decades of running a multi-million-dollar business.[22]

---

[22] The defendant also argues that the conditions at the MDC and in BOP facilities are mitigating factors that warrant a lenient sentence.   (Def. Mem. at 10-18, 29-32).   With respect to the general conditions at the MDC and the emotional impact of MDC lockdowns on the defendant, the defendant, once sentenced, will no longer be housed at the MDC.   Ultimately, even the defendant concedes that despite the conditions at the MDC, he has still been able to benefit from his experience there.   (*Id.*, Ex. 1).   With respect to the general descriptions of conditions across BOP facilities, the defendant has requested to be housed at FCI Terminal Island, and the BOP will

### C.    Deterrence and Public Safety

A significant sentence is warranted to deter the defendant from committing future crimes that could harm even more victims.  The defendant has established himself as a serial liar and a repeat fraudster who, even now at sentencing, refuses to be forthright and admit and acknowledge the full scope of his criminal conduct.  A significant sentence is also warranted for the purposes of general deterrence.  The increase in frauds committed by PACs and telemarketers—commonly referred to as "Scam PACs"—has skyrocketed in recent years.  *See, e.g.*, 9/12/2019 CPI Report.  This is in part because many PAC and telemarketing frauds are committed against countless victims who give small-dollar donations, it is extremely resource-intensive to detect such frauds, and because individuals committing such frauds typically use sophisticated methods to evade law enforcement detection.  Through its sentence, the Court will send a message to the defendant and others similarly situated that individuals who run telemarketing companies and fundraising PACs—and their employees—cannot mislead the public for profit.

## II.    Forfeiture, Restitution, a Fine, and Firearms

Forfeiture.  The Court issued the parties joint preliminary order of forfeiture on September 11, 2024.  (Dkt. 96; *see* PSR § 8(n)).  The Government requests that the forfeiture order be made final at the time of sentencing.

Restitution.  Pursuant to the plea agreement, the defendant has agreed to pay restitution in the amount of $8,906,760.00.  (PSR § 8(o)).  The Government requests that the Court issue a

---

determine where he is housed.  (*Id.* at 2).  The Government does not oppose a recommendation from the Court that the defendant be housed at FCI Terminal Island.

restitution order at the time of sentencing, and permit the Government to submit a schedule of victims to the Clerk's Office within 90 days of sentencing, pursuant to 18 U.S.C. § 3664.

Fine.  U.S.S.G. § 5E1.2(a) "requires a district court to 'impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine.'"  *United States v. Glick*, 142 F.3d 520, 528 (2d Cir. 1998) (citation omitted).  In assessing an appropriate fine, the sentencing court must consider certain factors, such as the defendant's income, earning capacity, and financial resources.  *Id.*  These factors are relevant "only to the amount of the fine, rather than the decision whether to impose a fine." *United States v. Corace*, 146 F.3d 51, 56 (2d Cir. 1998).  The applicable fine range is $35,000 to $350,000.  The Government submits that a fine within the applicable fine range would be appropriate in this case given the defendant's lack of transparency with respect to his finances, the amount of wealth he has likely amassed over the last three decades, and his failure to establish that he unable to pay a fine.

Firearms.  At the time the FBI searched the defendant's residence in or about August 2023, the FBI discovered approximately 20 to 30 firearms, including rifles and handguns.  (PSR ¶ 97).  The Probation Office contacted the parties to secure the firearms given that the defendant was selling his residence.  The defendant was not able to provide details about the firearms, such as the make and models.  (*Id.*).  The defense advised the Probation Office that the defendant, through his ex-wife, had sold the firearms.  (*Id.*).  The Probation Office is awaiting further information from the defense confirming this sale, including invoices.  (*Id.*).

## CONCLUSION

For the foregoing reasons, a Guidelines sentence is appropriate in this case, and the Court should order forfeiture, restitution, and a fine, consistent with the above.

Dated: New York, New York
December 3, 2024

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:  /s_____
Jane Kim
Rebecca Dell
Emily Deininger
Assistant United States Attorneys
Tel.: 212-637-2038 / 2198 / 2472