# EXHIBIT A

THE GOVERNMENT'S SENTENCING SUBMISSION

<u>United States v. Zeitlin</u>, 23 Cr. 419 (LAK)

Filed: December 3, 2024

LAW OFFICES OF

# DRATEL & LEWIS

29 BROADWAY
Suite 1412
NEW YORK, NEW YORK 10006
—
TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: jdratel@dratellewis.com

JOSHUA L. DRATEL
LINDSAY A. LEWIS
—
AMY E. GREER

ACHARA AMY SCHRODER
*Paralegal*

November 25, 2024

**BY ELECTRONIC MAIL (johnny_kim@nysp.uscourts.gov)**

Johnny Y. Kim
United States Probation Officer Specialist
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:    *United States v. Richard Zeitlin*,
                23 Cr. 419 (LAK)

Dear USPO Specialist Kim:

This letter constitutes defendant Richard Zeitlin's corrections, additions, and objections to the draft Pre-Sentence Report ("draft PSR") (ECF # 99) (and some additional information at the end of this letter in response to your inquiries). These are in addition to the clarifications provided in my November 15, 2024, letter with respect ¶¶ 83-95 of the draft PSR detailing Mr. Zeitlin's financial condition.

(1)    at ¶ 8(e), it should be noted that, in fact, with respect to the offense conduct, Mr. Zeitlin was acting on behalf of a political organization – a political action committee ("PAC"), but not on behalf of a charitable organization;

(2)    at ¶ 12(d), the draft PSR should be corrected because Mr. Zeitlin did not own or control LAV Services, EYP Consultants, Wired4Data, and Standard Data Services;

(3)    at ¶ 13, neither Mr. Zeitlin nor his entities retained "approximately 90 percent" of the money raised. Nor would it have been illegal even if that were the case. Indeed, in its July 15, 2024, Memorandum Opinion (ECF # 83) denying Mr. Zeitlin's motion to suppress evidence, the Court pointed out, "the government concedes that aspects of defendant's business were legitimate and does not prove sufficiently that the business was permeated with fraud." *Id.*, at 15;

LAW OFFICES OF
**DRATEL & LEWIS**

Johnny Y. Kim
United States Probation Officer Specialist
Southern District of New York
November 25, 2024
Page 2 of 5

In any event, the majority of the money raised through the calling campaigns that Mr. Zeitlin and his entities received was expended on vendor services and overhead, including payroll, rent, substantial charges for telecommunications and data services, and postage. All of those expenditures were borne by Mr. Zeitlin's entities, and not the charities/PAC's, and amounted to approximately 75-80% of the gross funds raised. In addition, the average collection rate for fundraising was approximately 30% of those who pledged contributions over the phone. Of course, the more money Mr. Zeitlin's companies raised, the more the charity or PAC and Mr. Zeitlin's companies received, based on the percentage contracts;

(4)     at ¶ 20, the portion of the money that the veterans' charities and/or PAC's received was indeed intended (as far as Mr. Zeitlin was aware) to provide disabled veterans "medical needs the [Veterans Administration] doesn't provide[;]"

(5)     at ¶ 22, it should be noted that while the claim is that "the Zeitlin Call Centers raised *tens of millions of dollars* in contributions[]" through misrepresentations, in fact the Plea Agreement sets the loss amount at $8,906,760. *See also* draft PSR at ¶ 13 ("the rest of which was disbursed to the respective PAC);

(6)     at ¶ 23, the draft PSR should be corrected because there were no flat fee arrangements of the type described in ¶ 23. Regarding that particular client, no agreement was ever reached or signed with respect to any flat fee;

(7)     at ¶ 25(d), Mr. Zeitlin's answer was not false because, as noted **ante**, at item (2), he was *not* associated with and did *not* own LAV Services, EYP Consultants, Wired4Data, and Standard Data Services;

(8)     at ¶ 32, the draft PSR should be corrected consistent with item (2) above, *i.e.*, the "certain of the New Zeitlin Entities" should explicitly exclude LAV Services, EYP Consultants, Wired4Data, and Standard Data Services;

(9)     at ¶ 33, the draft PSR should be corrected to add that my October 21, 2024, letter to you (attached to my email of the same date) stated that "Mr. Zeitlin relies on his guilty plea allocution and Plea Agreement for purposes of establishing his Acceptance of Responsibility[;]"

(10)     at ¶ 56, the draft PSR should be corrected to add certain information that Mr. Zeitlin imparted during the PSR interview. That information is as follows:

LAW OFFICES OF
**DRATEL & LEWIS**

Johnny Y. Kim
United States Probation Officer Specialist
Southern District of New York
November 25, 2024
Page 3 of 5

(a)    regarding his family's financial growing up, Mr. Zeitlin did not say the family "experienced no financial difficulties." Rather, he said he (and his family) was provided with "food and a roof;"

(b)    regarding his relationships with his family, Mr. Zeitlin did not say he "maintained stable relational ties with his family members," or that he had "no particular problems with them." Instead – as I specifically elicited from him after he initially declined to share this information – Mr. Zeitlin said his father was completely disengaged from the family and him (Mr. Zeitlin even said "disengaged" was not sufficient to describe the relationship). For example, Mr. Zeitlin recounted how, at the dinner table, he could not see his father's face because his father had the newspaper unfolded in front of him. Mr. Zeitlin said his father expressed resentment (even to his children, including Mr. Zeitlin) at having any children, and that doing so had changed his father's life inalterably for the worse (because it placed upon him certain financial and other responsibilities).[1] Mr. Zeitlin's father would also call Mr. Zeitlin and his brothers names. Mr. Zeitlin recalled his father never even played catch with him;

(c)    regarding his relationships with his other family members, Mr. Zeitlin reported during the interview that he is entirely estranged from his brother Steven, but he maintains regular contact with his other brother, Alan. Mr. Zeitlin attributes that in part to the affection-less atmosphere his father created at home while they were growing up;

(11)    at ¶ 58, the date of Mr. Zeitlin's marriage to Liliana De Ocana was June 15, 2013. Also, Mr. Zeitlin reports that he believes her formal name is Liliana Ocana;

(12)    at ¶ 64, the draft PSR should be corrected to add (as noted in ¶ 66) that Mr. Zeitlin subsequently resumed counseling with Dr. John Friel;

(13)    at ¶ 66, Mr. Zeitlin does not believe there was a six-year interval before he resumed counseling with Dr. Friel. Mr. Zeitlin believes the period was shorter,

---

[1]  Some of this language is mine, but it reflects the substance of what Mr. Zeitlin reported during the interview. Also, Mr. Zeitlin has reviewed this letter, and concurs in the characterizations. In addition, to the extent the description above in item (10) is more detailed than what was provided during the interview, Mr. Zeitlin supplements those remarks with these written additions to the draft PSR.

LAW OFFICES OF
**DRATEL & LEWIS**

Johnny Y. Kim
United States Probation Officer Specialist
Southern District of New York
November 25, 2024
Page 4 of 5

although during that period the sessions may not have been as regular as they were starting in 2018;

(14)    at ¶ 68, Mr. Zeitlin did not limit his willingness to participate in drug treatment to "after he is released from custody." In fact, he would very much like to participate in the Bureau of Prisons' Residential Drug and Alcohol Program ("RDAP");

(15)    at ¶ 71, Mr. Zeitlin began attending Washington High School in 1984 (not 1985). Also, he left high school in his senior year (12th grade), and not during eleventh grade;

(16)    at ¶ 75, as noted **ante**, in items (2), (7), and (8), Mr. Zeitlin did not own or control LAV Services, EYP Consultants, Wired4Data, and Standard Data Services;

(17)    at ¶ 77, Mr. Zeitlin did not work 40 hours per week for Chrome Builder Construction Inc. He was a silent owner/investor, and did not perform any work for the company;

(18)    for ¶¶ 83-95 (Mr. Zeitlin's financial condition), please see the comments in my November 15, 2024, letter; and

(19)    regarding ¶ 83, the following information merits revision of Mr. Zeitlin's financial situation as reported in those paragraphs:

(a)    last week Mr. Zeitlin sold his house at 7815 West La Madre Way, Las Vegas, Nevada. The closing occurred Friday. The impact on his financial situation is as follows:

(i)    the Internal Revenue Service received $1,605,144.98 representing part of taxes owed by Mr. Zeitlin and his wife; and

(ii)    Chase Bank received $2,117,699.76 to satisfy the outstanding mortgage on the property.

As a result, Mr. Zeitlin's liabilities have been reduced by $3,722,844.74. Conversely, the West La Madre Way residence is no longer in his possession, reducing his assets by $4,495,000. The sale price was $4,000,000, and the remainder of the proceeds were paid as real estate

LAW OFFICES OF
**DRATEL & LEWIS**

Johnny Y. Kim
United States Probation Officer Specialist
Southern District of New York
November 25, 2024
Page 5 of 5

       broker commissions, taxes and fees (*i.e.*, title insurance fees, recording
fees, local taxes and service charges, escrow charges, and other fees), and
to satisfy liens filed by attorneys handling the divorce between Mr. Zeitlin
and his wife;  and

(b)     Mr. Zeitlin's businesses report receivables of $78,000 (all from PAC
clients), but the confidence level for collection of any of that money is
low.

       Also, in response to your question about cryptocurrency, Mr. Zeitlin believes that he had
accounts with either Coinbase or crypto.com (or both), but he emptied those accounts when he
transferred his Bitcoin to the flash drive mentioned at ¶¶ 83 & 91.

       In addition, regarding the firearms, the information Mr. Zeitlin received from his wife
Liliana was that they were all sold to Anthony Potter of Las Vegas.  We do not have additional
information at this point, but will provide any that we receive.

       Respectfully submitted,

       Joshua L. Dratel

JLD/

# EXHIBIT B

THE GOVERNMENT'S SENTENCING SUBMISSION

<u>United States v. Zeitlin</u>, 23 Cr. 419 (LAK)

Filed: December 3, 2024



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 2, 2024

**BY EMAIL**
Johnny Y. Kim
United States Probation Officer Specialist
United States Probation Office
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    <u>United States v. Richard Zeitlin</u>, 23 Cr. 419 (LAK)

Dear Officer Kim:

      The Government writes in response to the defense's letter objections, dated November 25, 2024, to the draft Presentence Investigation Report, dated November 8, 2024. The Probation Office has requested the Government's responses to the first eight of the defendant's objections, which are set forth below.

      1.    Paragraph 8(e) should not be changed because it is a factually correct recitation of the language in the plea agreement. The language uses the terms contained in the applicable section of the Guidelines manual. The fact that Zeitlin was providing services to political action committees, and misrepresenting to donors that they were charities, is described in the fact section of the offense conduct at Paragraphs 20 and 22.

      2.    Paragraph 12(d) should not be changed because it is factually correct. Paragraph 12 states that Zeitlin controlled and operated telemarketing call centers (the "Zeitlin Call Centers"), which were operated through the entities listed in Paragraph 12(d). The Paragraph does not state that Zeitlin <u>owned</u> the entities referred to as the "New Zeitlin Entities," but Zeitlin did control them and direct their activities. The nominal ownership of the New Zeitlin Entities is discussed in Paragraph 25(a).

      3.    Paragraph 13 should not be changed because it is factually correct. The defense explains how the money that went to the Zeitlin Entities was spent, but claims that the amount that went to the Zeitlin Entities was 75 to 80 percent, rather than 90 percent of the funds raised. Invoices reflect, however, that the Zeitlin Call Centers collected approximately 85 to 100 percent of funds raised. Further, even assuming there were instances in which the Zeitlin Entities received 75 to 80 percent of funds raised (for which the defense offers no support), the defendant ignores that, at times, the Zeitlin Entities received <u>100 percent</u> of the funds raised, pursuant to certain agreements. *See* Exs. A-B (certain of the 100% agreements). Finally, that the Zeitlin Call Centers retained approximately 90 percent of the money raised was not, by itself, criminal, and the defense's reference to Judge Kaplan's Opinion of July 15, 2024, is therefore irrelevant.

4.    Paragraph 20 should not be changed because it is factually correct.  Providing direct services to disabled veterans is one example of the misrepresentations made by the Zeitlin Call Centers at Zeitlin's direction.  Indeed, emails and witness testimony establish that Zeitlin directed employees to change a call script for the US Veterans Assistance Foundation ("VAFUS") to mislead donors into believing they were donating to a charity that provided direct services to veterans.  The <u>fraudulent script</u> included the following language (or largely similar language):

> Hi this is Paul calling on behalf of the US Veterans Assistance Foundation. Now, The [sic] reason for the call is to let you know that the new drive is underway and <u>your support helps the handicapped and disabled veterans by working on getting them the medical needs the VA doesn't provide</u>. You know these men and women were there when we needed them the most and we just want to let them know they're not fortgotten. [sic] If we were to send you an envelope could they count on your support?

The fraudulent script above was used from in or about January 2018 through in or about March 2020, with the exception of a short time period in or about August and September 2018.

On or about August 20, 2018, when the Zeitlin Call Centers began to receive complaints about the fraudulent script, Zeitlin directed his employees to temporarily use a less misleading script:

> Hi this is Paul calling on behalf of the US Veterans Assistance Foundation. Now, The [sic] reason for the call is to let you know that the new drive is underway and your support will help us to <u>advocate as a political action committee</u> that the VA provides the medical needs of handicapped and disabled veterans. You know these men and women were there when we needed them the most and we just want to let them know they're not forgotten. If we were to send you an envelope could they count on your support?

Once the complaints waned, the Zeitlin Call Centers returned to the fraudulent script, which was used in or about 2019 and 2020.

5.    The Government does not oppose changing "tens of millions" to "millions" in Paragraph 22.

6.    Paragraph 23 is factually correct and should not be changed.  The flat-fee arrangements are reflected in the attached.  *See* Exs. A-B (certain of the 100% agreements).

7.    Paragraph 25(d) should not be changed because it is factually correct.  *See supra* ¶ 2.  As described in Paragraph 25(a), to which the defense has no objection, Zeitlin selected certain employees to act as nominal owners of the New Zeitlin Entities, even though he managed and controlled them.

8.      Like Paragraph 25(d), Paragraph 32 should not be changed because it is factually correct for the same reasons stated above.  *See supra* ¶¶ 2, 7; *see also* Draft PSR ¶ 25(a).

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:    /s Jane Kim_____
       Jane Kim / Rebecca Dell / Emily Deininger
       Assistant United States Attorneys
       (212) 637-2038 / 2198 / 2472

cc:    Defense Counsel

# EXHIBIT A

## AGREEMENT

**THIS AGREEMENT** is made and entered into by and between **Association for Emergency Responders and Firefighters,** (hereinafter referred to as Organization) and **TPFE, Inc** (hereinafter referred to as "TPFE ").  Said expressions to include the respective party's successors and assigns.

**WHEREAS,** Organization is desirous to have TPFE conduct one or more calls to action and request for support campaigns in and throughout the United States.

**WHEREAS,** TPFE is willing to conduct calls to action and fundraising on behalf of Organization.

**WITNESSETH:**

For and in consideration of the mutual covenants herein contained, the sufficiency of which is acknowledged as evidenced by the signatures of the parties hereto, it is mutually agreed as follows.

**1.  PURPOSE OF THE AGREEMENT.**  The parties enter into this Agreement to create an arrangement whereby TPFE will be granted the right to conduct fundraising and call to action activities in and throughout the United States on behalf of ORGANIZATION.

**2.  GRANT OF AUTHORITY.**  Organization does hereby grant to TPFE the authority to conduct calls to action and fundraising appeals on behalf of ORGANIZATION throughout the term of this Agreement including option to subcontract to qualified entities.

**3.  TERM.**  This agreement shall commence on October 1st, 2017 and shall continue for an initial period of six (6) months, through March 31st, 2018.  This agreement will automatically extend for an additional six (6) month term unless either party gives notice forty-five (45) days prior to termination of its decision to allow this agreement to expire.

1

4.  **OBLIGATIONS OF TPFE .**  As an inducement to Organization to enter into this Agreement, TPFE  agrees to do the following:

(a)    Conduct an appeal on behalf of ORGANIZATION in a professional manner and in compliance with all applicable state and federal laws, including but not limited to, registration, disclosure, and compliance with applicable provisions of the Telemarketing Sales Rule (TSR).

(b)    Hire and supervise a competent and professional work force to ensure that all calls are of the highest quality.

(c)    Utilize only those materials (scripts, pledge commitment materials, etc.) approved by ORGANIZATION.  (TPFE  is responsible for the cost of pledge commitment materials).

(d)    Honor and record individual do-not-call requests.

5.  **COMPENSATION.**  TPFE shall give ORGANIZATION the sum of (thirty thousand) dollars $30,000 on or before October 1st, 2017 in one lump sum.  TPFE shall be compensated 100% of the gross proceeds collected as a result of the services of TPFE.  The term "gross proceeds collected" shall be defined to mean the amount actually received after credits are given for stop payment orders and refunds.

6.  **PROCEEDS.**  All proceeds shall be sent directly to a designated depository or location for deposit into an ORGANIZATION bank account as directed.   The parties further agree that proceeds from pledges may continue to be collected for a period of one hundred fifty (150) days after the date of termination of this Agreement regardless of cause.  All such proceeds received thereafter shall belong in their entirety to ORGANIZATION.

**7. <u>RECORDS</u>.** TPFE shall maintain, or cause to be maintained, books and records as may be required by law or by this Agreement including, but not limited to the following records in a PCI compliant manner:

- A record of all donor names, address, contribution amount and contribution date for 3.5 years

- Donor information for donors that contribute $200.00 or more per calendar year, this amount to be an aggregate of all contributions from all contractors from that donor to ORGANIZATION in a calendar year

TPFE shall provide and post all information weekly of all donation checks and credit card transactions received the previous Monday through Sunday as well as check images of any donation checks of $200.00 or greater to a secure FTP site designated by ORGANIZATION for compliance reporting purposes. All records created under this campaign shall remain the exclusive property of TPFE , who will provide them to ORGANIZATION in a timely manner when and as required by law. ORGANIZATION shall be responsible for supplying such records to the FEC as may be required by current federal election laws and applicable regulations.

**7a. <u>COMPLIANCE</u>.** Each party agrees to comply with any and all applicable state and federal laws regulating the activities of political fundraising. ORGANIZATION further agrees that it shall be responsible for ensuring that the recordkeeping and reporting requirements set forth in the applicable federal elections laws and regulations as enforced by the Federal Election Commission (FEC) are met. ORGANIZATION shall also ensure that any approved solicitation materials used by TPFE in soliciting contributions, on behalf of ORGANIZATION contain all statements and disclosures required

3

to be made under laws applicable to it when soliciting contributions, including those requirements issued and enforced by the FEC from time to time.

8. **MUTUAL RIGHT OF TERMINATION.**  Either party shall have the right to terminate this Agreement without cause upon thirty (30) days written notice.

9. **NOTICES.**  Legal notices shall be in writing and sent by certified mail return receipt requested, or first class U.S. Mail, postage prepaid, or by fax, email, courier or next day delivery service, and shall be addressed as follows:

TO ORGANZATION :     Association for Emergency Responders and Firefighters
8444 County Road M
Fredonia WI 53021

TO TPFE :     TPFE INC
1835 E Charleston Blvd.
Las Vegas NV 89104

10. **ENTIRE AGREEMENT.**  This Agreement represents the entire agreement by and between the parties hereto, and all prior oral understandings or written agreements are deemed merged here.  This Agreement may only be modified in a writing signed by each of the parties hereto.

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the day and year set forth below.

4

**ASSOCIATION FOR EMERGENCY RESPONDERS AND FIREFIGHTERS        TPFE INC**

By: _Robert Piaro_____     By: _Rick Zeitlin_____

Dated: ___9/27/2017_____     Dated: _____9/27/2017_____

**POLITICAL ORGANIZATION**

# EXHIBIT B

# AGREEMENT

**THIS AGREEMENT** is made and entered into by and between **Standing By Vets,** (hereinafter referred to as Organization) and **TPFE, Inc** (hereinafter referred to as "TPFE "). Said expressions to include the respective party's successors and assigns.

**WHEREAS,** Organization is desirous to have TPFE conduct one or more calls to action and request for support campaigns in and throughout the United States.

**WHEREAS,** TPFE is willing to conduct calls to action and fundraising on behalf of Organization.

**WITNESSETH:**

For and in consideration of the mutual covenants herein contained, the sufficiency of which is acknowledged as evidenced by the signatures of the parties hereto, it is mutually agreed as follows.

1. **PURPOSE OF THE AGREEMENT.** The parties enter into this Agreement to create an arrangement whereby TPFE will be granted the right to conduct fundraising and call to action activities in and throughout the United States on behalf of ORGANIZATION.

2. **GRANT OF AUTHORITY.** Organization does hereby grant to TPFE the authority to conduct calls to action and fundraising appeals on behalf of ORGANIZATION throughout the term of this Agreement including option to subcontract to qualified entities.

3. **TERM.** This agreement shall commence on November 1st, 2017 and shall continue for an initial period of nine (9) months, through July 31st, 2018. This agreement will automatically extend for an additional six (6) month term unless either party gives notice forty-five (45) days prior to termination of its decision to allow this agreement to expire.

1

4.  **OBLIGATIONS OF TPFE** .  As an inducement to Organization to enter into this Agreement, TPFE  agrees to do the following:

(a)    Conduct an appeal on behalf of ORGANIZATION in a professional manner and in compliance with all applicable state and federal laws, including but not limited to, registration, disclosure, and compliance with applicable provisions of the Telemarketing Sales Rule (TSR).

(b)    Hire and supervise a competent and professional work force to ensure that all calls are of the highest quality.

(c)    Utilize only those materials (scripts, pledge commitment materials, etc.) approved by ORGANIZATION.  (TPFE  is responsible for the cost of pledge commitment materials).

(d)    Honor and record individual do-not-call requests.

5.  **COMPENSATION**.  TPFE shall give ORGANIZATION the sum of (thirty thousand) dollars $30,000 on or before November 20th, 2017 in one lump sum.  TPFE shall be compensated 100% of the gross proceeds collected as a result of the services of TPFE.  The term "gross proceeds collected" shall be defined to mean the amount actually received after credits are given for stop payment orders and refunds.

6.  **PROCEEDS**.  All proceeds shall be sent directly to a designated depository or location for deposit into an ORGANIZATION bank account as directed.   The parties further agree that proceeds from pledges may continue to be collected for a period of one hundred fifty (150) days after the date of termination of this Agreement regardless of cause.  All such proceeds received thereafter shall belong in their entirety to ORGANIZATION.

7. **RECORDS.** TPFE shall maintain, or cause to be maintained, books and records as may be required by law or by this Agreement including, but not limited to the following records in a PCI compliant manner:

- A record of all donor names, address, contribution amount and contribution date for 3.5 years
- Donor information for donors that contribute $200.00 or more per calendar year, this amount to be an aggregate of all contributions from all contractors from that donor to ORGANIZATION in a calendar year

TPFE shall provide and post all information weekly of all donation checks and credit card transactions received the previous Monday through Sunday as well as check images of any donation checks of  $200.00 or greater to a secure FTP site designated by ORGANIZATION for compliance reporting purposes.  All records created under this campaign shall remain the exclusive property of TPFE , who will provide them to ORGANIZATION in a timely manner when and as required by law.   ORGANIZATION shall be responsible for supplying such records to the FEC as may be required by current federal election laws and applicable regulations.

7a. **COMPLIANCE.**  Each party agrees to comply with any and all applicable state and federal laws regulating the activities of political fundraising.  ORGANIZATION further agrees that it shall be responsible for ensuring that the recordkeeping and reporting requirements set forth in the applicable federal elections laws and regulations as enforced by the Federal Election Commission (FEC) are met.  ORGANIZATION shall also ensure that any approved solicitation materials used by TPFE  in soliciting contributions, on behalf of ORGANIZATION contain all statements and disclosures required

3

to be made under laws applicable to it when soliciting contributions, including those requirements issued and enforced by the FEC from time to time.

**8.  MUTUAL RIGHT OF TERMINATION.**  Either party shall have the right to terminate this Agreement without cause upon thirty (30) days written notice.

**9.  NOTICES.**  Legal notices shall be in writing and sent by certified mail return receipt requested, or first class U.S. Mail, postage prepaid, or by fax, email, courier or next day delivery service, and shall be addressed as follows:

TO ORGANZATION :        Standing By Vets
                        8444 County Road M
                        Fredonia WI 53021

TO TPFE :               TPFE INC
                        1835 E Charleston Blvd.
                        Las Vegas NV 89104

**10.  ENTIRE AGREEMENT.**  This Agreement represents the entire agreement by and between the parties hereto, and all prior oral understandings or written agreements are deemed merged here.  This Agreement may only be modified in a writing signed by each of the parties hereto.

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the day and year set forth below.

4

**STANDING BY VETS**

By: _____

Dated: 11/16/2017 _____

**POLITICAL ORGANIZATION**

**TPFE INC**

By: _____

Dated: 11/16/2017 _____

# EXHIBIT C

**REDACTED/PUBLICLY FILED**

THE GOVERNMENT'S SENTENCING SUBMISSION

<u>United States v. Zeitlin</u>, 23 Cr. 419 (LAK)

Filed: December 3, 2024

Your Honor,

I write to you today to share how the actions of Richard Zeitlin and his companies have profoundly affected my life, my family, and the veterans I had worked to serve.

[REDACTED]

[REDACTED]

[REDACTED] I launched the United American Veterans PAC, hoping to make a difference by supporting veteran candidates in politics. My [REDACTED] continued to praise Rick and his professional fundraising efforts. I ended up hiring Zeitlin's companies to solicit funds for the Political Action Committee, and soon after, the PAC fell victim to Zeitlin's fraudulent practices as well. I soon began receiving calls from upset donors who had been misled by his telemarketers, who falsely claimed we were supporting wounded amputee soldiers returning from overseas. This is the furthest away from our mission we could possibly get as a political action committee. I immediately issued a cease and desist and demanded call logs, scripts, and records of their solicitations. It seems he had instructed one of his office personnel to forge documents and present them back to us as if it were something we had approved.

What followed was even more troubling. While at the post office, I received a call from Zeitlin. He had threatened both myself and my business partner, demanding money he believed his companies had earned despite his/managers'/employees' efforts to mislead the public with our organization's name and image. [REDACTED]

[REDACTED]

To make matters even worse, [REDACTED] which I believe is a direct result of Zeitlin's mismanagement and deceit. I truly believe I would have never been in

this situation, had he been an honest person. ███████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████████████████████████████████████
███████████████████████████████████ I am relieved that some justice is being served, however, the damage done to my life, my family, and the veterans we sought to help is immeasurable.

Your Honor, I ask you to consider the profound and lasting impact Richard Zeitlin's actions have had on me, my family, and the veterans we sought to serve. This has been more than just a financial loss; it has been a betrayal of trust, a destruction of my reputation, and a source of deep emotional pain. The consequences of this ordeal will continue to affect me for years to come.

I truly appreciate your time and consideration.

Respectfully,

████████████████

# EXHIBIT D

**REDACTED/PUBLICLY FILED**

THE GOVERNMENT'S SENTENCING SUBMISSION

<u>United States v. Zeitlin</u>, 23 Cr. 419 (LAK)

Filed: December 3, 2024

**Sent:**      Tuesday, May 29, 2018 1:59:56 PM
**Subject:**   Important: UNAVPAC
**From:**
**To:**        Rick Zeitlin <ccirickz@gmail.com>

Good morning Rick,

Over the last few weeks we have been contacted by multiple different contributors who claim that phone operators are either rude or lying about who we are and what we do. From what we have gathered, some of your staff have said that we help pay for expenses of wounded soldiers, that we are a 501c3 organization, that their contribution is tax deductible, that we send money to directly help veterans, and the list goes on.

This type of miscommunication cannot continue, being that we have now been reported on to the FTC, FCC, and BBB multiple times and have had our FEC liaison contacted by these same contributors.

These actions could bring us to a screeching halt if they are not corrected.

When calling for our campaign, is there a number we can call in to listen?

Are you currently recording all calls while calling for our campaign?

Is your system capable of tracking who made the call, and would we be able to request the recording of certain contributors?

We are currently receiving 3-4 negative phone calls a day regarding the information your staff are pitching potential contributors.

-------------------------------------------------------------------------------------------------------------------------

A disabled veteran contacted us,

> **Subject** Paul isn't the right guy...
> **Message** The asshole you guys have making calls to Veterans is a shitbag and your PAC is not going to succeed with this guy disrespecting everyone he engages.

-------------------------------------------------------------------------------------------------------------------------

Please have Paul re-trained, or refrain from allowing Paul to call for our campaign.

Being disrespectful, dishonest, or misleading cannot be tolerated.


V/R


Treasurer
UNAVPAC

DISCLOSURE MATERIAL SUBJECT TO PROTECTIVE ORDER

# EXHIBIT E

**REDACTED/PUBLICLY FILED**

THE GOVERNMENT'S SENTENCING SUBMISSION

<u>United States v. Zeitlin</u>, 23 Cr. 419 (LAK)

Filed: December 3, 2024

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ pfeinc.com>
**Sent:** Tuesday, August 21, 2018 2:15:25 PM
**Subject:** VAFUS script change 8/20/18
**To:** Rick Zeitlin <rickz@tpfeinc.com>

Hello Rick,
I got a call from Pepe saying he was getting some phone calls about what we were running on VAFUS and that he wanted to change what we were using. He said he understood that you had requested we run what was in there and that he would call you directly to let you know about the changes.

Here is what we were running yesterday up until 530pm:

Hi this is Paul calling on behalf of the US Veterans Assistance Foundation. Now, The reason for the call is to let you know that the new drive is underway and your support helps the handicapped and disabled veterans by working on getting them the medical needs the VA doesn't provide. You know these men and women were there when we needed them the most and we just want to let them know they're not fortgotten. If we were to send you an envelope could they count on your support?

Here is what we are running now and as of 530pm yesterday:

Hi this is Paul calling on behalf of the US Veterans Assistance Foundation. Now, The reason for the call is to let you know that the new drive is underway and your support will help us to advocate as a political action committee that the VA provides the medical needs of handicapped and disabled veterans. You know these men and women were there when we needed them the most and we just want to let them know they're not forgotten. If we were to send you an envelope could they count on your support?

Thank you,
▮▮▮▮▮▮▮▮▮▮▮▮▮

# EXHIBIT F

THE GOVERNMENT'S SENTENCING SUBMISSION

<u>United States v. Zeitlin</u>, 23 Cr. 419 (LAK)

Filed: December 3, 2024

# Exhibit D

# Deposition of Richard Zeitlin, Dec. 8, 2020

USAO_00003609

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2                   DISTRICT OF NEVADA

 3

 4   RICHARD ZEITLIN, ADVANCED
     TELEPHONY CONSULTANTS, MRZ
 5   MANAGEMENT, LLC, DONOR
     RELATIONS, LLC, TPFE, INC.,      CASE NO.
 6   AMERICAN TECHNOLOGY SERVICES,    2:18-cv-01919-RFB-DJA
     COMPLIANCE CONSULTANTS, CHROME
 7   BUILDERS CONSTRUCTION, INC.,
     and UNIFIED DATA SERVICES,
 8
                     Plaintiffs,
 9
          v.
10
     BANK OF AMERICA, N.A., and
11   JOHN and JANE DOES 1-100,

12                   Defendants.

13

14

15       VIDEOTAPED DEPOSITION OF RICHARD ZEITLIN

16        Taken on Tuesday, December 8, 2020

17          By a Certified Court Reporter

18              At 10:09 a.m.

19

20

21

22          ATKINSON-BAKER, INC.
               www.depo.com
23            (800) 288-3376

24          FILE NO.:  AE087D2

25   Reported by:  Alexander J. Nagle, CCR 923
```

052

USAO_00003610

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

<table>
<tr><td colspan="2">Page 2</td></tr>
<tr><td>1</td><td>APPEARANCES (All parties appeared remotely):</td></tr>
<tr><td>2</td><td></td></tr>
<tr><td>3</td><td></td></tr>
<tr><td></td><td>For Plaintiffs:  THE BERNHOFT LAW FIRM, S.C.</td></tr>
<tr><td>4</td><td>1402 East Cesar Chavez Street</td></tr>
<tr><td></td><td>Austin, Texas 78702</td></tr>
<tr><td>5</td><td>BY:  ROBERT G. BERNHOFT, ESQ.</td></tr>
<tr><td></td><td>THOMAS E. KIMBLE, ESQ.</td></tr>
<tr><td>6</td><td>Ph. (512)582-2100; Fax (512)373-3159</td></tr>
<tr><td></td><td>rgbernhoft@bernhoftlaw.com</td></tr>
<tr><td>7</td><td>tekimble@bernhoftlaw.com</td></tr>
<tr><td>8</td><td></td></tr>
<tr><td>9</td><td>For Defendant Bank of America, N.A.:</td></tr>
<tr><td>10</td><td></td></tr>
<tr><td></td><td>SNELL & WILMER L.L.P.</td></tr>
<tr><td>11</td><td>3883 Howard Hughes Parkway</td></tr>
<tr><td></td><td>Suite 1100</td></tr>
<tr><td>12</td><td>Las Vegas, Nevada 89169</td></tr>
<tr><td></td><td>BY:  BLAKELEY E. GRIFFITH, ESQ.</td></tr>
<tr><td>13</td><td>KIAH D. BEVERLY-GRAHAM, ESQ.</td></tr>
<tr><td></td><td>Ph. (702)784-5200; Fax (702)784-5252</td></tr>
<tr><td>14</td><td>bgriffith@swlaw.com</td></tr>
<tr><td></td><td>kbeverly@swlaw.com</td></tr>
<tr><td>15</td><td></td></tr>
<tr><td>16</td><td></td></tr>
<tr><td>17</td><td>Also Present:    Audra Friedland, Videographer</td></tr>
<tr><td>18</td><td>Hunter Holland</td></tr>
<tr><td>19</td><td></td></tr>
<tr><td>20</td><td></td></tr>
<tr><td>21</td><td></td></tr>
<tr><td>22</td><td></td></tr>
<tr><td>23</td><td></td></tr>
<tr><td>24</td><td></td></tr>
<tr><td>25</td><td></td></tr>
</table>

**Page 3**

```
 1                        INDEX
 2              Examination  Further Examination
 3  By Ms. Griffith        10
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                    EXHIBITS
 2  Deposition Exhibits                            Page
 3   4 - Plaintiff's Responses to Defendant's First  197
       Set of Request for Interrogatories
 4   7 - Letter dated 8/27/18 to Mr. and Mrs. Brian  220
       Moynihan from Richard Zeitlin
10 - E-mail dated August 16, 2018 to Shane T       221
       Hannah from Richard Zeitlin
 6  13 - Account statements for Chrome Builders     139
33 - Settlement Agreement and [Proposed] Order Re: 209
 7       Courtesy Call, Inc.
    34 - Business Signature Card with Substitute Form 195
 8       W-9 for TPFE Inc
    35 - Business Signature Card with Substitute Form 195
 9       W-9 for MRZ Management LLC
    36 - Business Signature Card with Substitute Form 195
10       W-9 for Advanced Telephony Consultants LLC
    37 - Business Signature Card with Substitute Form 196
11       W-9 for Donor Relations LLC
    38 - Business Signature Card with Substitute Form 191
12       W-9 for Unified Data Services LLC
    39 - Business Signature Card with Substitute Form 193
13       W-9 for Compliance Consultants LLC
    40 - Business Signature Card with Substitute Form 193
14       W-9 for American Technology Services LLC
    41 - Business Signature Card with Substitute Form 194
15       W-9 for Chrome Builders Construction Inc
    42 - Account statements for TPFE              149
16  43 - Account statements for MRZ Management     163
    46 - Account statements for Donor Relations    78
17  47 - Account statements for Compliance Consultants 181
       LLC
18  57 - Laid Off Employee Names                  223
    58 - Consolidated Profit and Loss Master      100
19  61 - Paid Collections by Year and Month desc CSTDO 137
    62 - Advanced Technology Services Invoice to   78
20       Childrens Leukemia Support Network
    63 - Compliance Consultants Invoice to Childrens 80
21       Leukemia Support Network
    64 - Unified Data Services Invoice to Childrens 80
22       Leukemia Support Network
    72 - Cumulative Fulfillment Frequency 2017-2019 135
23  73 - Fulfillment Frequency Year-by-Year       136
    94 - Politico article                         248
24
25
```

**Page 5**

```
 1      MS. GRIFFITH:  So, Robert, you're upset
 2  because we have included additional documents in our
 3  deposition exhibits, correct?
 4      MR. BERNHOFT:  No.  I'm not upset.  I
 5  object to BANA's intention to query plaintiff
 6  Mr. Zeitlin during this deposition on 20 or more
 7  documents that were never disclosed in discovery or
 8  otherwise exchanged during discovery, which is a
 9  violation of Rule 26 and 37(c).
10      Our position was clearly set forth in our
11  e-mail exchange.  I have to say that in the decades of
12  combined experience with the attorneys over here in
13  federal practice, we've never seen a circumstance where
14  an opposing party attempted to introduce exhibits
15  during a deposition that were not previously disclosed
16  or otherwise exchanged.
17      Rule 26 combination of 37 prohibit that.
18  It's unfair surprise and prejudice.  It's the type of
19  ambush and sandbagging that the rules and the cases
20  expressly prohibit.
21      Per our e-mail exchange, we demand that
22  BANA withdraw these 20 some-odd newly disclosed
23  documents that it intends to use as exhibits in this
24  deposition, and then we can sort through the physical
25  delivery of the exhibits that do comprise previously
```

Richard Zeitlin
December 08, 2020

2..5

053

USAO_00003611

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 6

1 disclosed documents or discovery.
2      MS. GRIFFITH: Okay. So, Robert, we
3 disagree. One, it's common practice in this
4 district -- we -- to disclose documents during the
5 public record at the deposition. That's not uncommon
6 here.
7      Second, these are all documents in the
8 public record that we looked at in preparing for this
9 deposition.
10      Third, we're in the middle of discovery
11 right now, so we're -- it's timely. We have the right
12 to ask Mr. Zeitlin questions about these documents.
13 So -- but here, we want to be reasonable and give you
14 some options.
15      So I think my recommendation today would
16 be that we proceed with the deposition, and when we get
17 to those documents, if we get to them, we can discuss
18 them, and -- or at the same time, we could schedule a
19 time today to talk with the magistrate about those
20 documents so we could proceed with the deposition and
21 have the magistrate on the phone at a later point in
22 the day before we talk about those documents.
23      Also, we could proceed with the deposition
24 and reserve talking about those documents until a later
25 date, to continue it till that time for those

Page 7

1 documents. That would also be fine with us. We're --
2 we're open to suggestions there.
3      MR. BERNHOFT: No, I appreciate that.
4 Well, I assume, with some measure of justification,
5 that the Federal Rules of Civil Procedure are operative
6 and enforced in the District of Nevada, so I'm not
7 certain what you're referring to in terms of customs
8 and practices in the district. Rule 26 and 37(c)1 are
9 very clear. That is my comment on your observation
10 regarding customs and practices.
11      We have engaged in substantial deposition
12 preparation over here, as one might imagine. We had
13 time allotted and scheduled to conclude our deposition
14 prep this morning, and then there was a link that was
15 sent with the documents, and we were grateful for the
16 e-mail with the link, something on the order of
17 8:00 p.m. Central last night.
18      We came into the office this morning and
19 started going through the exhibits to prepare for the
20 deposition and identify 20-plus documents that hadn't
21 been previously disclosed.
22      The question of whether they're in the
23 public record or not is irrelevant. These documents
24 wouldn't have relevancy for BANA, unless BANA
25 contemplated and intended for these documents to help

Page 8

1 defend against plaintiff's claims or to support BANA's
2 affirmative defenses.
3      These documents needed to be disclosed
4 prior to several hours before Mr. Zeitlin's deposition,
5 and we will not permit Mr. Zeitlin to be unfairly
6 prejudiced by this sandbag. This is unacceptable.
7      Having said that, I do want to think about
8 a proper way forward that will be respectful of the
9 lawyers' time and Mr. Zeitlin's time and to be as
10 productive as we can.
11      Blakeley, you identified several options
12 there. We are certainly willing to go forward with
13 that part of the deposition that confines itself to
14 exhibits that BANA intends to introduce to the
15 deposition that have been previously disclosed or
16 exchanged in discovery. I think that makes sense.
17      And then, you know, we can sort through
18 where we go from there regarding the disputed exhibits,
19 and I'm amenable to one or more of your suggestions,
20 frankly.
21      So we're in need of both -- those are all
22 reasonable ways forward. We do have the problematic of
23 not receiving the physical uncontroversial deposition
24 exhibits. So we have to sort through that and figure
25 out where we stand with that.

Page 9

1      MS. GRIFFITH: Okay. Well, let me --
2 let's pause for a second because I just received a call
3 from the paralegal, and I'm going to give her a call
4 back, and let's see where those exhibits are.
5      MR. BERNHOFT: All right. So we'll be off
6 the record.
7      (Discussion off the record.)
8      (Recess taken.)
9      THE VIDEOGRAPHER: I'm Audra Friedland,
10 your videographer, and I represent Atkinson-Baker in
11 Glendale, California. I'm a notary public, and I'm not
12 financially interested in this action nor am I a
13 relative or employee of any attorney or any other
14 parties.
15      Today's date is December 8th, 2020, and
16 the time is 10:29 a.m. This deposition is being taken
17 place via Zoom videoconferencing. This is Case
18 No. 2:18-cv-0191-RFB-DJA [sic] entitled Richard Zeitlin
19 versus Bank of America. The deponent today is Richard
20 Zeitlin.
21      This deposition is being taken on behalf
22 of the defendant. Your court reporter today is Alex
23 Nagle from Atkinson-Baker.
24      Counsel, will you please now introduce
25 yourselves.

Richard Zeitlin
December 08, 2020

6..9

Atkinson Baker, Inc.
www.depo.com

Page 10

1        MS. GRIFFITH:  Sure.  This is Blakeley
2   Griffith from Snell & Wilmer, on behalf of Bank of
3   America.  Also on with me today is Kiah Beverly-Graham,
4   also from Snell & Wilmer, on behalf of Bank of America.
5        MR. BERNHOFT:  Yes.  Attorney Robert
6   Gerald Bernhoft, appearing for plaintiff Richard
7   Zeitlin and the plaintiff companies here defending
8   plaintiff Richard Zeitlin's deposition.  We're in
9   Austin, Texas in the conference room of the Bernhoft
10   Law office.
11        With me in the conference room is our
12   litigation paralegal Bethany.  We also have attorney
13   Tom Kimble and attorney Patrick Kane.
14        THE VIDEOGRAPHER:  Court reporter, would
15   you like to swear in the witness now.
16
17        RICHARD ZEITLIN,
18        having been first duly sworn, was
19        examined and testified as follows:
20
21        EXAMINATION
22   BY MS. GRIFFITH:
23   Q.   So this is Blakeley Griffith.  We're on
24   the record.  So Robert, we can't see you or the other
25   attorneys in the conference room.  Normally, of course,

Page 11

1   we could.  So while, of course, you're not going to be
2   coaching the witness or anything like that, we can't
3   see you-all at all.
4        Is there a way that we can make sure that
5   you're on screen so we can see when you object and what
6   else is going on?
7        MR. BERNHOFT:  We typically do it this
8   way.  I don't -- when we've done video depos, you know,
9   in the past, as you say, there's -- you know, the
10   lawyers can see each other in the room, but the lawyers
11   aren't actually on the -- the video.
12        MS. GRIFFITH:  Do you think that you could
13   have a separate -- maybe a separate camera on a --
14   like, a laptop that we can see you-all but you can mute
15   yourself and be objecting in that room?
16        THE VIDEOGRAPHER:  This is the
17   videographer.  Another way to do it is to use your
18   phone and call in as a separate participant.  You have
19   a little box up at the top of the screen.  Just a
20   suggestion.
21        MR. BERNHOFT:  Yeah.  We can -- I'm sorry.
22   Madam Court Reporter, could you say that again, please,
23   your suggestion.
24        THE VIDEOGRAPHER:  It's the videographer.
25   You can call in with your phone to Zoom.  You dial in.

Page 12

1   You log in through Zoom on your phone and then use your
2   phone camera, so that you have your own --
3        MR. BERNHOFT:  Oh, no.  We've got --
4   here's what we'll do, Blakeley, and that's well taken.
5   What we'll do is we will open up the Zoom invite on our
6   laptop, and then we'll be on the call.  We'll be in the
7   little blocks, and then Blakeley and Kiah will have the
8   benefit of seeing us.  Give us one moment, please.
9        THE WITNESS:  I'd like to be able to see
10   Blakeley as well.
11        MS. GRIFFITH:  Yeah.  Let me see if I can
12   fix my video.  It's really just the lighting.  I'm not
13   sure why it's not --
14        THE VIDEOGRAPHER:  Counsel, if you want to
15   close the blinds behind you, it may help.
16        MS. GRIFFITH:  Maybe that.  It's still
17   pretty dark on my face.  Let me try again.  I think
18   that's better.  Yeah.
19        Is that better, Mr. Zeitlin?
20        MR. BERNHOFT:  Yeah.  There we go.  Thank
21   you.  Yes.  Thank you.
22        So just give us a moment.  We're going to
23   have -- Mr. Kimble and I, we're defending the depo
24   directly, so we'll get Zoom open.  We'll hit the
25   invitation, and we should join shortly.

Page 13

1        THE VIDEOGRAPHER:  Would you like to go
2   off the record while they're doing this?
3        MS. GRIFFITH:  Yeah.  Let's go ahead and
4   go off the record for a second.
5        THE VIDEOGRAPHER:  Going off the record,
6   and the time on the monitor is 10:34 a.m.
7        (Recess taken.)
8   BY MS. GRIFFITH:
9   Q.   Mr. Zeitlin, would you go ahead and state
10   your full name for the record.
11   A.   Richard Zeitlin.
12        THE VIDEOGRAPHER:  Stand by, Counsel.
13        THE WITNESS:  R-i-c-h-a-r-d Z-e-i-t-l-i-n.
14        THE VIDEOGRAPHER:  One moment, sir.
15   Please stand by.  We're going to get back on the
16   record.  I'm sorry.
17        Going back on the record, and the time is
18   now 10:39 a.m.
19   BY MS. GRIFFITH:
20   Q.   Okay.  Mr. Zeitlin, I'm sorry.  This is --
21   this is the nature of -- of remote depositions.
22        Could you go ahead and state and spell
23   your full name for the record again.
24   A.   Richard Zeitlin, R-i-c-h-a-r-d
25   Z-e-i-t-l-i-n.

Richard Zeitlin
December 08, 2020

10..13

USAO_00003613

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 14

1 Q. Okay. And my name's Blakeley Griffith.
2 I'll be taking your deposition today. I represent Bank
3 of America.
4 Especially since we are on this video, if
5 you don't understand me or need me to repeat a
6 question, please let me know, and we can -- we can do
7 that.
8 What's your current address?
9 A. 7815 West La Madre Way, Las Vegas, Nevada
10 89149.
11 Q. Okay. Have you ever had a deposition --
12 your deposition taken before?
13 A. Yes.
14 Q. Okay. When was that?
15 A. In the past. I'm not sure of the date.
16 Q. Okay. How many times have you had it
17 taken before?
18 A. Once.
19 Q. Just once. Okay. And it was in the past.
20 Do you remember what the case was about
21 that you had it taken?
22 A. It was a -- some kind of a patent
23 discussion or a fight over money I happened to be
24 dragged into.
25 Q. Were you a party to that case, or were you

Page 15

1 just a witness who had their deposition taken?
2 A. I was a witness.
3 Q. Okay. And you -- I'm just trying to get
4 an idea of how comfortable you are with depositions.
5 Was this about 10 years ago, longer, quite
6 a while ago?
7 A. Oh, I don't know. About five years, eight
8 years.
9 Q. Okay. Great.
10 Well, before we get really -- get into --
11 started today, I'm going to talk with you a little bit
12 about the deposition -- call them the deposition rules.
13 So -- and these are just rules that, if we both try to
14 stick to, the deposition will go smoother.
15 So you will have the opportunity to read
16 and sign your deposition at the end. I'm assuming that
17 your counsel will want to do that. If you change any
18 of your testimony after you review and sign, I will
19 have the ability to comment on that later.
20 When I ask you a question, try to have a
21 verbal response, so no "ums," nodding of the head,
22 shaking of the head. It just helps the court reporter
23 get a clear record.
24 On that same note, you'll want to wait
25 until I finish my question before you respond so that

Page 16

1 we're not speaking over each other.
2 A. Understood.
3 Q. Okay. Great. Thanks.
4 If you need a break, we can take one.
5 Just let me know. If there's a question pending, I
6 will ask that you answer it before the break, but we
7 are happy to take any breaks when you need.
8 Also, let me know if you do not understand
9 the question that I ask. So if you answer the
10 question, I'm going to assume that you understood it.
11 Do you understand?
12 A. Yes.
13 Q. Is there any reason that you cannot
14 testify competently today? So any medication that
15 you're on?
16 A. No.
17 Q. Drugs, alcohol, anything else?
18 A. No.
19 Q. Any history of medical illness?
20 A. Any history of medical illness? Well,
21 I've been sick before. What do you want to know?
22 Q. Is there any illness in the past that
23 would affect your ability to testify?
24 A. No.
25 Q. Have you ever been convicted of a crime?

Page 17

1 A. No.
2 Q. Okay. No felony, no misdemeanors
3 involving truth or honesty?
4 MR. BERNHOFT: Asked and answered.
5 Objection.
6 THE WITNESS: The answer's no.
7 BY MS. GRIFFITH:
8 Q. Have you ever been arrested?
9 A. No.
10 Q. Okay. What did you do to prepare for your
11 deposition today?
12 A. Meeting with counsel.
13 Q. Anything else? Did you talk to anybody
14 else besides your counsel?
15 A. No.
16 Q. Tell me about your educational background.
17 Did you go to high school?
18 A. Yes.
19 Q. Where did you go?
20 A. Washington High School, Milwaukee,
21 Wisconsin.
22 Q. Okay. Did you graduate?
23 A. No.
24 Q. What was your highest grade level
25 achieved?

Richard Zeitlin
December 08, 2020

14..17

USAO_00003614

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 18

1    A.   11th.
2    Q.   And what -- about what year was that?
3    A.   What year was that?
4    Q.   When you were in high school?
5    A.   I started high school in 1984.
6    Q.   Okay.  So high school -- where that was
7 again?  Sorry.
8    A.   Milwaukee, Wisconsin.
9    Q.   Okay.  Do you have any licenses?  So any,
10 like, real estate licenses?  Any licenses, like, broker
11 licenses, anything like that?
12   A.   I have a driver's license.
13   Q.   Anything else besides a driver's license?
14   A.   No.
15   Q.   Any professional licenses?
16   A.   No.
17   Q.   So let's talk a little bit about your
18 employment history.  So 1984, you were in high school.
19        After high school, what was your first
20 job?
21   A.   My first job, I believe, was at Whitlock
22 Auto Parts.
23   Q.   Was that also in Wisconsin?
24   A.   It was.
25   Q.   Okay.  And when did you come to Las Vegas?

Page 19

1    A.   1994.
2    Q.   Okay.  1994.
3        And did you come to Las Vegas to start a
4 business or to -- for business reasons?
5    A.   Yes.
6    Q.   Okay.  And what was that for?
7    A.   I was in, at the time, fund-raising, call
8 center operation.
9    Q.   And this was your first -- had you been
10 involved in -- in fund-raising and call center
11 operation before 1994?
12   A.   Yes.
13   Q.   Okay.  So when did you first get involved
14 in fund-raising and call operations?
15   A.   1987.
16   Q.   1987.  Okay.
17        How did you get involved in -- in this?
18   A.   I was offered a job while delivering a
19 pizza to a telemarketing fund-raising operation, and I
20 accepted.
21   Q.   So did you -- so what was your role there?
22   A.   Agent.
23   Q.   Okay.  And what does an agent do?  Or what
24 did you do as an agent?
25   A.   Made outgoing calls for donations.

Page 20

1    Q.   This is 1987.
2        Who was your employer at the time?
3    A.   The company was named Professionally
4 Speaking, Incorporated.
5    Q.   And who ran that company?
6    A.   My -- guy who hired me that day was Kevin
7 Paykel.
8    Q.   Can you spell his last name, if you know
9 it.
10   A.   P-a-y-k-e-l.
11   Q.   Okay.  Do you know if they're still in
12 business?
13   A.   I'm sorry?
14   Q.   Do you know if they're still in business?
15   A.   Not to my knowledge.
16   Q.   Okay.  So you came to Las Vegas in 1994,
17 working in fund-raising and call center.
18        Did you start a business?
19   A.   I did.
20   Q.   Okay.  Tell me about that business that
21 you started in 1994.
22   A.   It was a business that did nonprofit
23 fund-raising.
24   Q.   How did it fund-raise?
25   A.   Via the telephone and then donations sent

Page 21

1 in the mail.
2    Q.   So what would -- were there agents there?
3    A.   You're asking me what I did?
4    Q.   Well --
5    A.   Clarify your question.
6    Q.   Sir, I'm happy to.
7        So it was a fund-raising business.  It
8 fund-raised via telephone.
9        Were there any -- did it have any
10 employees?
11   A.   When?
12   Q.   When it started in 1994.
13   A.   It was just -- it was me and a former
14 partner at the time.  That's how it started.
15   Q.   Okay.  What was the name --
16   A.   And, of course, we hired employees as time
17 went on.
18   Q.   Okay.  So you hired employees as time went
19 on.
20        What was the name of the company?
21   A.   Courtesy Call.
22   Q.   Okay.  Courtesy Call.
23        Who was the name of your partner?
24   A.   Morry Rosenblatt.
25   Q.   Do you still work with Warren [sic]

Richard Zeitlin
December 08, 2020

18..21

057

USAO_00003615

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 22

1 Rosenblatt?
2    A.  No.  No.
3    Q.  Okay.  When did you stop working with him?
4    A.  I believe it was 2003.
5    Q.  Okay.  So first of all, you started in
6 1994.
7        Did you and Mr. Rosenblatt own it equally,
8 50/50?
9    A.  Yes.
10   Q.  Did you have any other companies at this
11 time?
12   A.  No.
13   Q.  Okay.  So your main job was running
14 Courtesy Call; is that accurate?
15   A.  Yes.
16   Q.  Okay.  And so is Courtesy Call still in
17 existence?
18   A.  No.
19   Q.  Okay.  When did it terminate, or when --
20 when did you end Courtesy Call?
21   A.  I'm not exactly sure of the date.  I'd
22 have to go back and look at my records to see the exact
23 date of the end of the company.
24   Q.  Do you have an estimate of when it ended?
25   A.  In the past.  I don't want to play games

Page 23

1 here of estimating.  I could do that all day.
2    Q.  Do it all day.  Okay.  So sometime in the
3 past.  You're not sure when.  You'd have to look at
4 your records.
5    A.  If you want accuracy.
6    Q.  Okay.  That's fine.
7        So Courtesy Call started in 1994, ended at
8 sometime in the past.  We're not sure when.
9        And eventually how many employees did it
10 have?
11   A.  I guess I'd like to ask a question here.
12 You're asking me for specifics, estimations and things,
13 guesstimates.
14       What are -- what -- you know, what are --
15 what are you trying to accomplish here?
16   Q.  I'm just trying to have you answer the
17 question.  So I'm trying to find out about what you --
18 what your previous employment history was -- Courtesy
19 Call was.
20       So, you know, do you know how many --
21   A.  On the record -- if you want me to answer
22 accurately, it was a moving number at all times.
23   Q.  Okay.  Moving number at all times.
24       Now, about how many people were employed
25 by it when it was closed down?

Page 24

1    A.  Maybe a hundred.
2    Q.  What did those people do?
3    A.  There's a lot of different jobs at the
4 time.
5    Q.  Okay.  Can you describe some of those job
6 descriptions for me.
7    A.  Agents that would make calls for
8 donations, agents that would verify information,
9 management, janitorial, technical.
10   Q.  Okay.  Agents that would verify
11 information, what information would -- what did that
12 consist of?
13   A.  Making sure that the -- address, spelling
14 of names, amounts promised and pledged.
15   Q.  Okay.  So there would be agents that make
16 the calls.  There would be agents that verify the
17 information.
18       Where was Courtesy Call located?
19   A.  In Las Vegas.  That was the headquarters,
20 in Las Vegas.
21   Q.  Okay.  What was the address?
22   A.  1835 East Charleston Boulevard, Las Vegas,
23 Nevada 89104.
24   Q.  So, Mr. Zeitlin, what do you currently do?
25   A.  What do I currently do?

Page 25

1    Q.  Yeah.
2    A.  I have a number of businesses that do a
3 number of different things, ranging from technology to
4 acceptance of payments, software development and
5 design.  I also am part owner of a construction
6 company.  I own a real estate management company.
7    Q.  So for the real estate management company,
8 what's the name of that company?
9    A.  MRZ Management.
10   Q.  What does MRZ Management stand for?
11   A.  Whatever you like it to.
12   Q.  So MRZ doesn't have a specific thing that
13 it stands for?
14   A.  At one time it did, and then I changed
15 what it meant in my heart.
16   Q.  Well, previously, what did it stand for?
17   A.  At the time, it was owned by myself and
18 Morry Rosenblatt, so it was a blending of initials.
19   Q.  Okay.  And when did it -- when was it
20 started?
21   A.  I don't remember.
22   Q.  And what did it do?
23   A.  It managed real estate.
24   Q.  Okay.  Where?  Where is the real estate?
25   A.  In Las Vegas.

Richard Zeitlin
December 08, 2020

22..25

USAO_00003616

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 26

1    Q.   How many properties does it manage?
2    A.   Two.
3    Q.   Eight?
4    A.   Two.
5    Q.   Sorry.  Can you say that again.  Two?
6    A.   Two.
7    Q.   Two.  Great.
8         Where are those properties located?
9    A.   One's in Las Vegas.  One is in Henderson.
10   Q.   What's the address of those properties?
11   A.   Again, 1835 East Charleston Boulevard,
12   Las Vegas, Nevada 89104.  The other one is 1009 Whitney
13   Ranch Drive, Henderson, Nevada 89014.
14   Q.   Okay.  And what is the day -- does
15   anybody -- does that company have any employees?
16   A.   Which company?
17   Q.   MRZ Management.
18   A.   No.
19        MR. BERNHOFT:  Counsel, may I ask a quick
20   question, please?
21        MS. GRIFFITH:  Sure.
22        MR. BERNHOFT:  Yeah, you'd mentioned that
23   BANA's expert is -- is on the call.  Is the expert on
24   the call -- on this Zoom videoconference?
25        MS. GRIFFITH:  I do not see them on the

Page 27

1    call.
2         MR. BERNHOFT:  Okay.  I mean, if and when
3    the expert does come in and participate, I would
4    appreciate identification of who that is.
5         MS. GRIFFITH:  Okay.  Yeah.  If I see them
6    join or if anybody sees them join, we'll make sure that
7    we put them in the record.
8         MR. BERNHOFT:  I appreciate it.  Thank
9    you.
10        MS. GRIFFITH:  Sure.
11   BY MS. GRIFFITH:
12   Q.   Okay.  So, Mr. Zeitlin, are you an
13   employee of MRZ Management?
14   A.   I've never really thought about it, in all
15   honesty.  I own the company.  I own the shares.
16   Q.   So you own the company --
17   A.   I'm -- actually, I guess I'd be the
18   managing member.
19   Q.   Okay.  The managing member.
20        And do you own the company individually,
21   100 percent?
22   A.   Yes.
23   Q.   Okay.  Do those two properties pay MRZ
24   Management rent?
25   A.   Yes.

Page 28

1    Q.   Okay.  How much is the monthly rent?
2    A.   I don't know, offhand.
3    Q.   Do you have an estimate?
4    A.   Back to that game?  So we want a -- you
5    know, an estimate of what I pay -- what I charge for
6    rent?  What I paid for rent?
7    Q.   Yes.  If you know.
8    A.   15,000 a month.
9    Q.   For each property or total?
10   A.   Total.
11   Q.   Mr. Zeitlin, you have several other
12   companies that are plaintiffs in this action; is that
13   right?
14   A.   Yes.
15   Q.   Okay.  So I just want to talk about those
16   for a little bit.  So Donor Relations is one of those
17   companies; is that correct?
18   A.   Donor Relations is closed.
19   Q.   Donor Relations is closed?
20   A.   Yes.
21   Q.   When did it close?
22   A.   It's -- it was dissolved, I think, 2018.
23   Q.   Do you recall if it was dissolved before
24   or after your lawsuit against Bank of America?
25   A.   I believe it was in the process of

Page 29

1    dissolution.
2    Q.   What did -- what was the business of Donor
3    Relations when it was operating?
4    A.   A professional fund-raising company.
5    Q.   Okay.  So can you describe to me what that
6    entails, what a professional fund-raising company does?
7    A.   It raises funds for nonprofit
8    organizations.
9    Q.   So for charities?
10   A.   Yes.
11   Q.   Any other organizations?
12   A.   That company raised funds for nonprofit
13   organizations.
14   Q.   Okay.  Did it raise --
15   A.   That's what a professional fund-raiser
16   does.  It raises funds.
17   Q.   It raises funds for nonprofits?
18   A.   Yes.
19   Q.   Did it also raise funds for a PAC?
20   A.   No.
21   Q.   So Donor Relations did not raise funds for
22   any political action committees?
23   A.   No.
24   Q.   So a professional fund-raising company.
25   It raises funds for charities.

USAO_00003617

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 30

1 How does it go about doing that?
2 A. It can raise money in a number of ways,
3 whatever it chooses to do, however. We raise money via
4 telephone, as well as direct mail campaigns.
5 Q. Okay. Can you describe for me how you
6 raise money by telephone.
7 A. You would call people up and ask for
8 donations.
9 Q. So you personally called up people and
10 asked for donations?
11 A. That's what an agent would do. That's not
12 always the -- you asked how it's done. That's how it's
13 done.
14 Q. Okay. So that's how it's done.
15 So I -- so the fund-raising -- the
16 fund-raising company would employ agents, and those
17 agents would make telephone calls, asking people to
18 donate funds; is that accurate?
19 A. I would say it's accurate.
20 Q. Okay. For the agents, about how many were
21 employed by Donor Relations?
22 A. I don't recall.
23 Q. Are agents employed -- there are several
24 plaintiffs in this action.
25 Are agents employed across different

Page 31

1 companies. Or were they employed solely by one
2 company?
3 A. Can you rephrase that question.
4 Q. Sure. So there's several different
5 plaintiffs in this case. Did -- Donor Relations sounds
6 like it employed agents to make calls.
7 Did any other companies employ agents to
8 make calls?
9 A. No.
10 Q. So Donor Relations was in charge of
11 employing agents to make the calls, and no other
12 companies did; is -- is that right?
13 A. Donor Relations, at the time that I assume
14 you're talking, when the bank seized all my money,
15 was not -- it wasn't operational. It was a bank
16 account that was sitting there. And of course, when
17 they confiscated one, they confiscated all. They were
18 prejudiced on that.
19 Q. So Donor Relations, at the time of the
20 freeze of your accounts in August 2018, was not
21 operational?
22 A. That's correct.
23 Q. Where was it located when it was
24 operational?
25 A. In Las Vegas.

Page 32

1 Q. Okay. At that same address?
2 A. On Charleston.
3 Q. Yeah. The one on Charleston.
4 Were the employees who were making calls
5 located there as well?
6 A. Some of them were, yes.
7 Q. Is that address on Charleston -- would you
8 call that a call center?
9 A. At one time.
10 Q. At one time.
11 Is it currently a call center, or no?
12 A. No.
13 Q. Okay. So some of the employees at Donor
14 Relations were at the Charleston address.
15 Where else were employees or agents of
16 Donor Relations?
17 A. A location -- Alabama. We had a location
18 in Wisconsin.
19 Q. Okay. Anywhere else?
20 A. We -- I believe we also had some agents
21 from home that had different states.
22 Q. You had agents working from home.
23 Is that what you said, Mr. Zeitlin?
24 A. Yes.
25 Q. Did Donor Relations share space with any

Page 33

1 of the other plaintiffs? So did it rent the same
2 place?
3 A. I don't understand.
4 Q. Okay. Well, maybe it will be easier if I
5 ask it this way: There's a company that you own called
6 Advanced Telephony Consultants, LLC?
7 A. Yes.
8 Q. Was that located at the same Charleston
9 address?
10 A. You mean Advanced Telephony Consultants?
11 Q. Yes.
12 A. Yes. It was that address.
13 Q. Is it still operational?
14 A. Yes.
15 Q. Is it still on Charleston?
16 A. No.
17 Q. Where is it located now?
18 A. In Henderson.
19 Q. In Henderson.
20 At the -- at that address you said
21 earlier?
22 A. Yes.
23 Q. Okay. TPFE, that's another plaintiff.
24 Was TPFE also located at the Charleston
25 address?

Richard Zeitlin
December 08, 2020

30..33

USAO_00003618

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 34

1    A.   I don't recall.  That was a time when we
2  were -- I was just buying the building in Henderson, so
3  I don't remember if it was there or in Henderson.
4    Q.   Okay.  So it might have been in
5  Charleston, but at the time you were buying a building
6  in Henderson, and that's where -- did you relocate all
7  of your companies to the Henderson building?
8    A.   No.
9    Q.   Okay.  Is there any company that is still
10  at the Charleston address?
11    A.   Chrome Builders Construction.
12    Q.   Okay.  How about -- is TPFE still in
13  business?
14    A.   No.
15    Q.   When was it dissolved?
16    A.   I don't remember.
17    Q.   Do you recall if it was before or after
18  the lawsuit against Bank of America?
19    A.   TPFE was -- yeah, I don't remember at all.
20  I don't remember.
21    Q.   Okay.  That's fair.
22         What about Unified Data Services, LLC?
23  Was that ever at the Charleston address?
24    A.   No.
25    Q.   Okay.  That was only at the Henderson

Page 35

1  address?
2    A.   Yes.
3    Q.   How about Compliance Consult -- is Unified
4  Data Services, LLC, still in operation?
5    A.   Yes.
6    Q.   How about Compliance Consultants, LLC?
7    A.   How about --
8    Q.   Is that -- sorry -- was that ever located
9  at the Charleston address?
10    A.   No.
11    Q.   And that was located at the Henderson
12  address?
13    A.   Yes.
14    Q.   Is it still in existence?
15    A.   Yes.
16    Q.   How about Integrated Telecom?  Was that
17  ever at the Charleston address?
18    A.   Never in Henderson, no.
19    Q.   It was in -- it was in -- at the
20  Charleston, but it never went to Henderson?
21    A.   Yes.
22    Q.   Is that still operational?
23    A.   No.
24    Q.   Do you recall when that was dissolved?
25    A.   No.

Page 36

1    Q.   How about Chrome Builders Construction?
2  That was always at the Charleston address and still is?
3    A.   Yes.
4    Q.   Okay.  And that -- is that company still
5  operational?
6    A.   Yes.
7    Q.   And do you own this one 100 percent,
8  Mr. Zeitlin, or does somebody own it with you?
9    A.   I have my wife and a partner.  Three
10  owners.
11    Q.   And what's your wife's name?
12    A.   Mrs. Zeitlin.
13    Q.   Mrs. Zeitlin.
14         Does she have a first name?
15    A.   Juliana.
16    Q.   And then, who's the partner?
17    A.   Anthony Taylor.
18    Q.   Is Mr. Taylor in Las Vegas?
19    A.   I assume he's still there.
20    Q.   Okay.  Great.
21         MRZ Management, we talked about.  That is
22  still in existence.
23         Does it have a location?
24    A.   Henderson.
25    Q.   Henderson.  Okay.

Page 37

1         MR. BERNHOFT:  Counsel, has -- has Kiah
2  left us?
3         MR. BEVERLY-GRAHAM:  No.  I'm still here.
4         MS. GRIFFITH:  He's still there.  Yeah.
5         MR. BERNHOFT:  Okay.  We don't have a
6  video of Kiah.  Not that it's essential, but I just
7  note that he's not in one of the blocks.
8         MS. GRIFFITH:  All right.
9  BY MS. GRIFFITH:
10    Q.   So are all of your companies,
11  Mr. Zeitlin -- are they incorporated in Las -- in
12  Nevada, or are they incorporated elsewhere?
13    A.   Some are; some aren't.
14    Q.   Okay.  Well, we'll walk through each of
15  them in a minute.  All right.  Let's just talk a little
16  bit now about Advanced Telephony Consultants.
17         That is still operational, correct?
18    A.   Correct.
19    Q.   Okay.  And what does this company do?
20    A.   Software design and maintenance of
21  software.
22    Q.   Okay.  What kind of software is it
23  designing?
24    A.   Call center software.
25    Q.   It's designing --

Richard Zeitlin
December 08, 2020

34..37

USAO_00003619

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 38

1   A.  Call center software.
2   Q.  Okay.  So what does that consist of?
3   A.  Often that would be used for call centers.
4   Q.  Does it have any employees?
5   A.  Yes.
6   Q.  Okay.  How many people does it employ?
7   A.  Ten.
8   Q.  Who does it employ?
9   A.  Who does it employ?
10  Q.  Yeah.  So --
11  A.  All the ten people?  I don't know the
12  names, offhand.
13  Q.  Okay.  By general occupation, is there a
14  designer?  Is there an engineer?  Who's employed there?
15  A.  There's a manager, and there's
16  programmers.  There's help desk.
17  Q.  And do you own this company 100 percent?
18  A.  Yes.
19  Q.  When was it started?
20  A.  I don't recall.
21  Q.  And this one is still active, correct?
22  A.  Yes.
23  Q.  So it employs about ten people.
24      Does it play -- pay all those employees
25  salaries?

Page 39

1   A.  Does it pay salaries?
2   Q.  Yes.
3   A.  Yes, of course, it pays salaries.
4   Q.  Who are its clients?
5   A.  I'm sorry?
6   Q.  Does it have clients?
7   A.  Does it have clients?
8   Q.  Yes.
9   A.  Indirectly, but not directly.
10  Q.  Okay.  Can you just explain that to me.
11  A.  It's more of a -- it's a company that was
12  formed for servicing the call center operations.
13  Q.  Okay.  So are your other companies its
14  clients?  So does it work directly with them?
15  A.  One more time?
16  Q.  I'm trying to figure out, does it -- does
17  it work with your other companies?  Are they the
18  clients?  Like, who -- who gives -- who pays this
19  company?
20  A.  Advanced Telephony Consultants has been
21  put into a situation where it's -- it's around still to
22  provide health insurance.  And my other companies have
23  the direct client relations.  Ever since ObamaCare,
24  things became very difficult with insurance.
25      So it's around -- so is it still

Page 40

1  operational?
2   A.  Yes.
3   Q.  Okay.  Does it get paid for its services?
4   A.  Yes.
5   Q.  Who pays it for its services?  Who uses
6  it?
7   A.  I use it internally at my discretion.
8   Q.  So when you say, you, you mean you, Richard
9  Zeitlin, use it?  You're the customer, or another
10  business?
11  A.  Advanced Telephony Consultants is a
12  company that's there, unfortunately, because that's how
13  health insurance is dealt with.  People work for that
14  company so they can receive health care.  People also
15  indirectly would be working with the clients to provide
16  services.  That's the best I can explain it to you.
17  Q.  Okay.  So sorry.  I don't mean to be
18  obtuse about it.  But I am not a businessperson.  I am
19  a lawyer.  So I'm going to -- I'm going to follow up
20  and try to figure it out.
21      So does it provide software design and
22  maintenance?
23  A.  I'm sorry.  I didn't understand.  Say that
24  again.
25  Q.  Sorry.  Does this company provide software

Page 41

1  design and maintenance?
2   A.  Yes.
3   Q.  Okay.  It does.
4   A.  That's what it's -- yes.  That's what it
5  does.  Yes.
6   Q.  Okay.  Who does it provide software design
7  and maintenance to?  What companies?
8   A.  The people that work within that company
9  service a number of different clients, and, again, I --
10  I guess someone's who's not in -- who's not involved in
11  running a business or having to deal with employees and
12  insurance won't understand the necessity sometimes for
13  keeping a company around for the necessity of health
14  insurance.
15      So as time goes on, you still have to
16  maintain your relations with your clients.  I don't
17  know what to tell you.  So that's how it is.
18  Q.  So when you say "clients," who are you
19  talking about?
20  A.  The different organizations that my
21  companies do work with.
22  Q.  Are these the nonprofits that you work
23  with?
24  A.  Currently, yes.
25  Q.  So the employees of Advanced Telephony --

Richard Zeitlin
December 08, 2020

38..41

USAO_00003620

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 42

1    A.    There you go.
2    Q.    -- service a number of the clients, so
3  they provide software design and maintenance to a
4  number of your clients.
5    A.    Yes.
6    Q.    And the clients are the nonprofits that
7  you work with.
8          Is that all of the nonprofits that you
9  work with or just a couple of them?
10    A.    I have closely held companies that work
11  with the clients.  I don't know what else you want me
12  to say about it.  I know it sounds -- I'm not trying to
13  dodge you, and it may sound confusing, and I don't
14  blame you for being confused with it.  However, that's
15  how it is.
16    Q.    What about TPFE?  What does TPFE do?
17    A.    It's also dissolved.
18    Q.    I'm sorry.  Can you say that again.
19    A.    That is also dissolved.  And --
20    Q.    That is also dissolved.
21    A.    Yeah.
22    Q.    What did it do before it was dissolved?
23    A.    At one time it was also doing fund-raising
24  for different nonprofit organizations.
25    Q.    Okay.

Page 43

1    A.    And it ended up having, very similar to
2  Advanced Telephony, a longer shelf life due to
3  insurance -- health insurance for those employed, as
4  well.
5    Q.    So it used to be doing fund-raising like
6  Donor Relations; is that accurate?
7    A.    Yes.
8    Q.    Okay.  And it was fund-raising for -- for
9  nonprofits.
10          Does that include PACs?
11    A.    No.
12    Q.    Okay.  It was not fund-raising for PACs.
13          Just charities?
14    A.    Yes.
15    Q.    And was it also -- did it also employ
16  agents who would make calls -- is that generally how it
17  worked?
18    A.    Yes.
19    Q.    Where were the agents located?
20    A.    They were in the same locations throughout
21  the country as I stated before: Las Vegas, Alabama,
22  Wisconsin, remotely.
23    Q.    Okay.  Would they -- so they were the same
24  locations as stated before.
25          Were any of the agents [inaudible] by both

Page 44

1  Donor Relations and TPFE, or were they -- the agents
2  employed separately?
3    A.    They would be separate.
4    Q.    Okay.  About how many agents did TPFE
5  employ?
6    A.    I really don't recall.
7    Q.    So it made calls.
8          Did it also do direct mailing?
9    A.    It would have.
10    Q.    Okay.  Do you have any of the specific
11  name of its clients?
12    A.    Not offhand, no.  It was a very
13  short-lived company.
14    Q.    Okay.  About how long was it in business?
15    A.    Well, it was incorporated along with
16  active business, again, as I stated before, for health
17  insurance reasons.
18    Q.    Why did you dissolve it?
19    A.    Because I went to a different method.
20    Q.    Okay.
21    A.    And a different direction of business.
22    Q.    What method did you go to?
23    A.    Started up different entities to focus in
24  and give better service to the clients that we were
25  working with.

Page 45

1    Q.    What are these new entities?
2    A.    I'd have to have a list in front of me.
3  As you can see, I have quite a few businesses, and I'd
4  have to read them off to remember all the -- I don't
5  want to misstate whether it's a d/b/a or anything else.
6    Q.    But they -- so they were started to
7  provide better service.
8          Are they still doing the same -- are these
9  new companies doing the same thing, so fund-raising?
10    A.    No.  There -- it's more segmented in the
11  approach of what the company's doing.
12    Q.    How so?
13    A.    Well, why don't you ask me a specific
14  question about a specific company?  I'll try to help
15  you out and answer it.
16    Q.    So you dissolved the company because you
17  wanted to provide better service to your clients.
18          And now you've segmented, I guess, what
19  TPFE was doing and divided it into different companies;
20  is that accurate?
21    A.    I'd have to think about that one.
22    Q.    Okay.  Go ahead.
23    A.    As I continue to do business, it seemed
24  that things had to be segmented now and changed,
25  working for political action committees.

Richard Zeitlin
December 08, 2020

42..45

USAO_00003621

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 46

1    Q.   So are now --
2    A.   I'd like to take a break now, if that's
3  okay with you.
4    Q.   Excuse me.  What?
5    A.   Can I take a break for a couple minutes
6  here?
7    Q.   That's fine.  We'll go ahead and take a
8  break.
9    A.   Thank you.
10        MR. BERNHOFT:  And, Counsel, I've been
11  advised that the physical exhibits were delivered here
12  now.
13        MS. GRIFFITH:  Okay.  Great.  That's good
14  to know that they're there.
15        MR. BERNHOFT:  Yes.  How long would you
16  like to break?  I think we want to get that exhibit
17  binder for Mr. Zeitlin and make sure we're queued up.
18  What do you suggest in terms of minutes for this break?
19        MS. GRIFFITH:  Maybe five.  Stretch legs,
20  use the bathroom.
21        MR. BERNHOFT:  Sure.  Why don't we -- if
22  we could, I've got about -- that's fine.  Five minutes
23  is great.
24        MS. GRIFFITH:  Five, ten, whatever.
25        THE VIDEOGRAPHER:  Going off the record,

Page 47

1  and the time is 11:28 a.m.
2          (Recess taken.)
3        THE VIDEOGRAPHER:  Going back on the
4  record.  Please stand by.
5        MR. BERNHOFT:  Counsel, may I ask, there's
6  a -- there's a Hunter Holland that's participating in
7  the deposition.  Is that BANA's expert that's on the
8  line with us?
9        THE VIDEOGRAPHER:  You're muted.
10        MR. BERNHOFT:  You're muted.
11        MS. GRIFFITH:  Yes.  Hunter is from our
12  expert.
13        MR. BERNHOFT:  Thank you.
14        THE VIDEOGRAPHER:  Going back on the
15  record, and the time is now 11:38 a.m.
16  BY MS. GRIFFITH:
17    Q.   Okay.  So, Mr. Zeitlin, we were talking
18  about TPFE, who is no longer operating, similar to
19  Donor Relations, and you had said that Donor Relations
20  and -- and TPFE essentially dissolved, and new
21  companies were created to provide better client
22  services; is that right?
23    A.   Yes.
24    Q.   Okay.  Okay.  And that was -- were they
25  not providing good client services before they were

Page 48

1  dissolved?
2    A.   Wanted to be more specialized services as
3  opposed to more of a large suite of doing everything.
4    Q.   Okay.  Did you think that's something that
5  the market required in fund-raising?  Is that kind of
6  where fund-raising is headed, or -- or no?
7    A.   I wouldn't be able to comment on that.
8    Q.   Would you consider yourself sophisticated
9  in the area of fund-raising?
10    A.   Well, I would never consider myself
11  sophisticated in anything.
12    Q.   Okay.  Okay.
13        Would you -- would you consider yourself
14  knowledgeable in the area of fund-raising?
15    A.   Yeah.  I'd say that's true.
16    Q.   Okay.  And you've been in this space
17  since -- it sounds like either 1987 or about 1994?
18    A.   Yes.
19    Q.   And -- and have run multiple companies in
20  the fund-raising space.
21    A.   Yes.
22    Q.   And also, it sounds like you run several
23  other companies not in the fund-raising space.
24    A.   Yes.
25    Q.   Mr. Zeitlin, are you the person who

Page 49

1  oversees all of these companies?
2    A.   One more time?
3    Q.   Are you the person who oversees all of
4  these companies?
5    A.   Yes.
6    Q.   So TPFE employed agent -- did it have any
7  other employees?
8    A.   I'm sorry.  Which company?
9    Q.   TPFE.
10    A.   It had agents and management and
11  verification.  Janitorial.
12    Q.   Okay.  And the janitor -- the janitorial
13  staff, I guess, was to take care of the facilities, the
14  call centers, things like that?
15    A.   Take care of the facilities that people
16  worked.
17    Q.   Okay.  Okay.
18        Now, did it directly employ janitors, or
19  did it hire that out?
20    A.   Direct.
21    Q.   And it employed agents who made calls, and
22  it also employed agents who did verification, and it
23  had management.
24        Now, who was the -- who managed TPFE?
25    A.   I would say I managed TPFE.

Richard Zeitlin
December 08, 2020

46..49

USAO_00003622

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 50

1    Q.   Anyone else?
2    A.   Yeah.  We had different managers in the
3 different centers.
4    Q.   So the different managers in the different
5 centers, would they be employed by both TPFE and
6 Donor Relations or separately by each -- would you have
7 a manager just for TPFE, or would you have a manager
8 just for Donor Relations, or would they work both?
9    A.   They wouldn't work both, no.
10   Q.   So separate managers.
11   A.   And, again, one went away, and one sat,
12 and then that one went away as well.
13   Q.   Okay.  So was the timeline, Donor
14 Relations was in existence and operating, then it went
15 away, and then TPFE was in existence and operating, and
16 then it went away?
17   A.   Yes.
18   Q.   Okay.  So were Donor Relations and TPFE
19 essentially doing the same thing but at different
20 times?
21   A.   Yes.
22   Q.   Okay.  So they didn't cross over at the
23 same time.
24   A.   Yeah, like that.  Exactly.
25   Q.   Now --

Page 51

1    A.   I'm sorry.  I didn't hear you.
2    Q.   I'm sorry.  I -- I was just taking a
3 second.
4    A.   Oh.
5    Q.   Would -- would TPFE work with any of the
6 other plaintiffs?  So would it work with Unified Data
7 Services?
8    A.   No.
9    Q.   Okay.  Would it work with Compliance
10 Consultants?
11   A.   No.
12   Q.   Okay.  Would it work with Integrated
13 Telecom?
14   A.   No.
15   Q.   Would it work with Advanced Telephony?
16   A.   No.
17   Q.   Okay.  So it -- it was its own separate
18 entity.  It didn't work with any of the other
19 companies.
20   A.   Correct.
21   Q.   Same thing for Donor Relations.  Was it
22 its own separate company?  Would it work with any of
23 the other companies?
24   A.   No.
25   Q.   Okay.  So it was separate?

Page 52

1    A.   Yes.
2    Q.   What did Unified Data Services do?
3    A.   Unified Data Services does billing and
4 database services for nonprofit groups.
5    Q.   So would it -- so it does the billing and
6 database.  So if Advanced -- I'm going to -- I'm going
7 to say if TPFE was making the calls, would Unified Data
8 Services be sending the bills, or no?
9    A.   No, because at that time, TPFE was gone.
10   Q.   Okay.  Is there a call center company that
11 Unified Data Services works with?
12   A.   No.
13   Q.   And Unified Data Services is still in
14 existence, right?
15   A.   Yes.
16   Q.   Okay.  And who are its -- its clients are
17 nonprofits?
18   A.   Yes.
19   Q.   Okay.  Are its clients PACs?
20   A.   Yes.
21   Q.   Are those clients solely PACs, or is it
22 PACs and charities?
23   A.   PACs.
24   Q.   Do you recall what PACs are its clients?
25   A.   No.  There's too many to mention.

Page 53

1    Q.   Okay.  About how many are there?
2    A.   Quite a few.
3    Q.   Okay.  Can you recall any of the names of
4 any of them?
5    A.   You're just going to help to embarrass me,
6 so I'm going to say no right now.  I can certainly get
7 a list if I needed to have one.
8    Q.   Okay.  You do have a list of them, but you
9 can't recall off the top of your head.
10   A.   Kind of like asking Bank of America, "Can
11 you tell me all your clients?"
12   Q.   And you can't -- you can't name -- do you
13 think that you have as many clients as Bank of America
14 has clients?
15   A.   Not quite yet.
16   Q.   There's probably a big difference, Bank --
17 but I --
18   A.   Maybe one day.  Maybe one day.
19   Q.   Okay.  So maybe we'll be able to find some
20 of those clients later.  Okay.  Unified Data Services.
21        What about Compliance Consultants?  What
22 does it do?
23   A.   It handles billing verification and PCI
24 compliance of accepting of credit card payments.
25   Q.   And it's still operational, as well,

USAO_00003623

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 54

1 right?
2    A.   It is.
3    Q.   Does it do the same thing as Unified Data
4 Services?  Are there -- is it -- is it totally separate
5 things that it does?
6    A.   It does credit card acceptance to make
7 sure it's done through PCI-compliant methods.  That's
8 how it incorporates the billing on that side.
9    Q.   Who is it accepting credit card -- who is
10 it doing credit card acceptance for?
11   A.   For the various clients that we service,
12 the PAC clients, if you will.
13   Q.   So it's processing the PAC clients.
14   A.   Yes.
15   Q.   It's not processing the credit cards for
16 the donors.
17   A.   We are not a merchant processor if that's
18 what you're asking.
19   Q.   Okay.  I'm not sure if that's what I'm
20 asking.  But --
21   A.   Well --
22   Q.   It only processes credit cards for the
23 actual PACs.  It's not processing credit cards for the
24 people that are getting called on the phone.
25   A.   For people who -- who agree to give?

Page 55

1    Q.   Yes, exactly.
2    A.   They accept the payments for those
3 donations.
4    Q.   Okay.  What would you call those people?
5 Would you call those the donors?
6    A.   Call who?
7    Q.   The people who agree to give.
8    A.   Yeah.  Donor.  You got it.
9    Q.   And then there's Compliance Consultants --
10 what does Integrated Telecom do?
11   A.   Integrated Telecom is long gone.  I'm not
12 quite sure why it's on the list.
13   Q.   Okay.
14   A.   It could have had an account meeting
15 when -- when the -- the confiscation happened, but it
16 was just probably a few dollars and just -- you know,
17 since there was no rhyme or reason why they took all
18 the money, they just took everything.
19   Q.   Okay.  Okay.  So -- let's see.
20        Can you talk me through the process of how
21 an agent makes a call, they get a donation.  Does the
22 donation go through a credit card, typically?  Just --
23 so what's the process look like?  How -- how does the
24 agent find out what number to call?
25   A.   They sit at a station.  The numbers are

Page 56

1 populated throughout the system.  Call comes up with
2 the prospective donor.  They ask the prospective donor
3 if they want to give.  If they say, "Yes," they ask if
4 they would like to have it in the mail or pay by credit
5 card on the spot.
6    Q.   Okay.  So the number populated, how does
7 that number come up?  Is there a program you-all have?
8 Is there a data -- is there a database that's used?
9    A.   Yes.  We use a list.
10   Q.   Okay.  Where do you get that list?
11   A.   We have a provider that we work with.
12   Q.   Okay.  Who is that provider?
13   A.   Nationwide Marketing.
14   Q.   Any other providers, or is that just
15 Nationwide Marketing?
16   A.   At the moment, that's all we use.
17   Q.   Okay.  Have you ever used anybody else?
18   A.   Yes.
19   Q.   Who was previously used?
20   A.   We had bought some various lists from
21 different provide -- I can't remember the names of
22 them.  It was a few years ago.  We follow down the line
23 as a test.
24   Q.   Okay.  So the agent sets up the station.
25 The call comes up, and they -- they get in touch with

Page 57

1 the prospective donor.
2        Do they use a script?  How do they know
3 what to say?
4    A.   Yes.  They use a script.
5    Q.   Okay.  Who writes the script for them?
6    A.   The organizations that we represent.
7    Q.   Okay.  They write the script.
8        Do you have any input into the script?
9    A.   No.
10   Q.   Okay.  Do you verify that the script is
11 accurate?
12   A.   I really wouldn't know how to answer that
13 question.  When we work with PACs, it's a First
14 Amendment, freedom of speech, so I'd have to leave it
15 at that.  I'm not there to tell someone how to word
16 things.  I'm not the word police.
17   Q.   Okay.  So --
18   A.   I certainly wouldn't allow someone to
19 break the law and, you know, lie, things of that
20 nature, if that's what you're asking.
21   Q.   Right.  So do you -- so to make sure that
22 you're not lying on these calls, do you do anything to
23 verify the scripts to make sure that they're accurate?
24   A.   What we would do for a client is look at
25 their mission statement to make sure that it equals

Richard Zeitlin
December 08, 2020

54..57

USAO_00003624

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 58

1 what they're wanting to have the script say.
2     Q. Okay. So you would review the mission
3 statement.
4       Would you do anything else?
5   A. It's about all we can do.
6     Q. So for PACs, they have public filings
7 about how their money's distributed.
8       Do you ever look at that information?
9   A. I have.
10     Q. Okay. You have.
11       Do you do that -- do you ever look at that
12 to check and make sure that scripts are accurate?
13   A. Looking at a filing wouldn't see if a
14 script is accurate.
15     Q. Okay. Do scripts ever talk about
16 percentage of donations or where the money is going?
17   A. They can, of course.
18     Q. Okay. Would you verify that that script
19 about where they're saying the money is going is
20 accurate?
21   A. Can you reword that. One more time,
22 please. You broke up on me.
23     Q. Sorry.
24       So if you have a script, and it talks
25 about how the money is being used that the donor is

Page 59

1 making, would you verify that the statement is
2 accurate?
3   A. I would look at the organization's
4 document, as I said before, and make sure that it
5 equals what they're saying.
6     Q. So you would look at their mission
7 statement.
8   A. Yes.
9     Q. Would you look at anything else?
10   A. That's all I'd have to go on if I had a
11 client that's doing those types of things.
12     Q. So you wouldn't do any investigation into
13 the client yourself.
14   A. Outside of the mission statement?
15     Q. Uh-huh.
16   A. And looking at their reporting? No, that
17 would be about it.
18     Q. Could you --
19   A. Ultimately -- ultimately the FEC is the
20 one that regulates those people. That's the Federal
21 Election Commission.
22     Q. Okay. So even though your agents are
23 making representations on the telephone, you wouldn't
24 look into those representations; is that accurate?
25     MR. BERNHOFT: Objection. Foundation.

Page 60

1 Argumentative.
2 BY MS. GRIFFITH:
3     Q. You can answer the question.
4   A. Can you re-ask it, again.
5     Q. Sorry.
6       So my question is: If you're -- you're
7 employing the agents that are talking with the donors;
8 is that right?
9   A. Yes.
10     Q. Okay. And they're reading scripts that
11 have been provided by your clients, the PACs or
12 charities; is that right?
13   A. Right.
14     Q. And to -- to verify that those
15 representations that they're making are accurate, you
16 would look at their mission statement; is that right?
17   A. Yes.
18     Q. But you wouldn't do any independent
19 research or investigation into -- at the PACs, other
20 than that; is that right?
21     MR. BERNHOFT: Objection. Asked and
22 answered.
23 BY MS. GRIFFITH:
24     Q. You can answer the question.
25   A. I'm not a regulate -- I'm not a regulator.

Page 61

1     Q. Okay.
2   A. As I said -- I guess I can answer it
3 again. An organization gives their mission statement
4 and their script. We follow what they want said,
5 period.
6     Q. Okay. So they make the call. They say
7 the script. Somebody would like to donate -- the
8 donor, I guess, would like to donate.
9       And they can either do that by credit card
10 or sending a check; is that right?
11   A. Yes.
12     Q. Is one method preferred, or no?
13   A. We would prefer if it was to be paid by
14 credit card.
15     Q. Any reason for the preference?
16   A. It's better for cash flow. Saves on mail,
17 then. Save on reminders.
18     Q. [Inaudible] the payment work with the
19 clients? So --
20   A. Say that again. What?
21     Q. How does the payment work with your --
22 with your charity and PAC client -- are you only doing
23 work for PACs now or charities or both?
24   A. Both.
25     Q. Both. Okay.

Richard Zeitlin
December 08, 2020

58..61

067

USAO_00003625

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 62

1 So how are -- what's the -- how do you
2 come up with the agreement between yourself and the
3 nonprofit about how the donations -- how you're paid?
4    A.  How do I come up with it?  Is that what
5 you said?
6    Q.  Yeah.
7    A.  Well, we have fees that we charge,
8 depending on what service we're providing.  We charge
9 by the hour or by the piece.
10    Q.  Okay.  So what does "by the piece" mean?
11    A.  It means by the collected donation,
12 however many would pay.  We have a per-piece that we
13 charge.
14    Q.  Okay.  So you could either charge by the
15 hour or charge by the piece, or do you do both?
16    A.  It depends on which company it is.  If
17 it's Unified Data, they're charging by the piece.  If
18 it's the other two entities, they're charging by the
19 hour.
20    Q.  So Unified Data's charging by the piece.
21        Compliance Consultants is charging by the
22 hour; is that right?
23    A.  Yes.
24    Q.  And what's the other company that's
25 charging by the hour?

Page 63

1    A.  It would be the technology piece that's
2 going to charge also by the hour.
3    Q.  And do you -- what's that company's name?
4    A.  I believe it's American Technology
5 Services.
6    Q.  So of the plaintiffs in the action -- in
7 this action, the three that are in fund-raising and
8 that are still active are Unified Data Services,
9 Compliance Consultants, and American Technology
10 Services; is that right?
11    A.  They are on the complaint, yes.
12    Q.  Okay.  And are they still active?
13    A.  Yes.
14    Q.  Okay.  Those three are still active.
15        And what does American Technology Services
16 do?
17    A.  They run the dialer on the CRM side where
18 the -- the actual computers where the people sit, and
19 they maintain the software on those systems.
20    Q.  Okay.  What company is doing the calling?
21    A.  We work with different companies that do
22 the calling, depending -- it could be the remote
23 agents.  We also work with other vendors, as well, that
24 do the actual calling.
25    Q.  Okay.  So do any of these three companies

Page 64

1 do the actual calling?
2    A.  No.
3    Q.  Okay.  Do you hire that out by entities
4 that you have an interest in, or is it third parties?
5    A.  Third party.
6    Q.  Okay.  Third party.  Okay.
7        What -- what companies do the actual
8 calling?
9    A.  Sorry?
10    Q.  So what companies do the actual calling?
11 What are these third parties?
12    A.  There's quite a number of them that do the
13 actual calling.
14    Q.  Okay.  Can you list a few of them.
15    A.  Allied Global.  ICCS.
16    Q.  Okay.
17    A.  CBS.
18    Q.  Okay.
19    A.  There's others.  I can't -- I'm going to
20 have to look at my list of vendors that we use.
21    Q.  Okay.  So they do the actual calling.
22        So who is employing the agents that are
23 calling?
24    A.  The vendors.
25    Q.  So the vendors.  So you hire these

Page 65

1 vendors.
2        They employ the agents; is that right?
3    A.  Yes.
4    Q.  So do you internally have any agents doing
5 calls?
6    A.  I'm sorry?
7    Q.  Do you internally employ any --
8    A.  You're breaking up.
9    Q.  Do you internally employ any agents that
10 do calling?
11    A.  Yes.
12    Q.  Oh, you do.  Okay.
13        So you contract out some of the calling to
14 the different vendors, but then you also do some
15 internally.
16    A.  Yes.
17    Q.  What percentage is internal, and what
18 percentage is contracted out?
19    A.  Am I supposed to speculate?
20    Q.  You can estimate.  I'm not going to say
21 you -- it's 51 percent exactly, but, you know, if you
22 have an estimate, that would be great.
23    A.  So, well, I would say 80 percent is -- we
24 do 20 percent internally.
25    Q.  Was that the same with Donor Relations and

USAO_00003626

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

1 TPFE, or did they do more the calling?

2    A.  No. They did the calling.

3    Q.  They did the calling. Okay.

4      So that's -- that's part of the new

5 business model, is to contract it -- it out to vendors.

6    A.  Yes.

7    Q.  Why the change?

8    A.  Economic reasons.

9    Q.  Okay. Is it cheaper to do it this way?

10   A.  Yes.

11   Q.  Significantly?

12   A.  It's better profit margins.

13   Q.  Any other reason to contract the calls

14 out?

15   A.  They're more reliable.

16   Q.  Why is that?

17   A.  Americans are losing a step, in my

18 experience.

19   Q.  So the vendors, are these -- these

20 overseas callers?

21   A.  They're nearshore and offshore, yes.

22   Q.  What's nearshore?

23   A.  Nearshore would be connected to the -- you

24 know, it would be Central America. It could be Mexico.

25 That's called nearshore. Offshore would be the

1 Philippines, India.

2    Q.  Okay. Okay.

3      When did you start using these vendors to

4 make calls?

5   A.  Six, seven, eight years ago.

6   Q.  Okay. But Donor Relations and TPFE did it

7 all internally; is that right?

8   A.  Well, if I -- to come to think of it, no.

9 You have corrected me. We were using the -- Donor

10 Relations was using the nearshore agents and vendors.

11 They --

12   Q.  How about TPFE?

13   A.  In that short period of time, TPFE, I

14 don't recall. I don't remember. It was a very

15 short-lived company.

16   Q.  Okay. Okay. So for the donations, the

17 payment of the donations, we were talking about --

18 Unified Data is -- is a -- let me -- let me actually --

19 so Compliance and American Technology Services charge

20 by the hour; is that right? And Unified Data charges

21 by the piece?

22   A.  Yes.

23   Q.  And they charge the nonprofits?

24   A.  Yes.

25   Q.  Okay. Okay.

1      Do -- for the charges to the nonprofits,

2 how is this memorialized? Is there a contract?

3   A.  Weekly billing. Weekly invoicing.

4   Q.  So weekly billing, weekly invoicing.

5   A.  Those are the same thing.

6   Q.  Yeah. That's what I was thinking. Those

7 are the same thing. Okay. So weekly invoicing.

8      Is there -- is there any written

9 agreement?

10   A.  No.

11   Q.  How do they know if they're going to be

12 charged by the piece or the hour?

13   A.  That's how they're always charged.

14   Q.  That's how they're always charged.

15      Did you have conversations, saying, like,

16 "We're going to charge you by the piece" or "We're

17 going to charge you by the hour"? How did that

18 agreement come to be?

19   A.  During -- if we're -- if we onboard a

20 client, we put the terms out there. We discuss them.

21 If they take them, then we work with them.

22   Q.  Okay. So how do you onboard a client?

23 How do you get your clients?

24   A.  By word of mouth, Web site. Been on for a

25 while.

1    Q.  Do they reach out to you? Do you contact

2 them?

3   A.  People reach out to me.

4   Q.  Okay. And so the client will reach out to

5 you, and you'll say, "Here are our fees"; is that

6 accurate?

7   A.  That's accurate.

8   Q.  Okay. And so how are the fees kept -- so

9 the fees are populated per hour.

10      So what's the per-hour rate?

11   A.  I believe -- I'm -- again, don't hold me

12 to this, but I'll be as accurate as I can. The per

13 piece is $3.90, and the hourly for Unified Data, I

14 believe, is $16 an hour. And American Tech is $21 an

15 hour, give or take.

16   Q.  Okay. So for the piece, so any donation

17 amount, do you get $3.90? So if the donor makes a

18 donation of a hundred dollars, you get 3. -- you get

19 $3.90; if they make a donation of a thousand dollars

20 or -- how does that work?

21   A.  Exactly.

22   Q.  Okay. So no matter what, if you make a --

23 I'm going to call it a sale. And I guess, if you

24 make -- if you -- if your agent makes a donation or

25 secures a donation, you get $3.90 for that one.

Richard Zeitlin
December 08, 2020

66..69

USAO_00003627

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 70

```
1       A.   Unified Data charges $3.90 for each
2   received donation.
3       Q.   Okay.
4       A.   Irrespective of the size, yes.
5       Q.   Irrespective of the size.
6            Is there a cap on any amount that you
7   receive, or no?
8       A.   Is there a what?
9       Q.   Do you have a cap on how much you receive?
10  Like, if there were, you know, a hundred thousand
11  donations is 3.90 -- would there ever be a cap, like a
12  limit, like, "We're going to charge 3.90, but if we
13  charge" -- "if we make over X amount of donations, then
14  we're not" -- "you know, we cap it"?
15      A.   No.  I've given -- I've given credits back
16  to, you know, good clients, but on the norm, no.  We
17  have our -- our fees per piece and -- whether it's ten
18  pieces or 10,000.
19      Q.   Okay.  Does this -- does the rate vary by
20  any of the clients, or is just -- this just the rate
21  for all -- for these three companies?
22      A.   Well, I think I told you the rates, right,
23  for the three different companies?
24      Q.   You -- you did.  And I'm just wondering
25  if -- do you ever give a discount to a certain client
```

Page 71

```
1   or anything like that, or is it just, "This is the
2   rate.  Take it or leave it"?
3       A.   Oh.  Some clients receive a slightly
4   different rate.
5       Q.   Okay.  Any -- any reason for a different
6   rate for different clients?
7       A.   Well, if they've been around a while, and
8   we have a good working relationship, and maybe larger
9   volume, they can certainly get a -- sometimes a --
10  credits or better deals overall, yes.
11      Q.   What's the difference between a sold
12  donation and a paid donation?
13      A.   You say what's the difference between a
14  sold donation and a paid donation?
15      Q.   Yes.
16      A.   A sold would be someone says, "Yes, I'll
17  give."  A paid means that they actually gave.  A lot of
18  people promise and never fulfill that promise.
19      Q.   Okay.  Yeah, to get people off the phone,
20  right?
21      A.   Exactly.
22      Q.   And for the per piece, you're only paid
23  for the paid donations.
24      A.   Right.
25      Q.   For -- now, for the sold donations, for
```

Page 72

```
1   those other ones, it doesn't really matter because
2   you're paid on an hourly basis.
3       A.   Exactly.
4       Q.   Okay.  Now, are there any other fees
5   charged to the client, any other services, or is it
6   just the donations, and that's how the money comes in?
7   Anything else?
8       A.   Any other services that -- what, that I
9   provide or --
10      Q.   That you provide and the client pays for.
11  So is there any --
12      A.   That the client pays for, no.  That's it.
13      Q.   That's it.  So it's only paid, the money
14  in.
15           What about mailings?
16      A.   What about mailings?
17      Q.   Is there a different fee structure?
18      A.   I charge $3.90 for each piece given.
19      Q.   And the same hourly rate?
20      A.   The hourly rate is either 16 or about 21.
21      Q.   Okay.  Do Advanced -- no.
22           Do -- American Technology Services,
23  Unified Data, Compliance Consultants, do they share any
24  employees?
25      A.   Do they share employees?
```

Page 73

```
1       Q.   Yes.
2       A.   No.
3       Q.   No.  Okay.  How many people does Unified
4   Data Services employ?
5       A.   Oh, I don't know, offhand.  I don't know.
6   These are -- these are moving numbers, and I don't -- I
7   don't keep track of those -- those numbers.  I'm sorry.
8       Q.   Okay.  Do you -- are there a lot of people
9   employed, or -- or -- or no?
10      A.   What's your definition of "a lot"?
11      Q.   Like, is there more than a hundred?
12      A.   Yes.
13      Q.   And these are people -- well, actually,
14  let me -- let me rephrase that.  And is it the same
15  category of employees?  So [inaudible] making calls,
16  agents who are verifying, management, janitor, is there
17  anybody else who's employed over there for Unified Data
18  Services?
19      A.   That's what we have.  It's how it works,
20  agents and so on.  Don't confuse it with what we were
21  talking about before with Donor Relations.  Because if
22  if you work for Compliance, you're only going to be
23  doing the verification piece.
24      Q.   I see.
25      A.   There would be agents for that.  And, of
```

Richard Zeitlin
December 08, 2020

70..73

USAO_00003628

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 74

1 course, they're -- you know, they have management, as
2 well. They have trainings, so, yes, it's its own
3 stand-alone entity.
4     **Q. So Unified Data Services, they don't do**
5 **the verification piece.**
6     A. No.
7     **Q. No. Okay. Compliance Consultants does**
8 **the verification piece.**
9     A. Yes.
10     **Q. And could you describe for me what**
11 **verification is.**
12     A. If a donor agrees to give, the agent takes
13 the -- the information from the donor: name, address,
14 credit card number; verifies the amount. That's what
15 they would do.
16     **Q. Okay. Wouldn't each agent be doing that**
17 **when they secured a donation? So if somebody was just**
18 **a regular call agent, wouldn't they get that**
19 **information?**
20     A. We don't do it that way.
21     **Q. Okay. Can you describe to me how you do**
22 **it.**
23     A. I just told you how we do it. You're
24 asking me if I -- if the -- if the caller would do
25 that, and they don't. I told you what the verifier

Page 75

1 does, what the compliance section would do.
2     **Q. Okay.**
3     A. Why don't Bank of America have tellers do
4 loans?
5     **Q. Okay. So a donor decides to donate.**
6 **They're on a call with an agent who's just called them**
7 **and secured their donation.**
8     A. Yeah. They transfer that into the
9 compliance department.
10     **Q. Okay. So if Unified Data Services has an**
11 **employee, an agent, that's made a call and secured a**
12 **donation, they get transferred --**
13     A. Unified Data -- Unified Data is a company
14 that does the billing.
15     **Q. Okay. So --**
16     A. They get the databasing after a donor has
17 agreed to give.
18     **Q. Okay. So who's the company that calls the**
19 **donor to get the donation?**
20     A. That would be the American Tech side.
21     **Q. Okay. So American Technology, they have a**
22 **donor on the phone who's agreed to give. They get**
23 **transferred to Compliance Consultants.**
24     A. Yes.
25     **Q. Okay. Compliance Consultants verifies the**

Page 76

1 information.
2     A. Yes.
3     **Q. And then how does Unified Data Services**
4 **work -- work in here?**
5     A. The donor, after the donor has agreed to
6 give, is -- then that information is sent over
7 electronically to Unified Data to process and database
8 the donation.
9     **Q. Okay. They process and database the**
10 **donation.**
11 **And who do they report that information**
12 **to? The nonprofit?**
13     A. Yes.
14     **Q. Do they have any contact with the donor?**
15     A. Who?
16     **Q. Unified Data Services, do they have any**
17 **contact with the donor?**
18     A. Well, they send out their package to them.
19     **Q. Okay. So they send out, like, a billing**
20 **to them, saying, "Hey, you said you were going to give**
21 **this much," you know, give --**
22     A. Correct.
23     **Q. Oh, okay.**
24     A. No verbal contact.
25     **Q. Say that again.**

Page 77

1     A. No verbal contact.
2     **Q. Okay. No verbal contact.**
3     **What company invoices the client?**
4     A. Say it again.
5     **Q. What company invoices the client?**
6 **So how --**
7     A. You're breaking up. What? What invoices?
8     **Q. Sorry.**
9     **What company invoices the client?**
10     A. Unified Data.
11     **Q. Okay. Do any of the other companies**
12 **invoice the client?**
13     A. No.
14     **Q. Okay. Let's quickly open up the exhibit**
15 **binder, Mr. Zeitlin.**
16     A. Yes.
17     **Q. And let's turn to Tab 62.**
18     A. Tab what?
19     **Q. Tab 62.**
20     MR. KIMBLE: Blakeley, just to be clear,
21 you're talking about Exhibit 62. Now, some of us are
22 accessing this electronically.
23     MS. GRIFFITH: Yes, Exhibit 62.
24     MR. KIMBLE: Exhibit 62. Just want --
25 just want to make clear.

Richard Zeitlin
December 08, 2020

74..77

071

USAO_00003629

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 78

1    THE WITNESS: Thank you.
2    (Deposition Exhibit 62 marked.)
3 BY MS. GRIFFITH:
4    Q.   And I'll -- I'll describe it to you,
5 Mr. Zeitlin, too.
6    A.   Yes.
7    Q.   So, Mr. Zeitlin, this looks -- this is --
8 at the very bottom, it says "Zeitlin_000293." That's
9 the Bates stamp. And this looks to be an invoice from
10 American Technology Services.
11    Do you see that?
12    A.   I do.
13    Q.   Okay. Have you seen this document before?
14    A.   No.
15    Q.   You haven't seen this?
16    A.   No. I -- we do quite a few invoices every
17 week and I'm not -- I don't do the invoicing.
18    Q.   Who does the invoicing?
19    A.   My administrative staff.
20    Q.   Is there a particular person at each
21 company, or does the same person do it?
22    A.   This would be done by -- by Leslie
23 Vadreen.
24    Q.   Could you say her last name again.
25    A.   Vadreen.

Page 79

1    Q.   Okay. Okay. So Leslie does the billing
2 for American Technology Services.
3    So this looks like it's an invoice to
4 Childrens Leukemia Support Network.
5    Do you see that?
6    A.   I do.
7    Q.   And it's for IP services/tech support.
8    A.   Yes.
9    Q.   Does that sound right as to what American
10 Technology Services would be doing for -- for Childrens
11 Leukemia Support Network?
12    A.   Yes.
13    Q.   Okay.
14    A.   I'll take your word that this is what it's
15 supposed to be. I'm not sure if this has been altered,
16 but yeah, it looks okay to me.
17    Q.   Okay. Well, I have not -- not changed it.
18 It was provided by your counsel, so --
19    A.   Okay.
20    Q.   I don't think they altered it, but I --
21    I hope they didn't.
22    Q.   I can say that, so -- so this is an
23 invoice. It's dated 7/3/2018. It's to Childrens
24 Leukemia Support Network, and it's for IT services, and
25 it looks like the total invoice is for $6,685.28.

Page 80

1    (Deposition Exhibit 63 marked.)
2 BY MS. GRIFFITH:
3    Q.   And then if you turn to the next tab,
4 it's -- I believe it's 63. And it's -- I'll let you
5 get there. And it's a bill from Compliance
6 Consultants, LLC, and it's to the same Childrens
7 Leukemia Support Network.
8    A.   Right.
9    Q.   And this one is for payment processing
10 hours.
11    Do you see that?
12    A.   I do.
13    Q.   Okay. What's payment processing hours?
14    A.   That would be the verification of the
15 information --
16    Q.   Okay.
17    A.   -- as we discussed before.
18    Q.   Okay. And this one's also dated 7/3/2018.
19    A.   Right.
20    (Deposition Exhibit 64 marked.)
21 BY MS. GRIFFITH:
22    Q.   Okay. And so then if you turn to 64 --
23    A.   Right.
24    Q.   -- there's another invoice, and it's to
25 Childrens Leukemia Support Network. This one's from

Page 81

1 Unified Data Services.
2    Do you see that?
3    A.   I do.
4    Q.   Okay. And this is for data services. And
5 it's the rate at 3.90. So this must be when there was
6 a paid donation, the total amount kind of equals that.
7    A.   Right.
8    Q.   Right. So, now -- and the date's also
9 7/3/2018. So these are three invoices from the three
10 different companies.
11    So is this abnormal to have three
12 different invoices, or was this standard?
13    A.   This is normal.
14    Q.   Okay. So this is normal. So earlier when
15 you said that only -- the client only received an
16 invoice from Unified Data Services, that was incorrect.
17    A.   Well, I don't know what you were asking
18 before.
19    Q.   Okay. So they receive invoices from each
20 company for the different services.
21    A.   Of course, they do.
22    Q.   Oh, okay. Great.
23    Have you ever heard of a phrase called
24 "turnkey fund-raising"?
25    A.   Say it again.

Richard Zeitlin
December 08, 2020

78..81

USAO_00003630

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 82

1   Q.   Have you ever heard of turnkey
2 fund-raising?
3       A.   Turnkey fund-raising?
4   Q.   Yeah.
5       A.   Is that a company?
6   Q.   No. It's just a -- is it an -- I was
7 wondering if you ever heard of it before, that phrase.
8       A.   I could -- I could see what that means. I
9 could assume what it is.
10  Q.   Okay. Do you know what it means?
11      A.   I can assume, if you'd like me to.
12  Q.   Yes, please do.
13      A.   It's probably offering a sleet of services
14 to raise funds for somebody, to do everything that's --
15 that's necessary to raise funds in a turnkey fashion, I
16 would assume.
17  Q.   And is that -- would you think -- is that
18 what your companies do?
19      A.   Yes.
20  Q.   Just a quick follow-up question.
21      For -- looking back at Exhibit No. 64,
22 that Unified Data Services invoice.
23      A.   64?
24      Q.   Yeah. 64, Unified Data Services, LLC,
25 invoice.

Page 83

1       A.   Okay.
2   Q.   That has an address at 1350 Southport
3 Road, Indianapolis, Tennessee.
4       Is -- is Unified Data Services located
5 there, or no?
6       A.   We use that as a centrally located box, so
7 no. It's just a box.
8   Q.   Okay. Why do you use it?
9       A.   We like to have a number of different box
10 throughout the country in the event of weather-related
11 issues. A lot of times if you have all your mail going
12 to one area, and there's a problem, which has happened,
13 whether it be a blizzard or a hurricane, you want to
14 have diversity of where mail goes, so we have boxes set
15 up in different parts of the country.
16  Q.   Is that because you're receiving checks at
17 different locations, like money?
18      A.   Payments would be sent there for the
19 services, not from the donors.
20  Q.   Okay. And flipping to Exhibit 63 again,
21 it looks like Compliance Consultants has an address of
22 1345 North Jefferson Street, No. 454.
23      Is that the same thing?
24      A.   That's where I had my center in Milwaukee.
25      Q.   That's what?

Page 84

1       A.   I had a center in Milwaukee at one time.
2   Q.   Is it still there?
3       A.   No.
4   Q.   Okay. And was that a call center?
5       A.   It was.
6   Q.   When did you stop using that center?
7       A.   Just recently with the -- the COVID crisis
8 has put a hurt on the -- certain locations and the --
9 unfortunately.
10  Q.   Did you rent that center, or did you own
11 it?
12      A.   Rent.
13  Q.   Then looking at No. 62.
14      A.   Yes.
15  Q.   This is American Technology Services, and
16 if you look at the address, it's 125 North 2nd Street,
17 Unit 110, Box 241, Phoenix, Arizona.
18      Same thing, you're trying to get diversity
19 in where mail is being sent?
20      A.   Yeah. That's where the location is at,
21 yes.
22  Q.   Is -- but American Technology Services is
23 located at the Henderson address, right?
24      A.   That's where the work would be done from,
25 yes, on that company.

Page 85

1   Q.   Any other locations for --
2       A.   Actually, also have the work done in the
3 different centers and so on throughout the -- the
4 organization. So --
5   Q.   And those centers are --
6       A.   We have a number of companies. We have
7 our headquarters in Henderson. So I have to use the --
8 loosely say, "That's where it's from."
9   Q.   Okay. But there's -- there's different
10 call centers for -- in Alabama, right?
11      A.   Yeah. We have no call center in Phoenix.
12  Q.   No call center in Phoenix, right?
13      A.   Right.
14  Q.   So it's Alabama -- where are the call
15 centers? It's Alabama, Wisconsin, and Las Vegas?
16      A.   Yes.
17  Q.   And then remotely, you have some of the --
18 the --
19      A.   Yes.
20  Q.   -- call centers are at home?
21      A.   Right.
22  Q.   So just going back to the payments again,
23 the donors make payments directly to the client -- to
24 your clients, right, and then your clients pay you?
25      A.   Yes.

Richard Zeitlin
December 08, 2020

82..85

USAO_00003631

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 86

1     Q.   Donations, they never come to any of your
2 companies; is that right?
3     A.   Exactly.
4     Q.   Okay. Okay. Let's talk a little bit
5 about the donations that come in and how they're
6 solicited.
7       So you said that you do direct mail
8 campaign, right?
9     A.   Right.
10    Q.   And calls, are those cold calls?
11    Some of them are, yes.
12    Q.   Okay. And then are some calls to prior
13 donors?
14    A.   Yes.
15    Q.   So you have cold calls to new donors, I'm
16 assuming. Then you have direct mail.
17       Does the direct mail campaign -- does that
18 go to people who have already donated?
19    A.   It can, yes.
20    Q.   Okay. And it can also go to -- to new
21 people?
22    A.   It can.
23    Q.   And then you have calls to prior donors
24 and call -- and new calls.
25       Do you ever -- so if a prior donor has --

Page 87

1 has donated to, say, Childrens Leukemia Support
2 Network, would you ever call that same donor in order
3 to donate to another client, or no?
4    A.   Yes.
5    Q.   Oh, you would. Okay.
6       Does that happen often?
7    A.   I would say it's common. I wouldn't say
8 often, but it does happen, yes.
9    Q.   Okay. When -- when you get a positive
10 donor, so somebody who's made a donation and, you know,
11 that's -- I would -- I want to say it's like a hot
12 lead, right, but I don't know if that's a term used in
13 the industry. But you have somebody who's given a
14 donation.
15       Are those people statistically more likely
16 to give again?
17    A.   Yes.
18    Q.   Okay. Do you share the donor's
19 information -- I'm assuming yes, because they send
20 money in. Do you share that with the -- the -- your
21 client, so the nonprofit?
22       MR. BERNHOFT: Objection. Form.
23 Compound.
24 BY MS. GRIFFITH:
25    Q.   You can answer the question.

Page 88

1    A.   Ask it one more time.
2    Q.   So you secure a donation from a donor.
3       Do you share that donor's information with
4 your client, the nonprofit?
5    A.   Do I share -- so if someone gave to the
6 organization, do I share that with -- with -- who gave?
7    Q.   Yes.
8    A.   Well, yes, they're a client.
9    Q.   Okay.
10    A.   Of course. It's their list.
11    Q.   Okay. So it's their list.
12    A.   Oh, yeah.
13    Q.   Once that list is developed, do they still
14 use you, or no?
15    A.   They do.
16    Q.   They do. So -- so they keep using you.
17    A.   Yes.
18    Q.   So would the nonprofit call the donor
19 again, or would -- would your companies do that?
20    A.   They could call themselves if they have a
21 call center, I suppose. But, yes, we often call people
22 back.
23    Q.   Do they -- does the nonprofit -- so does
24 the nonprofit generally hire you over and over again?
25 Like, are they a consistent customer?

Page 89

1    A.   Yes.
2    Q.   Do any of your clients do their own direct
3 mail campaign?
4    A.   I don't know.
5    Q.   So you don't know if they do.
6    A.   They wouldn't have to share with me if
7 they were, so I don't know what they do.
8    Q.   Do you -- do you use one method of
9 soliciting donations, so direct mail, cold calls, calls
10 to leads, more heavily than another method, or are they
11 equal?
12    A.   I guess I don't understand your question.
13    Q.   So these other companies utilize cold
14 calls more than direct mail?
15    A.   Maybe you can ask it a different way,
16 because I'm not sure if I'm getting what you're really
17 trying to get at. I don't -- I don't keep statistics
18 or percentages, so I'm not -- maybe ask it a different
19 way. I'm happy to answer it, but I'm not quite sure
20 what you're asking me.
21    Q.   Well, let me ask this way: Are -- is
22 direct mail more profitable than calling?
23    A.   There's too many variables to answer that
24 question. I'm sorry.
25    Q.   What are the variables?

USAO_00003632

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 90

1    A.   How is the list?  How old is the list?
2 Where is the list?  Who are the people?  It's your --
3 it's not as easy as you're making it out to be to
4 qualify that, unfortunately.
5    Q.   So where would the list be?
6    A.   Depends on the state.  You know, there
7 might -- you know, the people in Iowa may be much more
8 honest than the people in say, California.  So you --
9 just depends on who's -- who's giving, and there's too
10 many -- there's a lot of statistics that would have to
11 play into that, so I can't answer that for you.  Sorry.
12    Q.   So do you use all of these methods
13 equally?
14    A.   We use these methods as we see fit.  It
15 can't -- there's -- there's nothing equal anything.
16 One day you might do this; one day you might do that.
17 So I -- again, you're -- you're asking a really very
18 vague question.
19    Q.   Okay.  Well, let's see if we can -- we can
20 figure it out more.
21        So one day you might do something, and one
22 day you might do the next.
23        How do you decide what to do from day to
24 day, then?
25    A.   Well, it depends on what the client wants

Page 91

1 done.  Depends on where, if there's -- you know, what
2 project is being called at what time.
3        You're still -- you're asking extremely
4 vague questions, and I hate to say that to you, but you
5 are.  I just can't answer what you're asking.  But I'm
6 happy to do it if I could get a decent, understandable
7 question.  I understand -- I'm sorry.  I understand
8 what you're saying, but you're just not asking it in
9 such a way where I can give you an accurate answer.
10    Q.   Okay.  So you said the client will say
11 what they want done.  So the client comes to you and
12 say, "We would like to make calls" or "We would like to
13 do direct mail."
14        Does that ever happen?
15    A.   Well, the client would like to -- for us
16 to raise them -- you know, get them some money going, I
17 get some resources for that.
18    Q.   Okay.  So if the new client comes to you
19 and says, "I want you to get some resources for me,"
20 what would you do?  What would -- where would you
21 start?
22    A.   Depends on what kind of client it would
23 be, but we could utilize previous donors to start the
24 campaign.  We could then utilize cold-calling
25 campaigns.  We could then utilize direct mail

Page 92

1 campaigns.  It depends on the -- the circumstances, the
2 type of client, the time of year.
3        Does that help?
4    Q.   Yeah.  That does help.
5    A.   Good.
6    Q.   So is -- is one option better for certain
7 types of clients?
8    A.   Not necessarily, no.  I wouldn't say.
9    Q.   Does a certain type of year [inaudible] --
10        MR. BERNHOFT:  You're --
11        THE WITNESS:  You're breaking up here.
12        MR. BERNHOFT:  I didn't hear the question.
13 You're breaking up.
14        MS. GRIFFITH:  All right.  Wait a second.
15        MR. BERNHOFT:  Yeah.  I'm sorry.  There --
16 and then -- yeah.  It's breaking up periodically, so --
17 BY MS. GRIFFITH:
18    Q.   Okay.  Can you hear me now?  I just
19 plugged in.  So it might be difficult, because it was
20 connecting with my -- okay.
21        So one type of year, would that be better
22 for a certain type of solicitation?
23    A.   Well, like, for instance, the holidays are
24 never a good time.  So if somebody wants to come to me
25 during the holiday season, we could certainly try it,

Page 93

1 but we probably wouldn't be very successful.  So it
2 just depends on, you know --
3    Q.   For any of the -- for any of --
4    A.   Yeah.  If you want to start calling people
5 around tax time, they always have an excuse for saying,
6 "I got to pay my taxes."  So it just depends.
7    Q.   Okay.  So April -- April's not very --
8    A.   People like to use that even though no one
9 seems to pay taxes, but we'll leave that alone.
10    Q.   Okay.  So you said that the holiday
11 season's not very successful.
12        When do you think -- is that December,
13 November?
14    A.   Yeah, November, December is a -- is a more
15 difficult time.  There's lots of closures.  You know,
16 you're -- you're closed for the Thanksgiving, the
17 Christmas, the New Year's, all those.  There's a lot
18 of -- lot of shutdown days, and a lot of people are
19 preoccupied with holidays, so not the best time to
20 call, so I typically want to --
21    Q.   Or to -- or to do direct mail.
22    A.   Pardon?
23    Q.   Or to do direct mail.
24    A.   You could certainly try it.
25    Q.   Okay.  Are you familiar with the term

Richard Zeitlin
December 08, 2020

90..93

USAO_00003633

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 94

1 "direct campaign"?
2    A.   No.
3    Q.   How about [inaudible]?
4    A.   Can't hear you.
5    Q.   Sorry.  How about "credit card renewal"?
6    A.   That's a company?
7    Q.   No.  It's just -- are you familiar with
8 that term?
9    A.   With the "credit card renewal"?
10   Q.   Yeah.
11   A.   Sure.
12   Q.   Okay.  Do you ever use that method to
13 solicit from donors?
14   A.   Yes.
15   Q.   And how does that work?
16   A.   Well, if somebody gave a credit card in
17 the past, there's a pretty high chance they will
18 probably go to that credit card again, which allows a
19 very quick cash flow for the organization.  Very
20 important part of the industry.
21   Q.   So do you reach out to them again and say,
22 "We" -- "we want to use your credit card again," or --
23 or do they sign up for, like, monthly credit card
24 payments?
25   A.   No.  Let's say they gave a year ago.  You

Page 95

1 call them again.  It's like, they'll probably give.
2    Q.   Okay.  Okay.  You call them again, because
3 you got their credit card information the first time,
4 and you know that they'll --
5    A.   Yeah.  As opposed to someone who only does
6 it in the mail.
7    Q.   Okay.
8         MR. BERNHOFT:  Counsel, would this be a
9 convenient time for you for a short break, please.
10        MS. GRIFFITH:  That's fine.
11        MR. BERNHOFT:  Thank you.
12        MS. GRIFFITH:  Okay.  Let's go 10 minutes
13 or so.
14        MR. BERNHOFT:  Yeah.  Five minutes.
15        THE VIDEOGRAPHER:  Going off the record,
16 and the time is 10:49 [sic] a -- p.m.
17        (Recess taken.)
18        THE VIDEOGRAPHER:  Going back on the
19 record, and the time is 1:06 p.m.
20 BY MS. GRIFFITH:
21    Q.   We're back on -- on the record.
22         And Mr. Zeitlin, you know that you're
23 still under oath.
24    A.   Yes.
25    Q.   Correct?

Page 96

1    A.   Yes.
2    Q.   Okay.  All right.  So [inaudible] pledged
3 [inaudible]?
4    A.   I'm sorry.  You're breaking up again.
5    Q.   Oh, am I?  Let's see.  Is this better?
6         What are pledge sales?
7         MR. KIMBLE:  I'm not hearing the question.
8         THE WITNESS:  You're real choppy.
9         MR. KIMBLE:  You said, "Pledge" something
10 or other.
11        THE VIDEOGRAPHER:  Counsel, do you want to
12 go back off the record.  We can try to -- we'll go back
13 to the settings and do what we did.  Do you remember
14 how we did that?
15        MS. GRIFFITH:  Yeah.  I do.
16        MR. BERNHOFT:  It's very choppy.  Maybe we
17 should do -- go off the record and resolve that issue.
18        MS. GRIFFITH:  Sure.
19        THE VIDEOGRAPHER:  Going off the record,
20 and the time is 1:06 p.m.
21        (Discussion off the record.)
22        THE VIDEOGRAPHER:  Going back on the
23 record, and the time is 1:08 p.m.
24 BY MS. GRIFFITH:
25    Q.   Mr. Zeitlin, are you familiar with pledge

Page 97

1 sales?
2    A.   With pledge sales?
3    Q.   Yes.
4    A.   You want me to assume what that means?
5    Q.   Well, I would like you to tell me what
6 that means, if you know.
7    A.   I don't know what it means.  I mean, I
8 can -- I can only assume.  It's -- it's a vernacular
9 I'm not familiar with.
10   Q.   Okay.
11   A.   I know what a pledge is.  So -- I'm sorry.
12   Q.   For calls where you call the same donor
13 again, how long do you wait -- or do you wait before
14 you call them?
15   A.   How long do we wait until we call a donor
16 back to give again?
17   Q.   Yes.
18   A.   About five or six months.
19   Q.   Do you have a set time period, or it can
20 be whenever?
21   A.   It's between five and six months.
22   Q.   Do you ever call back sooner, or no?
23   A.   We could.
24   Q.   Why would you?
25   A.   In an emergent situation where you had to

Richard Zeitlin
December 08, 2020

94..97

076

USAO_00003634

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 98

1 bring in revenues for a very quick reason, yes, you
2 could go ahead, and you could get your donors a bit
3 early.

4     Q.   Have you ever done that before, or no?
5     A.   Yes, I have.
6     Q.   Okay.  When have you done it?
7     A.   Well, right when the bank condemned and
8 took all my money, I had no choice but to go ahead and
9 use that exact strategy during the seizure of my funds
10 to go ahead and try to get cash going right away, so,
11 yes, in that instance I did have to do that.
12     Q.   Okay.  Have you done it any other times?
13     A.   Only other time we're going to do that is
14 if we're going to close a campaign down.  We would do
15 one last run.
16     Q.   And so you said that you did it also
17 during the bank freeze?
18     A.   Yeah.  The seizure, yes, I did.
19     Q.   Okay.  So that was in August and September
20 of 2018; is that right?
21     A.   That was what?
22     Q.   That was in August and September of 2018?
23     A.   Yeah.  The seizure started on the 8th of
24 August.
25     Q.   Okay.  And -- and when did you start doing

Page 99

1 those renewal calls, then?
2     A.   We started calling the -- those leads
3 probably a few days after.
4     Q.   Okay.  And what company made those renewal
5 calls?
6     A.   The companies that we're discussing here,
7 American Technology and the whole suite of services
8 that we provide.
9     Q.   American Technology, Unified Data, and
10 Compliance Consultants?
11     A.   Yes.
12     Q.   Donor Relations or TPFE would not have
13 been making calls?
14     A.   Correct.
15     Q.   And you were winding or had wound those
16 companies down unrelated to Bank of America; is that
17 right?
18     A.   That's correct.
19     Q.   Do you sell the names of donors to anyone
20 else?
21     A.   Do I what?
22     Q.   Do you ever sell the names of donors?
23     A.   No.
24     Q.   Okay.  Let's go to Exhibit 58.
25     A.   Okay.

Page 100

1         (Deposition Exhibit 58 marked.)
2 BY MS. GRIFFITH:
3     Q.   You have to look at it that way.  So at
4 the bottom of this page, it says "Zeitlin_000152."
5         Do you see that in tiny print?
6     A.   I do.  I do.
7     Q.   Do you recognize this document?
8     A.   No.
9     Q.   Okay.  So did you create this document?
10     A.   Me personally, no.
11     Q.   Okay.  Do you know who created it?
12     A.   No.
13     Q.   Do you know what it is?
14     A.   It looks like a ledger from QuickBooks.
15     Q.   Okay.  And do you see at the top it has
16 "Ordinary Income/Expense," "Totals," "Compliance
17 Consultants," "American PCI," et cetera?
18     A.   I do.
19     Q.   Okay.  So this was a financial
20 statement -- I think it's profit and loss -- for 2018
21 that we received from your counsel.  And it does look
22 to be a QuickBooks file.
23         Have you ever reviewed this?
24     A.   No.
25     Q.   Do you know if the information contained

Page 101

1 in this is accurate?
2     A.   I can only assume.  I've never seen this
3 before today.
4     Q.   Okay.  So you don't know if it's
5 accurate -- if this is accurate or not.
6     A.   I wouldn't bet my life on it, but it looks
7 to be okay.
8     Q.   Okay.  And -- and you don't know who
9 created it?
10     A.   No.
11     Q.   Okay.  Was it created on your behalf?
12     A.   I can assume that's probably who it was
13 created on, for me.
14     Q.   Okay.  All right.
15         Do you know why it was created?
16     A.   Since I don't know exactly what this is, I
17 don't know why it was created or who did it.
18     Q.   Okay.
19     A.   I have a lot of -- I have CPAs and lawyers
20 and a lot of professionals that do things for me.  So
21 that's all I can -- that's all I can answer you.  I
22 don't know what this is.  It's the first time I've seen
23 it.  If you want me to assume things, I'll begin to
24 assume.
25     Q.   No, I don't want you to assume anything.

Richard Zeitlin
December 08, 2020

98..101

USAO_00003635

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 102

1 I'm just trying to find out about this document you-all
2 provided. So -- let's see here.
3       So, you know, it was -- this was titled a
4 Profit and Loss Sheet.
5       Was it your -- and this is for 2018.
6       Was it your habit to create profit and
7 loss statements for companies for each year prior to
8 2018?
9   A.  No.
10      Q.  So you typically wouldn't create something
11 like this.
12  A.  No. I don't do profit and loss
13 statements.
14      Q.  Do you -- would you have an accountant do
15 profit and loss statements for you --
16  A.  No.
17      Q.  -- prior to 2018? No. Okay.
18      Who does the taxes for your entities?
19  A.  Really, it's Wegner CPA.
20      Q.  Prior to their employment, who did your
21 taxes?
22  A.  Terry Raymond, CPA.
23      Q.  And he would do them for your companies
24 too?
25  A.  He did.

Page 103

1       Q.  Okay. Okay. Well, let's -- let's talk
2 about this sheet. If you look at it -- let's go
3 through the expenses. And I'm looking at the first
4 line. It's advertising and promotion. And there's a
5 total of about 6,570 -- oh, is that for advertising?
6 Yep -- 6,575, and it looks like if you go over three
7 columns, there's American PCI, and there's advertising
8 expense of $6,000; is that right?
9   A.  Yep. Yes.
10      Q.  What's American PCI?
11  A.  American PCI would be one of the -- it's a
12 d/b/a off of Compliance Consultants.
13      Q.  Okay. It's -- it's a d/b/a of Compliance
14 Consultants?
15  A.  That's right.
16      Q.  Okay. Now, next to it is Compliance
17 Consultants.
18  A.  Right.
19      Q.  So American PCI is not separate from
20 Compliance Consultants; they're the same entity?
21  A.  They -- one's a d/b/a. Different checking
22 accounts.
23      Q.  So different checking accounts. Okay.
24      So American PCI, its checking account
25 would be American PCI -- it would be Compliance

Page 104

1 Consultants, doing business as American PCI; is that
2 right?
3   A.  It should be that way, yes.
4       Q.  Okay. Where did American PCI bank?
5   A.  That must have been -- American PCI was
6 banking at Nevada State Bank, I believe.
7       Q.  Now, has American PCI been a d/b/a of
8 Compliance Consultants since Compliance Consultants was
9 started?
10  A.  No. That came along afterwards. And I
11 don't know the dates.
12      Q.  Okay. And so American PCI does the same
13 thing as Compliance Consultants. They don't -- it
14 doesn't operate any other kind of business. It
15 verifies call information.
16  A.  Yes. The American PCI would do it for the
17 charities, as opposed to the PACs.
18      Q.  Okay. If you -- if you go up to Ordinary
19 Income/Expense, there's income. For Compliance
20 Consultants, it looks like there was income of about
21 5.7 million, year to date. And American PCI, it looks
22 like -- same, similar, 5.7, year to date, and that
23 would be for the verification fees that we discussed
24 earlier.
25  A.  Right.

Page 105

1       Q.  Any other way that Compliance Consultants
2 or American PCI would get income?
3   A.  No.
4       Q.  Okay. Now, and American PCI banked
5 separately; they banked with Bank of -- Nevada State
6 Bank, correct?
7   A.  Yes. Yes.
8       Q.  And did they have a bank -- did you have a
9 bank account for them at the time of the freeze in
10 August of 2018?
11  A.  I did. Thank goodness.
12      Q.  Now, where does Compliance Consultants
13 bank currently?
14  A.  I'm not telling you where I bank
15 currently, with all due respect.
16      Q.  You're not going to tell me where you bank
17 currently?
18  A.  No, I'm not going to tell you, because you
19 guys are -- are not aboveboard. You think I trust you
20 with that kind of information?
21      Q.  So --
22  A.  Take me to court on that, but I refuse to
23 answer that question.
24      Q.  Where you currently bank?
25  A.  Yes.

USAO_00003636

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 106

```
1    Q.   Does where you currently bank have a
2  freeze clause?
3    A.   I don't know.
4    Q.   You don't know if where you currently bank
5  has a freeze clause?
6    A.   Let me say it again in English.  I don't
7  know.
8    Q.   Okay.  And so, for the record, you're
9  refusing to tell us where you currently bank.
10   A.   Yes.  Where do I bank?
11   Q.   Okay.  So advertising and promotion,
12 $6,000, do you know what that was for?
13   A.   I assume it was for advertising.
14   Q.   What kind of advertising does American PCI
15 do?
16   A.   Well, maybe for agents.
17   Q.   So you're advertising to get agents?
18   A.   Yes.
19   Q.   Anything else?
20   A.   No.
21   Q.   Okay.  Next line, automobile expense.  It
22 looks like Compliance Consultants has an $18,000
23 year-to-date automobile expense.
24        What was that for?
25   A.   Must have been automobile expense.
```

Page 107

```
1    Q.   Okay.  Does Compliance Consultants have a
2  vehicle?
3    A.   Well, they have an expense for it.
4    Q.   But you don't know if they have one.
5    A.   At the moment, they don't.
6    Q.   Okay.
7    A.   Back then, they did.
8    Q.   Okay.  What kind of vehicle was it?
9    A.   I don't remember.
10   Q.   What was the purpose of the vehicle?
11   A.   To drive.
12   Q.   To what?
13   A.   Oh, to work, to the airport to pick up
14 clients.  To drive.  Keep --
15   Q.   Was it like a van to drive agents?  Was it
16 a vehicle for you?
17   A.   It was my vehicle that I would use at my
18 discretion.
19   Q.   Okay.  Your vehicle at your discretion.
20        And you don't remember what it was?
21   A.   Well, I don't remember exactly what it
22 was.
23   Q.   Did you drive it often?
24   A.   I have several cars.  I'm not sure which
25 one you're talking about.
```

Page 108

```
1    Q.   Okay.  So you're not sure on that one.
2        How about for Donor Relations?  It looks
3  like there's an automobile expense of 2,500.
4    A.   Yes.
5    Q.   Okay.  What was that for?  Do you
6  remember?
7    A.   I don't remember.
8    Q.   Okay.  Did Donor Relations have an
9  automobile at some point?
10   A.   Donor Relations, as a benefit to some
11 employees, also made car payments on behalf of
12 employees.
13   Q.   What employees did it make car payments on
14 behalf of?
15   A.   Julie Johnson.  Steve Riley.  Lee Norris.
16   Q.   So was Julie Johnson employed by Donor
17 Relations?
18   A.   Yes.
19   Q.   Okay.  What did she do for Donor
20 Relations?
21   A.   She was my right hand, if you will.
22   Q.   Okay.  And as your right hand, what would
23 that entail?
24   A.   Oh, she would do things I needed to get
25 done.  She would -- accounting, bill paying, and things
```

Page 109

```
1  of that nature.
2    Q.   So she'd do accounting and bill paying.
3        Would she oversee any of the call centers,
4  anything like that?
5    A.   She would do some overseeing of some of
6  the agents here and there.  Some of the managers,
7  ultimately, she would be overseeing.
8    Q.   Okay.  Did she do anything else?
9    A.   That's -- that was her -- overseer,
10 management, and so on, that's -- I'd say was a good
11 description.
12   Q.   Okay.  What's Unlimited Tech Support?
13   A.   It's another d/b/a off of American
14 Technology that deals with the charity side of the
15 nonprofits.
16   Q.   Unlimited Tech Support, at the time of the
17 bank freeze --
18   A.   That's right.
19   Q.   -- did you have another bank account for
20 them?
21   A.   Yes.  Fortunately.
22   Q.   Also with Nevada -- also with Nevada State
23 Bank?
24   A.   Yes.
25   Q.   What about Cloud Data Service?  Are they
```

Richard Zeitlin
December 08, 2020

106..109

USAO_00003637

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 110

1 the d/b/a of Unified Data Services?
2    A.   That's right.
3    Q.   And same thing, do they handle the charity
4 side?
5    A.   Yes.
6    Q.   Okay.  And did they also bank at the time
7 of the freeze with Nevada State Bank?
8    A.   Yes.
9    Q.   Are you aware if Nevada State Bank has a
10 freeze clause?
11    A.   I don't know, offhand.  They probably have
12 some adhesion clause or some type of unlawful thing to
13 stick in to hurt people.  I'd have to look closer at
14 it, I guess.
15    Q.   Why the separation of these companies?  So
16 why have one arm for political action committees and
17 one arm for charities?
18    A.   That's what I wanted to do.
19    Q.   Was there a reason?
20    A.   Yeah, because I wanted to do it that way,
21 for delineation.
22    Q.   Any reason to have the delineation?  You
23 just wanted it that way?
24    A.   Yeah.  I thought it was cleaner that way.
25    Q.   Okay.  You'd never done that before with

Page 111

1 Donor Relations or TPFE, so why the change?
2    A.   Because they weren't doing both.  They
3 were only doing charities at the time.
4    Q.   Okay.  So when you began working with
5 PACs, you wanted to have a delineation of the names of
6 companies.
7    A.   That's right.
8    Q.   So are Compliance Consultants and American
9 PCI -- are they the same legal entity, then?
10    A.   I'm sorry.  Say that again.
11    Q.   Are Compliance Consultants and American
12 PCI -- is it the same legal entity?
13         MR. BERNHOFT:  Objection.  Calls for a
14 legal conclusion.
15 BY MS. GRIFFITH:
16    Q.   You can answer.
17    A.   It's a d/b/a.
18    Q.   It's a d/b/a.  Okay.  You don't -- you
19 haven't -- okay.  It's a d/b/a.  That's fine.
20    Q.   Okay.  What did Mr. Norris do for the
21 companies, and who was -- employed him?
22    A.   I believe that he was under TPFE for
23 insurance reasons.  He was a manager in Alabama.
24    Q.   Is he still with [inaudible]?
25    A.   Yes, he's still with me.

Page 112

1    Q.   Is he still the manager in Alabama?
2    A.   I shut down the Alabama location when the
3 COVID hit.  So they're all remote agents from home in
4 Alabama, but he still does look over the Alabama folks.
5    Q.   Okay.  And how about Mr. Riley?
6    A.   How about him?
7    Q.   Is he -- what was his role with -- and
8 Mr. Norris, who's he employed by now?
9    A.   I think he is -- forgive me, but I
10 don't -- I don't know.  I'm not sure which entity he's
11 on right now.  Again, health insurance is a nasty
12 animal to deal with.  I could find out for you, if it's
13 important to you.
14    Q.   Well, I think we're in contact with him,
15 so I can ask him too.
16         Mr. Riley, what does he do, and what
17 company does he work for?
18    A.   He's also -- he's a manager for me in
19 the -- in Las Vegas.  And he worked for the same entity
20 that Mr. Norris does.  I assume it's probably TPFE,
21 again, for the insurance reasons.
22    Q.   And just on this -- this -- the sheet
23 again, just looking at the automobile expenses, I'm
24 looking under Unlimited Tech Support, and there is an
25 auto -- automobile expense for about 4.8 -- $4,800.

Page 113

1         Do you recall what that was for?
2    A.   I assume that's for automobile expenses.
3    Q.   Okay.  Do you know what car, who was
4 driving it?
5    A.   Not offhand, no.
6    Q.   Did Unlimited Tech Support have a car of
7 its own?
8    A.   Some managers, as -- as a -- as an
9 incentive and a reward, received car payments paid by
10 whichever entity I thought it was okay to pay it out
11 of.  I think one of the guys had a Nissan.  I think
12 Mr. Norris had a Chevy truck.
13         Does that help you?
14    Q.   Yeah, that does.  Thank you.
15    A.   There you go.
16    Q.   Okay.  So looking again at the expense --
17    A.   I think it was white, the truck.  Does
18 that help too?
19    Q.   Sure.  That's fine.
20    A.   White truck.
21    Q.   And it was owned by one of the employees.
22    A.   That's right.
23    Q.   Okay.  Going down to the expenses, there's
24 bad debt.  It looks like there's a total of 62,000, and
25 American Technology Services had 14,000 of it.

Richard Zeitlin
December 08, 2020

110..113

USAO_00003638

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 114

1    What was that for?
2    A.  I don't recall.
3    Q.  So you're -- you just don't know what the
4    bad debt for that company was for?
5    A.  No, I don't know, offhand.  I'm sorry.
6    Q.  Okay.  How about for Unified Data
7    Services?  They had bad debt of $46,000.  What was that
8    expense?
9    A.  I don't know.
10   Q.  And it looks like charitable -- charitable
11   contributions, total of $9,000, and it looks like that
12   was all from American PCI.
13        Do you know what that was for?
14   A.  Yeah.  That would be for my synagogue.
15   Q.  To your what?
16   A.  My synagogue.  I'm a Jew.
17   Q.  Okay.  So it was to your synagogue.
18        Any reason it was paid out of American
19   PCI?
20   A.  Well, that's where I had a check and I
21   took it from.  It was convenient.
22   Q.  Okay.  And the next line is commissions,
23   and if I look at Donor Relations, they had commissions
24   of about $11,000.
25        What makes up commissions?

Page 115

1    A.  You know, that's -- that's a legacy term
2    that was used years before by Courtesy Call when we
3    received commissions of a donation.  And I guess it was
4    never changed.  So that -- I'm not sure why it
5    didn't -- it wasn't -- why it's still there.  So I'm
6    not sure what comprises that number.
7    Q.  Okay.  Would commissions be like a payment
8    from -- from the -- from the charity?
9    A.  Yes.
10   Q.  Okay.  And TPFE has amount of about
11   580,000.  Is that [inaudible]?
12   A.  Is that what?
13   Q.  Is that the same thing?  So that would be
14   just payment for its services, basically?
15   A.  Yes.
16   Q.  Well, these are expenses, so I'm not --
17   oh, so what's -- these were expenses, so they wouldn't
18   be payments of the services.
19        What expense does commissions make up?
20   A.  I don't really know what you're talking
21   about.  Sorry.
22   Q.  But you're not sure what this $580,000 was
23   used to pay?
24   A.  You know, I'm not a CPA.  A lot of this
25   stuff is unfamiliar to me.  I would be remiss if I'm

Page 116

1    answering with intent to say I know about all these
2    business numbers.  I can really see this -- I don't
3    know what all these numbers mean.
4        And I'm very sorry.  I mean, I don't mean
5    to be evasive or glib, but that's why I employ
6    professionals to deal with these things.  I don't do
7    it.
8    Q.  I'm just trying to understand what you
9    know about them.  So that's -- that's all we're trying
10   to do here.
11        So -- so commissions, you're not sure what
12   this expense would signify.
13   A.  No.  I like to employ CPAs and
14   professionals to do these books for me, because I don't
15   know how to.
16   Q.  Okay.
17   A.  And I have to depend upon the
18   professionals to do it correct.  I assume they are.
19   Q.  How do they get information to create --
20   create these financial statements?  Do you know?
21   A.  This would have to come from QuickBooks.
22   That's our software that we use to pay bills and enter
23   in deposits and things of that nature.
24   Q.  And who oversees your QuickBooks?
25   A.  Currently, right now, or in the -- what --

Page 117

1    Q.  Yeah.
2    A.  -- what time frame?
3    Q.  Right now, who oversees your QuickBooks?
4    A.  Well, my -- my CPA firm, Wegner, would be
5    doing it.
6    Q.  Okay.  So in 2018, who oversaw your
7    QuickBooks?
8    A.  That would be Raymond.  Terry Raymond.
9    Q.  Okay.  So he oversaw the QuickBooks.  How
10   does this information get to them?  Do they take it
11   from bank statements?  Do they do the QuickBooks, or
12   does somebody on your team do the QuickBooks?
13   A.  In '18 it was Ms. Johnson.  She would
14   enter in the various numbers that would go into the
15   account.
16   Q.  Okay.  Would she also do the
17   classifications like such things -- like, such as
18   commissions, or you don't know?
19   A.  I would assume, yes.
20   Q.  Okay.  If you go down, there's a
21   consultant expense of $144,000, and that's for
22   Unlimited Tech Support.
23        Do you recall what that's for, or do you
24   know what it's for?
25   A.  Yes.

081

USAO_00003639

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 118

1   Q.   Okay.
2   A.   That's for someone that does consulting
3   for me.
4   Q.   Okay.  And who is that?
5   A.   That would be Total Business Solutions.
6   Q.   Okay.  And what kind of consulting
7   services do they provide?
8   A.   Well, strategic consulting.
9   Q.   Do they specialize in fund-raising?
10  A.   Yes.
11  Q.   Okay.  Total Business Solutions.
12  Strategic consulting.  So they specialize fund-raising.
13       Who runs that company?
14  A.   I'd rather not say.
15  Q.   You would rather not say who runs Total
16  Business Solutions?
17  A.   Yeah.  I really wouldn't.
18  Q.   Why?
19  A.   Well, I guess I'll say it.  Well, in all
20  honestly, Blakeley, I don't trust Bank of America
21  because they tried to destroy me, and I assume
22  everything that I'm going to say right now I'm going to
23  go right to hurt me again.  I am quite concerned about
24  anything I say to you.
25       However, his name is Jose Quinones who

Page 119

1   runs Total Business Solutions.
2   Q.   Okay.  And does he special -- do -- is
3   that who you work with from there?
4   A.   That's who I work with.
5   Q.   Okay.  And so does he specialize in, I
6   guess, fund-raising strategy?  Business plans?  I'm
7   just trying to get an understanding of -- of what he
8   does for Unlimited Tech Support.
9   A.   Let me explain.  No, no, he does -- he
10  does consulting.
11       MR. BERNHOFT:  Objection.  Asked and
12  answered.
13  BY MS. GRIFFITH:
14  Q.   He does consulting.  Strategic consulting
15  on the fund-raising side.
16       And does he only work for Unlimited Tech
17  Support, or does he work for all the companies?
18  A.   I believe he was getting paid out of that
19  one entity.
20  Q.   So did he only do consulting on behalf of
21  Unlimited Tech Support, or did he consult on behalf of
22  other companies?
23  A.   He was a general consulting for me in
24  the -- in the industry.
25  Q.   So for all of the companies.

Page 120

1   A.   Yeah.  He would do general consulting for
2   me for the industry.
3   Q.   Okay.  The next, depreciation, do you know
4   what that's for?
5   A.   I assume it's for depreciating things.
6   Q.   Okay.  But you don't -- you don't know any
7   information about what was depreciating.
8   A.   I'd assume equipment.  I don't know
9   offhand what it would be, no.
10  Q.   And equipment rental is the next line.
11       Would that be for, like, equipment rental
12  for the call systems, things like that?  Do you know?
13  A.   I would assume some computer server,
14  something like that.
15  Q.   Okay.  And then insurance, 618,000's the
16  total.  I'm assuming that's for insurance payments for
17  the companies.
18  A.   Yeah.  That's health insurance.
19  Q.   Do you know what IUPA stands for?
20  A.   I do.
21  Q.   What -- what does that stand for?
22  A.   International Union of Police
23  Associations.
24  Q.   Okay.  And so there's an expense of 286-,
25  and it looks like that was for Donor Relations.

Page 121

1       Do you know what that's for?
2   A.   I don't see how that would be -- how that
3   would be an expense, so I'm not quite sure why that
4   would be -- where does it say "expense"?  Oh, on this.
5   I don't know why that would be there.
6   Q.   Okay.  Were they a client of yours?
7   A.   Pardon?
8   Q.   Were they a client?
9   A.   Yeah, they're a client.
10  Q.   Okay.  But you would expect them to make
11  payments to you, not to have them as an expense.
12  A.   You know, again, I -- I can't answer why
13  that's on there.
14  Q.   Okay.  So -- let's see.  Office expenses.
15  Compliance Consultants -- well, first of all, I'm --
16  I'm assuming that this is for rent expenses.
17       Is that true, or is it just for other
18  office expenses, as well?
19  A.   I don't know.
20  Q.   Do you know what makes up the office
21  expenses?
22  A.   I assume office expenses makes up office
23  expenses.  I mean -- we can play this all day,
24  Blakeley, with all due respect.  I'm not a CPA.  I
25  don't do the books.  I'm far removed from the books.  I

Richard Zeitlin
December 08, 2020                              118..121

USAO_00003640

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 122

1  run the companies. I don't deal with CPAs, unless I
2  have to. So you want to keep going down that line,
3  that's your call.
4      Q.   You know, all I'm trying to do,
5  Mr. Zeitlin, is to find out what you know about these
6  things. If you don't know something about them, then
7  the answer is you don't know.
8      A.   All right. Continue on. Office expense,
9  I'm not sure what comprises that number.
10     Q.   Okay. Now, payroll expenses, I'm assuming
11 that's payroll.
12     A.   I think so.
13     Q.   Okay. And it looks like Donor Relations
14 had payroll of 1.6 million.
15          Do you see that?
16     A.   I do.
17     Q.   TPFE had payroll expenses of
18 3. -- 3 million and [inaudible].
19     A.   Right.
20     Q.   Okay. Advanced Telephony had 1.27
21 million.
22          Does that seem right?
23     A.   It does.
24     Q.   Now, the other companies do not have
25 payroll expenses.

Page 123

1          Did that seem right?
2      A.   Yes.
3      Q.   Okay. So they didn't have -- they -- how
4  would they -- would they not pay payroll, or was it --
5  was it run out of those companies?
6      A.   For insurance reasons, for health
7  insurance reasons, people were either getting paid a
8  payroll through -- those companies that had payroll.
9  Different states have different laws and different
10 options and so on. It was, again, very difficult to --
11 to deal with health insurance situations.
12     Q.   Okay. So the payroll expenses would be
13 through those companies, but they would also cover
14 employees who were working at Compliance Consultants,
15 American Technology Services, and Unified Data
16 Services, as well.
17     A.   You know, I don't know how to answer that
18 one. They were certainly doing work for other
19 entities, and to make sure that they were getting
20 health care, they had to get run through the other
21 companies for payroll. That's -- hope that answers
22 your question.
23          I mean, it's really horrible in the -- to
24 be -- to have to deal with health care issues with
25 people ever since the unaffordable care act. So I

Page 124

1  really can't say anything else besides that. I hope it
2  helps.
3      Q.   Okay. Professional fees, do you know what
4  those numbers are made up of? I'm assuming attorneys.
5  Do you know?
6      A.   Attorneys, CPAs. Outside mailing houses,
7  I would assume, is in there as well.
8      Q.   Okay. And then there's the rent expense.
9  That's actually where the rent expense is. Okay.
10 Okay. And then telephone.
11          Is there -- is there any reason why
12 American PCI has the entire telephone expense and
13 Compliance Consultants has no telephone expense?
14     A.   I have one phone bill that services all of
15 my telephonic needs.
16     Q.   And that goes through American PCI, and it
17 looks like American Technology Services?
18     A.   That's how it looks, yes.
19          MS. GRIFFITH: Are we off the record?
20          THE VIDEOGRAPHER: No.
21          MR. BERNHOFT: Blakeley, we advance
22 ordered some food so we could expedite, and I'm advised
23 it's just arrived. I suggest we take a 30-minute food
24 break, please.
25          MS. GRIFFITH: Yeah. That's fine.

Page 125

1          MR. BERNHOFT: All right. Thank you.
2          MS. GRIFFITH: Thanks.
3          THE VIDEOGRAPHER: Going off the record,
4  and the time is 1:51 p.m.
5              (Recess taken.)
6          THE VIDEOGRAPHER: Going back on the
7  record, and the time is 2:32 p.m.
8  BY MS. GRIFFITH:
9      Q.   Mr. Zeitlin, I think you explained this to
10 me earlier, but I can't remember and wanted to make
11 sure I know.
12          What did Integrated Telecom do before it
13 was dissolved?
14     A.   Integrated Telecom was low-voltage wiring
15 company. It never really got off the ground.
16     Q.   Okay. So did it have no relationship to
17 fund-raising?
18     A.   No. None.
19     Q.   And you probably already said this; do you
20 recall when it was dissolved?
21     A.   You broke up a bit there. What about --
22 say what?
23     Q.   I said, "You might have already told me
24 this, but do you recall when it was dissolved?"
25     A.   I don't have any idea.

Richard Zeitlin
December 08, 2020

122..125

USAO_00003641

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 126

1　Q.　And I think for this one, you thought it
2　was before the bank freeze.
3　　A.　Probably.
4　　Q.　Okay. [Inaudible] the d/b/a's. When the
5　[inaudible] occurred --
6　　A.　You're breaking up again.
7　　Q.　Sorry. There's a little bit of background
8　noise.
9　　　Still breaking up here?
10　　A.　Sounds good.
11　　MR. BERNHOFT: That's better.
12　　MS. GRIFFITH: Okay. Maybe I just need to
13　speak up. Just keep telling me if it breaks up. Okay?
14　BY MS. GRIFFITH:
15　　Q.　Okay. For those three d/b/a's that we
16　were talking about a minute ago, on Exhibit -- on 1 --
17　No. 152, which was the profit and loss statement, did
18　those entities keep operating during the freeze?
19　　A.　Yes.
20　　Q.　Was it business as usual for those three
21　entities, or were they impacted?
22　　MR. BERNHOFT: Objection. Form.
23　　THE WITNESS: Of course, they were
24　impacted.
25　///

Page 127

1　BY MS. GRIFFITH:
2　　Q.　How were they impacted?
3　　A.　Because I had to take all the money that I
4　had there to survive the times when the -- my money was
5　confiscated. So I had to make those companies broke.
6　So, of course, they were affected.
7　　Q.　So did you have to get a loan from anyone
8　during this time, or did you just use monies from those
9　entities?
10　　A.　During that time, I had to extend all
11　credit that I had. I didn't get an actual loan,
12　though, no.
13　　Q.　So when you say extend all credit that you
14　had, you had to max out your credit cards.
15　　A.　Max out credit cards. Also, my main
16　vendor that does a lot of work for me, they -- we were
17　not getting paid for several weeks.
18　　Q.　So your -- who was the main vendor who
19　wasn't getting paid?
20　　A.　Allied Global.
21　　Q.　I'm sorry. Was it Allied Global?
22　　A.　Allied Global and CCI Networks, which is
23　my phone company -- my phone carrier.
24　　Q.　And Allied Global is your main -- is a
25　main vendor.

Page 128

1　　　Is that for making calls?
2　　A.　Yeah. They do some work for me.
3　　Q.　Making calls, is that the work that they
4　do?
5　　A.　There's agents doing verification, agents
6　doing calls, agents doing reminders, so yes.
7　　Q.　And you weren't able to pay Allied Global
8　during the time of the freeze.
9　　A.　I didn't have any money, so no.
10　　Q.　Okay. And did they stop working with you
11　because of that?
12　　A.　No. They continued to work.
13　　Q.　Okay.
14　　A.　They trusted me.
15　　Q.　How about PCI Network? Did they continue
16　to work with you?
17　　A.　Yes. They continued to allow me to use
18　their long-distance network.
19　　Q.　Did anybody stop working with you?
20　　A.　Yes.
21　　Q.　Who stopped working with you?
22　　A.　It was a number of people that stopped
23　working. I know we submitted a list, so I'm not going
24　to be able to, you know, come close to remembering that
25　list.

Page 129

1　　　But in the -- in the havoc that ensued
2　after the -- the seizure of all the funds, I wasn't
3　quite sure if I would be able to make payroll and
4　continue on the operation, so there was a temporary
5　layoff of some -- many, many different agents and
6　people until we could see and figure out if I could be
7　able to continue on the operation.
8　　Q.　How long did that layoff last?
9　　A.　It was short. It was just for a day or
10　so.
11　　Q.　How many people were laid off?
12　　A.　In the hundreds.
13　　Q.　And how much did those people get paid?
14　　A.　The range of pays, I'm not going to be
15　able to get in the weeds with how much each person
16　made. I -- I could -- I'd have to get that
17　information.
18　　Q.　Did you continue to pay those people when
19　they were laid off?
20　　A.　No. I didn't pay them when they were
21　working, no.
22　　Q.　So when you say that people stopped
23　working with you, is that vendors who stopped working
24　with you or clients who stopped working with you or --
25　or both?

Richard Zeitlin
December 08, 2020

126..129

USAO_00003642

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 130

1   A.   What did I -- I mean, what are you -- what
2 are you -- repeat it back to me.  I'm a bit confused.
3 I'm sorry.
4   **Q.   You said that people stopped working with**
5 **you, and I was just trying to find out who that was.**
6   A.   I'm sorry.  I don't know what you're
7 talking about.
8   **Q.   You said at the time of the freeze, people**
9 **stopped working with you.**
10   A.   I don't remember saying that.
11   **Q.   Okay.**
12   A.   Sorry.
13   **Q.   That's okay.**
14   **Did anyone stop working with you during**
15 **the freeze?**
16   A.   Oh, like, did I lose any clients? you're
17 saying.  Is that what you're saying?  I guess I don't
18 know what you're --
19   **Q.   Sure.**
20   A.   -- what are you --
21   **Q.   Sure.  Let's start there.**
22   **Did -- did you lose any clients during the**
23 **freeze?**
24   A.   No.
25   **Q.   Did any of your vendors stop working with**

Page 131

1 you during the freeze?
2   A.   No.
3   **Q.   Were you able to make calls during the**
4 **freeze?**
5   A.   We had to shut down because of the
6 unknown, and that lasted for a day or so until I could
7 ascertain how much money we had in Nevada State Bank
8 and to see what was going to happen.  How much was
9 payroll?  How much were bills?
10   I was -- I was completely caught off
11 guard, in the lurch, would have never thought, after 24
12 years of being a -- you know, and I loved our
13 relationship with Bank of America.  Great people there.
14 I had no idea what was going on at the time.  So I just
15 had -- it was just strict -- it was survival.
16   **Q.   Do you recall if Bank of America unfroze**
17 **any of your payroll accounts in early August?**
18   A.   Well, they froze the accounts on
19 August 8th, and then I believe there was two accounts
20 that were unfrozen -- I want to say nine or ten days
21 after that.
22   **Q.   And do you recall if those accounts were**
23 **payroll accounts?**
24   A.   Well, I don't consider my businesses as
25 payroll accounts.  I think we're at a dispute over

Page 132

1 vernacular right now.  They owe money to one of the
2 entities.  I got the money back.  Was it a payroll
3 account?  We use Paychex for -- for payroll, so it
4 doesn't -- you know, I don't have what you're talking
5 about, so --
6   **Q.   Okay.**
7   A.   I don't get -- I -- I got two checks.
8 That's all I know.
9   **Q.   Okay.**
10   A.   I think the bank -- the checks were a
11 hundred thousand, 150,000, combined.
12   **Q.   Okay.  Now, during the freeze, did you get**
13 **a loan to help the businesses stay afloat?**
14   A.   As I said before, I did not get a loan.
15   **Q.   Mr. Zeitlin, I just had another clarifying**
16 **question.**
17   **Donor Relations, has that been officially**
18 **dissolved?**
19   A.   Yes.
20   **Q.   TPFE, has that been officially dissolved?**
21   A.   I'm pretty sure it has been.  I'd have to
22 look at the Secretary of State Web site to double-check
23 that, but I'm relatively sure it has been.
24   **Q.   American Telephony has not been officially**
25 **dissolved.**

Page 133

1   A.   No.
2   **Q.   It pays employees, but it's not -- is it**
3 **active?**
4   A.   Yes.
5   **Q.   Does it receive any income?**
6   A.   I transfer sufficient funds to cover
7 payroll from other accounts.
8   **Q.   Is it the entity that's in charge of**
9 **payroll, or there -- is there another entity that also**
10 **pays payroll?**
11   A.   Payroll comes from TPF -- all the TPFE and
12 Advanced Telephony.  I transfer required monies to
13 cover payroll and insurance expenses.
14   **Q.   So it comes from both of those.**
15   **Now TPFE --**
16   A.   It goes to both of those.
17   **Q.   It goes to both of those.**
18   **Now, TPFE, I thought you said, had been**
19 **officially dissolved and was no more.**
20   A.   Well, again, that is an account that's
21 used for insurance reasons.
22   **Q.   Okay.  Can you explain what those**
23 **insurance reasons are to me.  I wasn't following that.**
24   A.   I'll try to make it as easy as possible,
25 because it doesn't make a lot of sense to me either.

USAO_00003643

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

1 But when you give your employees health insurance,
2 depending on where they are, what state they're in,
3 there are certain censuses that are required to have
4 and certain percentages of people that have to get the
5 insurance, who offers the insurance.
6　　　　To go ahead and change to a different
7 company is -- is an astronomically huge task. And we
8 keep that company around for payroll reasons -- for --
9 for insurance reasons, because you have to be on the
10 payroll to get insurance. And I own the company, and
11 the people work for me. And that's why we have it
12 there.
13　　　　As a matter of fact, the -- the -- the
14 ACA, as it's been known, if you are a person like
15 myself who owns different companies, you have to offer
16 insurance, regardless of where they work. And it's
17 just how it ends up being the way to go ahead and
18 insure them. That was what I got, the advice I got
19 from the insurance agent.
20　 Q.　Okay.
21　 A.　I hope that helps. I mean, it's -- it's a
22 horrible situation for a business to deal with.
23　 Q.　Well, I know it's a big expense. Okay.
24　 A.　It's well beyond the expense of it, but
25 yes. It is a big expense, as well.

1　 Q.　Okay.
2　　　　MR. BERNHOFT: Counsel, if I might just
3 get a confirmation, Blakeley, that we have an agreement
4 during this aspect of the deposition that BANA will not
5 explore any of the -- what we're calling the
6 controversial exhibit documents; is that right? We
7 have that understanding?
8　　　　MS. GRIFFITH: I'm not planning on talking
9 about those exhibits until the end of the deposition,
10 and before we do so, I was going to talk about it.
11　　　　MR. BERNHOFT: Excellent. Thank you.
12　　　　MS. GRIFFITH: Yeah.
13　　　　(Deposition Exhibit 72 marked.)
14 BY MS. GRIFFITH:
15　 Q.　Mr. Zeitlin, can you turn to Exhibit --
16 Exhibit 72.
17　 A.　Okay.
18　 Q.　Okay. And this is marked Zeitlin 189. I
19 think you can see it. It's by that 100 percent.
20　 A.　Yes.
21　 Q.　What is this document?
22　 A.　It looks like -- again, I have never seen
23 this before. But it looks to me like things that have
24 paid -- like, donations that have paid with zero to 30
25 days and over 151 -- it looks like a time when things

1 paid.
2　 Q.　Okay. So this -- so you didn't create
3 this document.
4　 A.　No. I don't -- I don't even see a date
5 range or where it comes from. I don't -- it's pretty
6 nondescript.
7　 Q.　Yeah. And if -- if you had to make an
8 educated guess, you would -- you would guess that it's
9 when donations are paid; is that right?
10　 A.　Yeah. That's -- I assume.
11　　　　(Deposition Exhibit 73 marked.)
12 BY MS. GRIFFITH:
13　 Q.　Okay. And if you flip to the next
14 exhibit, 73?
15　 A.　This is 73?
16　 Q.　Yeah. It's the next one.
17　 A.　And 74?
18　 Q.　73. It's Zeitlin 194.
19　 A.　That's where I am. Oh, here. Okay. 194?
20　 Q.　So -- yeah. 194. Is that one 194?
21 This --
22　 A.　Okay.
23　 Q.　-- looks to be a similar document.
24　　　　Did you create this document?
25　 A.　No.

1　 Q.　You know, would your educated guess be
2 that it's the same -- have you seen it before?
3　 A.　No.
4　 Q.　Would your guess be that it's the same
5 thing, time to track donations?
6　 A.　Yeah. This goes by year.
7　 Q.　Okay.
8　 A.　Yeah. It looks to be the same thing.
9　　　　(Deposition Exhibit 61 marked.)
10 BY MS. GRIFFITH:
11　 Q.　Okay. If you go to Document No. 61 -- or
12 Exhibit No. 61?
13　 A.　Real small print, No. 192?
14　 Q.　Yeah. Number 192.
15　 A.　All right.
16　 Q.　Have you seen this document before?
17　 A.　No.
18　 Q.　Okay. It looks like at the top -- so I'm
19 assuming you did not create it; is that right?
20　 A.　Say it again.
21　 Q.　You didn't create this document.
22　 A.　No, I didn't. I didn't create this.
23　 Q.　Do you know who created it?
24　 A.　I'd have to assume.
25　 Q.　Okay. Would you assume your accountant?

Richard Zeitlin
December 08, 2020

134..137

USAO_00003644

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 138

1    A.   Probably.
2    Q.   Okay.  And do you know what it is?
3    A.   Well, it looks like paid amounts -- how
4  much paid in each month, printout going back
5  chronologically to January '17 through December of '19,
6  month by month.
7    Q.   Okay.  And do you know what CSTDO stands
8  for?
9    A.   I sure don't.
10   Q.   Okay.
11   A.   I would assume CST is cross semi tap.
12 It's a -- it's how a lead would be described -- or
13 cold --
14   Q.   Okay.
15   A.   -- cold.  Cold semi tap.
16   Q.   And that's how a lead would be described?
17   A.   Yeah, like a cold call or a semi or a tap.
18 Like, a tap would be renewal of someone who gave in the
19 past.  A semi would be just a giver for a different
20 project altogether.
21   Q.   Okay.
22   A.   And then D, that's direct mail.
23   Q.   Okay.
24   A.   The O, I don't know.
25   Q.   Okay.

Page 139

1    A.   Super hard to see this.
2    Q.   Yeah.  [Inaudible] on it.  So that's nice.
3         So Exhibit Number 25.
4    A.   25?  25?
5    Q.   Let me see here.  I might want you to go
6  to a different one.
7    A.   Did you say 25?
8         (Deposition Exhibit 13 marked.)
9  BY MS. GRIFFITH:
10   Q.   Oh, actually, let's go to Exhibit No. 13.
11   A.   13?
12   Q.   Yes.
13   A.   Okay.
14   Q.   Okay.
15   A.   Chrome Builders?
16   Q.   Yes.  See it?
17   A.   Yes.
18   Q.   Okay.  And these are your Chrome Builders
19 account statements.  We'll -- we'll go through these.
20 If -- if you want to flip through -- if you see at the
21 bottom, it says "BANA 249" on the first page.
22   A.   Uh-huh.
23   Q.   Do you recognize this document?
24   A.   Well, again, as I'll say with every
25 document in here, it seems to be a Bank of America

Page 140

1  statement.
2    Q.   Okay.  All right.  And this one is for
3  Chrome Builders.
4    A.   Right.
5    Q.   Right.  And the address on this is 1108
6  Emerald Tint Court --
7    A.   Right.
8    Q.   -- Las Vegas, Nevada.
9         Is that the address for Chrome Builders?
10   A.   No.
11   Q.   Okay.
12   A.   However, when I started the account, that
13 was my home address.
14   Q.   Do you recall when it was that you started
15 the account?
16   A.   Sometime in '18 -- early '18, I think.  I
17 don't know.  Sometime in '18.
18   Q.   Is that when -- when Chrome Builders was
19 started, in early -- in early '18, or had it been
20 around before then?
21   A.   No.  It's a new company.  Just got the
22 contractor's license.
23   Q.   It's a general contractor?
24   A.   Yes, it is.
25   Q.   Who runs this company?

Page 141

1    A.   My partner Anthony Taylor.
2    Q.   Okay.  And does Anthony have a background
3  in construction?
4    A.   Yes.
5    Q.   Okay.  And it's still operating, right?
6    A.   Yes.
7    Q.   The time of the freeze, did it have any
8  other bank accounts?
9    A.   No.
10   Q.   So this was the only bank account?
11   A.   Yes.
12   Q.   At the time of the freeze, was it working
13 on any projects?
14   A.   Yes, it was working on projects.  Yes.
15   Q.   Okay.  What -- what project was it working
16 on?
17   A.   I don't know, offhand.
18   Q.   Okay.  If you flip the page, page 206, and
19 I think it's double-sided, so it's on the back.
20   A.   Yes.
21   Q.   Okay.  When you look at the third
22 paragraph down on that page, it says, "Deposit
23 agreement."
24        Do you see that?
25   A.   "When you opened your account"?  Yes.

USAO_00003645

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 142

1   Q.   Yep.
2   A.   Yep.
3   Q.   It says, "you received a deposit
4  agreement."
5   A.   Right.
6   Q.   Have you seen that on your statement
7  before?
8   A.   Not -- no.
9   Q.   I'm sorry, Mr. Zeitlin, what did you say?
10  A.   I said, "No." I never noticed it before.
11  Q.   You never noticed it before.
12       But you would agree that it's on your
13  statement; is that true?
14  A.   I would agree it's on this statement, yes.
15  Q.   Okay. Great.
16       And let's look at the first statement,
17  BANA 251. So on -- it looks like 1/31/2018, there's a
18  Nevada teller transfer -- I think that's the
19  notation -- for $12,000.
20       Is that -- do you recall what this is for?
21  It looks to be, like, a cash deposit.
22  A.   Without doing more -- without doing more
23  investigation, I can only assume it's probably initial
24  deposit for the account. Maybe. I don't know.
25  Q.   Okay.

Page 143

1   A.   It's almost three years ago.
2   Q.   Okay. Would [inaudible] --
3   A.   You broke up. Say it again.
4   Q.   Would you make cash deposits to -- into
5  your accounts?
6   A.   No. Well, maybe a few dollars, but I
7  wouldn't -- I wouldn't have put $12,000 in cash in the
8  account, no.
9   Q.   Okay. So this would have been a
10  transfer of some -- like a wire transfer.
11  A.   It probably was a transfer right from my
12  personal account.
13  Q.   Okay. Okay. If you go to the next month,
14  and I'm looking at BANA 257 -- BANA 257.
15  A.   Okay.
16  Q.   There was a deposit for $90,000.
17       Do you recall what that was for?
18  A.   Yeah. That was for funding the business.
19  Q.   So, like, getting it started, that kind
20  of -- supplies and materials?
21  A.   You have to have money in the checking
22  account so they can determine how large your bond will
23  be.
24  Q.   Okay. Do you know where those funds came
25  from?

Page 144

1   A.   Where did that money come from?
2   Q.   Yeah.
3   A.   Me.
4   Q.   Okay. So it was probably a personal
5  deposit from you into that account?
6   A.   It was from me or one of my companies.
7   Q.   Okay. And let's go to BANA 265. So it's
8  a couple pages up.
9   A.   Okay.
10  Q.   Okay. And there's another deposit in --
11  it looks like it's a transfer, $150,000.
12       Do you know what this was for?
13  A.   It was trying to build up the account to
14  have us get the best possible bond while we were
15  getting our license.
16  Q.   Okay. And do you recall what entity or if
17  it was you who made that -- that deposit in?
18  A.   I don't remember.
19  Q.   Okay. And then if you go to BANA 279.
20  A.   Yes.
21  Q.   Okay. So it looks like there, there's a
22  transfer to Checking Account 8925.
23       Do you see that?
24  A.   Yes.
25  Q.   And it's for $160,000.

Page 145

1   A.   Yes.
2   Q.   Do you recall what that was for?
3   A.   That was me taking the money back.
4   Q.   Okay.
5   A.   Because we had already gotten our bond.
6   Q.   Okay.
7   A.   I'm sorry. It's a bid limit is what it
8  is.
9   Q.   It's a what?
10  A.   It's a bid limit, how big of a job you can
11  pursue in the -- in the general contracting space.
12  Q.   Okay. And 8925, that was Integrated
13  Telecom.
14  A.   Okay.
15  Q.   Any reason why that money was transferred
16  there?
17  A.   I don't recall.
18  Q.   Okay. Now, Integrated Telecom wasn't
19  really operating.
20  A.   That's correct.
21  Q.   Are you surprised it was transferred
22  there?
23  A.   No.
24       MR. BERNHOFT: Objection. Form.
25  ///

Richard Zeitlin
December 08, 2020

142..145

USAO_00003646

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 146

1 BY MS. GRIFFITH:
2    Q.   You can answer.
3    A.   No.
4    Q.   Why not?
5    A.   Can't hear you.
6    Q.   I said, "Why not?"
7    A.   Because I wasn't.
8    Q.   Okay.
9    A.   I didn't have reason to be concerned about
10 it.
11   Q.   Okay.
12   A.   I put the money in there.
13   Q.   Do you know why it was transferred to an
14 entity that wasn't operating anymore?
15   A.   It was a place to hold the money.
16   Q.   Okay.  Place to hold the money to do what
17 with?
18        MR. BERNHOFT:  Objection.  Form.
19 BY MS. GRIFFITH:
20   Q.   You can answer.
21   A.   Place to hold the money.
22   Q.   Any reason why you'd want to hold the
23 money there?
24        MR. BERNHOFT:  Objection.  Asked and
25 answered.

Page 147

1 BY MS. GRIFFITH:
2    Q.   You can answer.
3    A.   Yeah.  Because it's the place I wanted to
4 hold the money.
5    Q.   Okay.  And if you go to BANA 291.
6    A.   291?
7    Q.   291, in the same exhibit.
8    A.   Yes.
9    Q.   Okay.  And this is an account closing
10 transaction.  So this was a -- a check that was sent to
11 you closing the account and giving you the -- the
12 money.
13   A.   If you say so.
14   Q.   Okay.  Did you receive this check?
15   A.   Not for a long time after.
16   Q.   Okay.  If you turn the next page -- the
17 previous page, 289.
18   A.   289?
19   Q.   289.
20   A.   Yes.
21   Q.   Okay.  At 1108 Emerald Tint Court, that
22 was the address that was on file for Chrome Builders;
23 is that right?
24   A.   That's what it says.
25   Q.   Okay.

Page 148

1    A.   But I wasn't living there anymore.
2    Q.   Okay.  Had you updated your address?
3    A.   Don't remember.
4    Q.   Okay.  But you have received the Chrome
5 Builders check, as we sit here today; is that right?
6    A.   Yeah.  We got that a few months ago.
7    Q.   Has Chrome Builders continued operating
8 during this time?
9    A.   Yes.
10   Q.   Okay.  And I'm assuming it set up a
11 different bank account?
12   A.   It did.
13   Q.   Okay.  Does the -- does it have a freeze
14 clause at the bank account it's at now?
15   A.   I don't know.
16   Q.   When you set up your new bank account, did
17 you ask about a freeze clause?
18   A.   I didn't set it up.
19   Q.   Okay.  Who set it up?
20   A.   Mr. Taylor did.
21   Q.   Do you know if he asked?
22   A.   Mr. Taylor set it up.  I wasn't there.
23   Q.   So you don't know if he asked or not.
24   A.   Mr. Taylor set it up.  I wasn't there.
25   Q.   Mr. Zeitlin, is that an "I don't know"?

Page 149

1    A.   Mr. Taylor set it up.  I was not with him.
2 That's what that means.  Take it as you will.
3    Q.   And, Mr. Zeitlin, will you tell me who
4 that bank account is with?
5    A.   Only if I get the keys to your house.  How
6 does that sound?  We went down this road already,
7 Blakeley.  You guy -- you represent thieves who want to
8 destroy people.  I would never tell you where I bank.
9 So let's go on to the next question.  I refuse to
10 answer.  It's not going to happen.  Next question.
11   Q.   Okay.
12        MS. GRIFFITH:  Counsel, just so you know,
13 we reserve our rights with this issue, and we may seek
14 to have an adverse inference imposed if Mr. Zeitlin
15 will not answer the question about where he currently
16 banks.
17        MR. BERNHOFT:  Well, your intentions are
18 noted.  That's all I have to say about that.
19        MS. GRIFFITH:  Okay.
20        (Deposition Exhibit 42 marked.)
21 BY MS. GRIFFITH:
22   Q.   Let's go to Exhibit No. 42.
23   A.   4896?
24   Q.   4896.
25   A.   Yes.

Richard Zeitlin
December 08, 2020

146..149

USAO_00003647

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 150

1    Q.   Okay.  These are account statements for
2 TPFE.
3         Do you see -- do you see that?
4    A.   I do.
5    Q.   And if you turn the page to 4897, would
6 you agree at -- on the account statement, it references
7 the deposit agreement?
8    A.   I see that, yes.
9    Q.   Okay.  Great.  Thank you.
10        This statement is for January 1st to
11 January 31st, 2018, and if you look at page 4898, it
12 looks like there's a deposit from ER Responders.
13        Do you see that?
14   A.   I do.
15   Q.   Who are -- who is -- was ER Responders?
16   A.   That would be the emergency responders
17 organization.
18   Q.   Okay.  Is that a charity?  A PAC?
19   A.   That was a PAC.
20   Q.   Okay.  Do you know what ER Responders or
21 emergency organization, what it does?
22   A.   Offhand, they do political lobbying work
23 to benefit first responders, firefighters, paramedics,
24 and such.
25        Do you know who runs ER Responders?

Page 151

1    A.   I do.
2    Q.   Okay.  Who is that?
3    A.   Robert Piaro.
4    Q.   Then, if you go down, there's a deposit in
5 by Standing By Vets.
6         Do you know what that organization is?
7    A.   Yeah.  That's a veterans organization.
8         MR. KIMBLE:  Blakeley, where -- where are
9 you?  You said, "Go down."  What exhibit are you on?
10        MS. GRIFFITH:  We're on Exhibit 42 --
11        MR. KIMBLE:  Okay.
12        MS. GRIFFITH:  -- and we're on -- if you
13 go down to the page number, it's 4898, BANA 4898.
14        MR. KIMBLE:  Can I ask you just to clarify
15 this for those who are accessing this electronically.
16 Would you actually specify the exhibit and how far we
17 had to go down.
18        MS. GRIFFITH:  Sure.
19        MR. KIMBLE:  It's getting very hard to
20 follow.
21        MS. GRIFFITH:  Sure.  I'll be happy to.
22 BY MS. GRIFFITH:
23   Q.   So if you look at the next line down from
24 ER Responders, it's an entry dated 1/5/18.  It's a
25 deposit of $98,000, and it's from Standing by Vets.

Page 152

1         Do you see that, Mr. Zeitlin?
2    A.   I do.
3    Q.   And what is Standing by Vets?
4    A.   To the best of my recollection, that was
5 another -- a veterans PAC.
6    Q.   And who runs this PAC?
7    A.   You know, I -- I don't recall on this one.
8    Q.   Okay.  If you go down to the next entry,
9 also on 1/5/18, it's a deposit for $25,000.  And it's a
10 wire in.
11        Mr. Zeitlin, do you know where this was
12 coming from?
13   A.   Yes.
14   Q.   Okay.  Where -- where from?
15   A.   I was doing some subcontracting work for
16 a -- for a campaign that I'm not sure which one it was,
17 because I was subbing.  I didn't have the agreement
18 directly.
19   Q.   Okay.  So you were working with another
20 fund-raising entity, and they -- they were paying -- I
21 guess, paying for your services?
22   A.   Yeah.  You could say that, yes.
23   Q.   Okay.  What -- what entity was that?
24   A.   I don't know which one it was.  It doesn't
25 say here.

Page 153

1    Q.   Do you recall at this time what entities
2 you were working for in a subcontracting capacity?
3    A.   No.  Again, it's three years ago.
4    Q.   Okay.
5    A.   So --
6    Q.   Okay.  And if you turn the page and go to
7 BANA 4899.
8    A.   Yes.
9    Q.   And these look like they're withdrawals
10 and other debits.
11        Do you see that at the top?
12   A.   Yes.
13   Q.   Okay.  And there looks to be -- let's see.
14 If you go down to about six, seven lines down, it's a
15 date, 1/9/18.
16   A.   Yes.
17   Q.   Okay.  And there's a transfer to
18 Integrated Telecom.
19        Do you see that?
20   A.   I do.
21   Q.   Okay.  Was Integrated Telecom operating?
22   A.   No.
23   Q.   Okay.  Do you know why you transferred
24 funds to that account?
25   A.   That was a -- place that I would put

Richard Zeitlin
December 08, 2020

150..153

USAO_00003648

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 154

1 some money before I ultimately took it out.
2    Q.   Okay.  If you go down two lines down --
3 let's see -- it's 1/10/18, transfer for 23,000 to -- to
4 North American Fulfillment.
5         Do you know what North American
6 Fulfillment is?
7    A.   I do.
8    Q.   Okay.  What is it?
9    A.   They do database and fulfillment, lockbox
10 work for me.
11    Q.   Do they work on the fund-raising side?
12    A.   They do database and lockbox deposits of
13 inbound donations.
14    Q.   Database and -- so would they receive
15 donations and put them in a lockbox?  I'm sorry.  I'm
16 just not quite -- or do they make sure that the
17 donations are securely transferred?
18    A.   Yeah.  They receive donations.  They open
19 up the packages.  They go ahead and deposit -- this is
20 a third party that does all the depositing for the
21 various organizations.
22    Q.   For the various nonprofits.
23    A.   The actual -- the actual depositing of the
24 charity monies -- or the nonprofit monies.  Excuse me.
25    Q.   Okay.  So they do the -- so they're the

Page 155

1 ones that receive the checks from the donors?
2    A.   Yes.
3    Q.   Okay.  So those -- those checks don't go
4 directly -- then do they send them directly to the
5 charities or the nonprofits?
6    A.   They would deposit directly into their
7 accounts.
8    Q.   They would deposit that directly into a
9 nonprofit's accounts.
10    A.   Yes.
11    Q.   Is there a purpose just to make sure that
12 someone is tracking the donations that are coming in
13 accurately?
14    A.   Rephrase that for me.  I don't understand.
15    Q.   What's their purpose?  Why don't -- why
16 don't the money -- why doesn't the money just go
17 straight to the nonprofits?
18    A.   Because it has to be databased and
19 counted.  It's a very lengthy procedure and a difficult
20 procedure to be able to handle tens of thousands of
21 envelopes coming in, and they are specialists in this
22 category.
23    Q.   Okay.  And is part of the --
24    A.   If you were to -- if you were to -- if you
25 were to see ten thousand envelopes, you'd understand.

Page 156

1    Q.   Okay.  And is part of the reason because
2 it's -- it's a heavily regulated industry and they help
3 with that, or that doesn't have anything to do with it?
4    A.   Well, it's a third party that goes ahead
5 and accepts monies and deposits those monies into the
6 various accounts.  And they're accountable to the
7 organizations, as well as myself.  And they provide
8 reporting, and that's how the monies get dealt with, in
9 a very secure environment.
10    Q.   Okay.  And do you have a written contract
11 with them?
12    A.   You know, I hate to say it, but I'm not
13 really sure.  I've been working with the gentleman for
14 so many years now, I -- I don't know.  Maybe.
15    Q.   Okay.  And who do you work with from
16 there?  Who's the person?
17    A.   His name is John Bernhoft.
18    Q.   Is he related to your lawyer, or no?
19    A.   He is.
20    Q.   And then if you go down to the next line,
21 so we're -- we're not at the middle of the page, but
22 we're close.  It's 1/11/18.
23    A.   Yes.
24    Q.   And there's an online banking transfer to
25 check -- Checking Account 2231.

Page 157

1    A.   Right.
2    Q.   Donor Relations -- which is Donor
3 Relations.
4         Any idea why -- why that money was sent
5 from TPFE to Donor Relations?
6    A.   No.
7    Q.   If you go down all the way to the end,
8 1/29/18, it looks like there's a payment to American
9 Express.
10    A.   Yes.
11    Q.   Do you know if the American Express card
12 was held in the name of TPFE or if it was in somebody
13 else's name?
14    A.   No.  It was in a different name.
15    Q.   Okay.  Do you know who holds that card?
16    A.   Who holds it?  I hold it.
17    Q.   Okay.  Is it in your personal name?
18    A.   My name is on it, as well as whatever
19 company's on there right now.  Want me to look at it
20 for you?
21    Q.   Sure.  Do you have it?  Sure.
22    A.   Advanced TCI, which would be Advanced
23 Telephony Consultants, and my name.
24    Q.   Okay.
25    A.   It's real pretty too.

Richard Zeitlin
December 08, 2020

154..157

USAO_00003649

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 158

1　Q.　Well, they have nice cards.
2　A.　They do.
3　Q.　If you turn to BANA 4902.
4　　　MR. BERNHOFT:  I'm sorry.  4902?
5　　　MS. GRIFFITH:  4902, so it's the same
6　exhibit, BANA 4902.
7　　　MR. BERNHOFT:  Thank you.
8　　　THE WITNESS:  Page 7, I think that is.
9　BY MS. GRIFFITH:
10　Q.　Yeah.
11　A.　God, it's hard to see.
12　Q.　It is hard to see this one.  It looks like
13　it's a check payable to Masterbuilt Construction.
14　A.　Yes.
15　Q.　Do you know what Masterbuilt Construction
16　is?
17　A.　Yeah.  It's a general contractor.
18　Q.　And what was Masterbuilt Construction
19　doing?
20　A.　Construction.
21　Q.　Okay.  For TPFE?
22　A.　No.
23　Q.　Okay.
24　A.　They were doing it for me.
25　Q.　Were they building a house, something

Page 159

1　else?
2　A.　That's right.
3　Q.　Okay.  How about -- there's another check
4　on that page -- it looks like it's for $80,000 -- to
5　Exceptional Integrations.
6　　　What does Exceptional Integrations do?
7　　　MR. BERNHOFT:  Counsel, I just want to --
8　that Check No. 1628 is $60,000.
9　　　MS. GRIFFITH:  Oh, thank you.  You have
10　better eyes than me.
11　　　THE WITNESS:  That was for low-voltage
12　wiring at the time and other work with the
13　construction.
14　BY MS. GRIFFITH:
15　Q.　Okay.  For the house?
16　A.　Yes.
17　Q.　Okay.  Go to BANA 4906.
18　A.　Yes.
19　Q.　Okay.  And, you know, we -- we've talked
20　about Standing by Vets, which is the first entry.  I
21　think we talked about ER Responders.  And then if you
22　go down to about the middle of the page, there's an
23　entry from 2/14/18.
24　　　And it looks like it's from National
25　Assistance Committee; is that right?

Page 160

1　A.　Yes.
2　Q.　Do you know what Nation -- is National
3　Assistance Committee a charity?
4　A.　That was a PAC.
5　Q.　Okay.  And do you recall what they do?
6　A.　We didn't do much work with them.  I'm
7　not -- I don't remember what they were doing at the
8　time.  I'm sorry.
9　Q.　It's okay.  Do you recall who runs that
10　PAC?
11　A.　Yeah.  Her name was Crystal Sellers.
12　Q.　Okay.  And if you turn the page to BANA
13　4907.
14　A.　Yes.
15　Q.　There's an entry 2/6/18, about three lines
16　down, and it's an online banking transfer to Checking
17　Account 2231, which is Donor Relations, for $230,000.
18　A.　Okay.
19　Q.　Do you know what that was for?
20　A.　No.
21　Q.　Okay.  And then if you go to 4912.
22　A.　Yes.
23　Q.　Okay.  There's -- these are deposits and
24　other credits.  I'm looking at the second line down,
25　3/7/18.

Page 161

1　A.　Yes.
2　Q.　There's an online banking transfer from
3　Checking Account 6874, which is American Technology
4　Services.
5　　　Do you know what that transfer was for?
6　A.　No.
7　Q.　Any ideas?
8　A.　No.
9　Q.　And if you go down to 3/14/18, there was
10　an online banking transfer from Checking Account 6874
11　again for $40,000.
12　　　Do you know what that's for?
13　A.　No.
14　Q.　Okay.  3/21/18 --
15　A.　Maybe American Express.  But I don't know.
16　Q.　Okay.  So you might have had this
17　transferred in to pay your American Express bill?
18　　　MR. BERNHOFT:  Objection.  Form.
19　Misstates the quality of the evidence you're referring
20　to.
21　BY MS. GRIFFITH:
22　Q.　Okay.  So you said "American Express."
23　　　What did you mean?
24　A.　I remember seeing a $40,000 payment to
25　American Express, so I'm trying to help.

Richard Zeitlin
December 08, 2020

158..161

USAO_00003650

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 162

1    Q.   Okay.  When I look at 3/14/18, it looks
2  like it came from the checking account ending in 6874,
3  which is American Technology Services.
4        Do you know why American Technology
5  Services would be sending money to TPFE?
6        MR. BERNHOFT:  Objection.  Asked and
7  answered.
8  BY MS. GRIFFITH:
9    Q.   You can answer.
10   A.   Yeah.  That's my money, so I moved it
11 where it had to go, I suppose.
12   Q.   Okay.  And same thing for 3/28/18 from --
13 checking -- checking transfer from 6874, would that be
14 the same answer?
15   A.   Yeah.  As you can see, there is transfers
16 happened.  I guess I didn't realize there was
17 permission slips that had to be filled in first before
18 I transferred my money.
19   Q.   Was it pretty common for you to transfer
20 your money between your accounts?
21   A.   Yes.
22   Q.   Any reason for this?
23   A.   Well, money had to go where it had to go
24 to be -- to be utilized.
25   Q.   Did you have any documents with the

Page 163

1  companies, any operating agreements, providing for
2  these transfers or anything like that?
3    A.   No.
4        (Deposition Exhibit 43 marked.)
5  BY MS. GRIFFITH:
6    Q.   Okay.  Let's go to Exhibit No. 43.
7    A.   4958?
8    Q.   4958.
9    A.   Okay.
10   Q.   Bank account statements for MRZ
11 Management.
12       Do you see that?
13   A.   I do.
14   Q.   Okay.  So these ones start on January 1st,
15 2018.  And if you turn to 4960, there's a transfer from
16 2331 for $4,000, and then -- which is Donor Relations.
17       Do you see that there, Mr. Zeitlin?
18   A.   I do.
19   Q.   Okay.  And then on 1/10/18 there's a
20 commercial loans debit.
21       Do you know what that's for?
22   A.   Probably for the mortgage that I had from
23 Bank of America.
24   Q.   So MRZ Management, it is the company that
25 holds the two properties, the one in Henderson and the

Page 164

1  one on Charleston?
2    A.   Correct.
3    Q.   So when I -- let's turn to BANA 4966.
4  It's at the same exhibit, just the bottom.
5    A.   Yes.
6    Q.   And there's another -- another transfer
7  from Donor Relations for the $4,000.
8        Was this the rent?
9    A.   Yes.
10   Q.   Okay.  And then if you turn to
11 BANA 4984 -- that's the number at the bottom.
12   A.   Yes.
13       MR. BERNHOFT:  One moment for counsel to
14 locate.
15       MS. GRIFFITH:  That's fine.  Of course.
16       MR. KIMBLE:  Could you give us a page
17 number on those, Blakeley.
18       MS. GRIFFITH:  Yeah.  It's 4984.
19       MR. KIMBLE:  Okay.  It's 27.
20 BY MS. GRIFFITH:
21   Q.   There's an entry for withdraw on 6/21/18
22 for $30,000.
23       Do you recall what that was for?  It looks
24 like it's to Fidelity National Title.
25   A.   I think I may have been paying off the

Page 165

1  mortgage at that time.
2    Q.   Okay.
3    A.   But I'm not sure.
4    Q.   Okay.  Let's go to BANA 4990.  Same
5  exhibit, 4990.
6    A.   Yes.
7    Q.   So there's been a -- there's a couple
8  online transfers, it looks like, for the rent.  And
9  then if you look at the third line down --
10   A.   Hold on a minute.  30,000 -- I'm sorry,
11 Blakeley.  The other one, that $30,000 --
12   Q.   Yes.
13   A.   -- was -- was escrow on my building in
14 Henderson.
15   Q.   Okay.
16   A.   That's what it was.
17   Q.   Okay.  So 11/17/18, there's a wire
18 transfer in, it looks like from Nevada State Bank from
19 Compliance Consultants.
20       Do you see that?
21   A.   I do.
22   Q.   Okay.  For $250,000.  And so that was from
23 the Nevada State Bank account.
24       Do you recall what that money was for?
25   A.   Yes.

Richard Zeitlin
December 08, 2020

162..165

USAO_00003651

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 166

1   Q.  Okay. And what was that for?

2   A.  That would be buying the building in -- in

3 Henderson.

4   Q.  Okay. Okay.

5     Same thing with the next line. There was

6 another transfer in for American Technology Services

7 from the Nevada State Bank account for $200,000.

8     Same purpose?

9   A.  Yes.

10   Q.  Okay. And same thing with the Unified

11 Data Services Nevada State Bank account for a hundred

12 thousand dollars.

13     Same purpose?

14   A.  Yes.

15   Q.  And then there's some Bank of America

16 transfers -- let's see. So there's a transfer from

17 6874, which is American Technology Services, for 300-.

18     Same purpose?

19   A.  Yes.

20   Q.  If you go to the bottom, there's one from

21 Compliance Consultants from Nevada State Bank.

22     Same purpose?

23   A.  Yes.

24   Q.  Okay. And same thing --

25   A.  That was the -- the -- where's that --

Page 167

1 which one are you at now? Which amount?

2   Q.  That was the final one, 7/31/18.

3   A.  Yeah. A hundred thousand. Okay. Right.

4   Q.  Yeah.

5     So were all these transfers made into this

6 company to buy that proper -- property?

7   A.  Yes.

8   Q.  Okay.

9   A.  I remember we closed on August 5th.

10   Q.  August, okay. So that was before the

11 freeze.

12   A.  Obviously.

13   Q.  Okay.

14   A.  Remember being happy that I got to buy the

15 building before they took all my money.

16   Q.  After -- after the freeze, did the

17 entities eventually -- did they -- did they make up

18 rent to MRZ Management?

19     MR. BERNHOFT: Objection. Form.

20 BY MS. GRIFFITH:

21   Q.  Well, let me rephrase that, Mr. Zeitlin.

22     Did MRZ Management receive rent payments

23 during the freeze?

24   A.  No.

25   Q.  Okay. Has MRZ Management ever received

Page 168

1 rent payments for August and September of 2018?

2     MR. BERNHOFT: Objection. Relevancy.

3 BY MS. GRIFFITH:

4   Q.  You -- you can answer.

5   A.  No.

6   Q.  So it never received any rent payments

7 from your entities for that time.

8     MR. BERNHOFT: Objection. Asked and

9 answered.

10 BY MS. GRIFFITH:

11   Q.  You can answer.

12   A.  I did.

13   Q.  Can you hear me?

14   A.  Yeah.

15   Q.  Okay. Does it currently receive rent

16 payments?

17   A.  Yes.

18   Q.  Who does it receive the rent payments

19 from?

20   A.  Tenants.

21   Q.  And the tenants are your entities,

22 correct?

23   A.  No.

24   Q.  Okay.

25   A.  Well, some are, but no, not all.

Page 169

1   Q.  Not all. Okay.

2     Who -- what tenants are there that are not

3 your entities?

4   A.  I have a number of different tenants,

5 probably a dozen.

6   Q.  Were these [inaudible] during the freeze?

7     MR. BERNHOFT: We couldn't hear that,

8 Blakeley. That broke up hard.

9     MS. GRIFFITH: Sorry.

10 BY MS. GRIFFITH:

11   Q.  I said, "Were these tenants in place

12 during the freeze?"

13   A.  No.

14   Q.  Were any tenants in place during the

15 freeze?

16   A.  No. We had just moved from Charleston to

17 Henderson.

18   Q.  Okay. Did MRZ Management miss any

19 payments during [inaudible]?

20   A.  No.

21   Q.  Okay. Great. Let's go ahead to

22 Exhibit No. 44.

23     MR. BERNHOFT: Counsel, if I might suggest

24 a five-minute break over here.

25     MS. GRIFFITH: Sure. That's fine.

USAO_00003652

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 170

1    MR. BERNHOFT: All right. Off the record.
2        THE VIDEOGRAPHER: Off the record, and the
3 time is 3:42 p.m.
4        (Recess taken.)
5        THE VIDEOGRAPHER: We're going back on the
6 record, and the time is 3:53 p.m.
7        (Deposition Exhibit 46 marked.)
8 BY MS. GRIFFITH:
9    Q.   We're back on the record. So Mr. Zeitlin,
10 can you turn to Exhibit 46, please.
11    A.   46?
12    Q.   46.
13    A.   5116?
14    Q.   5116.
15    A.   Yes.
16    Q.   Account statements for Donor Relations.
17        Do you see that?
18    A.   I do.
19    Q.   Okay. Great. Okay.
20        So just looking at this -- at this date,
21 on 1/30/18, BANA 5118.
22    A.   I'm sorry. Say it again. Page number --
23        MR. KIMBLE: Blakeley.
24        THE WITNESS: Sorry. Not Betty.
25 ///

Page 171

1 BY MS. GRIFFITH:
2    Q.   Yes. Could you turn to Page No. 5118.
3    A.   Yes.
4    Q.   Okay. And if you will [inaudible] 1/3/18,
5 there is a transfer in from International Union of
6 Police.
7    A.   Yes.
8    Q.   What is this company?
9    A.   That --
10        MR. BERNHOFT: Objection. Objection.
11 Form.
12        THE WITNESS: That is the International
13 Union of Police Associations.
14 BY MS. GRIFFITH:
15    Q.   Okay. Is it a charity? A PAC?
16    A.   It's a client. It's a nonprofit.
17    Q.   Do you know if it's a charity or a PAC?
18    A.   It's neither.
19    Q.   Oh, it's neither. It's just a nonprofit?
20    A.   It's a -- it's a union, so they fall under
21 a different category.
22    Q.   Okay. It's a union. Do they have a
23 special mission, purpose, or anything like that?
24    A.   They have their own mission, of course,
25 yes.

Page 172

1    Q.   Do you recall what it is?
2    A.   No. I don't memorize mission statements.
3    Q.   Do you recall --
4    A.   They're the biggest -- they're the biggest
5 police union in the -- in the country, for sure.
6    Q.   Okay. And do you recall who runs it?
7    A.   I'm sorry?
8    Q.   Do you recall who runs this union?
9    A.   Yes.
10    Q.   Who is that?
11    A.   His name is Sam Cabral.
12    Q.   Okay. If you go down to the very next
13 line, there's a transfer in on 1/4/18, and that's for
14 American Veteran?
15    A.   Yes.
16    Q.   Do you know what entity that is?
17    A.   Well, apparently for one of the veterans
18 campaigns. I'm not sure which one. It's a bit vague.
19 There's a few different American veterans campaigns.
20    Q.   Okay. Would you know if it was a PAC or a
21 charity?
22    A.   No.
23    Q.   And so you wouldn't know who runs that one
24 either, right?
25    A.   I'm not sure which one it is.

Page 173

1    Q.   Okay. If you go down to the next line,
2 1/4/18.
3    A.   Yes.
4    Q.   Community Charity Advance.
5    A.   Yes.
6    Q.   What -- is that a charity?
7    A.   That one's a charity, yes.
8    Q.   Do you recall who runs that charity?
9    A.   I don't remember who -- I don't remember
10 the gentleman's name, offhand. This was years ago.
11    Q.   Okay. Are they still a client, or no?
12    A.   No.
13    Q.   Okay. International Union of Police, are
14 they still a client?
15    A.   Yes.
16    Q.   Okay. If you go down a couple lines,
17 1/5/18, there is a transfer in from Firefighters
18 Charitable Foundation.
19    A.   Right.
20    Q.   Are they a charity or a PAC?
21    A.   That was a charity.
22    Q.   Okay. Are they still a client?
23    A.   No.
24    Q.   No.
25        Do you recall who runs -- who ran that

USAO_00003653

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 174

1 one?
2     A.   No.
3     Q.   Okay.  If you go down to 1/2/18 -- oh,
4 excuse me -- if you turn the page to BANA 5119.
5     A.   Yes.
6     Q.   And there is the bottom of the page,
7 "Withdraws and other debits."
8         Do you see that?
9     A.   I do.
10    Q.   Okay.  The first line there says there's a
11 wire out to Administracion de Call Center,
12 International Bank.
13        Do you see that?
14    A.   I do.
15    Q.   Okay.  What's Administracion de Call
16 Center?
17    A.   That would be Allied Global.
18    Q.   Sorry, what did you say?
19    A.   That would be Allied Global, one of the
20 vendors.
21    Q.   So that would be a company under Allied
22 Global?
23    A.   Yeah.  That's -- then they called their
24 company, you know, call center -- Administracion de
25 Call Center, so this is what they call it in their bank

Page 175

1 account, apparently.
2     Q.   And do you know where this Administracion
3 de Call Center was located?
4     A.   Guatemala.
5     Q.   Guatemala.
6         Is that where Allied Global was located?
7     A.   Allied Global is -- has many different
8 locations.
9     Q.   Do they have a United States location?
10    A.   They do.
11    Q.   Why the payment to the Guatemala location?
12    A.   That's their headquarters.  That's where
13 they were founded.
14    Q.   Headquarters in Guatemala.
15        And this was a transfer for $375,000.
16        Do you see that?
17    A.   I do.
18    Q.   And does that seem right?
19        MR. BERNHOFT:  Objection.  Foundation.
20 Don't understand the question.
21 BY MS. GRIFFITH:
22    Q.   Okay.  How would you calculate your
23 payments to Allied Global?
24    A.   We were billed by the hour.
25    Q.   Okay.  What was the rate?

Page 176

1     A.   I don't remember.  It's -- again, you're
2 going back here three years.  We've had some rate
3 changes, so I'm not sure, offhand, what the rate was
4 back then.
5     Q.   Do you have an estimate or no?
6     A.   I'd rather not.
7     Q.   Okay.  Mr. Zeitlin, do you know that
8 Guatemala is on the FINCEN list for money laundering?
9         MR. BERNHOFT:  Objection.  Relevance.
10 BY MS. GRIFFITH:
11    Q.   You can answer.
12    A.   What is FINCEN?
13    Q.   Financial -- it's a government
14 organization that tracks places for fraud.
15    A.   No.  I have no idea what's on their list
16 of anything.
17    Q.   Are you aware that Guatemala is a place
18 known for -- for money laundering?
19        MR. BERNHOFT:  Objection.  Form.
20 Foundation.  Counsel is testifying.
21        Instruct the witness not to answer the
22 question.
23        MS. GRIFFITH:  What's the basis for the
24 instruction not to answer?
25        MR. BERNHOFT:  Counsel is testifying,

Page 177

1 based apparently on counsel's personal knowledge.
2         MS. GRIFFITH:  That's not a proper --
3         MR. BERNHOFT:  -- and that's --
4         MS. GRIFFITH:  That's not a proper -- I'm
5 asking the witness if he is aware.  That's not a proper
6 basis not to instruct him not to answer.
7         MR. BERNHOFT:  Well, so you say.  I'll
8 elaborate.  Counsel is drawing a conclusion based on
9 some sort of personal experience or knowledge and is
10 asking Mr. Zeitlin as the deponent to put his premature
11 answer, "yes" or "no" to you positing something that we
12 have no basis here in documents or evidence.
13        And I object to that.  Unless you can tell
14 me why Mr. Zeitlin should answer that question, I'm
15 going to maintain my instruction not to answer.
16        MS. GRIFFITH:  Okay.  So, Mr. Bernhoft,
17 that's an improper instruction.  You can instruct the
18 witness not to answer based on privilege and based on
19 harassment, but you can't instruct him not to answer --
20 well, actually, I don't know about improper --
21        MR. BERNHOFT:  Well, Officer -- Counsel, I
22 beg --
23        MS. GRIFFITH:  Please let me finish.
24        MR. BERNHOFT:  You're interrupting me
25 equally.

Richard Zeitlin
December 08, 2020

174..177

USAO_00003654

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

| Page 178 | Page 179 |
|---|---|
| 1     MS. GRIFFITH: I'm sorry. I am not | 1 objections, and -- |
| 2 interrupting you. | 2     MS. GRIFFITH: I -- |
| 3     MR. BERNHOFT: Yes, you were. | 3     MR. BERNHOFT: You're interrupting me now, |
| 4     MS. GRIFFITH: So you're instructing the | 4 Counsel. And I am allowed to interpose relevant |
| 5 witness not to answer that question; is that correct? | 5 objections and terse comment, and I'm saying that that |
| 6     MR. BERNHOFT: Yes, because -- | 6 is inappropriate. |
| 7     MS. GRIFFITH: Okay. | 7     MS. GRIFFITH: Okay. That's your comment. |
| 8     MR. BERNHOFT: -- the statement Counsel is | 8 Thank you. |
| 9 making is based on some unknown personal experience or | 9     MR. BERNHOFT: Yes, it is indeed my |
| 10 knowledge, and we have no way of testing the veracity | 10 comment, for the record. |
| 11 of that, and you're positing this question without | 11     MS. GRIFFITH: Good. |
| 12 foundation -- | 12     MR. BERNHOFT: I think Guatemala is known |
| 13     MS. GRIFFITH: Mr. Bernhoft, I'm just | 13 for banana harvesting, too, isn't it? |
| 14 going to change the question. | 14     THE WITNESS: Rum. |
| 15 BY MS. GRIFFITH: | 15     MR. BERNHOFT: Rum. |
| **16    Q.  Mr. Zeitlin, do you know if Guatemala is** | 16     THE WITNESS: And coffee, actually. |
| **17 known for money laundering?** | 17 BY MS. GRIFFITH: |
| 18    A.  No. | **18    Q.  Let's look at BANA 5120, same exhibit.** |
| **19    Q.  Okay. You don't know.** | 19    A.  Okay. |
| 20     MR. BERNHOFT: Gosh, I wasn't aware that | **20    Q.  I'm looking at the entry for 1/9/18 a** |
| 21 Guatemala is known for money laundering. That's | **21 little bit below the middle of the page.** |
| 22 totally inappropriate, Counsel. | 22    A.  Yes. |
| 23     MS. GRIFFITH: Mr. Bernhoft, I'm allowed | **23    Q.  Okay. That looks like it's a transfer to** |
| 24 to ask the questions. Okay. Thank you. | **24 Advanced Telephony -- Telephony Consultants; is that** |
| 25     MR. BERNHOFT: I'm allowed to interpose | **25 right?** |

| Page 180 | Page 181 |
|---|---|
| 1    A.  If you say so. | 1    A.  I'm sorry. Could you rephrase that to me. |
| **2    Q.  Well, their checking account number is** | **2    Q.  For your businesses that do fund-raising,** |
| **3 0080. That's --** | **3 do you collect 80 to 90 percent of the amount of money** |
| 4    A.  Yeah, I don't have a list of all the | **4 that comes in from donors?** |
| 5 account numbers in front of me like you do. I'll | 5    A.  Oh, I wish we did. No, the collection |
| 6 assume you're correct. | 6 rate's far lower than that. |
| **7    Q.  Do you know what that transfer was for?** | **7    Q.  So --** |
| 8    A.  No. | 8    A.  Probably -- |
| **9    Q.  Let's look at 5134.** | **9    Q.  I'm sorry. Go ahead.** |
| 10     MR. BERNHOFT: One moment for counsel to | 10    A.  Collection rates are -- you know, for a |
| 11 locate. | 11 cold campaign are usually in the 30s or 40s, on the |
| 12     MR. KIMBLE: That's page 19. | 12 renewal call may go up in the 60s. We never see 80 |
| 13     MR. BERNHOFT: Thank you. | 13 to 90 percent collections. |
| 14 BY MS. GRIFFITH: | **14    Q.  Okay. So you never see 80 or 90 percent** |
| **15    Q.  Okay. At the top of the page, there's** | **15 collections?** |
| **16 2/6/18. There's a transfer out to Administracion de** | 16    A.  No. That would be unheard of to see |
| **17 Call Center.** | 17 something like that. |
| **18    Is that the same Allied Global?** | **18    Q.  So a more standard rate, is that -- what** |
| 19    A.  Yes. | **19 did you say? It was 60 percent?** |
| **20    Q.  Okay. Also in Guatemala?** | 20    A.  It depends on -- if it's a cold campaign, |
| 21    A.  Yes. | 21 the collection rates would be 30, 35 percent, |
| **22    Q.  Mr. Zeitlin, for your businesses, when** | 22 maybe 40 percent. If it's a previous giver, it could, |
| **23 they make -- when they do their fund-raising, do you** | 23 you know, be in the 60s. Depends on the campaign. |
| **24 collect 80 to 90 percent of the money that comes in** | 24     (Deposition Exhibit 47 marked.) |
| **25 from donors?** | 25 /// |

Richard Zeitlin
December 08, 2020

178..181

097

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 182

1 BY MS. GRIFFITH:
2    **Q.**  Let's go to Exhibit No. 47.
3    A.  Okay. 5208?
4    **Q.**  Yeah. 5208.
5    A.  Okay.
6    **Q.**  So -- for the -- just going back quickly
7 **to the 80 to 90 -- to the percentage of collections,**
8 **are you thinking of funds actually paid in, so the**
9 **amount of donors that make -- that make payments to the**
10 **different nonprofits?**
11    MR. BERNHOFT: Objection. Form.
12    THE WITNESS: I don't even know what
13 you're saying right now.
14 BY MS. GRIFFITH:
15    **Q.**  Okay. So I'll come back to that. I'll
16 **follow up.**
17    A.  You're all -- you just blurbed out there.
18    **Q.**  Oh, sorry, Mr. Zeitlin. I said I would
19 **come back to that.**
20    Okay. So Exhibit No. 47.
21    A.  47. 5208.
22    **Q.**  Yes.
23    A.  Yes.
24    MR. BERNHOFT: I'm sorry. What number?
25    MR. KIMBLE: 47.

Page 183

1    MS. GRIFFITH: Exhibit 47.
2    THE WITNESS: I'm still on it.
3 BY MS. GRIFFITH:
4    **Q.**  Okay. Good.
5    A.  Yeah.
6    **Q.**  Okay. If you turn to 5210.
7    A.  If I turn to what, now?
8    **Q.**  Page 5 -- BANA 5210.
9    A.  Page 3. Yes. Go right ahead.
10    **Q.**  It looks like there's some transfers in
11 **from Cops and Kids Together.**
12    A.  Yes.
13    **Q.**  Okay. What's Cops and Kids Together?
14    A.  That's a charity.
15    **Q.**  Okay. That's a charity?
16    A.  Yes.
17    **Q.**  It's not a PAC?
18    A.  It's not a PAC.
19    **Q.**  Okay. And who runs that?
20    A.  The gentleman actually passed away who ran
21 that organization. His name was David Dierks. Passed
22 away this year.
23    **Q.**  I'm sorry to hear that.
24    Is -- is that organization still in
25 existence?

Page 184

1    A.  To my knowledge, they're -- they're --
2 it's all done. They're winding it all down, because
3 the guy who ran it has passed.
4    **Q.**  Okay. So they're not a current client,
5 **then, since they're winding it down?**
6    A.  Yeah, no, they're done.
7    **Q.**  Were they a long-standing client?
8    A.  No. We didn't do -- we didn't -- no.
9 They -- they were new at about this time.
10    **Q.**  Okay. Had you worked with Mr. Dierks
11 **previously?**
12    A.  We first started working with him at about
13 this time. That was the first organization.
14    **Q.**  Okay. And do you know what Cops and Kids
15 **Together -- what their purpose was?**
16    A.  Yeah. They would have police go to
17 schools and work with children so the -- the kids
18 weren't afraid of police, and things of that nature.
19    **Q.**  Okay. And do you know where they
20 **operated -- where the kids and the police would go to**
21 **school together?**
22    A.  This was headquartered in California.
23    **Q.**  Okay. And if you go to BANA 5216.
24    A.  Yes.
25    **Q.**  Okay. The top of that page, there's

Page 185

1 **deposits, and there's one from -- the second one**
2 **down -- U.S. Vet Assistant Foundation.**
3    Do you see that?
4    A.  Uh-huh. Yes.
5    **Q.**  Do you know -- was that a PAC or a
6 **charity?**
7    A.  That was a charity.
8    **Q.**  And do you know who ran -- or runs that?
9    A.  That would be Robert Piaro.
10    **Q.**  Is it still in existence?
11    A.  He ended up, I believe, going to a PAC
12 from an organization. So I'm not sure what happened
13 with the old one.
14    **Q.**  Do you still do work for him?
15    A.  I do.
16    **Q.**  Okay. Do you still do work for this
17 **specific U.S. vet -- veterans assistance foundation?**
18    A.  You know, again, the -- I'm not sure if
19 this is the charity or the PAC side, so I'm not
20 quite -- I'm not positive on that one.
21    **Q.**  Okay. If we go to BANA 5224.
22    A.  Yes.
23    **Q.**  And the second one down there's a transfer
24 to Administracion de Call Center.
25    Is that -- is that the Allied Global?

Richard Zeitlin
December 08, 2020

182..185

098

USAO_00003656

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 186

1   A.   Yes, it is.
2   Q.   Okay.  And where is that?
3        MR. BERNHOFT:  Asked and answered.
4   Objection.
5   BY MS. GRIFFITH:
6   Q.   Is it -- is it -- is it still Guatemala?
7   A.   Yeah.  Same company.
8   Q.   Okay.  Were all of the transfers to
9   Administracion de Call Center from your account to the
10  Guatemala Administracion de Call Center?
11  A.   I'm sorry.  One more time.
12  Q.   Were all the transfers from you to
13  Administracion de Call Center -- were they all
14  Guatemala?
15  A.   I don't -- I'm not sure.  They may have
16  changed or -- this is years.  I don't know.
17  Q.   Okay.
18  A.   You say "company."  I mean, they could
19  have changed the bank.  Some could have seized their
20  accounts.  I don't know.  But they're still around to
21  this day.  I still work with them to this day.
22  Q.   Are they still in Guatemala?  Are you
23  still sending payments to Guatemala?
24  A.   I'm not sure where the bank is right now.
25  I'd have to look that up.  They're also in Iowa and

Page 187

1   Denver.
2   Q.   Do you make -- do you make payments to
3   them in Iowa and Denver?
4   A.   Again, I'm not sure where the payments are
5   going as of -- that's -- my bookkeeper is doing the
6   payments.
7   Q.   Okay.  Who's your bookkeeper?
8   A.   Wegner CPA.
9   Q.   And they make the payments to Allied
10  Global?
11  A.   They're overseeing the books that's
12  entered directly by Leslie Vadreen, as I said earlier.
13  Q.   Who authorizes the payments to
14  Administracion de Call Center/Allied Global?
15  A.   Who authorized the payments?
16  Q.   Who --
17  A.   We do.
18  Q.   -- authorizes the payments?  You do.
19  Okay.
20  A.   We've only been -- yeah.  We worked with
21  them for many, many years, a long-time relationship, so
22  it's not like I'm worried about these folks, this
23  international call center operation that does
24  tremendous work.  I also authorize the pest control
25  bill.

Page 188

1   Q.   Okay.  Are you affiliated with any of the
2   charities that you work with?
3   A.   No.
4   Q.   No.  And the same question for any of the
5   nonprofits that you work with; are you affiliated with
6   any of the nonprofits you work with?
7   A.   Absolutely not.
8   Q.   Okay.  Do you ever review the Better
9   Business Bureau for any of the nonprofits you work
10  with?
11  A.   One more time.
12  Q.   Do you ever review the Better Business
13  Bureau ratings for any of nonprofits you work with?
14  A.   No.
15  Q.   [Inaudible] company called Davie Square?
16  A.   Yes.
17  Q.   Okay.  What does Davie Square do?
18  A.   That is where I was renting office space
19  in Davie, Florida.
20  Q.   Who was using the office space in
21  Denton -- Denton, Florida?  Is that what you said?
22  A.   Davie.  It's --
23  Q.   Oh, it's in Davie, Florida?
24  A.   It's not too far -- it's not too far from
25  Ft. Lauderdale.

Page 189

1   Q.   Who was using that office space?
2   A.   I had a small call center there.
3   Q.   What entity that was call center for?
4   A.   They would call for whichever projects
5   were being displayed at the time.
6   Q.   Which of your entities was using it?  So
7   was it American Technology?  Donor Relations?  All of
8   them?
9   A.   It was just -- the lease was probably in
10  the name of TPFE, I think.
11  Q.   Would you have employees from any of your
12  other entities work there?
13  A.   No.
14  Q.   Okay.
15  A.   It's closed now since the COVID pandemic.
16  Q.   Do you work with a Douglas Sailor?
17  A.   Say it again.
18  Q.   Do you work with a man named Douglas
19  Sailor?
20  A.   No.
21  Q.   So you've never done any consulting work
22  with him?
23       MR. BERNHOFT:  Objection.  Foundation.
24  Assumes facts not in evidence.
25  ///

Richard Zeitlin
December 08, 2020

186..189

099

USAO_00003657

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 190

1 BY MS. GRIFFITH:
2    Q.  You can answer, Mr. Zeitlin.
3    A.  Years ago.
4    Q.  And when you say "years ago," do you mean
5 around 2018?
6    A.  I would say yes, in the beginning of '18,
7 yes.
8    Q.  Okay.  And what did he do for you?
9        MR. BERNHOFT:  Objection.  Foundation.
10        THE WITNESS:  He didn't do anything for
11 me.
12 BY MS. GRIFFITH:
13    Q.  Did he do any -- did he do any consulting
14 work for your businesses?
15    A.  No.
16    Q.  Okay.  So how did you work with him?
17    A.  He ran -- he was a consultant for some
18 charities, and he brought those charities to me for me
19 to raise money for those charities.
20    Q.  And do you remember what those charities
21 were?
22    A.  There was a breast cancer charity,
23 firefighter charity, and that's all I can recall right
24 now.
25    Q.  Okay.  And do you work with him still, or

Page 191

1 no?
2    A.  No.
3    Q.  Would you ever pay any referral fees or
4 anything like that if somebody brought you different
5 charities?
6    A.  No.
7    Q.  So Mr. Sailor referred certain charities
8 to you, but you never paid him for any referrals or any
9 work.
10        MR. BERNHOFT:  Objection on both counts.
11 It's compound.  Both are asked and answered.
12 BY MS. GRIFFITH:
13    Q.  Sorry, Mr. Zeitlin.  You can go ahead and
14 answer.
15    A.  No.
16        (Deposition Exhibit 38 marked.)
17 BY MS. GRIFFITH:
18    Q.  Okay.  Let's turn to Exhibit 38.
19    A.  2696?
20    Q.  2696.
21        Do you recognize this document?
22    A.  Not offhand.  I can read what it says,
23 though.
24    Q.  Okay.  Yeah.
25        What does it look like to you?

Page 192

1    A.  It looks like a signature card for a
2 checking account.
3    Q.  Yeah.  And do you recall whether you
4 signed this document when you opened your -- and this
5 one's for Unified Data Services -- when you opened
6 Unified Data Services?
7    A.  Ask one more time.
8    Q.  Do you recall signing this document when
9 you opened the Unified Data Services account?
10    A.  I don't actually recall it, but it's
11 possible.
12    Q.  Okay.  Is -- is that your signature at the
13 bottom of the page?
14    A.  I'd say it looks like it.
15    Q.  Okay.  It looks like it was dated 12/7 --
16 27/17, and then if you look, in the middle of the page,
17 there's a line that says, "Social Security Number (or)
18 Employer Identification Number."
19        And underneath that, it's a statement that
20 says, "By signing below, I acknowledge and agree that
21 this account...will be governed by the terms and
22 conditions set forth in the...opening documents for my
23 account, as they are amended from time to time. The
24 account opening documents include the Deposit Agreement
25 and Disclosures and the Business Schedule of Fees."

Page 193

1        Do you see that?
2    A.  I do.
3    Q.  Do you recall receiving the deposit
4 agreement when you opened your account?
5    A.  No.  I don't recall reading it.
6    Q.  Okay.  You don't recall reading it.
7        Do you recall receiving it?
8    A.  No.
9    Q.  Would you agree that that's your signature
10 acknowledging that you did receive it on this page?
11    A.  I said before it looks like my signature,
12 yes.
13        (Deposition Exhibit 39 marked.)
14 BY MS. GRIFFITH:
15    Q.  Okay.  Let's turn to Exhibit 39.
16    A.  Okay.
17    Q.  This is -- let me know when you're there.
18 This is the same document for Compliance Consultants.
19    A.  Uh-huh.  Same page?
20    Q.  2698, yeah.  Same -- same doc -- same
21 document for Compliance Consultants, or similar.
22    A.  Yes.
23    Q.  Is that your signature on this document?
24    A.  It looks like it, yes.
25        (Deposition Exhibit 40 marked.)

Richard Zeitlin
December 08, 2020
190..193

100

USAO_00003658

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 194

1  BY MS. GRIFFITH:
2      Q.   Okay.  And if you turn to Exhibit 40, BANA
3  2700.
4      A.   Yes.
5      Q.   This is the business signature card for
6  American Technology Services.
7      A.   Yes.
8      Q.   Is this your -- does this look like your
9  signature on this document?
10     A.   Yep.  Looks just like it.
11     Q.   Okay.  And, again, this document has the
12  same language as the other one, stating that you would
13  receive the deposit agreement; is that right?
14     A.   Yes.
15          (Deposition Exhibit 41 marked.)
16  BY MS. GRIFFITH:
17     Q.   If we turn to 41, Chrome Builders
18  Construction.
19     A.   Uh-huh.  Yes.
20     Q.   Let's see.  This is the -- does that look
21  like your signature?
22     A.   It's a bit hazy, but I could assume
23  it's -- it's me.
24     Q.   Okay.  It looks like it might be your wife
25  too.  Mr. Taylor, I don't know where he signed it.

Page 195

1          Was he not originally on this account?
2      A.   I don't recall.  I think I opened it up
3  with my wife.
4          (Deposition Exhibit 34 marked.)
5  BY MS. GRIFFITH:
6      Q.   Okay.  If we go to -- if we go back -- we
7  go to No. 34.
8      A.   TPFE?
9      Q.   Yeah.  This is TPFE.
10     A.   Yes.
11     Q.   Does that look like your signature on this
12  document?
13     A.   It does.
14          (Deposition Exhibit 35 marked.)
15  BY MS. GRIFFITH:
16     Q.   And if you go to 35.
17     A.   MRZ Management?
18     Q.   Yeah.
19          Does that look like your signature here?
20     A.   It does.
21          (Deposition Exhibit 36 marked.)
22  BY MS. GRIFFITH:
23     Q.   Okay.  Number 36.
24     A.   Advanced Telephony?
25     Q.   Yeah.

Page 196

1      A.   Yes.
2      Q.   Is this your signature here opening the
3  account?
4      A.   Yes.
5          (Deposition Exhibit 37 marked.)
6  BY MS. GRIFFITH:
7      Q.   And when we go to Exhibit 37 --
8      A.   Yes.  Donor Relations?
9      Q.   Donor Relations.
10     A.   Yes.
11     Q.   Okay.  Is this your signature opening the
12  account?
13     A.   Yes.
14     Q.   Okay.  And is it safe to say the ones
15  where Ms. Johnson's on too, she was an authorized
16  signer for these accounts?
17     A.   Yes.
18     Q.   When you opened the accounts with Bank of
19  America, did you negotiate any terms of the accounts?
20     A.   Terms?  Like what?
21     Q.   Did you negotiate your contract with them?
22     A.   No, not to my knowledge.
23     Q.   Let's take a five-minute break.
24     A.   Okay.
25     Q.   Does that work for you?

Page 197

1      A.   Sure.
2          THE VIDEOGRAPHER:  Going off the record,
3  and the time is 4:32 p.m.
4          (Recess taken.)
5          THE VIDEOGRAPHER:  Going back on the
6  record, and the time is 4:46 p.m.
7  BY MS. GRIFFITH:
8      Q.   Mr. Zeitlin, [inaudible] your Bank of
9  America account.
10     A.   I can't hear you again.  You're all
11  garbled up.
12     Q.   Is that any better, or no?
13     A.   Yes.
14     Q.   Okay.  Okay.  Mr. Zeitlin, when you were
15  signing up for your Bank of America accounts for your
16  entities, do you recall if you had time to review the
17  documents that they provided?
18     A.   I don't recall.
19     Q.   Do you recall if you were rushed through
20  or pressured into opening up the accounts?
21     A.   Rushed through or what?
22     Q.   Do you recall if you were pressured into
23  opening up the accounts?
24     A.   Pressured, no, of course not.
25          (Deposition Exhibit 4 marked.)

Richard Zeitlin
December 08, 2020

194..197

USAO_00003659

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 198

1 BY MS. GRIFFITH:
2    Q.  Okay.  Mr. Zeitlin, can you turn to
3 Exhibit 4.
4    A.  Yes.
5    Q.  Okay.  And do you recognize this document?
6    A.  It looks like a hearing of sorts.
7    Q.  The title of it is Responses to
8 Defendant's Requests for Interrogatories -- or
9 Plaintiffs' Response -- Plaintiffs' Responses to
10 Defendant's Request for Interrogatories.
11   A.  Yes.  Yes.
12   Q.  Do you recall reviewing this document?
13   A.  Not recently.
14   Q.  Do you recall at some time reviewing it?
15   A.  I'm sure I read this when it was shown to
16 me a long time ago.  Yes.
17   Q.  If you look at page 2 of this document.
18   A.  Okay.
19   Q.  Interrogatory No. 5 asks, "Identify the
20 complete factual basis for each claim of damages,
21 including but not limited to Plaintiff's claim for
22 punitive damages."
23       Do you see that?
24   A.  I do.
25   Q.  Okay.  And then if you look at the top of

Page 199

1 page 3, it says, "Zeitlin was unable to implement a
2 plan of expansion of more than 200 agents and has lost
3 hundreds of thousands of dollars in" -- "per week in
4 sales and renewals that will never be recovered."
5       Can you tell me about the planned
6 expansion of more than 200 agents.
7    A.  Yes.  We were going to do an expansion of
8 at least 200 agents that was planned months before.  To
9 do a -- to do an expansion of this magnitude requires
10 ordering of a substantial amount of hardware --
11 computer hardware, switches.  You have to go ahead and
12 order well in advance, several months in advance.  The
13 long-distance lines.  You have to have colocation
14 space.
15       You have to be prepared to train and
16 hire -- or hire and train all the agents from the
17 different vendors that we use, as well as agents in
18 this country.
19       We were going to start right at the end of
20 August into September, so we have the agents ready to
21 go so we wouldn't have to start agents in the slow
22 downtime of the holidays.  So we'd be able to start
23 them in the end of August, beginning of September, and
24 they would be seasoned going forward, being able to
25 then bring up the revenue substantially.

Page 200

1       It was a time to grow.  We had all the --
2 we'd implemented the -- again, the ordering of the
3 hardware, ordering of the long-distance lines, and we
4 were prepared to make the jump.
5    Q.  Okay.  So you had ordered, and did you pay
6 for all of that hardware?
7    A.  Yes.
8    Q.  Have you ever utilized it?
9    A.  Perhaps we've used some of the servers
10 here or there.
11   Q.  How did you pay for it?
12   A.  Cash.
13   Q.  Do you have any documents reflecting
14 payment for this hardware?
15   A.  Sure.
16   Q.  Okay.  Have those been provided in
17 discovery?
18   A.  To my knowledge.
19   Q.  Where could I find that information?
20   A.  Oh, I don't know.  I'm not sure where
21 it's -- in this menagerie of documents here.  I'm not
22 sure.
23   Q.  Okay.  Do you know what the document's
24 called?
25   A.  What's it called?  I don't know.

Page 201

1    Q.  Yeah.  Okay.
2       Did you create the document?
3    A.  I had my IT manager go ahead and produce
4 receipts and things of that nature for the -- the
5 servers, as we call them, clusters, as well as the
6 long-distance lines and the travel for installing
7 servers and switches and technology of that fashion.
8    Q.  And these 200 agents, they were going to
9 be employed by your companies?
10   A.  Predominantly, they would be with Allied
11 Global and some other -- we have our Philippine
12 partners, as well, we work with.
13   Q.  Did you pay Allied Global --
14   A.  I'll use the -- excuse me, Blakeley.  I'm
15 sorry.  I'll use the term "vendor," not "partner,"
16 because I don't have any stock in them companies, so
17 they're vendors.
18   Q.  Did you pay Allied Global for these
19 agents?
20   A.  No.  We never were able to start them.
21   Q.  Okay.  Do you have a business plan related
22 to this expansion?
23   A.  Nothing written, no.
24   Q.  Any forecasts for the expansion?
25   A.  No.  Nothing written.

Richard Zeitlin
December 08, 2020

198..201

102

USAO_00003660

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 202

1    Q.   Anything written related to the expansion?
2    A.   Nothing written. As I said earlier,
3 having 11th grade education, I'm not a big person on
4 documentation and forecasting of how things will go. I
5 just make it happen.
6    Q.   If you go down to the middle of that --
7 that paragraph, it also says, "Zeitlin was forced to
8 lay off employees resulting in approximately 150,000 in
9 damages due to lost daily production."
10    A.   Right.
11    Q.   Is that that day that you let those
12 employees go?
13    A.   Exactly.
14    Q.   Do you have any written documents showing
15 that amount?
16    A.   No. At that time, we were doing a
17 production about 300,000 a day; half a day, 150,000.
18    Q.   How much was the cost of the production?
19 So how much were you paying people to produce the
20 300,000?
21    A.   I don't know, offhand. I'd have to go
22 back and look at the records and the bills and see
23 exactly how much we were paying each vendor and --
24 internally.
25    Q.   Right. Because if you didn't have to pay

Page 203

1 your employees, you would have saved that cost,
2 correct?
3    A.   Yes.
4    Q.   The next sentence, it says, "has been
5 forced to take on new credit resulting in an immediate
6 drop in his personal credit score, approximately a
7 hundred points."
8    A.   Yes.
9    Q.   Did you take on any loans at the time of
10 the freeze? Earlier, you said you did not.
11    A.   Well, it wasn't loans. It was credit, as
12 in maxing out available credit.
13    Q.   So you maxed out your --
14    A.   Not being -- not being able to pay
15 anything.
16    Q.   Okay.
17    A.   As a matter of fact, to this day, I still
18 have not got back to my 800 credit score.
19    Q.   Okay.
20    A.   I was so proud to have, the first time in
21 my life.
22    Q.   So you maxed out your available credit.
23      During this time, did you try to take out
24 any loans or anything like that?
25    A.   No. I couldn't have imagined trying to

Page 204

1 get a loan, showing that I had all my money gone. How
2 do you explain such a thing? That the bank's criminal?
3      Of course, a lot of people would believe
4 that, but it didn't seem like a thing to do at the time
5 to try to get a loan. But I had credit, so I was able
6 to utilize various credit cards, and that's what I did.
7    Q.   Okay. And you have [inaudible] I think
8 you said -- you had bank accounts with Nevada State
9 Bank.
10      Did you have any other bank accounts at
11 this time?
12    A.   Besides Nevada State Bank?
13    Q.   Yes.
14    A.   Is that what you asked?
15    Q.   Yes. Did you have any bank accounts
16 besides Nevada State Bank?
17    A.   No.
18    Q.   Okay. So you had three accounts at Nevada
19 State Bank; is that right?
20    A.   Yes.
21    Q.   Did you have any personal accounts
22 anywhere else, or was it only at Bank of America?
23    A.   Only at Bank of America. I had no reason
24 to at that time. I had trust, wrongfully placed, as it
25 was, to just use Bank of America. Matter of fact, were

Page 205

1 nice enough to freeze all my credit cards too with Bank
2 of America.
3      And you know what's funny on a comical
4 note lately is that they started harassing me because
5 they froze my accounts, and I couldn't even pay them,
6 because you can't pay an account that's frozen.
7 Because I had a -- I had a car loan. And I got whacked
8 on my credit for that too, to add insult to injury. On
9 my credit card, so --
10    Q.   Would -- would you ever do business with
11 Bank of America again?
12    A.   Absolutely not.
13    Q.   This last sentence in this paragraph, it
14 says, "Furthermore, Zeitlin suffered extreme stress and
15 anxiety resulting emotional distress. Zeitlin had
16 sleepless nights and was forced to seek a doctor's
17 assistance with the stress and anxiety."
18      Can you tell me about that.
19    A.   Sure. When you've worked your entire life
20 to build a business, you have trust. You've built up
21 partnerships domestically, internationally. You have
22 great relationships with your bank. And all of a
23 sudden, in one day, everything is gone.
24      Ultimately, it really began to question --
25 made me question my entire faith in the system, that a

Richard Zeitlin
December 08, 2020

202..205

103

USAO_00003661

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

1 bank, for no reason whatsoever, could take all my money
2 and confiscate it for no reason whatsoever.
3          And to add more insult to injury, that the
4 people running Bank of America, being their so-called
5 lawyers and legal team and their risk department, have
6 the audacity to say it's none of my business why they
7 did what they did, and they will take as much time as
8 they want.
9          They lied to my lawyers.  And I have no
10 idea why they did what they did.  And quite frankly, to
11 this day, we don't know why, and that's why we're doing
12 this.
13          So if you -- everything you fought for was
14 on the brink of losing everything; you have a child
15 that needs to go to a special school all of a sudden
16 you can't pay for; you don't know how you're going to
17 be able to buy your food, if you're going to be able to
18 survive; that caused me to this day horrible stress and
19 sleepless nights.
20          So, yes, you begin to question things.
21 Who runs the world?  The stinking bank?  They do what
22 they want to do?  Scumbag lawyers, they want -- not
23 you.  But scumbag lawyers who want to go ahead and tell
24 you that's none of your business where your money is?
25 It really makes you question everything you've ever

1 believed in.
2          I can't -- you know, I tell you, you seem
3 like a nice enough person.  I wouldn't wish this upon
4 you.  But you're representing some stone-cold criminals
5 that do what they want to do, and they laugh about it.
6 And they make fun about people like me that can't sleep
7 because they take my money.
8          Now, I look forward to the day of getting
9 this out into the periphery where people can see the
10 kind of -- the way that they're treated by Bank of
11 America.  And then they laugh.  The people that work
12 for Bank of America laughed at me.  Oh, look how funny
13 he is now.  LOL.  ROTFL.  And I'm the bad guy?
14          Yeah, I've had some sleepless nights, to
15 this day.  Thank you.
16    Q.    You had some sleepless nights.
17          Were you prescribed any medicine?
18    A.    I was.
19    Q.    Okay.  What were you prescribed?
20    A.    I think it was Valium, and I think -- oh,
21 jeez.  What was the other -- another tranquilizer of
22 sorts.  I forget what it was, offhand.  I gave the
23 prescriptions to the attorneys here.
24    Q.    Did you have any other stress going on in
25 your life at this time?

1    A.    No.  Things were good.  I was making
2 business, making good money.  No problems.
3    Q.    Did Donor Relations have a lawsuit at this
4 time with the FTC?
5    A.    No.
6    Q.    Has Donor Relations had a lawsuit with the
7 FTC?
8    A.    No.
9    Q.    Has Donor Relations ever been subpoenaed
10 by the FTC?
11    A.    They -- there were some questions and
12 investigation that ultimately was suspended.
13    Q.    Okay.  So there was an investigation into
14 Donor Relations; is that right?
15    A.    Yes.
16    Q.    What was the nature of the investigation?
17    A.    God, it's been so long now.  Again, they
18 dropped it pretty quick thereafter.  I'd have to go
19 back and refresh my memory.  I don't remember.
20    Q.    Any other investigations into you or your
21 entities by a government entity?
22    A.    Not to my recollection.
23    Q.    What about Courtesy Call?
24    A.    What about Courtesy Call?
25    Q.    Were they ever investigated by a

1 government entity?
2    A.    Yes.
3    Q.    Okay.  When?
4    A.    Oh, I can't recall the dates, offhand.
5 Courtesy Call started in 1994.  I'd have to -- nothing
6 that was ever a big issue that didn't get dispensed
7 quickly.
8    Q.    Do you remember the nature of the
9 investigation?
10    A.    I'd have to be -- I'd have to be reminded
11 of it.  I mean, all they -- no.  I can't remember,
12 offhand.
13          (Deposition Exhibit 33 marked.)
14 BY MS. GRIFFITH:
15    Q.    Okay.  Was it -- let's go to
16 Exhibit No. 33.
17    A.    2370.
18    Q.    Okay.
19    A.    Yes.
20    Q.    2370.
21    A.    Yes.
22    Q.    And this is People of the State of
23 California versus Association for Firefighters and
24 Paramedics, Inc.; Michael Gamboa; Public Awareness,
25 LLC; Community Support, Inc.; and Courtesy Call.

Richard Zeitlin
December 08, 2020

206..209

USAO_00003662

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 210

1  Do you see that?
2  A. I do.
3  Q. Okay. Do you recognize this document?
4  A. Yeah. Vaguely. It's old.
5  Q. If you look at the bottom of page 2370, it
6  says, "The Attorney General, on behalf of the People,
7  sued Courtesy Call in the underlying action for
8  deceptive and misleading charitable solutions [sic],
9  unfair competition, and disseminating false or
10 misleading statements."
11  Do you see that?
12  A. Where are you starting again?
13  Q. The very last line on the first page,
14 continuing on to the second --
15  A. "The Attorney General, on behalf of the
16 People" -- okay. "Sued Courtesy Call in the underlying
17 action." Yes. Okay. Go ahead.
18  Q. Okay. So you see that. So --
19  A. I do.
20  Q. And Courtesy Call says it denies any
21 wrongdoing.
22  A. Right.
23  Q. And the parties entered into a settlement;
24 is that right?
25  A. Right.

Page 211

1  Q. As part of that settlement, Courtesy Call
2  was not to do any business in California; is that
3  right?
4  A. No, that's not right. Can you tell me
5  what line you're looking at where it says that.
6  Q. Okay.
7  A. What line are you're talking about that
8  says we couldn't call in California?
9  Q. I'm talking about paragraph 5 on
10 page 2372.
11  A. "During" --
12  Q. Okay. So it says, "During year" -- "the
13 years 2010, 2011, and 2012, Courtesy Call will not
14 enter into any contracts or agreements to solicit in
15 California and/or on behalf of a California charity,
16 without first providing the California Attorney
17 General's Office, addressed to the attention of Deputy
18 Attorney General Jami L. Cantore, with a copy of the
19 contract or agreement for review ten business days
20 before the commencement of work."
21  Is that --
22  A. Yes.
23  Q. Okay. So is that accurate?
24  A. Yeah. So it doesn't say anything we
25 couldn't call. We complied with everything that they

Page 212

1 ever requested from us. Her name is Jami Cantore.
2 That's fine. Now that I read this more, I remember it
3 better.
4  Q. Have you ever had any negative press?
5  A. Have I ever had any negative press? I
6 guess it depends on what you mean by "negative."
7  Q. Have you ever had any press that says
8 you've been engaged in misleading fund-raising
9 activity?
10  MR. BERNHOFT: Objection. Objection.
11 Relevancy.
12  THE WITNESS: Can you -- can you point me
13 to whatever page you're talking about so I can be
14 educated on what you're discussing here.
15 BY MS. GRIFFITH:
16  Q. I'm just asking about your general
17 knowledge.
18  Are you aware of any articles that state
19 that you have engaged in misleading fund-raising
20 activity?
21  MR. BERNHOFT: Same objection.
22  THE WITNESS: You know, I don't remember
23 that -- that quote about me on any -- anything,
24 offhand.
25 ///

Page 213

1 BY MS. GRIFFITH:
2  Q. Are there any articles out there about
3 your fund-raising activities?
4  A. There are some articles that aren't very
5 flattering, yes.
6  Q. Would you say they're negative?
7  A. I'd say they're slanderous and unfounded.
8  Q. Have you sued any of those people who
9 published them for slander?
10  A. No.
11  Q. Do you think there's ever a situation
12 where a bank should have the ability to freeze an
13 account?
14  MR. BERNHOFT: Objection. Foundation.
15 Calls for speculation.
16 BY MS. GRIFFITH:
17  Q. You can answer.
18  A. Ask it one more time, please.
19  Q. Do you ever think there's any situation
20 where a bank should have the ability to freeze an
21 account?
22  A. I can't answer that question. I'm not --
23 I don't know where the banks stop and the government
24 begins and law enforcement begins, and I didn't realize
25 that the banks were supposed to be law enforcement

Richard Zeitlin
December 08, 2020

210..213

105

USAO_00003663

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 214

1 officials, so I guess that's up for debate. I can tell
2 you this much: I didn't like it.
3 **Q. If a bank was aware that fraud was**
4 **happening in its accounts, do you think it should**
5 **permit it to go on?**
6 A. I think that they should contact law
7 enforcement immediately and make sure to contact the
8 person that's doing it and have them arrested. At
9 least then they'd understand what's going on. They'd
10 have a chance to fight and know what's going on, as
11 opposed to blindly taking someone's money and laughing
12 about it. That's what I think should happen.
13 At least you get arrested, you know what
14 you're doing. You can look at your accuser in the face
15 instead of a bunch of cowards on the Internet or on a
16 telephone. That's my opinion. What's yours?
17 **Q. So, Mr. Zeitlin, do you think there's**
18 **never a situation where a bank should be able to freeze**
19 **an account?**
20 MR. BERNHOFT: Objection. Foundation.
21 Calls for speculation. It's a hypothetical. Asked and
22 answered.
23 THE WITNESS: I'll answer it again. I
24 think that it's very strange that the -- the citizenry
25 doesn't know where banks end and law enforcement begin

Page 215

1 and the unsavory relationship between the banks and the
2 government and people who seem to walk on water and can
3 destroy people's lives.
4 Do I think bank -- do that? Absolutely
5 not. Because I have gone through it, and to this day,
6 I still struggle with it. Do you think someone should
7 have the power to ruin someone's life and take all
8 their money and not know why?
9 You're asking questions that are really
10 astronomically ridiculous. Ask me about the weather.
11 It would make more sense. But go ahead.
12 BY MS. GRIFFITH:
13 **Q. Mr. Zeitlin, do you have any documentation**
14 **showing your receivables during the period of the**
15 **freeze?**
16 A. Not handy.
17 **Q. Do you have any at all?**
18 A. I'd assume we have bank statements from
19 the past.
20 **Q. Have you provided your Nevada State Bank**
21 **account statements in this action?**
22 A. I don't know. I can check with counsel
23 and do a little record digging to see.
24 **Q. How did your business change in March**
25 **2019?**

Page 216

1 A. How did my business change in March of
2 2019?
3 **Q. Yeah.**
4 A. Well, at that point it was an interesting
5 time. Of course, with the bank's nefarious actions,
6 making me do things I wouldn't typically do with our --
7 our lists, credit card renewals, and donors and so on,
8 we really ended up depleting the very best quality
9 material that we had, which was the majority of -- of
10 the -- the money that the company gets to make.
11 We had to start rebuilding the
12 acquisition, or the cold calls, which really lopsides
13 the business for a while until those cold acquisition
14 calls begin to pay.
15 We do have methods of how we call our
16 lists which are -- to be most productive, and for that
17 period of time, it swayed them dramatically, especially
18 during the holidays when things are already slow, so it
19 couldn't have happened at a much worse time, when the
20 bank, you know, confiscated my money.
21 It was -- it was a bizarre time too,
22 because ultimately, when you have a -- a direction
23 you're going, and someone throws TNT into it, you have
24 to restrategize and try to figure out how to keep the
25 company going, growing, and maintaining what you had.

Page 217

1 So doing direct mail campaigns, trying to
2 get things to -- to be as profitable as possible is
3 what we had to do.
4 Does that answer your question?
5 **Q. And that started in March 2019?**
6 A. It was the first quarter. Yeah, that's
7 when that all began to happen.
8 **Q. You changed the business model to include**
9 **direct mail campaigns.**
10 **Anything else?**
11 A. Well, I just told you what we did. Should
12 I state it again?
13 **Q. Well, when did you say -- you said that**
14 **you had to make calls to -- earlier than you would**
15 **like.**
16 **When were you doing that?**
17 A. When was I doing what?
18 **Q. When were you calling donors, I guess, too**
19 **soon?**
20 A. Oh, right away. Because I was -- I
21 couldn't have access to my money, and I -- the few
22 dollars that I had from Nevada State Bank was just
23 barely enough to keep the lights on.
24 So we had to get the cash flow in the door
25 quickly. And by doing that means hitting the credit

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 218

1 card donors, making sure you can get as much money as
2 possible as quickly as possible. But also you're just
3 robbing Peter to pay Paul. And then of course Paul
4 gets upset, because you robbed him. Paul got it.
5 Peter's broke.
6         So I had to -- we had to replenish the
7 coffers. It takes time to regain equilibrium after
8 something of that magnitude, not only that but the
9 uncertainty of what was even happening. Why did it --
10 why, how, and so on.
11     **Q.   The accounts were frozen on August 8th; is**
12 **that right?**
13     A.   Absolutely.
14     **Q.   Two were released in -- around August**
15 **15th?**
16     A.   I think the 16th, but, yeah, right around
17 there.
18     **Q.   And the rest, the money -- the accounts**
19 **were closed, and the money returned to you October 2nd?**
20     A.   I believe so, yes. Except for Chrome
21 Builders, of course.
22     **Q.   So how many weeks is that, about six?**
23     A.   It was over seven weeks, if you look at
24 the days. August has 31 days.
25     **Q.   So during that seven weeks, you needed to**

Page 219

1 get cash in the door as soon as possible.
2     A.   Yes.
3     **Q.   So you -- you did the credit card renewals**
4 **too soon. I guess you went to the well.**
5     **What -- what exactly could you not do**
6 **during that period?**
7     A.   What could I not do?
8     **Q.   Yeah.**
9     A.   What does that mean?
10     **Q.   Did any of the businesses stop besides --**
11 **I know they stopped for that day or half day.**
12     A.   Can you rephrase that question, because
13 I'm confused. I'm sorry.
14     **Q.   Was there anything that the businesses --**
15 **sorry. I'll rephrase.**
16     **The businesses kept operating over the**
17 **seven-week period; is that right?**
18     A.   Yes.
19     **Q.   Okay. Mr. Zeitlin, do you recall if the**
20 **deposit agreement [inaudible] a time limit on the**
21 **freeze?**
22     A.   I'm sorry. One more time.
23     **Q.   Do you recall if the deposit agreement set**
24 **a time limit on a -- on freezing the accounts?**
25     A.   You're -- you're breaking up again. One

Page 220

1 more time.
2     **Q.   Do you recall if the deposit agreement set**
3 **a time limit on freezing the accounts?**
4     A.   Do I recall if the deposit agreement had a
5 limit?
6     **Q.   Yes.**
7     A.   I have no idea. I didn't look at the
8 deposit agreements at that -- at that time.
9     **Q.   Okay. When did you look at the deposit**
10 **agreement?**
11     A.   I don't recall.
12     (Deposition Exhibit 7 marked.)
13 BY MS. GRIFFITH:
14     **Q.   Let's turn to Exhibit No. 7.**
15     A.   7?
16     **Q.   Yes.**
17     A.   Okay. Yes. 210.
18     **Q.   Yes. 210.**
19     **This is addressed to Mr. and Mrs. Brian**
20 **Moynihan?**
21     A.   Yes.
22     **Q.   Do you know who that is?**
23     A.   I do.
24     **Q.   Who's that?**
25     A.   It's the president of Bank of America.

Page 221

1     **Q.   How did you get his personal address?**
2     A.   From my attorney.
3     **Q.   Do you know how anybody got that address?**
4     A.   I don't know. I assume that they're
5 resourceful.
6     **Q.   Is that the way that you got the addresses**
7 **of all the Bank America executives that you sent**
8 **letters to?**
9     A.   Yes.
10     **Q.   From your attorney?**
11     A.   Sure. Absolutely.
12     **Q.   And you sent these letters to their home**
13 **addresses; is that right?**
14     A.   Right.
15     (Deposition Exhibit 10 marked.)
16 BY MS. GRIFFITH:
17     **Q.   Okay. Let's go to Exhibit 10.**
18     A.   236.
19     **Q.   Yeah. 236.**
20     A.   Yes. Gotcha.
21     **Q.   Did you send -- did you review this**
22 **e-mail?**
23     A.   Yes. I see it.
24     **Q.   Okay. Did you write this e-mail?**
25     A.   It looks like me. Yes.

Richard Zeitlin
December 08, 2020

218..221

USAO_00003665

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 222

1    Q.    This says, "caused the layoffs of hundreds
2    of people."
3          Is that referring to that day layoff?
4    A.    That's right.
5          There are some things in life you wish you
6    could retract.  This ain't one of them.  Hopefully, as
7    you read this, you would begin to realize what a panic
8    I was in and how -- how just blown away with
9    everything.
10         No -- no -- no phone -- no phone calls, no
11   reasons, no anything.  This was the e-mail from a
12   desperate man on the verge of losing his mind.  And
13   that I didn't is a damn miracle.
14   Q.    What day was the layoff of your employees?
15   A.    That must have been on the 9th or 10th of
16   August, to the best of my memory.
17   Q.    Mr. Zeitlin, you've said that the bank
18   caused damage to your reputation.
19         How did the bank damage your reputation?
20   A.    Well, it was not a good time in my life to
21   have to go in and explain to my clients that, yeah, by
22   the way, all my money's been frozen from the bank.
23   It's quite embarrassing.
24         Fortunately, my clients and associates
25   that know me realized that it wasn't my fault, and,

Page 223

1    yeah, the bank is a bunch of real scumbag pieces of
2    garbage, and they never held it against me.
3          But at the time, I thought I could have
4    some real bad, lasting effects against me.  But
5    fortunately, my reputation was better than the banks
6    tried to make mine, if that helps.
7          It's amazing there's not many more people
8    hated than the bank, especially after you do things
9    like this to just prove how nasty and despicable they
10   really are, unaccountable, except this time.  We're
11   going to make history together on this one.
12         (Deposition Exhibit 57 marked.)
13   BY MS. GRIFFITH:
14   Q.    Can you turn to Exhibit No. 57.
15   A.    Of course.  145?
16   Q.    No, number -- yeah.  145, Zeitlin 145.
17   A.    Yes.
18   Q.    Okay.  So we -- I think that this is a
19   list of the employees that were laid off; is -- is that
20   right?
21   A.    Yes.
22   Q.    Did you create this document?
23   A.    Well, one of my people did.  Not me
24   personally but -- yeah, these were the folks that were
25   on the phone at the time.

Page 224

1    Q.    Okay.  And these were all people who were
2    making calls?
3    A.    Yes.
4    Q.    So for this list, is this all of your
5    employees, some of your employees?  What percentage of
6    the employees here?
7    A.    What percent of my employees?  What does
8    that -- what does that --
9    Q.    What does this list entail?
10   A.    What does that exactly mean?
11   Q.    Is this all of your employees?
12   A.    Oh, no.  At this time, we probably had
13   1,200 agents, so this is a piece of it.
14   Q.    Okay.  So this is -- so you had 1,200
15   agents at the time, and -- let's see -- it looks like
16   226 were laid off.
17   A.    That looks like the number.
18   Q.    Okay.  So of the other agents that were
19   not laid off, what were they doing?
20   A.    Working.
21   Q.    Any -- any other -- so -- any other
22   employees that were laid off at this time, or no?
23   A.    I think this is a comprehensive list.
24   Q.    And these people were hired back the next
25   day?

Page 225

1    A.    Yes.  They came back right away.
2    Q.    Were any of the offices or call centers
3    shut down totally?
4    A.    It was a half day.
5    Q.    Was that any specific center?
6    A.    No.
7    Q.    So employees from all centers were sent
8    home, but some employees stayed at the centers.
9    A.    You know, I really don't remember who went
10   and who didn't.  Again, it's been a while and -- the
11   exact circumstances -- this is the list of the people.
12   That's all I could say.
13   Q.    Mr. Zeitlin, I asked you earlier about the
14   percentage of money collected from donations.
15   A.    Yeah.
16   Q.    Do you remember that?
17   A.    I do.
18   Q.    My question was intended to refer to the
19   percentage of donations that you personally collect
20   versus what is disbursed to the charity.
21   A.    Say it again.  You broke up there.
22   Q.    Sorry.  So my question was intended to
23   refer to the percentages of donations that you collect,
24   your companies collect, versus what is disbursed to the
25   charity, so the revenues.

Richard Zeitlin
December 08, 2020

222..225

108

USAO_00003666

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 226

1    Does that change your answer?
2    A.   The revenues?
3    Q.   So in other words, is it accurate to say
4  that 80 to 90 percent of the money raised from donors
5  is retained by your entity?
6        MR. BERNHOFT:  Objection.  Foundation.
7  Have no evidentiary predicate for those assumptions in
8  the question.
9  BY MS. GRIFFITH:
10   Q.   So I think, Mr. Zeitlin, my question is,
11 for the money that comes in from donors, does -- as
12 compared to the amount going to different charities or
13 nonprofits, do your companies receive 80 to 90 percent
14 of those amounts?
15   A.   I receive my invoices paid from the
16 clients, depending upon hours, depending how many
17 pieces that have collected.  If you look at the
18 aggregate, if you were to add them together, it may be
19 between 80, 85 percent, possibly.
20       Besides those numbers, what's also not so
21 easily seen is the other services that are also
22 rendered by myself, being paid for all the reporting
23 that's required to the government agencies, bonuses and
24 credits that are given for loyalty and for -- time time
25 being with me as a client.

Page 227

1    So I've never really gone ahead at the end
2  of the day and did a percentage of how much money is
3  kept.  I suppose I could do that calculation, and it
4  would probably be in -- the 80s somewhere.
5    Q.   Okay.  And you just said that -- that you
6  pay for the reporting.
7        You pay for the reporting for the
8  charities?
9    A.   For the PAC clients, they have to have a
10 very strong reporting requirement for the FEC, which
11 has to transfer every single donor to them, and, of
12 course, where all expenditures go.
13       And I went ahead, at my expense, and
14 created software for the -- the client to use, which
15 saves the clients a tremendous amount of money and have
16 a very high level of accuracy when it comes to
17 reporting to the correct authorities.
18   Q.   And for that software, does one of your
19 companies own that?
20   A.   Yes.
21   Q.   Which one is it?
22   A.   That would be Advanced Telephony.
23   Q.   So through this software, the reporting is
24 done for the FEC.
25   A.   That's right.

Page 228

1    Q.   Does somebody from Advanced Telephony do
2  this reporting for the clients?
3    A.   Ultimately, the client themselves ends up
4  doing it, because we've made it very user friendly.
5  They enter in the information that we export from our
6  databases, and it makes for a very simple, clean report
7  to the FEC.
8    Q.   So you export the information from your
9  databases and -- and provide that to the client, and
10 they input it into the software; is that accurate?
11   A.   Yes.  Without that, it would probably cost
12 the clients 25,000 a quarter to do reporting for the
13 FEC.
14   Q.   Do you get paid -- does Advanced Telephony
15 get paid for doing the reporting?
16   A.   No.
17   Q.   So the client just --
18   A.   That's not -- I like to call it value add.
19   Q.   Okay.  So did the client ever pay for the
20 software or anything like that?
21   A.   No.  I like to call it a value add.  They
22 don't pay for it.  As being a customer, it's an
23 incentive, because it's a very expensive reporting that
24 has to be done if you use a different provider, and
25 they make sure it gets done correctly with the use of

Page 229

1  my software.
2    Q.   The time of the freeze, some of your
3  clients' accounts were frozen as well.
4        Do you recall that?
5    A.   Yes.
6    Q.   And did that lead to a delay in you
7  getting paid?
8    A.   Absolutely.
9    Q.   Okay.  Did your clients have any other --
10 or do you know -- do they have any other funds that
11 they could have used to pay you?
12   A.   Well, if they did, they weren't telling me
13 about it.  I was hobbled very well by Bank of America.
14 They really tried to knock me out.
15   Q.   Do you know -- do you know if they could
16 have taken on a line of credit or something else to --
17 to pay you?
18   A.   Well, I certainly wouldn't be asking a
19 nonprofit to let them take a line of credit out because
20 the banks were stealing all of our money.  We were all
21 in it together, unfortunately.
22       I also know that, vindictively, the bank
23 contacted one of our credit card acceptance companies
24 and made sure to drop a dime on that and freeze that
25 too.

Richard Zeitlin
December 08, 2020
226..229

109

USAO_00003667

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 230

1    Q.  So what are you talking about there?
2    A.  We were using a credit card authorization
3 company. What's the name of it again? It will come to
4 me. A merchant processor. And they went ahead and
5 reached out to them and told them that they better
6 freeze those accounts as well, even though they had
7 nothing to do with Bank of America.
8     And that was your own -- excuse me -- your
9 own clients laughing at me as they did everything they
10 could to freeze every single dollar that I could get.
11 And they had no right doing that, as well. Completely
12 scummy to go along with their other behaviors and
13 actions. Lecherous.
14    Q.  So this credit card authorization company,
15 did they reach out and tell you about this?
16    A.  We got that in discovery. Well, no. No.
17 They froze the money right away. We ended up finding
18 out why, because your folks told them to do it. And
19 they thought it was -- and they laughed. They said LOL
20 on their -- in their snarky message. Authorize.net,
21 that's who it was. They thought that was real funny.
22 "Let's really cripple this guy."
23    Q.  Okay. Let's take another just five-minute
24 break real quick.
25    MR. BERNHOFT: Yes. And court reporter,

Page 231

1 could we have the court reporter clock time. I think
2 we might be approaching the witching hour.
3    THE VIDEOGRAPHER: Going off the record,
4 and the time is 5:40 p.m.
5    (Recess taken.)
6    THE VIDEOGRAPHER: Going back on the
7 record, and the time is 5:54 p.m.
8 BY MS. GRIFFITH:
9    Q.  It sounds like we've got about an hour
10 left. So Mr. Zeitlin, we were talking about the -- the
11 wholesale business change in March 2019. And I wanted
12 to talk about that with you a little bit more, because
13 I'm -- I'm not understanding it, which happens. You
14 know, I'm not [inaudible].
15    So -- so the accounts were frozen for
16 seven weeks from -- in August to October. Two accounts
17 were released earlier, in -- in -- about -- around
18 August 15th.
19    During the time period of the freeze,
20 business operations kept going. You had to max out
21 your credit cards. You had to use all the funds from
22 other accounts. But they kept going.
23    MR. BERNHOFT: Counsel, is this a
24 question?
25    MS. GRIFFITH: I'm just going back through

Page 232

1 to give the witness as much information as he can to
2 answer. I'm going to get to a question.
3 BY MS. GRIFFITH:
4    Q.  Okay. So that was all during the freeze
5 time period. But then six months later, there's a
6 wholesale business change.
7    Can you describe that business change for
8 me.
9    A.  It wasn't six months. It would be more
10 about four to five months. And one thing that's
11 important, I think, that we -- we have to look at is
12 with the -- the inability to utilize my funds as -- in
13 a -- a company the size of mine that had as many agents
14 and employees and so on, there is an attrition that
15 happens.
16    So during that time, there was no
17 attrition hiring, as we call it. And I can do an
18 equation pretty simply. So if you -- let's just say a
19 thousand agents, and you're going to go ahead and have
20 a 5 percent attrition per month, which would be low,
21 but let's just call it 5 percent.
22    Well, you're losing 50 people a month, at
23 least. So for that period of time for those months, we
24 were atrophy -- we were shrinking that many agents. So
25 we're losing agents just due to the normal attrition.

Page 233

1    We took new agents during the holidays at
2 a much higher clip than that. For historical reason --
3 I really can't say, but we do seem to lose people
4 through the Christmas period, as well.
5    So we probably lost 2 -- 2- to 300 agents
6 during that time, which is normal, but we were not in a
7 position to continue to rehire to replenish those
8 agents. So now you've already lost 25, 30 percent of
9 your crew.
10    So that's happening. And then to add
11 insult to injury, so you're losing all those agents
12 that are typically going to do the cold calling or the
13 acquisition calling, as we've discussed. You just have
14 less people to do it.
15    So you have to go ahead and to keep
16 revenues -- and yes, you might say, "Well, they weren't
17 there, so you weren't paying them." Yes, I understand
18 that. But with that logic, you might as well say just
19 get rid of everybody, you don't have to pay anybody.
20    So the logic says you must keep your
21 people around. So to -- to sophomorically say, "Well,
22 there was no one that" -- "you didn't pay them, so you
23 didn't lose any money," it's ridiculous. You're not
24 making any money either.
25    So that being said -- but I've said

Richard Zeitlin
December 08, 2020

230..233

110

USAO_00003668

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 234

1 this -- now this will be the third or fourth time. To
2 have to dramatically adjust how we utilized our lead
3 base -- which quite frankly is no business of Bank of
4 America's anyways, how I run my business, but they
5 forced my hand and the changing how I did things.
6        I don't want to be second-guessed. I did
7 what I thought was best. And I guarantee that Moynihan
8 and all these other scumbags can't run a call center
9 anyways. We'll leave that to the side.
10       So as we continue to overuse our list, it
11 depletes the profitability of the list, which doesn't
12 take long. As I said before, when you go into the
13 holidays, you're already crippled by at least a week
14 time off. Christmas Eve, Christmas Day, New Year's
15 Eve, New Year's Day, Thanksgiving, Black Friday, all
16 these days are not available to utilize. So a lot of
17 time is simply gone, which also stresses any type of
18 inbound revenues.
19       So that being said, you really kind of
20 almost have -- I don't want to say start the business
21 from scratch, because we had an operating operation,
22 but you're going to have to go ahead and refuel the
23 engine, and it's a very labor-intensive,
24 capital-intensive thing to go ahead and get those cold
25 calls going, which is the lifeblood of the industry.

Page 235

1        So if you go ahead and you stop calling
2 cold, you really hobble the entire operation. So
3 hence, you have to go ahead and rebuild it. Is that
4 enough?
5    Q.  In October -- after October 2nd, when the
6 funds were released, why didn't you hire more
7 employees?
8    A.  Well, you know, I know you've seen my
9 letters to the various people, Bank of America, and I
10 certainly did hold my tongue for the most part of it.
11       Just because I got my money back, and,
12 quite frankly, it wasn't all the money. They just
13 went -- they took my personal accounts. My clients
14 sold me money, and that went on for several more weeks
15 as well.
16       So it wasn't I got all of my money back.
17 I still didn't -- I was very uncertain what was going
18 to happen. What was going -- why -- what -- you know,
19 was -- is the government in cahoots with the bank or
20 vice versa? What's happening?
21       It's very difficult to go, "Okay. Here's
22 your money back. Business as usual. Stop your
23 crying." Well, unfortunately, I'm not that sharp or
24 strong to just disregard what has happened.
25       And, you know, perhaps you've defended

Page 236

1 Bank -- probably this is normal for Bank of America, to
2 just steal people's money, and you just defending it.
3 Okay. Well, it's indefensible.
4        And it just rocks someone's world. So to
5 say, "Well, you've got your money back. Go back to
6 work" -- well, walk a mile in my shoes before you say
7 such a, with all due respect, ludicrous, ridiculous
8 thing when you just don't know what's going to happen.
9 When is the next shoe going to drop? So that's my
10 answer to you.
11   Q.  Okay. So why didn't you start making cold
12 calls after October 2nd?
13   A.  Did you hear me? Did you hear what I said
14 to you?
15   Q.  Yes. I heard you.
16   A.  Okay. Well, you're not listening, then,
17 or understanding me. You know, it's -- it's -- it's
18 not just, okay, back to normal. Hire 300 people and
19 get back on the horse.
20       You got -- you are -- you are really not
21 understanding how someone's confidence in everything
22 can just -- you know, oh, it's all good, Rick. Back to
23 work you go. No. It's absurd to think that.
24       I have senses. I know things aren't
25 right. Oh, now it's going to be okay. What's

Page 237

1 happening in this? So, no, I -- it wasn't just start
2 making cold calls again.
3    Q.  Okay.
4    A.  I did it when we did it, when I felt it
5 was correct in time to do it. And the other clients
6 that they don't need -- they had more money owed to me.
7 It was hundreds of thousands of dollars still that I
8 didn't get that I was -- I was made whole to until
9 weeks later, and then it was five months after that,
10 because of your clients decided to call authorize.net
11 and take that money from me too.
12   Q.  Okay. So what clients owed you money and
13 weren't able to pay? I think you said there were two.
14   A.  Oh, no, there were several clients. I
15 think it was five different clients --
16   Q.  Okay.
17   A.  -- that owed me money.
18   Q.  Who were they?
19   A.  I don't have the list in front of me right
20 now.
21   Q.  Okay. Were your other clients able to
22 continue paying?
23   A.  Yes. Although, I can tell you that the
24 other clients that we authorize -- that money was
25 frozen up, so they had to get a whole new merchant

Richard Zeitlin
December 08, 2020

234..237

111

USAO_00003669

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 238

1 accept -- merchant account, which froze that money off
2 too. And that delayed being able to call more
3 campaigns.
4     So that's why this is an absolute
5 conspiracy. This is an absolute flogging. There is no
6 way that something this far reaching could just
7 accidentally happen.
8     If you want to ask me again if I know
9 about Guatemala, don't even insult my intelligence,
10 because this is craziness, what happened to me, and I
11 think it's downright criminal. And why didn't I get
12 back to work? I didn't go to that school. But go
13 ahead.
14   Q.   So in March, what was the wholesale
15 change? Did you hire more employees, finally?
16   A.   You can ask the court reporter to read it
17 back. I'm sick of saying the same thing over and over
18 to you. I mean, all due respect. How many times can I
19 say this to you? You're not -- you're not listening to
20 me.
21     MR. BERNHOFT: Counsel, I'm going to take
22 two minutes with my client. He's obviously very
23 emotional here. I'd like to go off the record for two
24 minutes, please.
25     MS. GRIFFITH: That's fine.

Page 239

1     THE VIDEOGRAPHER: Going off the record,
2 and the time is 6:04 p.m.
3     (Recess taken.)
4     THE VIDEOGRAPHER: Going back on the
5 record, and the time is 6:10 p.m.
6 BY MS. GRIFFITH:
7   Q.   Mr. Zeitlin, you've produced call records
8 for this case for September and October of 2020.
9     Do you recall that?
10   A.   Call records?
11   Q.   Yeah. Call records?
12   A.   What number would that be?
13   Q.   I'll pull it up, but unfortunately, it's
14 a -- it's an Excel spreadsheet, so we're going to have
15 the court reporter pull it up.
16     Do you recall producing those or not?
17   A.   I don't -- I'm not sure what you're
18 talking about. I have to look at it.
19   Q.   Okay. Let's -- let's pull it up. So here
20 we go.
21     Do you keep call records for your
22 companies?
23   A.   Do I keep what?
24   Q.   Call records, records of people that
25 you've called.

Page 240

1   A.   Give me an example of what that would look
2 like to you.
3   Q.   So it would be data on number of calls
4 made, hours worked, paid sales, that kind of
5 information.
6   A.   We don't keep too much information on --
7 on calls made, because it's just so many. It would
8 clog up our database, to be able to maintain those
9 types of numbers. But certainly sales made, of course,
10 that's kept, yes. Absolutely.
11   Q.   Sales -- okay. So paid sales.
12     Any -- how about hours worked?
13   A.   Hours worked?
14   Q.   Yeah.
15   A.   Sure. Sure.
16   Q.   Do you have that information for the time
17 of the freeze period?
18   A.   Not handy, but, yes, we should have that
19 somewhere.
20   Q.   Can you provide that to your counsel if
21 you can get it.
22   A.   And you want to be able to have how many,
23 like, hours that were worked?
24   Q.   Hours -- any call data. Hours worked,
25 paid sales.

Page 241

1   A.   I'll -- I'll see what I can -- probably
2 would come out of payroll records. I certainly
3 wouldn't have, you know, calls made and those types of
4 things going back that -- you know, that long. It's
5 going to be -- come off of payroll reports. That's the
6 best I can probably do for you.
7   Q.   So, Mr. Zeitlin, you said that you were
8 going to do a planned expansion, correct?
9   A.   Yes.
10   Q.   And your agents were going to be employed
11 through Allied; is that right?
12   A.   Some of them.
13   Q.   But you were going to be employing some
14 too?
15   A.   We have a number of different vendors that
16 we work with, so it wouldn't all just be with Allied.
17   Q.   So they would be with different vendors?
18   A.   Yes.
19   Q.   Why did you buy the tech equipment for the
20 planned expansion if -- if the vendors were going to be
21 making the calls?
22   A.   Because they -- they use my system to make
23 the calls.
24   Q.   Okay. So you supply the systems to the
25 vendors?

Richard Zeitlin
December 08, 2020

238..241

112

USAO_00003670

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 242

1    A.   Yeah.  It's like a cloud, if you will.  We
2  operate what's -- essentially is a -- a very loud --
3  large cloud.
4    Q.   Okay.  And you own the cloud.
5    A.   I do.
6    Q.   And you hire a vendor who sends in people
7  to work on the cloud; is that right?
8    A.   We do that all in-house.
9    Q.   Okay.  So what does the vendor do?  Makes
10  calls.
11    A.   Yeah.  They're, like, the labor.  It's a
12  labor arbitrage, if that helps.
13    Q.   I'm sorry, Mr. Zeitlin.  I still don't
14  understand.
15        Why would you buy equipment to make calls
16  if your company is not making the calls?
17    A.   Because they -- I -- my systems that are
18  in our cloud is how they make the calls.  They would
19  have to -- the vendors would have to buy -- would have
20  to furnish their own stations -- workstation, and then
21  they Internet into our systems.
22        This might help:  We have what's called --
23  we call it a cluster.  And a cluster is a group of
24  servers and switches that we house all the software in
25  for the agents to be able to utilize.  Each cluster,

Page 243

1  it's about $50,000, and that's going to be able to
2  house about 50 or 55 agents.  And we had -- we
3  purchased four clusters for that.
4        Without -- without that, then they would
5  not be able to go into our system.  You could use your
6  laptop and call into our system if we gave you access
7  to it.  So it requires a -- it requires a station for
8  the agent, and then they are able to -- to go into our
9  system to utilize it.
10    Q.   Okay.  So, Mr. Zeitlin, was American
11  Children's Society, Inc. -- was that a client of yours?
12    A.   Sounds familiar.  I think they may have
13  had -- they may have gone by a different name.  But
14  offhand, I don't remember.
15    Q.   Do you know if it was a PAC or a charity?
16    A.   I don't recall what the exact campaign
17  was.
18    Q.   Okay.  How about Childrens Leukemia
19  Support Network?
20    A.   Yes.
21    Q.   Was that a client?
22    A.   Yes.
23    Q.   Are they still a client?
24    A.   That organization ended up shutting down,
25  but I still work with the gentleman, who has other

Page 244

1  organizations.
2    Q.   And what was their mission, or what did
3  they do?
4    A.   They were trying to move the political
5  needle to get more research and funding for legislation
6  for leukemia victims.
7    Q.   Okay.  And who -- who runs that
8  organization?  Or who ran it?
9    A.   His name is Chris Pollock.  He has
10  leukemia, so it's close to his thoughts.
11    Q.   Okay.  How about -- and it was -- and that
12  was a PAC?
13    A.   It was.
14    Q.   Okay.  How about Autism Hear Us Now?
15    A.   Say it again.
16    Q.   Autism Hear Us Now.  Was that a client?
17    A.   It is a client, yes.
18    Q.   Okay.  Current client?
19    A.   Yes.
20    Q.   A charity or a PAC?
21    A.   PAC.
22    Q.   Okay.  And what's their purpose?
23    A.   They're trying to effect legislation, have
24  more funding for schools and so on for children with
25  autism.  He has a son that's severely autistic, which I

Page 245

1  can relate to, and he's trying to help out politicians
2  that see his way of things.
3    Q.   When -- when you say "he," who -- who runs
4  that company?
5    A.   That's Oliver Kaplan.
6    Q.   Who?
7    A.   Oliver Kaplan.
8    Q.   Oliver.  Okay.
9        How about Heart Disease Network of
10  America?  Is that a client?
11    A.   That was a client.
12    Q.   Is that a PAC?
13    A.   Yes.
14    Q.   And who ran that organization?
15    A.   That was also Chris Pollock.
16    Q.   Is it still operating?
17    A.   No.
18    Q.   Oh, and do you know the mission of that
19  company?
20    A.   Yeah.  They were trying to help further
21  heart disease legislation and so on, trying to get more
22  funding for that.  Which he also had heart disease, a
23  pretty sick guy, unfortunately.
24    Q.   Okay.  So leukemia and heart disease.
25    A.   Yeah.

Richard Zeitlin
December 08, 2020

242..245

113

USAO_00003671

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 246

1    Q.   Police Officers Defense Alliance LLC, do
2 you know -- what -- is that a client?
3    A.   Yes.  Current client.
4    Q.   Current client.
5         And PAC or a nonprofit -- or a charity?
6    A.   PAC.  PAC.
7    Q.   And who runs that company?
8    A.   Chris Pollock does.
9    Q.   And he's still running that one?
10   A.   Yes.
11   Q.   How about Americans for Police and Trooper
12 Safety?  Is that a client still?
13   A.   Not anymore.
14   Q.   Okay.  Who -- who that runs one?
15   A.   That was a gentleman that passed away in
16 California.
17   Q.   Okay.  And was that a PAC or a charity?
18   A.   PAC.
19   Q.   Mr. Zeitlin, are you familiar with a
20 company called Button Pusher Productions?
21   A.   No.
22   Q.   How about -- how about a Phillip LeConte?
23   A.   No.
24   Q.   How about a Paul Kutac, K-u-t-a-c?
25   A.   Yes.  Him, I know.

Page 247

1    Q.   Okay.  What does he do?
2    A.   I'm sorry?
3    Q.   How do you know him?
4    A.   He was working with the gentleman who
5 passed away, and he's currently winding down the
6 campaigns.
7    Q.   So are you still working with him, or no?
8    A.   Well, the campaigns are done.
9    Q.   Do you know a Donald Harmer?
10   A.   No.
11   Q.   Okay.  How about Jane Barrett?
12   A.   No.
13   Q.   Mr. Zeitlin, do you know if your financial
14 statements are recorded on an accrual -- accrual or
15 cash basis?
16   A.   No idea.
17   Q.   Okay.  Let's -- let's quickly go off the
18 record, and then we'll come back on and finish.  Just
19 five minutes.
20        MR. BERNHOFT:  Certainly.
21        THE VIDEOGRAPHER:  Going off the record,
22 and the time is 6:23 p.m.
23            (Recess taken.)
24        THE VIDEOGRAPHER:  Going back on the
25 record, and the time is 6:29 p.m.

Page 248

1         (Deposition Exhibit 94 marked.)
2 BY MS. GRIFFITH:
3    Q.   Mr. Zeitlin, I've pulled up an exhibit on
4 the screen.  We can add this at the very end.  I don't
5 know if you can see it from where you sit.
6    A.   Yes, I can.
7    Q.   Oh, okay.  This is a Politico article.
8         Have you ever seen this before?
9    A.   Yes.
10   Q.   Okay.  Have you read it before?
11   A.   Yes.
12   Q.   Okay.  Are you familiar with the term
13 "scam PACs"?
14   A.   I've heard it.
15   Q.   Okay.  What does it mean to you?  Do you
16 think it's a legitimate term?
17   A.   No.
18   Q.   Okay.  Are there any PACs that are scams?
19   A.   I'm not the PAC police.  I assume there
20 are.  If they're Democrats, they probably are.
21   Q.   The Democrats have the scam PACs.  Okay.
22   A.   Absolutely.
23   Q.   So you --
24   A.   Black Lives Matter's probably a scam PAC.
25   Q.   Okay.  So there could be scam PACs; is

Page 249

1 that accurate?
2    A.   There's -- I'm not the -- I'm not the PAC
3 police.  You have to ask somebody else.
4    Q.   Okay.  Now, this article, this Politico
5 article, talks about several of your clients, Cops and
6 Kids Together, Americans for the Cure of Breast Cancer.
7         Do you disagree with the article?
8         MR. BERNHOFT:  Objection.  Vague.  Please
9 ask him direct, specific questions so he can give
10 competent answers.
11        MS. GRIFFITH:  Okay.
12 BY MS. GRIFFITH:
13   Q.   So if we look at the first page of the
14 article, BANA 2302.
15   A.   Can you move it down so we can see it.
16        MR. KIMBLE:  We can't even access the --
17 this article, Blakeley, with the shared screen.
18        MS. GRIFFITH:  You know, it's -- it's --
19 we have produced it.  It's BANA 2302.
20        MR. KIMBLE:  We can't access it now.
21        THE WITNESS:  Is it in this -- it's in
22 here.
23 BY MS. GRIFFITH:
24   Q.   No, it's not there.  It's on the screen.
25 There we go.  Okay.  So BANA 2 -- 02302, and I'll

Richard Zeitlin
December 08, 2020

246..249

114

USAO_00003672

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 250

1  remember to move it down, because I did not realize
2  that it wasn't automatically doing that.  At -- the
3  bottom of it says, "A web of political action
4  committees raised nearly" -- it looks like "6
5  million" -- "in recent months under the guise of
6  supporting police, veterans and cancer research.  But
7  nearly all the money has gone to their own vendors and
8  staff, as opposed to those causes -- hallmarks of
9  so-called scam PACs."
10         Do you see that?
11     A.   I do.
12     Q.   Would you agree that that was a -- is a
13  hallmark of a scam PAC?
14         MR. BERNHOFT: Objection. Form.
15  Foundation.
16  BY MS. GRIFFITH:
17     Q.   You can answer.
18     A.   I don't even know what that -- I mean,
19  what, were they Hallmark cards?  What do they mean, a
20  hallmark?  Of what?  It's a disjointed sentence that
21  makes up a moniker called "scam PACs" that really
22  caught on.  I give them credit, those hacks over there
23  at Politico.
24         So, I mean, do I agree with that?  I mean,
25  it's a made-up word.  Is it in Webster's?  I don't know

Page 251

1  what they mean.  What am I supposed to agree with or
2  disagree with?  Hallmark.  So I'm sorry.  I mean, I
3  don't even know how to comment on that.
4     Q.   So another question for you, if you go to
5  the middle of the page, I'm looking at the paragraph
6  starting, "The new PACs have feel-good names like Cops
7  and Kids Together."
8     A.   Uh-huh.
9     Q.   Do you see that paragraph?
10    A.   I do.
11    Q.   "Their activities highlight an unpleasant
12  truth: Political groups often receive less oversight
13  and get more leeway than charities, even though they
14  have to disclose more details about their donations and
15  spending."
16         Would you agree with that sentence, or no?
17         MR. BERNHOFT: Objection. Foundation.
18  Relevance.
19         THE WITNESS: I'm not the PAC police.  I
20  didn't write this article.  Whoever did, again, is
21  disjointed and doesn't really -- you know, they're
22  looking for -- it's a hit job.  Congratulations to
23  them.
24  BY MS. GRIFFITH:
25    Q.   Okay.  So in your experience, are PACs

Page 252

1  more regulated than charities or less regulated?
2     A.   I wouldn't even begin to answer that here.
3     Q.   Okay.
4     A.   Who am I --
5     Q.   You don't know.
6     A.   No.  I don't run charities or PACs, so I'm
7  not the one to ask.
8     Q.   Okay.  If you go down to the third
9  paragraph that's showing, "Before late 2017, no
10  businesses at that address -- 1835 East Charleston
11  Boulevard -- had provided services to federal campaigns
12  or PACs."
13         Do you see that?
14    A.   I do.
15    Q.   Okay.  "But in April, the seven new PACs
16  disclosed spending 3.9 million with Donor Relations."
17         Do you see that?
18    A.   I do.
19    Q.   Okay.  In your opinion, is that correct?
20    A.   No.
21    Q.   Okay.  Why not?
22    A.   Donor Relations didn't do any PAC work.
23    Q.   Okay.  Did any of -- your other companies
24  did do PAC work; is that right?
25    A.   Yes.  I'd like to add one thing, that

Page 253

1  irrespective of them being right or wrong, they write
2  what they want to write.  Donor Relations was a
3  professional fund-raiser.  It didn't do -- it didn't do
4  PAC work.
5         But they don't care, because all they want
6  to do is write their articles and whatever.  These are
7  the people who are unaccountable.  Almost like the --
8     Q.   Did you file a lawsuit against the people
9  who wrote this article or Politico?
10    A.   I looked into it, actually, and what I
11  learned about these so-called political writers and
12  these people who write for newspapers, they have a
13  wonderful cloak of First Amendment, and they can
14  disparage people at will, and there's nothing you can
15  do about it.
16         It's a very sad thing in this country,
17  that you can make up whatever and say, "Oh, no, First
18  Amendment, freedom of speech, freedom of the press," so
19  that's why I have very little respect, if any, for the
20  pressroom.  They're all fake news, liars.
21         I've been too busy suing Bank of America
22  to sue any newspapers.
23    Q.   Okay.  But like Bank of America, those
24  newspapers have disparaged you; is that -- is that
25  accurate?

Richard Zeitlin
December 08, 2020

250..253

115

USAO_00003673

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Page 254

1   A.  They write lies.  They didn't steal from
2 me at least.
3   Q.  Yeah.
4       And -- and your opinion is that the
5 government has also worked with Bank of America against
6 you?
7   A.  No.  I said before that I question where
8 the bank stops and the government begins and vice
9 versa.  Because when I reached out to get help from the
10 government agencies, I got no help from the Consumer
11 Protection Division, from the OCC, from anybody.
12 Nobody wanted to go ahead and help me deal with
13 despicable actions of the bank.
14  Q.  Yeah.
15  A.  Which is very sad.  You would think that
16 Consumer Protection would help out a consumer, but they
17 could care less.  So I just wonder, with all these
18 people that are supposed to help out, why come -- how
19 come I don't get any help?  They could care less.
20      So when that -- just -- again, I'm not
21 that smart, but it makes me draw the conclusions about
22 who's -- who's running things, when they can,
23 willy-nilly, do what they want to do.  I hope that
24 helps to clarify my feelings.
25  Q.  Do you have a Web site called Richard

Page 255

1 Zeitlin Truth?
2   A.  I do.
3   Q.  Okay.  Do you maintain that Web site?
4   A.  Yeah.  Well, not personally, but I have
5 someone that does it.  I'm not a web guy.
6   Q.  Do you agree with the statements that you
7 make in that Web site?
8   A.  Absolutely.
9   Q.  Okay.
10  A.  Do you?
11  Q.  So when you say on your Web site that "I
12 must strive to fight a coordinated government effort to
13 shutter my business and take away my right to earn a
14 living and support my family," do you think the
15 government is -- is trying to shutter your businesses?
16  A.  I think that there is some ugliness by the
17 government, yes.  Absolutely.
18  Q.  Okay.  I don't have any further questions.
19      MR. BERNHOFT:  Thank you, Counsel.  Would
20 you give counsel just a brief moment off the record to
21 confer about where we think we stand.
22      MS. GRIFFITH:  Okay.
23      MR. BERNHOFT:  Come back on.  Thank you.
24 Appreciate it.
25      THE VIDEOGRAPHER:  Going off the record.

Page 256

1 The time is 6:40 p.m.
2           (Recess taken.)
3       THE VIDEOGRAPHER:  Going back on the
4 record, and the time is 6:44 p.m.
5       MR. BERNHOFT:  Yes.  Counsel, we've
6 conferred, we don't have any cross-examination
7 questions for Mr. Zeitlin, so I do believe the
8 deposition is due to be concluded.
9       MS. GRIFFITH:  I think that's right.
10      THE VIDEOGRAPHER:  This concludes today's
11 deposition of Richard Zeitlin.  The time on the monitor
12 is 6:44 p.m.
13
14          (Whereupon the deposition
15           was concluded at 6:44 p.m.)
16
17
18
19
20
21
22
23
24
25

Page 257

1           REPORTER'S CERTIFICATE
2 STATE OF NEVADA    )
                     )  ss.
3 COUNTY OF CLARK    )
4
        I, Alexander J. Nagle, a Certified Court
5 Reporter licensed by the State of Nevada, do hereby
  certify:
6
        That I reported the taking of the deposition
7 of RICHARD ZEITLIN on Tuesday, December 8, 2020,
  commencing at the hour of 10:09 a.m.  That prior to
8 being examined, the witness was by me duly sworn to
  testify to the truth, the whole truth, and nothing but
9 the truth.
10      That I thereafter transcribed my said
  stenographic notes via computer-aided transcription
11 into written form, and that the typewritten transcript
  of said deposition is a complete, true and accurate
12 transcription of my said stenographic notes taken down
  at said time.  That review of the transcript was
13 requested.
14      I further certify that I am not a relative,
  employee or independent contractor of counsel involved
15 in said action; nor a person financially interested in
  said action; nor do I have any other relationship that
16 may reasonably cause my impartiality to be questioned.
17      IN WITNESS WHEREOF, I have subscribed my name
  this 21st day of December, 2020.
18
19
20 _____
      Alexander J. Nagle, CCR 923
21
22
23
24
25

Richard Zeitlin
December 08, 2020                              254..257

116

USAO_00003674

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

## Exhibits

**Exhibit 4** 4:3
197:25 198:3

**Exhibit 7** 4:4
220:12,14

**Exhibit 10** 4:5
221:15,17

**Exhibit 13** 4:6
139:8,10

**Exhibit 33** 4:6
209:13,16

**Exhibit 34** 4:7
195:4

**Exhibit 35** 4:8
195:14

**Exhibit 36** 4:9
195:21

**Exhibit 37** 4:10
196:5,7

**Exhibit 38** 4:11
191:16,18

**Exhibit 39** 4:12
193:13,15

**Exhibit 40** 4:13
193:25 194:2

**Exhibit 41** 4:14
194:15

**Exhibit 42** 4:15
149:20,22 151:10

**Exhibit 43** 4:16
163:4,6

**Exhibit 46** 4:16
170:7,10

**Exhibit 47** 4:17
181:24 182:2,20
183:1

**Exhibit 57** 4:18
223:12,14

**Exhibit 58** 4:18
99:24 100:1

**Exhibit 61** 4:19
137:9,12

**Exhibit 62** 4:19
77:21,23,24 78:2

**Exhibit 63** 4:20
80:1 83:20

**Exhibit 64** 4:21
80:20 82:21

**Exhibit 72** 4:22
135:13,16

**Exhibit 73** 4:23
136:11

**Exhibit 94** 4:23
248:1

## $

**$11,000** 114:24

**$12,000** 142:19
143:7

**$144,000** 117:21

**$150,000** 144:11

**$16** 69:14

**$160,000** 144:25

**$18,000** 106:22

**$200,000** 166:7

**$21** 69:14

**$230,000** 160:17

**$25,000** 152:9

**$250,000** 165:22

**$3.90** 69:13,17,
19,25 70:1 72:18

**$30,000** 164:22
165:11

**$375,000** 175:15

**$4,000** 163:16
164:7

**$4,800** 112:25

**$40,000** 161:11,
24

**$46,000** 114:7

**$50,000** 243:1

**$580,000** 115:22

**$6,000** 103:8
106:12

**$6,685.28** 79:25

**$60,000** 159:8

**$80,000** 159:4

**$9,000** 114:11

**$90,000** 143:16

**$98,000** 151:25

## 0

**0080** 180:3

**02302** 249:25

## 1

**1** 126:16

**1,200** 224:13,14

**1.27** 122:20

**1.6** 122:14

**1/10/18** 154:3
163:19

**1/11/18** 156:22

**1/2/18** 174:3

**1/29/18** 157:8

**1/3/18** 171:4

**1/30/18** 170:21

**1/31/2018** 142:17

**1/4/18** 172:13
173:2

**1/5/18** 151:24
152:9 173:17

**1/9/18** 153:15
179:20

**10** 15:5 95:12
221:15,17

**10,000** 70:18

**100** 27:21 36:7
38:17 135:19

**1009** 26:12

**10:29** 9:16

**10:34** 13:6

**10:39** 13:18

**10:49** 95:16

**10th** 222:15

**11/17/18** 165:17

**110** 84:17

**1108** 140:5
147:21

**11:28** 47:1

**11:38** 47:15

**11th** 18:1 202:3

**12/7** 192:15

**125** 84:16

**13** 139:8,10,11

**1345** 83:22

**1350** 83:2

**14,000** 113:25

**145** 223:15,16

**15,000** 28:8

**150,000** 132:11
202:8,17

**151** 135:25

**152** 126:17

**15th** 218:15
231:18

**16** 72:20

**1628** 159:8

**16th** 218:16

**17** 138:5

**18** 117:13 140:16,
17,19 190:6

**1835** 24:22 26:11
252:10

**189** 135:18

**19** 138:5 180:12

**192** 137:13,14

**194** 136:18,19,20

**1984** 18:5,18

**1987** 19:15,16
20:1 48:17

**1994** 19:1,2,11
20:16,21 21:12
22:6 23:7 48:17
209:5

**1:06** 95:19 96:20

**1:08** 96:23

**1:51** 125:4

**1st** 150:10 163:14

## 2

**2** 198:17 233:5
249:25

**2,500** 108:3

**2-** 233:5

**2/14/18** 159:23

**2/6/18** 160:15
180:16

**20** 5:6,22 65:24

**20-plus** 7:20

**200** 199:2,6,8
201:8

**2003** 22:4

**2010** 211:13

**2011** 211:13

**2012** 211:13

**2017** 252:9

**2018** 28:22 31:20
98:20,22 100:20
102:5,8,17
105:10 117:6
150:11 163:15
168:1 190:5

**2019** 215:25
216:2 217:5
231:11

Richard Zeitlin
December 08, 2020

258

USAO_00003675

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Index: 2020..90

| | | | |
|---|---|---|---|
| **2020** 9:15 239:8 | | **50** 232:22 243:2 | **6874** 161:3,10 162:2,13 166:17 |
| **206** 141:18 | **3** | **50/50** 22:8 | **6:04** 239:2 |
| **21** 72:20 | | **51** 65:21 | **6:10** 239:5 |
| **210** 220:17,18 | **3** 69:18 122:18 183:9 199:1 | **5116** 170:13,14 | **6:23** 247:22 |
| **2231** 156:25 160:17 | **3.9** 252:16 | **5118** 170:21 171:2 | **6:29** 247:25 |
| **226** 224:16 | **3.90** 70:11,12 81:5 | **5119** 174:4 | **7** |
| **23,000** 154:3 | **3/14/18** 161:9 162:1 | **5120** 179:18 | **7** 158:8 220:12,14, 15 |
| **2302** 249:14,19 | **3/21/18** 161:14 | **5134** 180:9 | **7/3/2018** 79:23 80:18 81:9 |
| **2331** 163:16 | **3/28/18** 162:12 | **5208** 182:3,4,21 | **7/31/18** 167:2 |
| **236** 221:18,19 | **3/7/18** 160:25 | **5210** 183:6,8 | **72** 135:13,16 |
| **2370** 209:17,20 210:5 | **30** 135:24 181:21 233:8 | **5216** 184:23 | **73** 136:11,14,15, 18 |
| **2372** 211:10 | **30,000** 165:10 | **5224** 185:21 | **74** 136:17 |
| **24** 131:11 | **30-minute** 124:23 | **55** 243:2 | **7815** 14:9 |
| **241** 84:17 | **300** 233:5 236:18 | **57** 223:12,14 | **8** |
| **249** 139:21 | **300,000** 202:17, 20 | **58** 99:24 100:1 | **80** 65:23 180:24 181:3,12,14 182:7 226:4,13, 19 |
| **25** 139:3,4,7 233:8 | **300-** 166:17 | **580,000** 115:11 | **800** 203:18 |
| **25,000** 228:12 | **30s** 181:11 | **5:40** 231:4 | **80s** 227:4 |
| **251** 142:17 | **31** 218:24 | **5:54** 231:7 | **85** 226:19 |
| **257** 143:14 | **31st** 150:11 | **5th** 167:9 | **89014** 26:13 |
| **26** 5:9,17 7:8 | **33** 209:13,16 | **6** | **89104** 24:23 26:12 |
| **265** 144:7 | **34** 195:4,7 | **6** 250:4 | **89149** 14:10 |
| **2696** 191:19,20 | **35** 181:21 195:14, 16 | **6,570** 103:5 | **8925** 144:22 145:12 |
| **2698** 193:20 | **36** 195:21,23 | **6,575** 103:6 | **8:00** 7:17 |
| **27** 164:19 | **37** 5:17 196:5,7 | **6/21/18** 164:21 | **8th** 9:15 98:23 131:19 218:11 |
| **27/17** 192:16 | **37(c)** 5:9 | **60** 181:19 | **9** |
| **2700** 194:3 | **37(c)1** 7:8 | **60s** 181:12,23 | **90** 180:24 181:3, |
| **279** 144:19 | **38** 191:16,18 | **61** 137:9,11,12 | |
| **286-** 120:24 | **39** 193:13,15 | **618,000's** 120:15 | |
| **289** 147:17,18,19 | **3:42** 170:3 | **62** 77:17,19,21, 23,24 78:2 84:13 | |
| **291** 147:5,6,7 | **3:53** 170:6 | **62,000** 113:24 | |
| **2:18-cv-0191-rfb-dja** 9:18 | | **63** 80:1,4 83:20 | |
| **2:32** 125:7 | | **64** 80:20,22 82:21,23,24 | |
| **2nd** 84:16 218:19 235:5 236:12 | | | |

| | |
|---|---|
| **4** | **5** |
| **4** 197:25 198:3 | **5** 183:8 198:19 211:9 232:20,21 |
| **4.8** 112:25 | **5.7** 104:21,22 |
| **40** 181:22 193:25 194:2 | |
| **40s** 181:11 | |
| **41** 194:15,17 | |
| **42** 149:20,22 151:10 | |
| **43** 163:4,6 | |
| **44** 169:22 | |
| **454** 83:22 | |
| **46** 170:7,10,11,12 | |
| **47** 181:24 182:2, 20,21,25 183:1 | |
| **4896** 149:23,24 | |
| **4897** 150:5 | |
| **4898** 150:11 151:13 | |
| **4899** 153:7 | |
| **4902** 158:3,4,5,6 | |
| **4906** 159:17 | |
| **4907** 160:13 | |
| **4912** 160:21 | |
| **4958** 163:7,8 | |
| **4960** 163:15 | |
| **4966** 164:3 | |
| **4984** 164:11,18 | |
| **4990** 165:4,5 | |
| **4:32** 197:3 | |
| **4:46** 197:6 | |

Richard Zeitlin
December 08, 2020

259

118

USAO_00003676

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Index: 94..ahead

**13,14** 182:7
226:4,13

**94** 248:1

**9th** 222:15

---

**A**

**a.m.** 9:16 13:6,18
47:1,15

**ability** 15:19
16:23 213:12,20

**abnormal** 81:11

**aboveboard**
105:19

**absolute** 238:4,5

**Absolutely**
188:7 205:12
215:4 218:13
221:11 229:8
240:10 248:22
255:8,17

**absurd** 236:23

**ACA** 134:14

**accept** 55:2
238:1

**acceptance** 25:4
54:6,10 229:23

**accepted** 19:20

**accepting** 53:24
54:9

**accepts** 156:5

**access** 217:21
243:6 249:16,20

**accessing** 77:22
151:15

**accidentally**
238:7

**accomplish**
23:15

**account** 31:16
55:14 103:24
105:9 109:19
117:15 132:3
133:20 139:19

140:12,15
141:10,25 142:24
143:8,12,22
144:5,13,22
147:9,11 148:11,
14,16 149:4
150:1,6 153:24
156:25 160:17
161:3,10 162:2
163:10 165:23
166:7,11 170:16
175:1 180:2,5
186:9 192:2,9,23,
24 193:4 195:1
196:3,12 197:9
205:6 213:13,21
214:19 215:21
238:1

**account...will**
192:21

**accountable**
156:6

**accountant**
102:14 137:25

**accounting**
108:25 109:2

**accounts** 31:20
103:22,23
131:17,18,19,22,
23,25 133:7
141:8 143:5
155:7,9 156:6
162:20 186:20
196:16,18,19
197:15,20,23
204:8,10,15,18,
21 205:5 214:4
218:11,18 219:24
220:3 229:3
230:6 231:15,16,
22 235:13

**accrual** 247:14

**accuracy** 23:5
227:16

**accurate** 22:14
30:18,19 43:6
45:20 57:11,23
58:12,14,20 59:2,
24 60:15 69:6,7,
12 91:9 101:1,5

211:23 226:3
228:10 249:1
253:25

**accurately** 23:22
155:13

**accuser** 214:14

**achieved** 17:25

**acknowledge**
192:20

**acknowledging**
193:10

**acquisition**
216:12,13 233:13

**act** 123:25

**action** 9:12 28:12
29:22 30:24
45:25 63:6,7
110:16 210:7,17
215:21 250:3

**actions** 216:5
230:13 254:13

**active** 38:21
44:16 63:8,12,14
133:3

**activities** 213:3
251:11

**activity** 212:9,20

**actual** 54:23
63:18,24 64:1,7,
10,13,21 127:11
154:23

**add** 205:8 206:3
226:18 228:18,21
233:10 248:4
252:25

**additional** 5:2

**address** 14:8
24:13,21 26:10
32:1,7,14 33:9,
12,20,25 34:10,
23 35:1,9,12,17
36:2 74:13 83:2,
21 84:16,23
140:5,9,13
147:22 148:2
221:1,3 252:10

**addressed**
211:17 220:19

**addresses**
221:6,13

**adhesion** 110:12

**adjust** 234:2

**Administracion**
174:11,15,24
175:2 180:16
185:24 186:9,10,
13 187:14

**administrative**
78:19

**advance** 124:21
173:4 199:12

**Advanced** 33:6,
10 37:16 39:20
40:11 41:25 43:2
51:15 52:6 72:21
122:20 133:12
157:22 179:24
195:24 227:22
228:1,14

**adverse** 149:14

**advertising**
103:4,5,7 106:11,
13,14,17

**advice** 134:18

**advised** 46:11
124:22

**affect** 16:23

**affected** 127:6

**affiliated** 188:1,5

**affirmative** 8:2

**afloat** 132:13

**afraid** 184:18

**agencies** 226:23
254:10

**agent** 19:22,23,
24 30:11 49:6
55:21,24 56:24
69:24 74:12,16,
18 75:6,11
134:19 243:8

**agents** 21:2 24:7,
8,10,15,16 30:16,
17,20,23,25 31:6,
7,11 32:15,20,22
43:16,19,25 44:1,
4 49:10,21,22
59:22 60:7 63:23
64:22 65:2,4,9
67:10 73:16,20,
25 106:16,17
107:15 109:6
112:3 128:5,6
129:5 199:2,6,8,
16,17,20,21
201:8,19 224:13,
15,18 232:13,19,
24,25 233:1,5,8,
11 241:10 242:25
243:2

**aggregate**
226:18

**agree** 54:25 55:7
142:12,14 150:6
192:20 193:9
250:12,24 251:1,
16 255:6

**agreed** 75:17,22
76:5

**agreement** 62:2
68:9,18 135:3
141:23 142:4
150:7 152:17
192:24 193:4
194:13 211:19
219:20,23 220:2,
4,10

**agreements**
163:1 211:14
220:8

**agrees** 74:12

**ahead** 13:3,9,22
45:22 46:7 98:2,
8,10 134:6,17
154:19 156:4
169:21 181:9
183:9 191:13
199:11 201:3
206:23 210:17
215:11 227:1,13
230:4 232:19
233:15 234:22,24

USAO_00003677

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Index: airport..back

235:1,3 238:13 254:12

**airport** 107:13

**Alabama** 32:17 43:21 85:10,14, 15 111:23 112:1, 2,4

**alcohol** 16:17

**Alex** 9:22

**Alliance** 246:1

**Allied** 64:15 127:20,21,22,24 128:7 174:17,19, 21 175:6,7,23 180:18 185:25 187:9 201:10,13, 18 241:11,16

**allotted** 7:13

**allowed** 178:23, 25 179:4

**altered** 79:15,20

**altogether** 138:20

**amazing** 223:7

**ambush** 5:19

**amenable** 8:19

**amended** 192:23

**Amendment** 57:14 253:13,18

**America** 9:19 10:3,4 14:3 28:24 34:18 53:10,13 66:24 75:3 99:16 118:20 131:13,16 139:25 163:23 166:15 196:19 197:9,15 204:22, 23,25 205:2,11 206:4 207:11,12 220:25 221:7 229:13 230:7 235:9 236:1 245:10 253:21,23 254:5

**America's** 234:4

**American** 63:4,9, 15 67:19 69:14 72:22 75:20,21 78:10 79:2,9 84:15,22 99:7,9 100:17 103:7,10, 11,19,24,25 104:1,4,5,7,12, 16,21 105:2,4 106:14 109:13 111:8,11 113:25 114:12,18 123:15 124:12,16,17 132:24 154:4,5 157:8,11 161:3, 15,17,22,25 162:3,4 166:6,17 172:14,19 189:7 194:6 243:10

**Americans** 66:17 246:11 249:6

**amount** 69:17 70:6,13 74:14 81:6 115:10 167:1 181:3 182:9 199:10 202:15 226:12 227:15

**amounts** 24:14 138:3 226:14

**and/or** 211:15

**animal** 112:12

**answer's** 17:6

**answering** 116:1

**answers** 123:21 249:10

**Anthony** 36:17 141:1,2

**anxiety** 205:15, 17

**anymore** 146:14 148:1 246:13

**apparently** 172:17 175:1 177:1

**appearing** 10:6

**approach** 45:11

**approaching** 231:2

**approximately** 202:8 203:6

**April** 93:7 252:15

**April's** 93:7

**arbitrage** 242:12

**area** 48:9,14 83:12

**Argumentative** 60:1

**Arizona** 84:17

**arm** 110:16,17

**arrested** 17:8 214:8,13

**arrived** 124:23

**article** 248:7 249:4,5,7,14,17 251:20 253:9

**articles** 212:18 213:2,4 253:6

**ascertain** 131:7

**asks** 198:19

**aspect** 135:4

**assistance** 159:25 160:3 185:17 205:17

**Assistant** 185:2

**associates** 222:24

**Association** 209:23

**Associations** 120:23 171:13

**assume** 7:4 16:10 31:13 36:19 82:9,11,16 97:4,8 101:2,12, 23,24,25 106:13 112:20 113:2 116:18 117:19 118:21 120:5,8,

13 121:22 124:7 136:10 137:24,25 138:11 142:23 180:6 194:22 215:18 221:4 248:19

**Assumes** 189:24

**assuming** 15:16 86:16 87:19 120:16 121:16 122:10 124:4 137:19 148:10

**assumptions** 226:7

**astronomically** 134:7 215:10

**Atkinson-baker** 9:10,23

**atrophy** 232:24

**attempted** 5:14

**attention** 211:17

**attorney** 9:13 10:5,12,13 210:6, 15 211:16,18 221:2,10

**attorneys** 5:12 10:25 124:4,6 207:23

**attrition** 232:14, 17,20,25

**audacity** 206:6

**Audra** 9:9

**August** 31:20 98:19,22,24 105:10 131:17,19 167:9,10 168:1 199:20,23 218:11,14,24 222:16 231:16,18

**Austin** 10:9

**authorities** 227:17

**authorization** 230:2,14

**authorize** 187:24

237:24

**authorize.net** 230:20 237:10

**authorized** 187:15 196:15

**authorizes** 187:13,18

**autism** 244:14, 16,25

**autistic** 244:25

**auto** 18:22 112:25

**automatically** 250:2

**automobile** 106:21,23,25 108:3,9 112:23, 25 113:2

**aware** 110:9 176:17 177:5 178:20 212:18 214:3

**Awareness** 209:24

---
**B**
---

**back** 9:4 13:15,17 22:22 28:4 47:3, 14 70:15 82:21 85:22 88:22 95:18,21 96:12, 22 97:16,22 107:7 125:6 130:2 132:2 138:4 141:19 145:3 170:5,9 176:2,4 182:6,15, 19 195:6 197:5 202:22 203:18 208:19 224:24 225:1 231:6,25 235:11,16,22 236:5,18,19,22 238:12,17 239:4 241:4 247:18,24 255:23

USAO_00003678

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

**background** 17:16 126:7 141:2

**bad** 113:24 114:4, 7 207:13 223:4

**BANA** 5:22 7:24 8:14 135:4 139:21 142:17 143:14 144:7,19 147:5 151:13 153:7 158:3,6 159:17 160:12 164:3,11 165:4 170:21 174:4 179:18 183:8 184:23 185:21 194:2 249:14,19, 25

**BANA's** 5:5 8:1 26:23 47:7

**banana** 179:13

**bank** 9:19 10:2,4 14:2 28:24 31:14, 15 34:18 53:10, 13,16 75:3 98:7, 17 99:16 104:4,6 105:5,6,8,9,13, 14,16,24 106:1,4, 9,10 109:17,19, 23 110:6,7,9 117:11 118:20 126:2 131:7,13, 16 132:10 139:25 141:8,10 148:11, 14,16 149:4,8 163:10,23 165:18,23 166:7, 11,15,21 174:12, 25 186:19,24 196:18 197:8,15 204:8,9,10,12,15, 16,19,22,23,25 205:1,11,22 206:1,4,21 207:10,12 213:12,20 214:3, 18 215:4,18,20 216:20 217:22 220:25 221:7 222:17,19,22 223:1,8 229:13, 22 230:7 234:3

**bank's** 204:2 216:5

**banked** 105:4,5

**banking** 104:6 156:24 160:16 161:2,10

**banks** 149:16 213:23,25 214:25 215:1 223:5 229:20

**barely** 217:23

**Barrett** 247:11

**base** 234:3

**based** 177:1,8,18 178:9

**basically** 115:14

**basis** 72:2 176:23 177:6,12 198:20 247:15

**Bates** 78:9

**bathroom** 46:20

**beg** 177:22

**began** 111:4 205:24 217:7

**begin** 101:23 206:20 214:25 216:14 222:7 252:2

**beginning** 190:6 199:23

**begins** 213:24 254:8

**behalf** 9:21 10:2, 4 101:11 108:11, 14 119:20,21 210:6,15 211:15

**behaviors** 230:12

**believed** 207:1

**benefit** 12:8

**235:9,19 236:1** 253:21,23 254:5, 8,13

**108:10 150:23**

**Bernhoft** 5:4 7:3 9:5 10:5,6,9 11:7, 21 12:3,20 17:4 26:19,22 27:2,8 37:1,5 46:10,15, 21 47:5,10,13 59:25 60:21 87:22 92:10,12, 15 95:8,11,14 96:16 111:13 119:11 124:21 125:1 126:11,22 135:2,11 145:24 146:18,24 149:17 156:17 158:4,7 159:7 161:18 162:6 164:13 167:19 168:2,8 169:7,23 170:1 171:10 175:19 176:9,19,25 177:3,7,16,21,24 178:3,6,8,13,20, 23,25 179:3,9,12, 15 180:10,13 182:11,24 186:3 189:23 190:9 191:10 212:10,21 213:14 214:20 226:6 230:25 231:23 238:21 247:20 249:8 250:14 251:17 255:19,23

**bet** 101:6

**Bethany** 10:12

**Betty** 170:24

**Beverly-graham** 10:3 37:3

**bid** 145:7,10

**big** 53:16 134:23, 25 145:10 202:3 209:6

**biggest** 172:4

**bill** 80:5 108:25 109:2 124:14 161:17 187:25

**billed** 175:24

**billing** 52:3,5 53:23 54:8 68:3,4 75:14 76:19 79:1

**bills** 52:8 116:22 131:9 202:22

**binder** 46:17 77:15

**bit** 15:11 18:17 28:16 37:16 86:4 98:2 125:21 126:7 130:2 172:18 179:21 194:22 231:12

**bizarre** 216:21

**Black** 234:15 248:24

**Blakeley** 8:11 10:1,23 12:4,7,10 14:1 77:20 118:20 121:24 124:21 135:3 149:7 151:8 164:17 165:11 169:8 170:23 201:14 249:17

**blame** 42:14

**blending** 25:18

**blindly** 214:11

**blinds** 12:15

**blizzard** 83:13

**blocks** 12:7 37:7

**blown** 222:8

**blurbed** 182:17

**bond** 143:22 144:14 145:5

**bonuses** 226:23

**bookkeeper** 187:5,7

**books** 116:14 121:25 187:11

**bottom** 78:8 100:4 139:21 164:4,11 166:20 174:6 192:13

**210:5 250:3**

**bought** 56:20

**Boulevard** 24:22 26:11 252:11

**box** 11:19 83:6,7, 9 84:17

**boxes** 83:14

**break** 16:4,6 46:2,5,8,16,18 57:19 95:9 124:24 169:24 196:23 230:24

**breaking** 65:8 77:7 92:11,13,16 96:4 126:6,9 219:25

**breaks** 16:7 126:13

**breast** 190:22 249:6

**Brian** 220:19

**bring** 98:1 199:25

**brink** 206:14

**broke** 58:22 125:21 127:5 143:3 169:8 218:5 225:21

**broker** 18:10

**brought** 190:18 191:4

**build** 144:13 205:20

**Builders** 34:11 36:1 139:15,18 140:3,9,18 147:22 148:5,7 194:17 218:21

**building** 34:2,5,7 158:25 165:13 166:2 167:15

**built** 205:20

**bunch** 214:15 223:1

Richard Zeitlin
December 08, 2020

USAO_00003679

SUBJECT TO PROTECTIVE ORDER

**Bureau** 188:9,13

**business** 19:4
20:12,14,18,20,
22 21:7 29:2
34:13 40:10
41:11 44:14,16,
21 45:23 66:5
104:1,14 116:2
118:5,11,16
119:1,6 126:20
134:22 143:18
188:9,12 192:25
194:5 201:21
205:10,20 206:6,
24 208:2 211:2,
19 215:24 216:1,
13 217:8 231:11,
20 232:6,7 234:3,
4,20 235:22
255:13

**businesses** 25:2
45:3 131:24
132:13 180:22
181:2 190:14
219:10,14,16
252:10 255:15

**businessperson**
40:18

**busy** 253:21

**Button** 246:20

**buy** 167:6,14
206:17 241:19
242:15,19

**buying** 34:2,5
166:2

**C**

**Cabral** 172:11

**cahoots** 235:19

**calculate** 175:22

**calculation**
227:3

**California** 9:11
90:8 184:22
209:23 211:2,8,
15,16 246:16

**call** 9:2,3 11:18,
25 12:6 15:12
19:7,10,14 20:17
21:21,22 22:14,
16,20 23:7,19
24:18 26:23,24
27:1 30:7 32:8,11
37:24 38:1,3
39:12 49:14
52:10 55:4,5,6,
21,24 56:1,25
61:6 69:23 74:18
75:6,11 84:4
85:10,11,12,14,
20 86:24 87:2
88:18,20,21
93:20 95:1,2
97:12,14,15,22
104:15 109:3
115:2 120:12
122:3 138:17
174:11,15,24,25
175:3 180:17
181:12 185:24
186:9,10,13
187:14,23 189:2,
3,4 201:5 208:23,
24 209:5,25
210:7,16,20
211:1,8,13,25
216:15 225:2
228:18,21
232:17,21 234:8
237:10 238:2
239:7,10,11,21,
24 240:24 242:23
243:6

**called** 30:9 33:5
54:24 66:25 75:6
81:23 91:2
174:23 188:15
200:24,25 239:25
242:22 246:20
250:21 254:25

**caller** 74:24

**callers** 66:20

**calling** 63:20,22,
24 64:1,8,10,13,
21,23 65:10,13
66:1,2,3 89:22
93:4 99:2 135:5
217:18 233:12,13

235:1

**calls** 19:25 24:7,
16 30:17 31:6,8,
11 32:4 43:16
44:7 49:21 52:7
57:22 65:5 66:13
67:4 73:15 75:18
86:10,12,15,23,
24 89:9,14 91:12
97:12 99:1,5,13
111:13 128:1,3,6
131:3 213:15
214:21 216:12,14
217:14 222:10
224:2 234:25
236:12 237:2
240:3,7 241:3,21,
23 242:10,15,16,
18

**camera** 11:13
12:2

**campaign** 86:8,
17 89:3 91:24
94:1 98:14
152:16 181:11,
20,23 243:16

**campaigns** 30:4
91:25 92:1
172:18,19 217:1,
9 238:3 247:6,8
252:11

**cancer** 190:22
249:6 250:6

**Cantore** 211:18
212:1

**cap** 70:6,9,11,14

**capacity** 153:2

**capital-intensive**
234:24

**car** 108:11,13
113:3,6,9 205:7

**card** 53:24 54:6,
9,10 55:22 56:5
61:9,14 74:14
94:5,9,16,18,22,
23 95:3 157:11,
15 192:1 194:5
205:9 216:7
218:1 219:3

229:23 230:2,14

**cards** 54:15,22,
23 127:14,15
158:1 204:6
205:1 231:21
250:19

**care** 40:14 49:13,
15 123:20,24,25
253:5 254:17,19

**carrier** 127:23

**cars** 107:24

**case** 9:17 14:20,
25 31:5 239:8

**cases** 5:19

**cash** 61:16 94:19
98:10 142:21
143:4,7 200:12
217:24 219:1
247:15

**category** 73:15
155:22 171:21

**caught** 131:10
250:22

**caused** 206:18
222:1,18

**CBS** 64:17

**CCI** 127:22

**censuses** 134:3

**center** 19:8,10
20:17 32:8,11
37:24 38:1 39:12
52:10 83:24 84:1,
4,6,10 85:11,12
88:21 174:11,16,
24,25 175:3
180:17 185:24
186:9,10,13
187:23 189:2,3
225:5 234:8

**Center/allied**
187:14

**centers** 38:3
49:14 50:3,5
85:3,5,10,15,20
109:3 225:2,7,8

**Central** 7:17
66:24

**centrally** 83:6

**cetera** 100:17

**chance** 94:17
214:10

**change** 15:17
66:7 111:1 134:6
178:14 215:24
216:1 226:1
231:11 232:6,7
238:15

**changed** 25:14
45:24 79:17
115:4 186:16,19
217:8

**changing** 234:5

**charge** 28:5
31:10 62:7,8,13,
14,15 63:2 67:19,
23 68:16,17
70:12,13 72:18
133:8

**charged** 68:12,
13,14 72:5

**charges** 67:20
68:1 70:1

**charging** 62:17,
18,20,21,25

**charitable**
114:10 173:18
210:8

**charities** 29:9,25
43:13 52:22
60:12 61:23
104:17 110:17
111:3 155:5
188:2 190:18,19,
20 191:5,7
226:12 227:8
251:13 252:1,6

**charity** 61:22
109:14 110:3
115:8 150:18
154:24 160:3
171:15,17 172:21
173:4,6,7,8,20,21
183:14,15 185:6,

USAO_00003680

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

7,19 190:22,23
211:15 225:20,25
243:15 244:20
246:5,17

**Charleston**
24:22 26:11 32:2,
3,7,14 33:8,15,24
34:5,10,23 35:9,
17,20 36:2 164:1
169:16 252:10

**cheaper** 66:9

**check** 58:12
61:10 114:20
147:10,14 148:5
156:25 158:13
159:3,8 215:22

**checking**
103:21,23,24
143:21 144:22
156:25 160:16
161:3,10 162:2,
13 180:2 192:2

**checks** 83:16
132:7,10 155:1,3

**Chevy** 113:12

**child** 206:14

**children** 184:17
244:24

**Children's**
243:11

**Childrens** 79:4,
10,23 80:6,25
87:1 243:18

**choice** 98:8

**chooses** 30:3

**choppy** 96:8,16

**Chris** 244:9
245:15 246:8

**Christmas** 93:17
233:4 234:14

**Chrome** 34:11
36:1 139:15,18
140:3,9,18
147:22 148:4,7
194:17 218:20

**chronologically**
138:5

**circumstance**
5:13

**circumstances**
92:1 225:11

**citizenry** 214:24

**Civil** 7:5

**claim** 198:20,21

**claims** 8:1

**clarify** 21:5
151:14 254:24

**clarifying** 132:15

**classifications**
117:17

**clause** 106:2,5
110:10,12
148:14,17

**clean** 228:6

**cleaner** 110:24

**clear** 7:9 15:23
77:20,25

**client** 39:23
47:21,25 57:24
59:11,13 61:22
68:20,22 69:4
70:25 72:5,10,12
77:3,5,9,12 81:15
85:23 87:3,21
88:4,8 90:25
91:10,11,15,18,
22 92:2 121:6,8,9
171:16 173:11,
14,22 184:4,7
226:25 227:14
228:3,9,17,19
238:22 243:11,
21,23 244:16,17,
18 245:10,11
246:2,3,4,12

**clients** 39:4,6,7,
14,18 40:15 41:9,
16,18 42:2,4,6,11
44:11,24 45:17
52:16,19,21,24
53:11,13,14,20
54:11,12,13

60:11 61:19
68:23 70:16,20
71:3,6 85:24 89:2
92:7 107:14
129:24 130:16,22
222:21,24 226:16
239:7,15 228:2,
12 229:9 230:9
235:13 237:5,10,
12,14,15,21,24
249:5

**clients'** 229:3

**clip** 233:2

**cloak** 253:13

**clock** 231:1

**clog** 240:8

**close** 12:15 28:21
98:14 128:24
156:22 244:10

**closed** 23:25
28:18,19 93:16
167:9 189:15
218:19

**closely** 42:10

**closer** 110:13

**closing** 147:9,11

**closures** 93:15

**cloud** 109:25
242:1,3,4,7,18

**cluster** 242:23,25

**clusters** 201:5
243:3

**coaching** 11:2

**coffee** 179:16

**coffers** 218:7

**cold** 86:10,15
89:9,13 138:13,
15,17 181:11,20
216:12,13 233:12
234:24 235:2
236:11 237:2

**cold-calling**
91:24

**collect** 180:24
181:3 225:19,23,
24

**collected** 62:11
225:14 226:17

**collection** 181:5,
10,21

**collections**
181:13,15 182:7

**colocation**
199:13

**columns** 103:7

**combination**
5:17

**combined** 5:12
132:11

**comfortable**
15:4

**comical** 205:3

**commencement**
211:20

**comment** 7:9
15:19 48:7 179:5,
7,10 251:3

**commercial**
163:20

**Commission**
59:21

**commissions**
114:22,23,25
115:3,7,19
116:11 117:18

**Committee**
159:25 160:3

**committees**
29:22 45:25
110:16 250:4

**common** 6:3
87:7 162:19

**Community**
173:4 209:25

**companies** 10:7
22:10 28:12,17
31:1,7,12 34:7

37:10 39:13,17,
22 41:7,21 42:10
45:9,19 47:21
48:19,23 49:1,4
51:19,23 63:21,
25 64:7,10 70:21,
23 77:11 81:10
82:18 85:6 86:2
88:19 89:13 99:6,
16 102:7,23
110:15 111:6,21
119:17,22,25
120:17 122:1,24
123:5,8,13,21
127:5 134:15
144:6 163:1
201:9,16 225:24
226:13 227:19
229:23 239:22
252:23

**company** 20:3,5
21:20 22:23 25:6,
7,8 26:15,16
27:15,16,20 29:4,
6,12,24 30:16
31:2 33:5 34:9
36:4 37:19 38:17
39:11,19 40:12,
14,25 41:8,13
44:13 45:14,16
49:8 51:22 52:10
62:16,24 63:20
67:15 75:13,18
77:3,5,9 78:21
81:20 82:5 84:25
94:6 99:4 112:17
114:4 118:13
125:15 127:23
134:7,8,10
140:21,25 163:24
167:6 171:8
174:21,24 186:7,
18 188:15
216:10,25 230:3,
14 232:13 242:16
245:4,19 246:7,
20

**company's**
45:11 63:3
157:19

**compared**
226:12

Richard Zeitlin
December 08, 2020

264

USAO_00003681

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Index: competent..created

competent
249:10

competently
16:14

competition
210:9

complaint 63:11

complete 198:20

completely
131:10 230:11

compliance
35:3,6 51:9
53:21,24 55:9
62:21 63:9 67:19
72:23 73:22 74:7
75:1,9,23,25 80:5
83:21 99:10
100:16 103:12,
13,16,20,25
104:8,13,19
105:1,12 106:22
107:1 111:8,11
121:15 123:14
124:13 165:19
166:21 193:18,21

complied 211:25

compound
87:23 191:11

comprehensive
224:23

comprise 5:25

comprises 115:6
122:9

computer 120:13
199:11

computers
63:18

concerned
118:23 146:9

conclude 7:13

conclusion
111:14 177:8

conclusions
254:21

condemned

98:7

conditions
192:22

confer 255:21

conference
10:9,11,25

confidence
236:21

confines 8:13

confirmation
135:3

confiscate 206:2

confiscated
31:17 127:5
216:20

confiscation
55:15

confuse 73:20

confused 42:14
130:2 219:13

confusing 42:13

Congratulations
251:22

connected 66:23

connecting
92:20

consist 24:12
38:2

consistent 88:25

conspiracy
238:5

construction
25:5 34:11 36:1
141:3 158:13,15,
18,20 159:13
194:18

consult 35:3
119:21

consultant
117:21 190:17

Consultants
33:6,10 35:6
37:16 39:20

40:11 51:10
53:21 55:9 62:21
63:9 72:23 74:7
75:23,25 80:6
83:21 99:10
100:17 103:12,
14,17,20 104:1,8,
13,20 105:1,12
106:22 107:1
111:8,11 121:15
123:14 124:13
157:23 165:19
166:21 179:24
193:18,21

consulting
118:2,6,8,12
119:10,14,20,23
120:1 189:21
190:13

consumer
254:10,16

contact 69:1
76:14,17,24 77:1,
2 112:14 214:6,7

contacted
229:23

contained
100:25

contemplated
7:25

continue 6:25
45:23 122:8
128:15 129:4,7,
18 233:7 234:10
237:22

continued
128:12,17 148:7

continuing
210:14

contract 65:13
66:5,13 68:2
156:10 196:21
211:19

contracted
65:18

contracting
145:11

contractor
140:23 158:17

contractor's
140:22

contracts 211:14

contributions
114:11

control 187:24

controversial
135:6

convenient 95:9
114:21

conversations
68:15

convicted 16:25

coordinated
255:12

Cops 183:11,13
184:14 249:5
251:6

copy 211:18

correct 5:3 28:17
31:22 37:17,18
38:21 51:20
76:22 95:25
99:14,18 105:6
116:18 145:20
164:2 168:22
178:5 180:6
203:2 227:17
237:5 241:8
252:19

corrected 67:9

correctly 228:25

cost 202:18 203:1
228:11

counsel 9:24
12:14 13:12
15:17 17:12,14
26:19 37:1 46:10
47:5 79:18 95:8
96:11 100:21
135:2 149:12
159:7 164:13
169:23 176:20,25
177:8,21 178:8,

22 179:4 180:10
215:22 231:23
238:21 240:20
255:19,20

counsel's 177:1

counted 155:19

country 43:21
83:10,15 172:5
199:18 253:16

counts 191:10

couple 42:9 46:5
144:8 165:7
173:16

court 9:22 10:14
11:22 15:22
105:22 140:6
147:21 230:25
231:1 238:16
239:15

Courtesy 21:21,
22 22:14,16,20
23:7,18 24:18
115:2 208:23,24
209:5,25 210:7,
16,20 211:1,13

cover 123:13
133:6,13

COVID 84:7
112:3 189:15

cowards 214:15

CPA 102:19,22
115:24 117:4
121:24 187:8

CPAS 101:19
116:13 122:1
124:6

craziness 238:10

create 100:9
102:6,10 116:19,
20 136:2,24
137:19,21,22
201:2 223:22

created 47:21
100:11 101:9,11,
13,15,17 137:23
227:14

Richard Zeitlin
December 08, 2020

265

USAO_00003682

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

**credit** 53:24 54:6, 9,10,15,22,23 55:22 56:4 61:9, 14 74:14 94:5,9, 16,18,22,23 95:3 127:11,13,14,15 203:5,6,11,12,18, 22 204:5,6 205:1, 8,9 216:7 217:25 219:3 229:16,19, 23 230:2,14 231:21 250:22

**credits** 70:15 71:10 160:24 226:24

**crew** 233:9

**crime** 16:25

**criminal** 204:2 238:11

**criminals** 207:4

**cripple** 230:22

**crippled** 234:13

**crisis** 84:7

**CRM** 63:17

**cross** 50:22 138:11

**crying** 235:23

**Crystal** 160:11

**CST** 138:11

**CSTDO** 138:7

**Cure** 249:6

**current** 14:8 184:4 244:18 246:3,4

**customer** 40:9 88:25 228:22

**customs** 7:7,10

— D —

**d/b/a** 45:5 103:12,13,21 104:7 109:13 110:1 111:17,18,

19

**d/b/a's** 126:4,15

**daily** 202:9

**damage** 222:18, 19

**damages** 198:20,22 202:9

**damn** 222:13

**dark** 12:17

**data** 34:22 35:4 51:6 52:2,3,7,11, 13 53:20 54:3 56:8 62:17 63:8 67:18,20 69:13 70:7 72:23 73:4, 17 74:4 75:10,13 76:3,7,16 77:10 81:1,4,16 82:22, 24 83:4 99:9 109:25 110:1 114:6 123:15 166:11 192:5,6,9 240:3,24

**Data's** 62:20

**database** 52:4,6 56:8 76:7,9 154:9,12,14 240:8

**databased** 155:18

**databases** 228:6,9

**databasing** 75:16

**date** 6:25 9:15 14:15 22:21,23 104:21,22 136:4 153:15 170:20

**date's** 81:8

**dated** 79:23 80:18 151:24 192:15

**dates** 104:11 209:4

**David** 183:21

**Davie** 188:15,17, 19,22,23

**day** 6:22 20:6 23:1,2 26:14 53:18 90:16,21, 22,23,24 121:23 129:9 131:6 186:21 202:11,17 203:17 205:23 206:11,18 207:8, 15 215:5 219:11 222:3,14 224:25 225:4 227:2 234:14,15

**days** 93:18 99:3 131:20 135:25 211:19 218:24 234:16

**de** 174:11,15,24 175:3 180:16 185:24 186:9,10, 13 187:14

**deal** 41:11 112:12 116:6 122:1 123:11,24 134:22 254:12

**deals** 71:10 109:14

**dealt** 40:13 156:8

**debate** 214:1

**debit** 163:20

**debits** 153:10 174:7

**debt** 113:24 114:4,7

**decades** 5:11

**December** 9:15 93:12,14 138:5

**decent** 91:6

**deceptive** 210:8

**decide** 90:23

**decided** 237:10

**decides** 75:5

**defend** 8:1

**defendant** 9:22

**Defendant's** 198:8,10

**defended** 235:25

**defending** 10:7 12:23 236:2

**Defense** 246:1

**defenses** 8:2

**definition** 73:10

**delay** 229:6

**delayed** 238:2

**delineation** 110:21,22 111:5

**delivered** 46:11

**delivering** 19:18

**delivery** 5:25

**demand** 5:21

**Democrats** 248:20,21

**denies** 210:20

**Denton** 188:21

**Denver** 187:1,3

**department** 75:9 206:5

**depend** 116:17

**depending** 62:8 63:22 134:2 226:16

**depends** 62:16 90:6,9,25 91:1,22 92:1 93:2,6 181:20,23 212:6

**depletes** 234:11

**depleting** 216:8

**depo** 12:23

**deponent** 9:19 177:10

**depos** 11:8

**deposit** 141:22 142:3,21,24

143:16 144:5,10, 17 150:7,12 151:4,25 152:9 154:19 155:6,8 192:24 193:3 194:13 219:20,23 220:2,4,8,9

**depositing** 154:20,23

**deposition** 5:3,6, 15,24 6:5,9,16, 20,23 7:11,13,20 8:4,13,15,23 9:16,21 10:8 14:2,11,12 15:1, 12,14,16 17:11 47:7 78:2 80:1,20 100:1 135:4,9,13 136:11 137:9 139:8 149:20 163:4 170:7 181:24 191:16 193:13,25 194:15 195:4,14,21 196:5 197:25 209:13 220:12 221:15 223:12 248:1

**depositions** 13:21 15:4

**deposits** 116:23 143:4 154:12 156:5 160:23 185:1

**depreciating** 120:5,7

**depreciation** 120:3

**Deputy** 211:17

**describe** 24:5 29:5 30:5 74:10, 21 78:4 232:7

**description** 109:11

**descriptions** 24:6

**design** 25:5 37:20 40:21 41:1, 6 42:3

Richard Zeitlin
December 08, 2020

266

125

USAO_00003683

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

**designer** 38:14

**designing** 37:23, 25

**desk** 38:16

**desperate** 222:12

**despicable** 223:9 254:13

**destroy** 118:21 149:8 215:3

**details** 251:14

**determine** 143:22

**developed** 88:13

**development** 25:4

**dial** 11:25

**dialer** 63:17

**Dierks** 183:21 184:10

**difference** 53:16 71:11,13

**difficult** 39:24 92:19 93:15 123:10 155:19 235:21

**digging** 215:23

**dime** 229:24

**direct** 30:4 39:23 44:8 49:20 86:7, 16,17 89:2,9,14, 22 91:13,25 93:21,23 94:1 138:22 217:1,9 249:9

**direction** 44:21 216:22

**directly** 12:24 39:9,14 49:18 85:23 152:18 155:4,6,8 187:12

**disagree** 6:3 249:7 251:2

**disbursed** 225:20,24

**disclose** 6:4 251:14

**disclosed** 5:7, 15,22 6:1 7:21 8:3,15 252:16

**Disclosures** 192:25

**discount** 70:25

**discovery** 5:7,8 6:1,10 8:16 200:17 230:16

**discretion** 40:7 107:18,19

**discuss** 6:17 68:20

**discussed** 80:17 104:23 233:13

**discussing** 99:6 212:14

**discussion** 9:7 14:23 96:21

**disease** 245:9, 21,22,24

**disjointed** 250:20 251:21

**disparage** 253:14

**disparaged** 253:24

**dispensed** 209:6

**displayed** 189:5

**dispute** 131:25

**disputed** 8:18

**disregard** 235:24

**disseminating** 210:9

**dissolution** 29:1

**dissolve** 44:18

**dissolved** 28:22, 23 34:15 35:24

42:17,19,20,22 45:16 47:20 48:1 125:13,20,24 132:18,20,25 133:19

**distress** 205:15

**distributed** 58:7

**district** 6:4 7:6,8

**diversity** 83:14 84:18

**divided** 45:19

**Division** 254:11

**doc** 193:20

**doctor's** 205:16

**document** 59:4 78:13 100:7,9 102:1 135:21 136:3,23,24 137:11,16,21 139:23,25 191:21 192:4,8 193:18, 21,23 194:9,11 195:12 198:5,12, 17 201:2 210:3 223:22

**document's** 200:23

**documentation** 202:4 215:13

**documents** 5:2, 7,23 6:1,4,7,12, 17,20,22,24 7:1, 15,20,23,25 8:3 135:6 162:25 177:12 192:22,24 197:17 200:13,21 202:14

**dodge** 42:13

**dollar** 230:10

**dollars** 55:16 69:18,19 143:6 166:12 199:3 217:22 237:7

**domestically** 205:21

**Donald** 247:9

**donate** 30:18 61:7,8 75:5 87:3

**donated** 86:18 87:1

**donation** 55:21, 22 62:11 69:16, 18,19,24,25 70:2 71:12,14 74:17 75:7,12,19 76:8, 10 81:6 87:10,14 88:2 115:3

**donations** 19:25 20:25 24:8 30:8, 10 55:3 58:16 62:3 67:16,17 70:11,13 71:23, 25 72:6 86:5,15 89:9 135:24 136:9 137:5 154:13,15,17,18 155:12 225:14, 19,23 251:14

**donor** 28:16,18, 19 29:2,21 30:21 31:5,10,13,19 32:13,16,25 43:6 44:1 47:19 50:6, 8,13,18 51:21 55:8 56:2 57:1 58:25 61:8 65:25 67:6,9 69:17 73:21 74:12,13 75:5,16,19,22 76:5,14,17 86:25 87:2,10 88:2,18 97:12,15 99:12 108:2,8,10,16,19 111:1 114:23 120:25 122:13 132:17 157:2,5 160:17 163:16 164:7 170:16 189:7 196:8,9 208:3,6,9,14 227:11 252:16,22 253:2

**donor's** 87:18 88:3

**donors** 54:16 55:5 60:7 83:19

85:23 86:13,15, 23 91:23 94:13 98:2 99:19,22 155:1 180:25 181:4 182:9 216:7 217:18 218:1 226:4,11

**door** 217:24 219:1

**double-check** 132:22

**double-sided** 141:19

**Douglas** 189:16, 18

**downright** 238:11

**downtime** 199:22

**dozen** 169:5

**dragged** 14:24

**dramatically** 216:17 234:2

**draw** 254:21

**drawing** 177:8

**drive** 26:13 107:11,14,15,23

**driver's** 18:12,13

**driving** 113:4

**drop** 203:6 229:24 236:9

**dropped** 208:18

**Drugs** 16:17

**due** 43:2 105:15 121:24 202:9 232:25 236:7 238:18

**duly** 10:18

---
**E**
---

**e-mail** 5:11,21 7:16 221:22,24 222:11

USAO_00003684

SUBJECT TO PROTECTIVE ORDER

**earlier** 33:21
81:14 104:24
125:10 187:12
202:2 203:10
217:14 225:13
231:17

**early** 98:3 131:17
140:16,19

**earn** 255:13

**easier** 33:4

**easily** 226:21

**East** 24:22 26:11
252:10

**easy** 90:3 133:24

**Economic** 66:8

**educated** 136:8
137:1 212:14

**education** 202:3

**educational**
17:16

**effect** 244:23

**effects** 223:4

**effort** 255:12

**elaborate** 177:8

**Election** 59:21

**electronically**
76:7 77:22
151:15

**else's** 157:13

**embarrass** 53:5

**embarrassing**
222:23

**Emerald** 140:6
147:21

**emergency**
150:16,21

**emergent** 97:25

**emotional**
205:15 238:23

**employ** 30:16
31:7 38:6,8,9
43:15 44:5 49:18

65:2,7,9 73:4
116:5,13

**employed** 23:24
30:21,23,25 31:1,
6 38:14 43:3 44:2
49:6,21,22 50:5
73:9,17 108:16
111:21 112:8
201:9 241:10

**employee** 9:13
27:13 75:11

**employees**
21:10,16,18 23:9
26:15 32:4,13,15
38:4,24 41:11,25
49:7 72:24,25
73:15 108:11,12,
13 113:21 123:14
133:2 134:1
189:11 202:8,12
203:1 222:14
223:19 224:5,6,7,
11,22 225:7,8
232:14 235:7
238:15

**employer** 20:2
192:18

**employing** 31:11
60:7 64:22
241:13

**employment**
18:18 23:18
102:20

**employs** 38:23

**end** 15:16 22:20,
23 135:9 157:7
199:19,23 214:25
227:1 248:4

**ended** 22:24 23:7
43:1 185:11
216:8 230:17
243:24

**ending** 162:2

**ends** 134:17
228:3

**enforced** 7:6

**enforcement**
213:24,25 214:7,

25

**engaged** 7:11
212:8,19

**engine** 234:23

**engineer** 38:14

**English** 106:6

**ensued** 129:1

**entail** 108:23
224:9

**entails** 29:6

**enter** 116:22
117:14 211:14
228:5

**entered** 187:12
210:23

**entire** 124:12
205:19,25 235:2

**entities** 44:23
45:1 62:18 64:3
102:18 123:19
126:18,21 127:9
132:2 153:1
167:17 168:7,21
169:3 189:6,12
197:16 208:21

**entitled** 9:18

**entity** 51:18 74:3
103:20 111:9,12
112:10,19 113:10
119:19 133:8,9
144:16 146:14
152:20,23 172:16
189:3 208:21
209:1 226:5

**entry** 151:24
152:8 159:20,23
160:15 164:21
179:20

**envelopes**
155:21,25

**environment**
156:9

**equal** 89:11
90:15

**equally** 22:7

90:13 177:25

**equals** 57:25
59:5 81:6

**equation** 232:18

**equilibrium**
218:7

**equipment**
120:8,10,11
241:19 242:15

**ER** 150:12,15,20,
25 151:24 159:21

**escrow** 165:13

**essential** 37:6

**essentially**
47:20 50:19
242:2

**estate** 18:10
25:6,7,23,24

**estimate** 22:24
28:3,5 65:20,22
176:5

**estimating** 23:1

**estimations**
23:12

**evasive** 116:5

**Eve** 234:14,15

**event** 83:10

**eventually** 23:9
167:17

**evidence** 161:19
177:12 189:24

**evidentiary**
226:7

**exact** 22:22 98:9
225:11 243:16

**EXAMINATION**
10:21

**examined** 10:19

**Excel** 239:14

**Excellent** 135:11

**Exceptional**
159:5,6

**exchange** 5:11,
21

**exchanged** 5:8,
16 8:16

**excuse** 46:4 93:5
154:24 174:4
201:14 230:8

**executives**
221:7

**exhibit** 46:16
77:14,21,23,24
78:2 80:1,20
82:21 83:20
99:24 100:1
126:16 135:6,13,
15,16 136:11,14
137:9,12 139:3,8,
10 147:7 149:20,
22 151:9,10,16
158:6 163:4,6
164:4 165:5
169:22 170:7,10
179:18 181:24
182:2,20 183:1
191:16,18
193:13,15,25
194:2,15 195:4,
14,21 196:5,7
197:25 198:3
209:13,16
220:12,14
221:15,17
223:12,14 248:1,
3

**exhibits** 5:3,14,
23,25 7:19 8:14,
18,24 9:4 46:11
135:9

**existence** 22:17
35:14 36:22
50:14,15 52:14
183:25 185:10

**expansion**
199:2,6,7,9
201:22,24 202:1
241:8,20

**expect** 121:10

**expedite** 124:22

**expenditures**

USAO_00003685

SUBJECT TO PROTECTIVE ORDER

**227:**12

**expense** 103:8
106:21,23,25
107:3 108:3
112:25 113:16
114:8 115:19
116:12 117:21
120:24 121:3,4,
11 122:8 124:8,9,
12,13 134:23,24,
25 227:13

**expenses** 103:3
112:23 113:2,23
115:16,17
121:14,16,18,21,
22,23 122:10,17,
25 123:12 133:13

**expensive**
228:23

**experience** 5:12
66:18 177:9
178:9 251:25

**expert** 26:23 27:3
47:7,12

**explain** 39:10
40:16 119:9
133:22 204:2
222:21

**explained** 125:9

**explore** 135:5

**export** 228:5,8

**Express** 157:9,
11 161:15,17,22,
25

**expressly** 5:20

**extend** 127:10,13

**extreme** 205:14

**extremely** 91:3

**eyes** 159:10

——————

**F**

**face** 12:17 214:14

**facilities** 49:13,
15

**fact** 134:13
203:17 204:25

**facts** 189:24

**factual** 198:20

**fair** 34:21

**faith** 205:25

**fake** 253:20

**fall** 171:20

**false** 210:9

**familiar** 93:25
94:7 96:25 97:9
243:12 246:19
248:12

**family** 255:14

**fashion** 82:15
201:7

**fault** 222:25

**FEC** 59:19
227:10,24 228:7,
13

**federal** 5:13 7:5
59:20 252:11

**fee** 72:17

**feel-good** 251:6

**feelings** 254:24

**fees** 62:7 69:5,8,9
70:17 72:4
104:23 124:3
191:3 192:25

**felony** 17:2

**felt** 237:4

**Fidelity** 164:24

**fight** 14:23
214:10 255:12

**figure** 8:24 39:16
40:20 90:20
129:6 216:24

**file** 100:22 147:22
253:8

**filing** 58:13

**filings** 58:6

**filled** 162:17

**final** 167:2

**finally** 238:15

**financial** 100:19
116:20 176:13
247:13

**financially** 9:12

**FINCEN** 176:12

**FINCEN's** 176:8

**find** 23:17 53:19
55:24 102:1
112:12 122:5
130:5 200:19

**finding** 230:17

**fine** 7:1 23:6 46:7,
22 95:10 111:19
113:19 124:25
164:15 169:25
212:2 238:25

**finish** 15:25
177:23 247:18

**firefighter**
190:23

**firefighters**
150:23 173:17
209:23

**firm** 117:4

**fit** 90:14

**five-minute**
169:24 196:23
230:23

**fix** 12:12

**flattering** 213:5

**flip** 136:13 139:20
141:18

**flipping** 83:20

**flogging** 238:5

**Florida** 188:19,
21,23

**flow** 61:16 94:19
217:24

**focus** 44:23

**folks** 112:4
187:22 223:24
230:18

**follow** 40:19
56:22 61:4
151:20 182:16

**follow-up** 82:20

**food** 124:22,23
206:17

**forced** 202:7
203:5 205:16
234:5

**forecasting**
202:4

**forecasts** 201:24

**forget** 207:22

**forgive** 112:9

**Form** 87:22
126:22 145:24
146:18 161:18
167:19 171:11
176:19 182:11
250:14

**formed** 39:12

**fortunately**
109:21 222:24
223:5

**forward** 8:8,12,
22 199:24 207:8

**fought** 206:13

**foundation**
59:25 173:18
175:19 176:20
178:12 185:2,17
189:23 190:9
213:14 214:20
226:6 250:15
251:17

**founded** 175:13

**fourth** 234:1

**frame** 117:2

**frankly** 8:20
206:10 234:3
235:12

**fraud** 176:14
214:3

**freedom** 57:14
253:18

**freeze** 31:20
98:17 105:9
106:2,5 109:17
110:7,10 126:2,
18 128:8 130:8,
15,23 131:1,4
132:12 141:7,12
148:13,17
167:11,16,23
169:6,12,15
203:10 205:1
213:12,20 214:18
215:15 219:21
229:2,24 230:6,
10 231:19 232:4
240:17

**freezing** 219:24
220:3

**Friday** 234:15

**Friedland** 9:9

**friendly** 228:4

**front** 45:2 180:5
237:19

**froze** 131:18
205:5 230:17
238:1

**frozen** 205:6
218:11 222:22
229:3 231:15
237:25

**Ft** 188:25

**FTC** 208:4,7,10

**fulfill** 71:18

**fulfillment** 154:4,
6,9

**full** 13:10,23

**fun** 207:6

**fund-raise** 20:24

**fund-raised** 21:8

**fund-raiser**
29:15 253:3

USAO_00003686

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

**fund-raising** 19:7,10,14,19 20:17,23 21:7 29:4,6,24 30:15, 16 42:23 43:5,8, 12 45:9 48:5,6,9, 14,20,23 63:7 81:24 82:2,3 118:9,12 119:6, 15 125:17 152:20 154:11 180:23 181:2 212:8,19 213:3

**funding** 143:18 244:5,24 245:22

**funds** 29:7,12,16, 17,19,21,25 30:18 82:14,15 98:9 129:2 133:6 143:24 153:24 182:8 229:10 231:21 232:12 235:6

**funny** 205:3 207:12 230:21

**furnish** 242:20

—— G ——

**Gamboa** 209:24

**game** 28:4

**games** 22:25

**garbage** 223:2

**garbled** 197:11

**gave** 71:17 88:5,6 94:16,25 138:18 207:22 243:6

**general** 38:13 119:23 120:1 140:23 145:11 158:17 210:6,15 211:18 212:16

**General's** 211:17

**generally** 43:16 88:24

**gentleman** 156:13 183:20

243:25 246:15 247:4

**gentleman's** 173:10

**Gerald** 10:6

**give** 6:13 9:3 12:8,22 44:24 54:25 55:7 56:3 69:15 70:25 71:17 74:12 75:17,22 76:6,20, 21 87:16 91:9 95:1 97:16 134:1 164:16 232:1 240:1 249:9 250:22 255:20

**giver** 138:19 181:22

**giving** 90:9 147:11

**Glendale** 9:11

**glib** 116:5

**Global** 64:15 127:20,21,22,24 128:7 174:17,19, 22 175:6,7,23 180:18 185:25 187:10,14 201:11,13,18

**God** 158:11 208:17

**good** 46:13 47:25 70:16 71:8 92:5, 24 109:10 126:10 179:11 183:4 208:1,2 222:20 236:22

**goodness** 105:11

**Gosh** 178:20

**Gotcha** 221:20

**governed** 192:21

**government** 176:13 208:21 209:1 213:23 215:2 226:23 235:19 254:5,8,

10 255:12,15,17

**grade** 17:24 202:3

**graduate** 17:22

**grateful** 7:15

**great** 15:9 16:3 26:7 36:20 46:13, 23 65:22 81:22 131:13 142:15 150:9 169:21 170:19 205:22

**Griffith** 5:1 6:2 9:1 10:1,2,22,23 11:12 12:11,16 13:3,8,19 14:1 17:7 26:21,25 27:5,10,11 37:4, 8,9 46:13,19,24 47:11,16 60:2,23 77:23 78:3 80:2, 21 87:24 92:14, 17 95:10,12,20 96:15,18,24 100:2 111:15 119:13 124:19,25 125:2,8 126:12, 14 127:1 135:8, 12,14 136:12 137:10 139:9 146:1,19 147:1 149:12,19,21 151:10,12,18,21, 22 158:5,9 159:9, 14 161:21 162:8 163:5 164:15,18, 20 167:20 168:3, 10 169:9,10,25 170:8 171:1,14 175:21 176:10,23 177:2,4,16,23 178:1,4,7,13,15, 23 179:2,7,11,17 180:14 182:1,14 183:1,3 186:5 190:1,12 191:12, 17 193:14 194:1, 16 195:5,15,22 196:6 197:7 198:1 209:14 212:15 213:1,16 215:12 220:13 221:16 223:13

226:9 231:8,25 232:3 238:25 239:6 248:2 249:11,12,18,23 250:16 251:24 255:22

**ground** 125:15

**group** 242:23

**groups** 52:4 251:12

**grow** 200:1

**growing** 216:25

**guarantee** 234:7

**guard** 131:11

**Guatemala** 175:4,5,11,14 176:8,17 178:16, 21 179:12 180:20 186:6,10,14,22, 23 238:9

**guess** 23:11 27:17 41:10 45:18 49:13 61:2, 8 69:23 89:12 110:14 115:3 118:19 119:6 130:17 136:8 137:1,4 152:21 162:16 212:6 214:1 217:18 219:4

**guesstimates** 23:13

**guise** 250:5

**guy** 20:6 149:7 184:3 207:13 230:22 245:23 255:5

**guys** 105:19 113:11

—— H ——

**habit** 102:6

**hacks** 250:22

**half** 202:17 219:11 225:4

**hallmark** 250:13, 19,20 251:2

**hallmarks** 250:8

**hand** 108:21,22 234:5

**handle** 110:3 155:20

**handles** 53:23

**handy** 215:16 240:18

**happen** 87:6,8 91:14 131:8 149:10 202:5 214:12 217:7 235:18 236:8 238:7

**happened** 14:23 55:15 83:12 162:16 185:12 216:19 235:24 238:10

**happening** 214:4 218:9 233:10 235:20 237:1

**happy** 16:7 21:6 89:19 91:6 151:21 167:14

**harassing** 205:4

**harassment** 177:19

**hard** 139:1 151:19 158:11,12 169:8

**hardware** 199:10,11 200:3, 6,14

**Harmer** 247:9

**harvesting** 179:13

**hate** 91:4 156:12

**hated** 223:8

**havoc** 129:1

Richard Zeitlin
December 08, 2020

270

USAO_00003687

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Index: hazy..instruct

hazy 194:22

head 15:21,22
53:9

headed 48:6

headquartered
184:22

headquarters
24:19 85:7
175:12,14

health 39:22
40:13,14 41:13
43:3 44:16
112:11 120:18
123:6,11,20,24
134:1

hear 51:1 92:12,
18 94:4 146:5
168:13 169:7
183:23 197:10
236:13 244:14,16

heard 81:23 82:1,
7 236:15 248:14

hearing 96:7
198:6

heart 25:15
245:9,21,22,24

heavily 89:10
156:2

held 42:10 157:12
223:2

helps 15:22
124:2 134:21
223:6 242:12
254:24

Henderson 26:9,
13 33:18,19 34:2,
3,6,7,25 35:11,
18,20 36:24,25
84:23 85:7
163:25 165:14
166:3 169:17

Hey 76:20

high 17:17,20
18:4,5,6,18,19
94:17 227:16

higher 233:2

highest 17:24

highlight 251:11

hire 49:19 64:3,
25 88:24 199:16
235:6 236:18
238:15 242:6

hired 20:6 21:16,
18 224:24

hiring 232:17

historical 233:2

history 16:19,20
18:18 23:18
223:11

hit 12:24 112:3
251:22

hitting 217:25

hobble 235:2

hobbled 229:13

hold 69:11
146:15,16,21,22
147:4 157:16
165:10 235:10

holds 157:15,16
163:25

holiday 92:25
93:10

holidays 92:23
93:19 199:22
216:18 233:1
234:13

Holland 47:6

home 32:21,22
85:20 112:3
140:13 221:12
225:8

honest 90:8

honestly 118:20

honesty 17:3
27:15

hope 79:21
123:21 124:1
134:21 254:23

horrible 123:23

134:22 206:18

horse 236:19

hot 87:11

hour 62:9,15,19,
22,25 63:2 67:20
68:12,17 69:9,14,
15 175:24 231:2,
9

hourly 69:13
72:2,19,20

hours 8:4 80:10,
13 226:16 240:4,
12,13,23,24

house 149:5
158:25 159:15
242:24 243:2

houses 124:6

huge 134:7

hundred 24:1
69:18 70:10
73:41 132:11
166:11 167:3
203:7

hundreds 129:12
199:3 222:1
237:7

Hunter 47:6,11

hurricane 83:13

hurt 84:8 110:13
118:23

hypothetical
214:21

___

I

ICCS 64:15

idea 15:4 125:25
131:14 157:4
176:15 206:10
220:7 247:16

ideas 161:7

identification
27:4 192:18

identified 8:11

identify 7:20
198:19

illness 16:19,20,
22

imagine 7:12

imagined 203:25

immediately
214:7

impacted
126:21,24 127:2

implement 199:1

implemented
200:2

important 94:20
112:13 232:11

imposed 149:14

improper
177:17,20

in-house 242:8

inability 232:12

inappropriate
178:22 179:6

inaudible 43:25
61:18 73:15 92:9
94:3 96:2,3
111:24 115:11
122:18 126:4,5
139:2 143:2
169:6,19 171:4
188:15 197:8
204:7 219:20
231:14

inbound 154:13
234:18

incentive 113:9
228:23

include 43:10
192:24 217:8

included 5:2

including 198:21

income 104:19,
20 105:2 133:5

Income/expense

100:16 104:19

incorporated
20:4 37:11,12
44:15

incorporates
54:8

incorrect 81:16

indefensible
236:3

independent
60:18

India 67:1

Indianapolis
83:3

indirectly 39:9
40:15

individually
27:20

industry 87:13
94:20 119:24
120:2 156:2
234:25

inference 149:14

information
24:8,11,17 58:8
74:13,19 76:1,6,
11 80:15 87:19
88:3 95:3 100:25
104:15 105:20
116:19 117:10
120:7 129:17
200:19 228:5,8
232:1 240:5,6,16

initial 142:23

initials 25:18

injury 205:8
206:3 233:11

input 57:8 228:10

installing 201:6

instance 92:23
98:11

instruct 176:21
177:6,17,19

Richard Zeitlin
December 08, 2020

271

USAO_00003688

SUBJECT TO PROTECTIVE ORDER

instructing 178:4

instruction 176:24 177:15,17

insult 205:8 206:3 233:11 238:9

insurance 39:22, 24 40:13 41:12, 14 43:3 44:17 111:23 112:11,21 120:15,16,18 123:6,7,11 133:13,21,23 134:1,5,9,10,16, 19

insure 134:18

Integrated 35:16 51:12 55:10,11 125:12,14 145:12,18 153:18,21

Integrations 159:5,6

intelligence 238:9

intended 7:25 225:18,22

intends 5:23 8:14

intent 116:1

intention 5:5

intentions 149:17

interest 64:4

interested 9:12

interesting 216:4

internal 65:17

internally 40:7 65:4,7,9,15,24 67:7 202:24

international 120:22 171:5,12 173:13 174:12 187:23

internationally 205:21

Internet 214:15 242:21

interpose 178:25 179:4

Interrogatories 198:8,10

Interrogatory 198:19

interrupting 177:24 178:2 179:3

introduce 5:14 8:14 9:24

investigated 208:25

investigation 59:12 60:19 142:23 208:12, 13,16 209:9

investigations 208:20

invitation 12:25

invite 12:5

invoice 77:12 78:9 79:3,23,25 80:24 81:16 82:22,25

invoices 77:3,5, 7,9 78:16 81:9, 12,19 226:15

invoicing 68:3,4, 7 78:17,18

involved 19:10, 13,17 41:10

involving 17:3

Iowa 90:7 186:25 187:3

IP 79:7

irrelevant 7:23

irrespective 70:4,5 253:1

issue 96:17 149:13 209:6

issues 83:11 123:24

IUPA 120:19

___

**J**

Jami 211:18 212:1

Jane 247:11

janitor 49:12 73:16

janitorial 24:9 49:11,12

janitors 49:18

January 138:5 150:10,11 163:14

jeez 207:21

Jefferson 83:22

Jew 114:16

job 18:20,21 19:18 22:13 24:5 145:10 251:22

jobs 24:3

John 156:17

Johnson 108:15, 16 117:13

Johnson's 196:15

join 12:25 27:6

Jose 118:25

Juliana 36:15

Julie 108:15,16

jump 200:4

justification 7:4

___

**K**

K-U-T-A-C 246:24

Kane 10:13

Kaplan 245:5,7

keeping 41:13

Kevin 20:6

keys 149:5

Kiah 10:3 12:7 37:1,6

kids 183:11,13 184:14,17,20 249:6 251:7

Kimble 10:13 12:23 77:20,24 96:7,9 151:8,11, 14,19 164:16,19 170:23 180:12 182:25 249:16,20

kind 14:22 37:22 48:5 53:10 81:6 91:22 104:14 105:20 106:14 107:8 118:6 143:19 207:10 234:19 240:4

knock 229:14

knowledge 20:15 177:1,9 178:10 184:1 196:22 200:18 212:17

knowledgeable 48:14

Kutac 246:24

___

**L**

La 14:9

labor 242:11,12

labor-intensive 234:23

laid 129:11,19 223:19 224:16, 19,22

language 194:12

laptop 11:14 12:6 243:6

large 48:3 143:22 242:3

larger 71:8

Las 14:9 18:25 19:3 20:16 24:19, 20,22 25:25 26:9, 12 31:25 36:18 37:11 43:21 85:15 112:19 140:8

lasted 131:6

lasting 223:4

late 252:9

Lauderdale 188:25

laugh 207:5,11

laughed 207:12 230:19

laughing 214:11 230:9

laundering 176:8,18 178:17, 21

law 10:10 57:19 213:24,25 214:6, 25

laws 123:9

lawsuit 28:24 34:18 208:3,6 253:8

lawyer 40:19 156:18

lawyers 11:10 101:19 206:5,9, 22,23

lawyers' 8:9

lay 202:8

layoff 129:5,8 222:3,14

layoffs 222:1

lead 87:12 138:12,16 229:6 234:2

USAO_00003689

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Index: leads..making

**leads** 89:10 99:2

**learned** 253:11

**lease** 189:9

**leave** 57:14 71:2 93:9 234:9

**Lecherous** 230:13

**Leconte** 246:22

**ledger** 100:14

**Lee** 108:15

**leeway** 251:13

**left** 37:2 231:10

**legacy** 115:1

**legal** 111:9,12,14 206:5

**legislation** 244:5,23 245:21

**legitimate** 248:16

**legs** 46:19

**lengthy** 155:19

**Leslie** 78:22 79:1 187:12

**letters** 221:8,12 235:9

**leukemia** 79:4, 11,24 80:7,25 87:1 243:18 244:6,10 245:24

**level** 17:24 227:16

**liars** 253:20

**license** 18:12,13 140:22 144:15

**licenses** 18:9,10, 11,15

**lie** 57:19

**lied** 206:9

**lies** 254:1

**life** 43:2 101:6 203:21 205:19

207:25 215:7 222:5,20

**lifeblood** 234:25

**lighting** 12:12

**lights** 217:23

**limit** 70:12 145:7, 10 219:20,24 220:3,5

**limited** 198:21

**lines** 153:14 154:2 160:15 173:16 199:13 200:3 201:6

**link** 7:14,16

**list** 45:2 53:7,8 55:12 56:9,10 64:14,20 88:10, 11,13 90:1,2,5 128:23,25 176:8, 15 180:4 223:19 224:4,9,23 225:11 234:10,11 237:19

**listening** 236:16 238:19

**lists** 56:20 216:7, 16

**litigation** 10:12

**lives** 215:3 248:24

**living** 148:1 255:14

**LLC** 33:6 34:22 35:4,6 80:6 82:24 209:25 246:1

**loan** 127:7,11 132:13,14 204:1, 5 205:7

**loans** 75:4 163:20 203:9,11, 24

**lobbying** 150:22

**locate** 164:14 180:11

**located** 24:18 26:8 31:23 32:5 33:8,17,24 35:8, 11 43:19 83:4,6 84:23 175:3,6

**location** 32:17 36:23 84:20 112:2 175:9,11

**locations** 43:20, 24 83:17 84:8 85:1 175:8

**lockbox** 154:9, 12,15

**log** 12:1

**logic** 233:18,20

**LOL** 207:13 230:19

**long** 44:14 46:15 55:11 97:13,15 129:8 147:15 198:16 208:17 234:12 241:4

**long-distance** 128:18 199:13 200:3 201:6

**long-standing** 184:7

**long-time** 187:21

**longer** 15:5 43:2 47:18

**looked** 6:8 253:10

**loosely** 85:8

**lopsides** 216:12

**lose** 130:16,22 233:3,23

**losing** 66:17 206:14 222:12 232:22,25 233:11

**loss** 100:20 102:4,7,12,15 126:17

**lost** 199:2 202:9 233:5,8

**lot** 24:3 71:17 73:8,10 83:11 90:10 93:17,18 101:19,20 115:24 127:16 133:25 204:3 234:16

**lots** 93:15

**loud** 242:2

**loved** 131:12

**low** 232:20

**low-voltage** 125:14 159:11

**lower** 181:6

**loyalty** 226:24

**ludicrous** 236:7

**lurch** 131:11

**lying** 57:22

**M**

**Madam** 11:22

**made** 19:25 44:7 49:21 75:11 87:10 99:4 108:11 124:4 129:16 144:17 167:5 205:25 228:4 229:24 237:8 240:4,7,9 241:3

**made-up** 250:25

**Madre** 14:9

**magistrate** 6:19, 21

**magnitude** 199:9 218:8

**mail** 21:1 30:4 56:4 61:16 83:11, 14 84:19 86:7,16, 17 89:3,9,14,22 91:13,25 93:21, 23 95:6 138:22 217:1,9

**mailing** 44:8 124:6

**mailings** 72:15, 16

**main** 22:13 127:15,18,24,25

**maintain** 41:16 63:19 177:15 240:8 255:3

**maintaining** 216:25

**maintenance** 37:20 40:22 41:1, 7 42:3

**majority** 216:9

**make** 11:4 24:7, 15 27:6 30:17 31:6,8,11 43:16 46:17 54:6 57:21, 23,25 58:12 59:4 61:6 67:4 69:19, 22,24 70:13 77:25 85:23 91:12 108:13 115:19 121:10 123:19 125:10 127:5 129:3 131:3 133:24,25 136:7 143:4 154:16 155:11 167:17 180:23 182:9 187:2,9 200:4 202:5 207:6 214:7 215:11 216:10 217:14 223:6,11 228:25 241:22 242:15,18 253:17 255:7

**makes** 8:16 55:21 69:17,24 114:25 121:10,22 206:25 228:6 242:9 250:21 254:21

**making** 24:13 32:4 52:7 59:1,23 60:15 73:15 90:3 99:13 128:1,3 178:9 208:1,2 216:6 218:1 224:2 233:24

Richard Zeitlin
December 08, 2020

273

USAO_00003690

SUBJECT TO PROTECTIVE ORDER

236:11 237:2 241:21 242:16

**man** 189:18 222:12

**manage** 26:1

**managed** 25:23 49:24,25

**management** 24:9 25:6,7,9,10 26:17 27:13,24 36:21 49:10,23 73:16 74:1 109:10 163:11,24 167:18,22,25 169:18 195:17

**manager** 38:15 50:7 111:23 112:1,18 201:3

**managers** 50:2, 4,10 109:6 113:8

**managing** 27:18, 19

**March** 215:24 216:1 217:5 231:11 238:14

**margins** 66:12

**marked** 78:2 80:1,20 100:1 135:13,18 136:11 137:9 139:8 149:20 163:4 170:7 181:24 191:16 193:13,25 194:15 195:4,14, 21 196:5 197:25 209:13 220:12 221:15 223:12 248:1

**market** 48:5

**Marketing** 56:13, 15

**Masterbuilt** 158:13,15,18

**material** 216:9

**materials** 143:20

**matter** 69:22 72:1

134:13 203:17 204:25

**Matter's** 248:24

**max** 127:14,15 231:20

**maxed** 203:13,22

**maxing** 203:12

**means** 62:11 71:17 82:8,10 97:4,6,7 149:2 217:25

**meant** 25:15

**measure** 7:4

**medical** 16:19,20

**medication** 16:14

**medicine** 207:17

**meeting** 17:12 55:14

**member** 27:18, 19

**memorialized** 68:2

**memorize** 172:2

**memory** 208:19 222:16

**menagerie** 200:21

**mention** 52:25

**mentioned** 26:22

**merchant** 54:17 230:4 237:25 238:1

**message** 230:20

**method** 44:19,22 61:12 89:8,10 94:12

**methods** 54:7 90:12,14 216:15

**Mexico** 66:24

**Michael** 209:24

**middle** 6:10 156:21 159:22 179:21 192:16 202:6 251:5

**mile** 236:6

**million** 104:21 122:14,18,21 250:5 252:16

**Milwaukee** 17:20 18:8 83:24 84:1

**mind** 222:12

**mine** 223:6 232:13

**minute** 37:15 126:16 165:10

**minutes** 46:5,18, 22 95:12,14 238:22,24 247:19

**miracle** 222:13

**misdemeanors** 17:2

**misleading** 210:8,10 212:8, 19

**mission** 57:25 58:2 59:6,14 60:16 61:3 171:23,24 172:2 244:2 245:18

**misstate** 45:5

**Misstates** 161:19

**model** 66:5 217:8

**moment** 12:8,22 13:14 56:16 107:5 164:13 180:10 255:20

**money** 14:23 30:2,3,6 31:14 55:18 58:16,19, 25 72:6,13 83:17 87:20 91:16 98:8 127:3,4 128:9 131:7 132:1,2 143:21 144:1 145:3,15 146:12, 15,16,21,23

147:4,12 154:1 155:16 157:4 162:5,10,18,20, 23 165:24 167:15 176:8,18 178:17, 21 180:24 181:3 190:19 204:1 206:1,24 207:7 208:2 214:11 215:8 216:10,20 217:21 218:1,18, 19 225:14 226:4, 11 227:2,15 229:20 230:17 233:23,24 235:11,12,14,16, 22 236:2,5 237:6, 11,12,17,24 238:1 250:7

**money's** 58:7 222:22

**monies** 127:8 133:12 154:24 156:5,8

**moniker** 250:21

**monitor** 13:6

**month** 28:8 138:4,6 143:13 232:20,22

**monthly** 28:1 94:23

**months** 97:18,21 148:6 199:8,12 232:5,9,10,23 237:9 250:5

**morning** 7:14,18

**Morry** 21:24 25:18

**mortgage** 163:22 165:1

**mouth** 68:24

**move** 244:4 249:15 250:1

**moved** 162:10 169:16

**moving** 23:22,23 73:6

**Moynihan** 220:20 234:7

**MRZ** 25:9,10,12 26:17 27:13,23 36:21 163:10,24 167:18,22,25 169:18 195:17

**multiple** 48:19

**mute** 11:14

**muted** 47:9,10

---

**N**

**Nagle** 9:23

**name's** 14:1

**named** 20:3 189:18

**names** 24:14 38:12 53:3 56:21 99:19,22 111:5 251:6

**nasty** 112:11 223:9

**Nation** 160:2

**National** 159:24 160:2 164:24

**Nationwide** 56:13,15

**nature** 13:21 57:20 109:1 116:23 184:18 201:4 208:16 209:8

**nearshore** 66:21,22,23,25 67:10

**necessarily** 92:8

**necessity** 41:12, 13

**needed** 8:3 53:7 108:24 218:25

**needle** 244:5

**nefarious** 216:5

USAO_00003691

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

**negative** 212:4,5, 6 213:6

**negotiate** 196:19,21

**network** 79:4,11, 24 80:7,25 87:2 128:15,18 243:19 245:9

**Networks** 127:22

**Nevada** 7:6 14:9 24:23 26:12,13 37:12 104:6 105:5 109:22 110:7,9 131:7 140:8 142:18 165:18,23 166:7, 11,21 204:8,12, 16,18 215:20 217:22

**newly** 5:22

**news** 253:20

**newspapers** 253:12,22,24

**nice** 139:2 158:1 205:1 207:3

**night** 7:17

**nights** 205:16 206:19 207:14,16

**Nissan** 113:11

**nodding** 15:21

**noise** 126:8

**nondescript** 136:6

**nonprofit** 20:22 29:7,12 42:24 52:4 62:3 76:12 87:21 88:4,18,23, 24 154:24 171:16,19 229:19 246:5

**nonprofit's** 155:9

**nonprofits** 29:17 41:22 42:6,8 43:9 52:17 67:23 68:1 109:15 154:22

155:5,17 182:10 188:5,6,9,13 226:13

**norm** 70:16

**normal** 81:13,14 232:25 233:6 236:1,18

**Norris** 108:15 111:20 112:8,20 113:12

**North** 83:22 84:16 154:4,5

**notary** 9:11

**notation** 142:19

**note** 15:24 37:7 205:4

**noted** 149:18

**noticed** 142:10, 11

**November** 93:13,14

**number** 23:22,23 25:2,3 30:2 41:9 42:2,4 55:24 56:6,7 64:12 74:14 83:9 85:6 115:6 122:9 128:22 137:14 139:3 151:13 164:11,17 169:4 170:22 180:2 182:24 192:17,18 195:23 223:16 224:17 239:12 240:3 241:15

**numbers** 55:25 73:6,7 116:2,3 117:14 124:4 180:5 226:20 240:9

---

**O**

**oath** 95:23

**Obamacare** 39:23

**object** 5:5 11:5 177:13

**objecting** 11:15

**objection** 17:5 59:25 60:21 87:22 111:13 119:11 126:22 145:24 146:18,24 161:18 162:6 167:19 168:2,8 171:10 175:19 176:9,19 182:11 186:4 189:23 190:9 191:10 212:10,21 213:14 214:20 226:6 249:8 250:14 251:17

**objections** 179:1,5

**observation** 7:9

**obtuse** 40:18

**OCC** 254:11

**occupation** 38:13

**occurred** 126:5

**October** 218:19 231:16 235:5 236:12 239:8

**offer** 134:15

**offered** 19:18

**offering** 82:13

**offers** 134:5

**offhand** 28:2 38:12 44:12 73:5 110:11 113:5 114:5 120:9 141:17 150:22 173:10 176:3 191:22 202:21 207:22 209:4,12 212:24 243:14

**office** 7:18 10:10 121:14,18,20,22 122:8 188:18,20 189:1 211:17

**Officer** 177:21

**Officers** 246:1

**offices** 225:2

**officially** 132:17, 20,24 133:19

**officials** 214:1

**offshore** 66:21, 25

**Oliver** 245:5,7,8

**onboard** 68:19, 22

**one's** 26:9 80:18, 25 103:21 173:7 192:5

**online** 156:24 160:16 161:2,10 165:8

**open** 7:2 12:5,24 77:14 154:18

**opened** 141:25 192:4,5,9 193:4 195:2 196:18

**opening** 192:24 196:2,11 197:20, 23

**operate** 104:14 242:2

**operated** 184:20

**operating** 29:3 47:18 50:14,15 126:18 141:5 145:19 146:14 148:7 153:21 163:1 219:16 234:21 245:16

**operation** 19:8, 11,19 35:4 129:4, 7 187:23 234:21 235:2

**operational** 31:15,21,24 33:13 35:22 36:5 37:17 40:1 53:25

**operations** 19:14 39:12

231:20

**operative** 7:5

**opinion** 214:16 252:19 254:4

**opportunity** 15:15

**opposed** 48:3 95:5 104:17 214:11 250:8

**opposing** 5:14

**option** 92:6

**options** 6:14 8:11 123:10

**order** 7:16 87:2 199:12

**ordered** 124:22 200:5

**ordering** 199:10 200:2,3

**Ordinary** 100:16 104:18

**organization** 61:3 85:4 88:6 94:19 150:17,21 151:6,7 176:14 183:21,24 184:13 185:12 243:24 244:8 245:14

**organization's** 59:3

**organizations** 29:8,11,13 41:20 42:24 57:6 154:21 156:7 244:1

**originally** 195:1

**outgoing** 19:25

**oversaw** 117:6,9

**overseas** 66:20

**oversee** 109:3

**overseeing** 109:5,7 187:11

**overseer** 109:9

Richard Zeitlin
December 08, 2020

275

134

USAO_00003692

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

**oversees** 49:1,3
116:24 117:3

**oversight** 251:12

**overuse** 234:10

**owe** 132:1

**owed** 237:12,17

**owned** 25:17
113:21

**owner** 25:5

**owners** 36:10

**owns** 134:15

---

**P**

**P-A-Y-K-E-L**
20:10

**p.m.** 7:17 95:16,
19 96:20,23
125:4,7 170:3,6
197:3,6 231:4,7
239:2,5 247:22,
25

**PAC** 29:19 54:12,
13 61:22 150:18,
19 152:5,6 160:4,
10 171:15,17
172:20 173:20
183:17,18 185:5,
11,19 227:9
243:15 244:12,
20,21 245:12
246:5,6,17,18
248:19,24 249:2
250:13 251:19
252:22,24 253:4

**package** 76:18

**packages** 154:19

**PACS** 43:10,12
52:19,21,22,23,
24 54:23 57:13
58:6 60:11,19
61:23 104:17
111:5 248:13,18,
21,25 250:9,21
251:6,25 252:6,
12,15

**pages** 144:8

**paid** 28:6 40:3
61:13 62:3 71:12,
14,17,22,23 72:2,
13 81:6 113:9
114:18 119:18
123:7 127:17,19
129:13 135:24
136:1,9 138:3,4
182:8 191:8
226:15,22
228:14,15 229:7
240:4,11,25

**pandemic**
189:15

**panic** 222:7

**paragraph**
141:22 202:7
205:13 211:9
251:5,9 252:9

**paralegal** 9:3
10:12

**paramedics**
150:23 209:24

**Pardon** 93:22
121:7

**part** 8:13 25:5
66:4 94:20
155:23 156:1
211:1 235:10

**participant**
11:18

**participate** 27:3

**participating**
47:6

**parties** 9:14 64:4,
11 210:23

**partner** 21:14,23
36:9,16 141:1
201:15

**partners** 201:12

**partnerships**
205:21

**parts** 18:22 83:15

**party** 5:14 14:25
64:5,6 154:20

156:4

**passed** 183:20,
21 184:3 246:15
247:5

**past** 11:9 14:15,
19 16:22 22:25
23:3,8 94:17
138:19 215:19

**patent** 14:22

**Patrick** 10:13

**Paul** 218:3,4
246:24

**pause** 9:2

**pay** 27:23 28:5
38:24 39:1 56:4
62:12 85:24 93:6,
9 113:10 115:23
116:22 123:4
128:7 129:18,20
161:17 191:3
200:5,11 201:13,
18 202:25 203:14
205:5,6 206:16
216:14 218:3
227:6,7 228:19,
22 229:11,17
233:19,22 237:13

**payable** 158:13

**Paychex** 132:3

**paying** 108:25
109:2 152:20,21
164:25 202:19,23
233:17 237:22

**Paykel** 20:7

**payment** 61:18,
21 67:17 80:9,13
115:7,14 157:8
161:24 175:11
200:14

**payments** 25:4
53:24 55:2 83:18
85:22,23 94:24
108:11,13 113:9
115:18 120:16
121:11 167:22
168:1,6,16,18
169:19 175:23
182:9 186:23

187:2,4,6,9,13,
15,18

**payroll** 122:10,
11,14,17,25
123:4,8,12,21
129:3 131:9,17,
23,25 132:2,3
133:7,9,10,11,13
134:8,10 241:2,5

**pays** 39:3,18 40:5
72:10,12 129:14
133:2,10

**PCI** 53:23 100:17
103:7,10,11,19,
24,25 104:1,4,5,
7,12,16,21 105:2,
4 106:14 111:9,
12 114:12,19
124:12,16 128:15

**PCI-
COMPLIANT**
54:7

**pending** 16:5

**people** 23:24
24:2 30:7,9,17
38:6,11,23 40:13,
14 41:8 49:15
54:24,25 55:4,7
59:20 63:18 69:3
71:18,19 73:3,8,
13 86:18,21
87:15 88:21 90:2,
7,8 93:4,8,18
110:13 123:7,25
128:22 129:6,11,
13,18,22 130:4,8
131:13 134:4,11
149:8 202:19
204:3 206:4
207:6,9,11
209:22 210:6,16
213:8 215:2
222:2 223:7,23
224:1,24 225:11
232:22 233:3,14,
21 235:9 236:18
239:24 242:6
253:7,8,12,14
254:18

**people's** 215:3
236:2

**per-hour** 69:10

**per-piece** 62:12

**percent** 27:21
36:7 38:17 65:21,
23,24 135:19
180:24 181:3,13,
14,19,21,22
224:7 226:4,13,
19 232:20,21
233:8

**percentage**
58:16 65:17,18
182:7 224:5
225:14,19 227:2

**percentages**
89:18 134:4
225:23

**period** 61:5 67:13
97:19 215:14
216:17 219:6,17
231:19 232:5,23
233:4 240:17

**periodically**
92:16

**periphery** 207:9

**permission**
162:17

**permit** 8:5 214:5

**person** 48:25
49:3 78:20,21
129:15 134:14
156:16 202:3
207:3 214:8

**personal** 143:12
144:4 157:17
177:1,9 178:9
203:6 204:21
221:1 235:13

**personally** 30:9
100:10 223:24
225:19 255:4

**pest** 187:24

**Peter** 218:3

**Peter's** 218:5

**Philippine**
201:11

Richard Zeitlin
December 08, 2020

276

USAO_00003693

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Index: Philippines..provider

**Philippines** 67:1

**Phillip** 246:22

**Phoenix** 84:17 85:11,12

**phone** 6:21 11:18,25 12:1,2 54:24 71:19 75:22 124:14 127:23 222:10 223:25

**phrase** 81:23 82:7

**physical** 5:24 8:23 46:11

**Piaro** 151:3 185:9

**pick** 107:13

**piece** 62:9,10,15, 17,20 63:1 67:21 68:12,16 69:13, 16 70:17 71:22 72:18 73:23 74:5, 8 224:13

**pieces** 70:18 223:1 226:17

**pizza** 19:19

**place** 9:17 33:2 146:15,16,21 147:3 153:25 169:11,14 176:17

**places** 176:14

**plaintiff** 5:5 10:6, 7,8 33:23

**plaintiff's** 8:1 198:21

**plaintiffs** 28:12 30:24 31:5 33:1 51:6 63:6

**Plaintiffs'** 198:9

**plan** 199:2 201:21

**planned** 199:5,8 241:8,20

**planning** 135:8

**plans** 119:6

**play** 22:25 38:24 90:11 121:23

**pledge** 96:6,9,25 97:2,11

**pledged** 24:14 96:2

**plugged** 92:19

**point** 6:21 108:9 212:12 216:4

**points** 203:7

**police** 57:16 120:22 171:6,13 172:5 173:13 184:16,18,20 246:1,11 248:19 249:3 250:6 251:19

**political** 29:22 45:25 110:16 150:22 244:4 250:3 251:12 253:11

**politicians** 245:1

**Politico** 248:7 249:4 250:23 253:9

**Pollock** 244:9 245:15 246:8

**populated** 56:1,6 69:9

**positing** 177:11 178:11

**position** 5:10 233:7

**positive** 87:9 185:20

**possibly** 226:19

**power** 215:7

**practice** 5:13 6:3

**practices** 7:8,10

**predicate** 226:7

**Predominantly** 201:10

**prefer** 61:13

**preference** 61:15

**preferred** 61:12

**prejudice** 5:18

**prejudiced** 8:6 31:18

**premature** 177:10

**preoccupied** 93:19

**prep** 7:14

**preparation** 7:12

**prepare** 7:19 17:10

**prepared** 199:15 200:4

**preparing** 6:8

**prescribed** 207:17,19

**prescriptions** 207:23

**president** 220:25

**press** 212:4,5,7 253:18

**pressroom** 253:20

**pressured** 197:20,22,24

**pretty** 12:17 94:17 132:21 136:5 157:25 162:19 208:18 232:18 245:23

**previous** 23:18 91:23 147:17 181:22

**previously** 5:15, 25 7:21 8:15 25:16 56:19 184:11

**print** 100:5 137:13

**printout** 138:4

**prior** 8:4 86:12, 23,25 102:7,17, 20

**privilege** 177:18

**problem** 83:12

**problematic** 8:22

**problems** 208:2

**procedure** 7:5 155:19,20

**proceed** 6:16,20, 23

**process** 28:25 55:20,23 76:7,9

**processes** 54:22

**processing** 54:13,15,23 80:9, 13

**processor** 54:17 230:4

**produce** 201:3 202:19

**produced** 239:7 249:19

**producing** 239:16

**production** 202:9,17,18

**Productions** 246:20

**productive** 8:10 216:16

**professional** 18:15 29:4,6,15, 24 124:3 253:3

**Professionally** 20:3

**professionals** 101:20 116:6,14, 18

**profit** 66:12 100:20 102:4,6,

12,15 126:17

**profitability** 234:11

**profitable** 89:22 217:2

**program** 56:7

**programmers** 38:16

**prohibit** 5:17,20

**project** 91:2 138:20 141:15

**projects** 141:13, 14 189:4

**promise** 71:18

**promised** 24:14

**promotion** 103:4 106:11

**proper** 8:8 167:6 177:2,4,5

**properties** 26:1, 8,10 27:23 163:25

**property** 28:9 167:6

**prospective** 56:2 57:1

**Protection** 254:11,16

**proud** 203:20

**prove** 223:9

**provide** 39:22 40:15,21,25 41:6 42:3 45:7,17 47:21 56:21 72:9, 10 99:8 118:7 156:7 228:9 240:20

**provided** 60:11 79:18 102:2 197:17 200:16 215:20 252:11

**provider** 56:11, 12 228:24

136

USAO_00003694

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

**providers** 56:14

**providing** 47:25
62:8 163:1
211:16

**public** 6:5,8 7:23
9:11 58:6 209:24

**published** 213:9

**pull** 239:13,15,19

**pulled** 248:3

**punitive** 198:22

**purchased** 243:3

**purpose** 107:10
155:11,15 166:8,
13,18,22 171:23
184:15 244:22

**pursue** 145:11

**Pusher** 246:20

**put** 27:7 39:21
68:20 84:8 143:7
146:12 153:25
154:15 177:10

**Q**

**qualify** 90:4

**quality** 161:19
216:8

**quarter** 217:6
228:12

**query** 5:5

**question** 7:22
14:6 15:20,25
16:5,9,10 21:5
23:11,17 26:20
31:3 45:14 57:13
60:3,6,24 82:20
87:25 89:12,24
90:18 91:7 92:12
96:7 105:23
123:22 132:16
149:9,10,15
175:20 176:22
177:14 178:5,11,
14 188:4 205:24,
25 206:20,25
213:22 217:4

219:12 225:18,22
226:8,10 231:24
232:2 251:4
254:7

**questions** 6:12
91:4 178:24
208:11 215:9
249:9 255:18

**queued** 46:17

**quick** 26:19
82:20 94:19 98:1
208:18 230:24

**Quickbooks**
100:14,22
116:21,24 117:3,
7,9,11,12

**quickly** 77:14
182:6 209:7
217:25 218:2
247:17

**Quinones**
118:25

**quote** 212:23

**R**

**R-I-C-H-A-R-D**
13:13,24

**raise** 29:14,19,21
30:2,3,6 82:14,15
91:16 190:19

**raised** 29:12
226:4 250:4

**raises** 29:7,16,
17,25

**ran** 20:5 173:25
183:20 184:3
185:8 190:17
244:8 245:14

**Ranch** 26:13

**range** 129:14
136:5

**ranging** 25:3

**rate** 69:10 70:19,
20 71:2,4,6
72:19,20 81:5

175:25 176:2,3
181:18

**rate's** 181:6

**rates** 70:22
181:10,21

**ratings** 188:13

**Raymond** 102:22
117:8

**re-ask** 60:4

**reach** 69:1,3,4
94:21 230:15

**reached** 230:5
254:9

**reaching** 238:6

**read** 15:15 45:4
191:22 198:15
212:2 222:7
238:16 248:10

**reading** 60:10
193:5,6

**ready** 199:20

**real** 18:10 25:6,7,
23,24 96:8
137:13 157:25
223:1,4 230:21,
24

**realize** 162:16
213:24 222:7
250:1

**realized** 222:25

**reason** 16:13
55:17 61:15
66:13 71:5 98:1
110:19,22 114:18
124:11 145:15
146:9,22 156:1
162:22 204:23
206:1,2 233:2

**reasonable** 6:13
8:22

**reasons** 19:4
44:17 66:8
111:23 112:21
123:6,7 133:21,
23 134:8,9
222:11

**rebuild** 235:3

**rebuilding**
216:11

**recall** 28:23
30:22 34:1,17
35:24 38:20 44:6
52:24 53:3,9
67:14 113:1
114:2 117:23
125:20,24
131:16,22 140:14
142:20 143:17
144:16 145:2,17
152:7 153:1
160:5,9 164:23
165:24 172:1,3,6,
8 173:8,25
190:23 192:3,8,
10 193:3,5,6,7
195:2 197:16,18,
19,22 198:12,14
209:4 219:19,23
220:2,4,11 229:4
239:9,16 243:16

**receipts** 201:4

**receivables**
215:14

**receive** 40:14
70:7,9 71:3 81:19
133:5 147:14
154:14,18 155:1
167:22 168:15,18
193:10 194:13
226:13,15 251:12

**received** 9:2 70:2
81:15 100:21
113:9 115:3
142:3 148:4
167:25 168:6

**receiving** 8:23
83:16 193:3,7

**recent** 250:5

**recently** 84:7
198:13

**recess** 9:8 13:7
47:2 95:17 125:5
170:4 197:4
231:5 239:3
247:23

**recognize** 100:7
139:23 191:21
198:5 210:3

**recollection**
152:4 208:22

**recommendatio
n** 6:15

**record** 6:5,8 7:23
9:6,7 10:24 13:2,
4,5,10,16,17,23
15:23 23:21 27:7
46:25 47:4,15
95:15,19,21
96:12,17,19,21,
23 106:8 124:19
125:3,7 170:1,2,
6,9 179:10 197:2,
6 215:23 231:3,7
238:23 239:1,5
247:18,21,25
255:20,25

**recorded** 247:14

**records** 22:22
23:4 202:22
239:7,10,11,21,
24 241:2

**recovered** 199:4

**refer** 225:18,23

**references** 150:6

**referral** 191:3

**referrals** 191:8

**referred** 191:7

**referring** 7:7
161:19 222:3

**reflecting** 200:13

**refresh** 208:19

**refuel** 234:22

**refuse** 105:22
149:9

**refusing** 106:9

**regain** 218:7

**regular** 74:18

**regulate** 60:25

Richard Zeitlin
December 08, 2020

278

USAO_00003695

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Index: regulated..Sailor

regulated 156:2
252:1

regulates 59:20

regulator 60:25

rehire 233:7

relate 245:1

related 156:18
201:21 202:1

relations 28:16,
18,19 29:3,21
30:21 31:5,10,13,
19 32:14,16,25
39:23 41:16 43:6
44:1 47:19 50:6,
8,14,18 51:21
65:25 67:6,10
73:21 99:12
108:2,8,10,17,20
111:1 114:23
120:25 122:13
132:17 157:2,3,5
160:17 163:16
164:7 170:16
189:7 196:8,9
208:3,6,9,14
252:16,22 253:2

relationship
71:8 125:16
131:13 187:21
215:1

relationships
205:22

relative 9:13

released 218:14
231:17 235:6

Relevance 176:9
251:18

relevancy 7:24
168:2 212:11

relevant 179:4

reliable 66:15

relocate 34:6

remember 14:20
25:21 34:3,16,19,
20 45:4 56:21
67:14 96:13

107:9,20,21
108:6,7 125:10
130:10 144:18
148:3 160:7
161:24 167:9,14
173:9 176:1
190:20 208:19
209:8,11 212:2,
22 225:9,16
243:14 250:1

remembering
128:24

reminded 209:10

reminders 61:17
128:6

remiss 115:25

remote 13:21
63:22 112:3

remotely 43:22
85:17

removed 121:25

rendered 226:22

renewal 94:5,9
99:1,4 138:18
181:12

renewals 199:4
216:7 219:3

rent 27:24 28:1,6
33:1 84:10,12
121:16 124:8,9
164:8 165:8
167:18,22 168:1,
6,15,18

rental 120:10,11

renting 188:18

repeat 14:5 130:2

rephrase 31:3
73:14 155:14
167:21 181:1
219:12,15

replenish 218:6
233:7

report 76:11
228:6

reporter 9:22

10:14 11:22
15:22 230:25
231:1 238:16
239:15

reporting 59:16
156:8 226:22
227:6,7,10,17,23
228:2,12,15,23

reports 241:5

represent 9:10
14:2 57:6 149:7

representations
59:23,24 60:15

representing
207:4

reputation
222:18,19 223:5

Request 198:10

requested 212:1

Requests 198:8

required 48:5
133:12 134:3
226:23

requirement
227:10

requires 199:9
243:7

research 60:19
244:5 250:6

reserve 6:24
149:13

resolve 96:17

resourceful
221:5

resources 91:17,
19

respect 105:15
121:24 236:7
238:18 253:19

respectful 8:8

respond 15:25

responders
150:12,15,16,20,

23,25 151:24
159:21

response 15:21
198:9

Responses
198:7,9

rest 218:18

restrategize
216:24

resulting 202:8
203:5 205:15

retained 226:5

retract 222:6

returned 218:19

revenue 199:25

revenues 98:1
225:25 226:2
233:16 234:18

review 15:18
58:2 188:8,12
197:16 211:19
221:21

reviewed 100:23

reviewing
198:12,14

reward 113:9

reword 58:21

rhyme 55:17

Richard 9:18,19
10:6,8,17 13:11,
24 40:8 254:25

Rick 236:22

rid 233:19

ridiculous
215:10 233:23
236:7

rights 149:13

Riley 108:15
112:5,16

risk 206:5

road 83:3 149:6

robbed 218:4

robbing 218:3

Robert 5:1 6:2
10:5,24 151:3
185:9

rocks 236:4

role 19:21 112:7

room 10:9,11,25
11:10,15

Rosenblatt
21:24 22:1,7
25:18

ROTFL 207:13

ruin 215:7

Rule 5:9,17 7:8

rules 5:19 7:5
15:12,13

Rum 179:14,15

run 48:19,22
63:17 98:15
122:1 123:5,20
234:4,8 252:6

running 22:13
41:11 206:4
246:9 254:22

runs 118:13,15
119:1 140:25
150:25 152:6
160:9 172:6,8,23
173:8,25 183:19
185:8 206:21
244:7 245:3
246:7,14

rushed 197:19,
21

S

sad 253:16
254:15

safe 196:14

Safety 246:12

Sailor 189:16,19
191:7

Richard Zeitlin
December 08, 2020

279

USAO_00003696

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

**salaries** 38:25 39:1,3

**sale** 69:23

**sales** 96:6 97:1,2 199:4 240:4,9,11, 25

**Sam** 172:11

**sandbag** 8:6

**sandbagging** 5:19

**sat** 50:11

**Save** 61:17

**saved** 203:1

**saves** 61:16 227:15

**scam** 248:13,21, 24,25 250:9,13, 21

**scams** 248:18

**schedule** 6:18 192:25

**scheduled** 7:13

**school** 17:17,20 18:4,5,6,18,19 184:21 206:15 238:12

**schools** 184:17 244:24

**score** 203:6,18

**scratch** 234:21

**screen** 11:5,19 248:4 249:17,24

**script** 57:2,4,5,7, 8,10 58:1,14,18, 24 61:4,7

**scripts** 57:23 58:12,15 60:10

**scumbag** 206:22,23 223:1

**scumbags** 234:8

**scummy** 230:12

**season** 92:25

**season's** 93:11

**seasoned** 199:24

**second-guessed** 234:6

**Secretary** 132:22

**section** 75:1

**secure** 88:2 156:9

**secured** 74:17 75:7,11

**securely** 154:17

**secures** 69:25

**Security** 192:17

**seek** 149:13 205:16

**sees** 27:6

**segmented** 45:10,18,24

**seized** 31:14 186:19

**seizure** 98:9,18, 23 129:2

**sell** 99:19,22

**Sellers** 160:11

**semi** 138:11,15, 17,19

**send** 76:18,19 87:19 155:4 221:21

**sending** 52:8 61:10 162:5 186:23

**sends** 242:6

**sense** 8:16 133:25 215:11

**senses** 236:24

**sentence** 203:4 205:13 250:20 251:16

**separate** 11:13, 18 44:3 50:10 51:17,22,25 54:4 103:19

**separately** 44:2 50:6 105:5

**separation** 110:15

**September** 98:19,22 168:1 199:20,23 239:8

**server** 120:13

**servers** 200:9 201:5,7 242:24

**service** 41:9 42:2 44:24 45:7,17 54:11 62:8 109:25

**services** 34:22 35:4 40:3,5,16 47:22,25 48:2 51:7 52:2,3,4,8, 11,13 53:20 54:4 63:5,8,10,15 67:19 72:5,8,22 73:4,18 74:4 75:10 76:3,16 78:10 79:2,10,24 81:1,4,16,20 82:13,22,24 83:4, 19 84:15,22 99:7 110:1 113:25 114:7 115:14,18 118:7 123:15,16 124:14,17 152:21 161:4 162:3,5 166:6,11,17 192:5,6,9 194:6 226:21 252:11

**services/tech** 79:7

**servicing** 39:12

**set** 5:10 83:14 97:19 148:10,16, 18,19,22,24 149:1 192:22 219:23 220:2

**sets** 56:24

**settings** 96:13

**settlement** 210:23 211:1

**seven-week** 219:17

**severely** 244:25

**shaking** 15:22

**share** 32:25 72:23,25 87:18, 20 88:3,5,6 89:6

**shared** 249:17

**shares** 27:15

**sharp** 235:23

**she'd** 109:2

**sheet** 102:4 103:2 112:22

**shelf** 43:2

**shoe** 236:9

**shoes** 236:6

**short** 67:13 95:9 129:9

**short-lived** 44:13 67:15

**shortly** 12:25

**showing** 202:14 204:1 215:14 252:9

**shown** 198:15

**shrinking** 232:24

**shut** 112:2 131:5 225:3

**shutdown** 93:18

**shutter** 255:13, 15

**shutting** 243:24

**sic** 9:18 21:25 95:16 210:8

**sick** 16:21 238:17 245:23

**side** 54:8 63:17 75:20 109:14

**settings** 110:4 119:15 154:11 185:19 234:9

**sign** 15:16,18 94:23

**signature** 192:1, 12 193:9,11,23 194:5,9,21 195:11,19 196:2, 11

**signed** 192:4 194:25

**signer** 196:16

**Significantly** 66:11

**signify** 116:12

**signing** 192:8,20 197:15

**similar** 43:1 47:18 104:22 136:23 193:21

**simple** 228:6

**simply** 232:18 234:17

**single** 227:11 230:10

**sir** 13:14 21:6

**sit** 55:25 63:18 148:5 248:5

**site** 68:24 132:22 254:25 255:3,7, 11

**sitting** 31:16

**situation** 39:21 97:25 134:22 213:11,19 214:18

**situations** 123:11

**size** 70:4,5 232:13

**slander** 213:9

**slanderous** 213:7

Richard Zeitlin
December 08, 2020

280

USAO_00003697

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

**sleep** 207:6

**sleepless** 205:16 206:19 207:14,16

**sleet** 82:13

**slightly** 71:3

**slips** 162:17

**slow** 199:21 216:18

**small** 137:13 189:2

**smart** 254:21

**smoother** 15:14

**snarky** 230:20

**Snell** 10:2,4

**so-called** 206:4 250:9 253:11

**Social** 192:17

**Society** 243:11

**software** 25:4 37:20,21,22,24 38:1 40:21,25 41:6 42:3 63:19 116:22 227:14, 18,23 228:10,20 229:1 242:24

**sold** 71:11,14,16, 25 235:14

**solely** 31:1 52:21

**solicit** 94:13 211:14

**solicitation** 92:22

**solicited** 86:6

**soliciting** 89:9

**solutions** 118:5, 11,16 119:1 210:8

**some-odd** 5:22

**someone's** 41:10 214:11 215:7 236:4,21

**son** 244:25

**sooner** 97:22

**sophisticated** 48:8,11

**sophomorically** 233:21

**sort** 5:24 8:17,24 177:9

**sorts** 198:6 207:22

**sound** 42:13 79:9 149:6

**sounds** 31:5 42:12 48:17,22 126:10 231:9 243:12

**Southport** 83:2

**space** 32:25 48:16,20,23 145:11 188:18,20 189:1 199:14

**speak** 126:13

**speaking** 16:1 20:4

**special** 119:2 171:23 206:15

**specialists** 155:21

**specialize** 118:9, 12 119:5

**specialized** 48:2

**specific** 25:12 44:10 45:13,14 185:17 225:5 249:9

**specifics** 23:12

**speculate** 65:19

**speculation** 213:15 214:21

**speech** 57:14 253:18

**spell** 13:22 20:8

**spelling** 24:13

**spending** 251:15 252:16

**spot** 56:5

**spreadsheet** 239:14

**Square** 188:15, 17

**staff** 49:13 78:19 250:8

**stamp** 78:9

**stand** 8:25 13:12, 15 25:10,16 47:4 120:21 255:21

**stand-alone** 74:3

**standard** 81:12 181:18

**Standing** 151:5, 25 152:3 159:20

**stands** 25:13 120:19 138:7

**start** 19:3 20:18 67:3 91:21,23 93:4 98:25 130:21 163:14 199:19,21,22 201:20 216:11 234:20 236:11 237:1

**started** 7:19 15:11 18:5 20:21 21:12,14 22:5 23:7 25:20 38:19 44:23 45:6 98:23 99:2 104:9 140:12,14,19 143:19 184:12 205:4 209:5 217:5

**starting** 210:12 251:6

**state** 13:9,22 90:6 104:6 105:5 109:22 110:7,9 131:7 132:22 134:2 165:18,23

166:7,11,21 204:8,12,16,19 209:22 212:18 215:20 217:12,22

**stated** 43:21,24 44:16

**statement** 57:25 58:3 59:1,7,14 60:16 61:3 100:20 126:17 140:1 142:6,13, 14,16 150:6,10 178:8 192:19

**statements** 102:7,13,15 116:20 117:11 139:19 150:1 163:10 170:16 172:2 210:12 215:18,21 247:14 255:6

**states** 32:21 123:9 175:9

**stating** 194:12

**station** 55:25 56:24 243:7

**stations** 242:20

**statistically** 87:15

**statistics** 89:17 90:10

**stay** 132:13

**stayed** 255:8

**steal** 236:2 254:1

**stealing** 229:20

**step** 66:17

**Steve** 108:15

**stick** 15:14 110:13

**stinking** 206:21

**stock** 201:16

**stone-cold** 207:4

**stop** 22:3 84:6 128:10,19

130:14,25 213:23 219:10 235:1,22

**stopped** 128:21, 22 129:22,23,24 130:4,9 219:11

**stops** 254:8

**straight** 155:17

**strange** 214:24

**strategic** 118:8, 12 119:14

**strategy** 98:9 119:6

**Street** 83:22 84:16

**stress** 205:14,17 206:18 207:24

**stresses** 234:17

**Stretch** 46:19

**strict** 131:15

**strive** 255:12

**strong** 227:10 235:24

**structure** 72:17

**struggle** 215:6

**stuff** 115:25

**subbing** 152:17

**subcontracting** 152:15 153:2

**submitted** 128:23

**subpoenaed** 208:9

**substantial** 7:11 199:10

**substantially** 199:25

**successful** 93:1, 11

**sudden** 205:23 206:15

**sue** 253:22

Richard Zeitlin
December 08, 2020

281

USAO_00003698

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

**sued** 210:7,16
213:8

**suffered** 205:14

**sufficient** 133:6

**suggest** 46:18
124:23 169:23

**suggestion**
11:20,23

**suggestions** 7:2
8:19

**suing** 253:21

**suite** 48:3 99:7

**Super** 139:1

**supplies** 143:20

**supply** 241:24

**support** 8:1 79:4,
7,11,24 80:7,25
87:1 109:12,16
112:24 113:6
117:22 119:8,17,
21 209:25 243:19
255:14

**supporting**
250:6

**suppose** 88:21
162:11 227:3

**supposed** 65:19
79:15 213:25
251:1 254:18

**surprise** 5:18

**surprised** 145:21

**survival** 131:15

**survive** 127:4
206:18

**suspended**
208:12

**swayed** 216:17

**swear** 10:15

**switches** 199:11
201:7 242:24

**sworn** 10:18

**synagogue**
114:14,16,17

**system** 56:1
205:25 241:22
243:5,6,9

**systems** 63:19
120:12 241:24
242:17,21

— T —

**tab** 77:17,18,19
80:3

**takes** 74:12 218:7

**taking** 14:2 51:2
145:3 214:11

**talk** 6:19,22 15:11
17:13 18:17
28:15 37:15
55:20 58:15 86:4
103:1 135:10
231:12

**talked** 36:21
159:19,21

**talking** 6:24
31:14 41:19
47:17 60:7 67:17
73:21 77:21
107:25 115:20
126:16 130:7
132:4 135:8
211:7,9 212:13
230:1 231:10
239:18

**talks** 58:24 249:5

**tap** 138:11,15,17,
18

**task** 134:7

**tax** 93:5

**taxes** 93:6,9
102:18,21

**Taylor** 36:17,18
141:1 148:20,22,
24 149:1 194:25

**TCI** 157:22

**team** 117:12
206:5

**tech** 69:14 75:20
109:12,16 112:24
113:6 117:22
119:8,16,21
241:19

**technical** 24:9

**technology** 25:3
63:1,4,9,15 67:19
72:22 75:21
78:10 79:2,10
84:15,22 99:7,9
109:14 113:25
123:15 124:17
161:3 162:3,4
166:6,17 189:7
194:6 201:7

**Telecom** 35:16
51:13 55:10,11
125:12,14
145:13,18
153:18,21

**telemarketing**
19:19

**telephone** 20:25
21:8 30:4,6,17
59:23 124:10,12,
13 214:16

**telephonic**
124:15

**Telephony** 33:6,
10 37:16 39:20
40:11 41:25 43:2
51:15 122:20
132:24 133:12
157:23 179:24
195:24 227:22
228:1,14

**teller** 142:18

**tellers** 75:3

**telling** 105:14
126:13 229:12

**temporary** 129:4

**ten** 38:7,11,23
46:24 70:17
131:20 155:25
211:19

**tenants** 168:20,
21 169:2,4,11,14

**Tennessee** 83:3

**tens** 155:20

**term** 87:12 93:25
94:8 115:1
201:15 248:12,16

**terminate** 22:19

**terms** 7:7 46:18
68:20 192:21
196:19,20

**Terry** 102:22
117:8

**terse** 179:5

**test** 56:23

**testified** 10:19

**testify** 16:14,23

**testifying**
176:20,25

**testimony** 15:18

**testing** 178:10

**Texas** 10:9

**Thanksgiving**
93:16 234:15

**the...opening**
192:22

**thieves** 149:7

**thing** 25:12 45:9
50:19 51:21 54:3
68:5,7 83:23
84:18 104:13
110:3,12 115:13
137:5,8 162:12
166:5,10,24
204:2,4 232:10
234:24 236:8
238:17 252:25
253:16

**things** 23:12 25:3
39:24 45:24
49:14 54:5 57:16,
19 59:11 101:20,
23 108:24,25
116:6,23 117:17

**thinking** 68:6
182:8

**thought** 27:14
110:24 113:10
126:1 131:11
133:18 223:3
230:19,21 234:7

**thoughts** 244:10

**thousand** 69:19
70:10 132:11
155:25 166:12
167:3 232:19

**thousands**
155:20 199:3
237:7

**throws** 216:23

**till** 6:25

**time** 6:18,19,25
7:13 8:9 9:16
13:6,17 19:7 20:2
21:14,16,18
22:11 24:4 25:14,
17 31:13,19 32:9,
10 34:1,5 39:15
41:15 42:23 47:1,
15 49:2 50:23
52:9 58:21 67:13
84:1 88:1 91:2
92:2,24 93:5,15,
19 95:3,9,16,19
96:20,23 97:19
98:13 101:22
105:9 109:16
110:6 111:3
117:2 125:4,7
127:8,10 128:8
130:8 131:14
135:25 137:5
141:7,12 147:15
148:8 153:1
159:12 160:8

**120**:5,12 122:6
135:23,25 184:18
201:4 202:4
206:20 208:1
216:6,18 217:2
222:5 223:8
234:5 236:24
241:4 245:2
254:22

Richard Zeitlin
December 08, 2020

USAO_00003699

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

165:1 168:7
170:3,6 184:9,13
186:11 188:11
189:5 192:7,23
197:3,6,16
198:14,16 200:1
202:16 203:9,20,
23 204:4,11,24
206:7 207:25
208:4 213:18
216:5,17,19,21
218:7 219:20,22,
24 220:1,3,8
222:20 223:3,10,
25 224:12,15,22
226:24 229:2
231:1,4,7,19
232:5,16,23
233:6 234:1,14,
17 237:5 239:2,5
240:16 247:22,25

**timeline** 50:13

**timely** 6:11

**times** 14:16
23:22,23 50:20
83:11 98:12
127:4 238:18

**Tint** 140:6 147:21

**tiny** 100:5

**title** 164:24 198:7

**titled** 102:3

**TNT** 216:23

**today** 6:15,19
9:19,22 10:3 14:2
15:11 16:14
17:11 101:3
148:5

**Today's** 9:15

**told** 70:22 74:23,
25 125:23 217:11
230:5,18

**Tom** 10:13

**tongue** 235:10

**top** 11:19 53:9
100:15 137:18
153:11 180:15
184:25 198:25

**total** 28:9,10
79:25 81:6 103:5
113:24 114:11
118:5,11,15
119:1 120:16

**totally** 54:4
178:22 225:3

**Totals** 100:16

**touch** 56:25

**TPF** 133:11

**TPFE** 33:23,24
34:12,19 42:16
44:1,4 45:19
47:18,20 49:6,9,
24,25 50:5,7,15,
18 51:5 52:7,9
66:1 67:6,12,13
99:12 111:1,22
112:20 115:10
122:17 132:20
133:11,15,18
150:2 157:5,12
158:21 162:5
189:10 195:8,9

**track** 73:7 137:5

**tracking** 155:12

**tracks** 176:14

**train** 199:15,16

**trainings** 74:2

**tranquilizer**
207:21

**transaction**
147:10

**transfer** 75:8
133:6,12 142:18
143:10,11
144:11,22 153:17
154:3 156:24
160:16 161:2,5,
10 162:13,19
163:15 164:6
165:18 166:6,16
171:5 172:13
173:17 175:15
179:23 180:7,16
185:23 227:11

**transferred**

75:12,23 145:15,
21 146:13 153:23
154:17 161:17
162:18

**transfers** 162:15
163:2 165:8
166:16 167:5
183:10 186:8,12

**travel** 201:6

**treated** 207:10

**tremendous**
187:24 227:15

**Trooper** 246:11

**truck** 113:12,17,
20

**true** 48:15 121:17
142:13

**trust** 105:19
118:20 204:24
205:20

**trusted** 128:14

**truth** 17:3 251:12
255:1

**turn** 77:17 80:3,
22 135:15 147:16
150:5 153:6
158:3 160:12
163:15 164:3,10
170:10 171:2
174:4 183:6,7
191:18 193:15
194:2,17 198:2
220:14 223:14

**turnkey** 81:24
82:1,3,15

**type** 5:18 92:2,9,
21,22 110:12
234:17

**types** 59:11 92:7
240:9 241:3

**typically** 11:7
55:22 93:20
102:10 216:6
233:12

**U**

**U.S.** 185:2,17

**ugliness** 255:16

**Uh-huh** 59:15
139:22 185:4
193:19 194:19
251:8

**ultimately** 59:19
109:7 154:1
205:24 208:12
216:22 228:3

**ums** 15:21

**unable** 199:1

**unacceptable**
8:6

**unaccountable**
223:10 253:7

**unaffordable**
123:25

**uncertain** 235:17

**uncertainty**
218:9

**uncommon** 6:5

**uncontroversial**
8:23

**underlying**
210:7,16

**underneath**
192:19

**understand** 14:5
16:8,11 33:3
40:23 41:12
89:12 91:7 116:8
155:14,25 175:20
214:9 233:17
242:14

**understandable**
91:6

**understanding**
119:7 135:7
231:13 236:17,21

**understood**
16:2,10

**unfair** 5:18 210:9

**unfairly** 8:5

**unfamiliar**
115:25

**unfounded**
213:7

**unfroze** 131:16

**unfrozen** 131:20

**unheard** 181:16

**Unified** 34:22
35:3 51:6 52:2,3,
7,11,13 53:20
54:3 62:17,20
63:8 67:18,20
69:13 70:1 72:23
73:3,17 74:4
75:10,13 76:3,7,
16 77:10 81:1,16
82:22,24 83:4
99:9 110:1 114:6
123:15 166:10
192:5,6,9

**union** 120:22
171:5,13,20,22
172:5,8 173:13

**Unit** 84:17

**United** 175:9

**unknown** 131:6
178:9

**unlawful** 110:12

**Unlimited**
109:12,16 112:24
113:6 117:22
119:8,16,21

**unpleasant**
251:11

**unrelated** 99:16

**unsavory** 215:1

**updated** 148:2

**upset** 5:1,4 218:4

**user** 228:4

**usual** 126:20
235:22

Richard Zeitlin
December 08, 2020

USAO_00003700

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

**utilize** 89:13 91:23,24,25 204:6 232:12 234:16 242:25 243:9

**utilized** 162:24 200:8 234:2

**V**

**Vadreen** 78:23, 25 187:12

**vague** 90:18 91:4 172:18 249:8

**Vaguely** 210:4

**Valium** 207:20

**van** 107:15

**variables** 89:23, 25

**vary** 70:19

**Vegas** 14:9 18:25 19:3 20:16 24:19, 20,22 25:25 26:9, 12 31:25 36:18 43:21 85:15 112:19 140:8

**vehicle** 107:2,8, 10,16,17,19

**vendor** 127:16, 18,25 201:15 202:23 242:6,9

**vendors** 63:23 64:20,24,25 65:1, 14 66:5,19 67:3, 10 129:23 130:25 174:20 199:17 201:17 241:15, 17,20,25 242:19 250:7

**veracity** 178:10

**verbal** 15:21 76:24 77:1,2

**verge** 222:12

**verification** 49:11,22 53:23 73:23 74:5,8,11

80:14 104:23 128:5

**verifier** 74:25

**verifies** 74:14 75:25 104:15

**verify** 24:8,10,16 57:10,23 58:18 59:1 60:14

**verifying** 73:16

**vernacular** 97:8 132:1

**versa** 235:20 254:9

**versus** 9:19 209:23 225:20,24

**vet** 185:2,17

**Veteran** 172:14

**veterans** 151:7 152:5 172:17,19 185:17 250:6

**Vets** 151:5,25 152:3 159:20

**vice** 235:20 254:8

**victims** 244:6

**video** 11:8,11 12:12 14:4 37:6

**videoconferenc**
**e** 26:24

**videoconferenci**
**ng** 9:17

**vindictively** 229:22

**violation** 5:9

**volume** 71:9

**W**

**wait** 15:24 92:14 97:13,15

**walk** 37:14 215:2 236:6

**wanted** 45:17

48:2 110:18,20, 23 111:5 125:10 147:3 231:11 254:12

**wanting** 58:1

**Warren** 21:25

**Washington** 17:20

**water** 215:2

**ways** 8:22 30:2

**weather** 215:10

**weather-related** 83:10

**web** 68:24 132:22 250:3 254:25

**Webster's** 250:25

**weeds** 129:15

**week** 78:17 199:3 234:13

**weekly** 68:3,4,7

**weeks** 127:17 218:22,23,25 231:16 235:14 237:9

**Wegner** 102:19 117:4 187:8

**West** 14:9

**whacked** 205:7

**whatsoever** 206:1,2

**whichever** 113:10 189:4

**white** 113:17,20

**Whitlock** 18:21

**Whitney** 26:12

**wholesale** 231:11 232:6 238:14

**wife** 36:9 194:24 195:3

**wife's** 36:11

**willy-nilly** 254:23

**Wilmer** 10:2,4

**winding** 99:15 184:2,5 247:5

**wire** 143:10 152:10 165:17 174:11

**wiring** 125:14 159:12

**Wisconsin** 17:21 18:8,23 32:18 43:22 85:15

**witching** 231:2

**withdraw** 5:22 164:21

**withdrawals** 153:9

**Withdraws** 174:7

**wonderful** 253:13

**wondering** 70:24 82:7

**word** 57:15,16 68:24 79:14 250:25

**words** 226:3

**work** 21:25 39:14,17 40:13 41:8,21,22 42:7, 9,10 50:8,9 51:5, 6,9,12,15,18,22 56:11 57:13 61:18,21,23 63:21,23 68:21 69:20 73:22 76:4 84:24 85:2 94:15 107:13 112:17 119:3,4,16,17 123:18 127:16 128:2,3,12,16 134:11,16 150:22 152:15 154:10,11 156:15 159:12 160:6 184:17 185:14,16 186:21 187:24 188:2,5,6,

9,13 189:12,16, 18,21 190:14,16, 25 191:9 196:25 201:12 207:11 211:20 236:6,23 238:12 241:16 242:7 243:25 252:22,24 253:4

**worked** 43:17 49:16 112:19 184:10 187:20 205:19 240:4,12, 13,23,24 254:5

**working** 20:17 22:3 32:22 40:15 44:25 45:25 71:8 111:4 123:14 128:10,19,21,23 129:21,23,24 130:4,9,14,25 141:12,14,15 152:19 153:2 156:13 184:12 224:20 247:4,7

**works** 52:11 73:19

**workstation** 242:20

**world** 206:21 236:4

**worried** 187:22

**worse** 216:19

**wound** 99:15

**write** 57:7 221:24 251:20 253:1,2,6, 12 254:1

**writers** 253:11

**writes** 57:5

**written** 68:8 156:10 201:23,25 202:1,2,14

**wrong** 253:1

**wrongdoing** 210:21

**wrongfully** 204:24

USAO_00003701

SUBJECT TO PROTECTIVE ORDER

Atkinson Baker, Inc.
www.depo.com

Index: wrote..Zoom

**wrote** 253:9

---

**Y**

---

**year** 18:2,3 92:2,
9,21 94:25 102:7
104:21,22 137:6
183:22 211:12

**Year's** 93:17
234:14,15

**year-to-date**
106:23

**years** 15:5,7,8
56:22 67:5 115:2
131:12 143:1
153:3 156:14
173:10 176:2
186:16 187:21
190:3,4 211:13

**you-all** 11:3,14
56:7 102:1

---

**Z**

---

**Z-E-I-T-L-I-N**
13:13,25

**Zeitlin** 5:6 6:12
8:5 9:18,20 10:7,
17 12:19 13:9,11,
20,24 24:24
27:12 28:11
32:23 36:8,12,13
37:11 40:9 46:17
47:17 48:25
77:15 78:5,7
95:22 96:25
122:5 125:9
132:15 135:15,18
136:18 142:9
148:25 149:3,14
152:1,11 163:17
167:21 170:9
176:7 177:10,14
178:16 180:22
182:18 190:2
191:13 197:8,14
198:2 199:1
202:7 205:14,15
214:17 215:13
219:19 222:17

223:16 225:13
226:10 231:10
239:7 241:7
242:13 243:10
246:19 247:13
248:3 255:1

**Zeitlin's** 8:4,9
10:8

**Zeitlin_000152**
100:4

**Zeitlin_000293**
78:8

**Zoom** 9:17 11:25
12:1,5,24 26:24

USAO_00003702

SUBJECT TO PROTECTIVE ORDER

# EXHIBIT G

THE GOVERNMENT'S SENTENCING SUBMISSION

<u>United States v. Zeitlin</u>, 23 Cr. 419 (LAK)

Filed: December 3, 2024

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSEPH SHOEMAKER, RICHARD GINDIN, DEMYA JOHNSON, KIMBERLY STARLING, And MATTHEW MCCORMICK, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> RICHARD ZEITLIN, AMERICAN TECHNOLOGY SERVICES, LLC, UNIFIED DATA SERVICES, LLC, COMPLIANCE CONSULTANTS, LLC, WIRED 4 DATA, LLC, and JOHN DOES 1-10, corporate entities and individuals presently unknown, <br><br> Defendants. | Civil No. 1:21-cv-01668-CCC <br><br> **Judge Conner** <br><br> **ELECTRONICALLY FILED** |

## SUPPLEMENTAL DECLARATION OF DEFENDANT RICHARD ZEITLIN IN SUPPORT OF DEFENDANTS' RULE 12(b)(2) MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT FOR LACK OF PERSONAL JURISDICTION

I, Richard Zeitlin, hereby declare under penalty of perjury that:

1.    I am a Defendant in the above-referenced matter.

1

USAO_00003486

SUBJECT TO PROTECTIVE ORDER

2. I have personal knowledge of the facts set forth in this Declaration and if called upon to testify, could do so competently.

3. I am neither an owner nor an officer of Wired 4 Data, LLC and never have been.

4. I am neither an owner nor an officer of LAV Services, LLC and never have been.

5. I am neither an owner nor an officer of Standard Data Services, LLC and never have been.

6. Unified Data Services, LLC, American Technology Consultants, LLC, and Compliance Consultants, LLC are not operating a joint venture to carry out a single business enterprise as alleged in paragraph 101 of the First Amended Complaint. All three entities were dissolved on April 21, 2021. None of these entities were in existence or doing business on July 14, 2021, the date Pennsylvania-resident Richard Grindin alleges he received a TCPA-violating phone call.

7. I do not conceal the identities of American Technology Consultants, LLC or Compliance Consultants, LLC by utilizing unregistered fictitious names as alleged in paragraphs 54 and 55 of the First Amended Complaint. These Limited Liability Companies no longer exist and did not exist on July 14, 2021. These Companies are not doing business as other companies; they are not doing business at all.

2

USAO_00003487

SUBJECT TO PROTECTIVE ORDER

8.     I do not own, operate, control, or have the right and ability to supervise, direct or control American Technology Consultants, LLC or Compliance Consultants, LLC as alleged in paragraphs 100 and 101 of the First Amended Complaint. The Companies do not exist as operational entities. These Companies were dissolved and canceled on April 21, 2021 according to the Delaware Secretary of State.

9.     I did not own, operate, control, or have the right and ability to supervise, direct, or control American Technology Consultants, LLC or Compliance Consultants, LLC at all relevant times as alleged in paragraphs 82 and 83 of the First Amended Complaint. These Limited Liability Companies do not exist as and did not exist as operational entities on July 14, 2021.

10.     Wired 4 Data, LLC is not associated with, operated by, or controlled by me as alleged in paragraph 158 of the First Amended Complaint. I am neither an owner nor an officer of this Limited Liability Company, and I do not direct, supervise, or control this entity.

11.     LAV Services, LLC is neither owned, operated, or controlled by me as alleged in paragraph 155 of the First Amended Complaint. I am neither an owner nor an officer of this Limited Liability Company, and I do not direct, supervise, or control this entity.

3

USAO_00003488

SUBJECT TO PROTECTIVE ORDER

12. Standard Data Services, LLC is neither owned, operated, or controlled by me as alleged in paragraph 162 of the First Amended Complaint. I am neither an owner nor an officer of this Limited Liability Company, and I do not direct, supervise, or control this entity.

13. This Declaration is offered in support of Defendants' Rule 12(b)(2) motion challenging this Court's personal jurisdiction and is not intended to convert Defendants' Rule 12(b)(6) motion to dismiss for failure to state a claim to a Rule 56 motion for summary judgment.

Dated this _14th_ day of March, 2022.

_____
Richard Zeitlin

4

USAO_00003489

SUBJECT TO PROTECTIVE ORDER